## Page 1

```
              UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF KENTUCKY
                       AT OWENSBORO
                   4:17-cv-00017-JHM-HBB

CYNTHIA GAY BORUM, as Administratrix)
of the Estate of Nicole Alyce Borum,)
      Plaintiff,                     )
vs.                                  )
JUNG WOOK KANG SMITH, MD, DEACONESS  )
CLINIC, INC., DEACONESS HOSPITAL,    )
INC., DEACONESS HEALTH SYSTEM, INC., )
      Defendants.                    )
```

     The discovery deposition of FINLEY BROWN, MD, taken in the above-entitled cause, before Barbara Manning, on the 16th day of October, 2019, at the hour of 2:12 p.m. at 200 North LaSalle Street, Suite 2900, Chicago, Illinois, pursuant to notice.

Reported by:   Barbara Manning, CSR
License No.:   084-003277

## Page 2

APPEARANCES:

   THE ELLIS LAW GROUP, PLLC
   BY:  MR. ANTHONY P. ELLIS
   aellis@theellislawgroup.com
   517 W. Ormsby Avenue
   Louisville, Kentucky  40203
   (502) 255-1076
        Representing the Plaintiff;

   PHILLIPS PARKER ORBERSON ARNETT, PLC
   BY:  MS. KATHERINE T. WATTS
   kwatts@ppoalaw.com
   716 West Main Street, Suite 300
   Louisville, Kentucky  40202
   (502) 583-9900
        Representing the Defendants.

## Page 3

```
                    I N D E X
WITNESS                          EXAMINATION
FINLEY BROWN, MD
   BY MS. WATTS                     4, 224
   BY MR. ELLIS                     221


                   E X H I B I T S
NUMBER                           MARKED FOR ID
Defendants'
   Exhibit No. 1                     12
   Exhibit No. 2                     77
   Exhibit No. 3                     86
   Exhibit No. 4                     97
   Exhibit No. 5                    221
```

## Page 4

                    (Witness sworn)
              FINLEY BROWN, MD,
called as a witness herein, having been first duly sworn, was examined and testified as follows:

                    EXAMINATION
BY MS. WATTS:
   Q.  Good afternoon, Dr. Brown.
   A.  Good afternoon, ma'am.
   Q.  My name is Katie Watts, and we just met a moment ago off the record.  I represent Dr. Jung Smith and Deaconess Health System and its related entities in a lawsuit that has been filed by the Estate of Nicole Borum.
       I understand you have been named as an expert in this lawsuit.  Is that your understanding as well?
   A.  Yes.
   Q.  Okay.  You have been named as an expert for the plaintiff; is that correct?
   A.  True.
   Q.  Okay.  And could you state your business address for me?
   A.  2511 North Kedzie Boulevard, Chicago,

DEFENDANT'S EXHIBIT B

**Page 65**

1  psychiatrist for the totality of their care?
2     A.   I think I answered that question.
3     Q.   Okay. Are you qualified to provide
4  psychotherapy?
5     A.   No.
6     Q.   All right. So unless you refer a
7  patient to a psychiatrist, none of your patients
8  who are suffering from depression are getting
9  psychotherapy?
10    A.   Well, I talk about the talk therapy
11 that I can occasionally give to a patient, and
12 they realize all of a sudden that they are in a
13 dead end job with a horrible boss and they have
14 been fighting themselves and not realizing what
15 they need to do.
16        They do and they go solve that problem,
17 and, bam, they don't need anything. That
18 happens a lot. 100 percent of the time if I
19 have a patient that has significant depression
20 who needs -- all patients don't need medicine,
21 and all patients don't need psychotherapy.
22        Some patients need just medicine. Some
23 patients need medicine and psychotherapy. If
24 there is any question in my mind on what to do,

**Page 66**

1  I send them to a psychiatrist.
2         I am willing sometimes to give people a
3  chance at behavioral modification alone or a
4  short course of antidepressants.
5         If that solves their problem, fabulous.
6  If that doesn't, sometimes by that time they are
7  willing to go see a psychiatrist.
8     Q.   You're talk counseling, talk therapy,
9  is not the same thing as psychotherapy?
10    A.   Sometimes it is. Sometimes it's not.
11    Q.   Well, you just told me you are not
12 qualified to provide psychotherapy.
13    A.   That's why I used the word talk
14 therapy, but talk therapy sometimes is kind of
15 the psychotherapy a wife gives a husband or a
16 mother gives a child.
17        It's direct, blunt, often very
18 effective, but you don't get paid like a
19 therapist giving advice.
20    Q.   It's not based on cognitive behavioral
21 therapy techniques?
22    A.   Of course.
23    MS. WATTS: Let's take a break.
24        (Recess taken)

**Page 67**

1  BY MS. WATTS:
2     Q.   Do you maintain policies and procedures
3  in your office?
4     A.   I do.
5     Q.   Okay. Are they written?
6     A.   Yes.
7     Q.   Do they relate to clinical practice or
8  just administration?
9     A.   I think both actually. I haven't
10 looked at it in a while. It's in a blue binder,
11 eight, ten, twelve pages.
12    Q.   All right. Do you have a policy or
13 procedure in place for monitoring and tracking
14 patients who are at risk for suicide?
15    A.   In my solo private office my procedure
16 is that if I have got a sick patient, somebody
17 who is not stable, somebody who potential their
18 life is at risk, I write my note, and I put the
19 file on my desk. And it never leaves my desk
20 until the problem is resolved one way or
21 another. So in a way I do, yes.
22    Q.   Okay. So that's your practice?
23    A.   That's the way I do it. Of course I
24 don't have the sophisticated software. I mean,

**Page 68**

1  I have a bunch of computers and so forth, but I
2  write my notes on paper. I have little stickies
3  that I put on the outside with the problem.
4         If it's somebody that I need to talk to
5  that night, I will have their cellphone or home
6  phone number on a piece of paper, and I put it
7  in my pocket.
8         I always look in my pocket to see what
9  piece of paper I have got, what duty I have to
10 do. It works pretty well. I've never had a
11 problem.
12    Q.   Okay. You said you put the chart on
13 your desk when a person's life is at risk. What
14 defines when a person's life is at risk?
15    A.   Okay. So let's say I have got a
16 patient who comes to my office with equivocal
17 signs and symptoms of appendicitis.
18        I'm a real good clinician so if I
19 really had any serious thought that they might
20 have appendicitis, I'd send him to the ER.
21        If on the other hand it's close to the
22 gray area, I give them my cellphone number, my
23 home phone number, my answering service number.
24 I tell them what to watch out for.



```
 1    Q.  Sure.
 2    A.  So in addition to my expert report --
 3    Q.  What else we got?
 4    A.  In addition to my expert report I also
 5  for my own benefit and for yours wrote down
 6  Deaconess Gross Pointe and Deaconess Clinic
 7  deviations from the standard of care one to
 8  three.  I now have 13 deviations from the
 9  standard of care by Syrrus Powell, the social
10  worker.
11    Q.  If they are not in your report, I am
12  not going to ask you about them.  You have four
13  in your report so you can't add --
14    A.  These are additional --
15    Q.  You can't add nine more today.  Sorry.
16    A.  Well, I think these are additional
17  opinions I have.  I am telling you what my
18  additional opinions are.  You can do what you
19  want with them.
20        And, you know, when I originally read
21  the material, I spend a lot of time putting it
22  all together and coming up with my opinions
23  which I talked to Mr. Ellis about, and then he
24  put together my expert disclosure.
                                              93
```

```
 1        As I review and re-review these
 2  materials, I come up with other insights and
 3  other opinions which I am allowed to do.
 4    Q.  Not in Federal court you are not, sir.
 5  Your disclosure is your -- your report is your
 6  disclosure in Federal court?
 7    A.  Say no more.  I have my expert
 8  disclosures here, and I have some further points
 9  about Bowling Green Kentucky Medical Center, the
10  communications and a split treatment scenario
11  between a social worker and a family physician
12  like Smith, standard of care for suicide
13  treatment, a note I wrote on the issue of the
14  availability of the psychiatric referral --
15  referrals, the issue of abandonment, notes on
16  SSRI's, a note on a statement that suicide is
17  preventable.  They speak for themselves I would
18  say.
19        MR. ELLIS:  And for the record I haven't
20  seen his list of 13 criticisms of Powell, but I
21  know he has a number of criticisms for Powell in
22  his report in both the summary section and in
23  the text of the report where he identifies
24  various breaches and factual deviations.
                                              94
```

```
 1        So it may be that his list of 13 items
 2  is just the detailed allegations that he
 3  identifies in his written report.
 4        So to the extent they have already been
 5  disclosed or track what's already been disclosed
 6  in his expert opinion, he has now produced that
 7  list to you which --
 8        MS. WATTS:  I am prepared for his expert
 9  report.  To the extent there is new things in
10  there, they are not --
11        MR. ELLIS:  But all I am saying is I believe
12  the Federal standard is he has to provide a
13  summary and the details of his opinions.
14        MS. WATTS:  Correct.
15        MR. ELLIS:  And to the extent his list
16  before what he just gave you is a summary of
17  what's in his report or consistent with the
18  disclosures and opinions he has in his report,
19  although he may have numbered them 1 through 13
20  in that document and may have numbered them 1
21  through 4 --
22        MS. WATTS:  I don't care what they are
23  numbered.  If it's not in his report, that's not
24  his opinion.
                                              95
```

```
 1        MR. ELLIS:  That's what we can take up with
 2  the Court.  To the extent that the list he just
 3  gave you, if you choose not to ask about it, I
 4  get that.
 5        That's a pretty lengthy disclosure, and
 6  there are a number of criticisms of Powell.  I
 7  don't think we are willing to concede that those
 8  are new criticisms as much as they might be
 9  slightly different words of the same criticisms
10  that he expresses in his report.
11        MS. WATTS:  Yeah.  And I am not going to sit
12  here and take my time that I have to depose him
13  to go line by line through his report which is
14  supposed to contain all of his opinions to see
15  if they are new or not.
16        I am going to go by his report which
17  under the Federal rules is supposed to contain
18  all of his opinions and which I am prepared to
19  cross-examine him on today.  It may --
20        MR. ELLIS:  Those are his notes so he is
21  just giving you what he brought with him.
22        MS. WATTS:  That's fine.
23        THE WITNESS:  I don't think I got anything
24  else.  I think I just gave you these.  I have a
                                              96
```



**Page 101**

1  Q.  Right.  You have never had training in
2  psychotherapy?
3  A.  Yes.  I am not a trained
4  psychotherapist.
5  Q.  Okay.  You never worked in or been
6  affiliated in any way with a mental health
7  facility?
8  A.  I have worked around and in a mental
9  health facility when my patients were
10 hospitalized there, treated there.  I am very
11 familiar with mental health facilities.
12  Q.  Yeah.  What mental health facilities
13 have you worked in?
14  A.  Well, we had an open and closed psych
15 ward at Illinois Masonic.  I don't think we
16 still do.  There is both at St. Joe's.
17       So over the years I followed my
18 patients.  I actually sought consultations for
19 psychiatrists who asked me to see patients for
20 medical issues that they had so I am familiar
21 with such an institution.
22  Q.  Okay.  And in those locked psych wards
23 at those two hospitals, those patients would be
24 followed by psychiatrists?

**Page 102**

1  A.  True.
2  Q.  You would be treating them for medical
3  problems?
4  A.  True.
5  Q.  And if anybody was providing
6  psychotherapy to them it wasn't you?
7  A.  True.
8  Q.  You would not be overseeing or
9  supervising in any way those who would be
10 providing psychotherapy to the patients?
11  A.  Correct.
12  Q.  You have never supervised or overseen
13 the practice of a licensed clinical social
14 worker or psychotherapist?
15  A.  Correct.
16  Q.  Do you know what their training
17 entails?
18  A.  I think an LCSW often has a Master's
19 degree and that I can't -- I don't recall as we
20 sit here.
21  Q.  Do you know how they are instructed to
22 conduct their therapy sessions?
23  A.  No.  I have always thought that
24 licensed clinical social workers were at the

**Page 103**

1  bottom of the totem pole, the least skilled, the
2  least qualified, the least able to manage a
3  patient with mental health issues.
4       I think there is wide consensus that
5  that's correct.  In today's mileau where
6  insurance companies don't want to pay for
7  anything, it seems that more and more
8  psychotherapy is delegated to LCSW's.
9       From my perspective as a sophisticated
10 family physician, I have very little to no
11 regard for the sophistication of an LCSW and
12 their ability to provide quality psychotherapy.
13      It's almost -- it's not quite
14 laughable, but it's almost in my opinion
15 laughable to think that, you know, a life and
16 death situation in a patient who tried to commit
17 suicide who took a serious drug overdose, to
18 give a psychotherapeutic job to an LCSW who
19 didn't even think that she had a duty to that
20 suicidal patient if she never came back for a
21 second visit, that there was no client
22 patient/relationship and that the fact that she
23 had suicidal ideation didn't make her
24 circumstance to the level of importance that she

**Page 104**

1  felt a need to call the patient much less
2  consider the patient really had a relationship
3  with her.
4  Q.  Do you remember what my question was?
5  A.  She could read it back if she --
6  Q.  I could tell you what it was.
7  A.  Please.  That will be easy for us.
8  Q.  Do you know how psychotherapists are
9  instructed to conduct their therapy sessions?
10 A.  That was my answer to that question.
11 Q.  That didn't even remotely answer that
12 question.  Are you aware of how they are trained
13 to provide psychotherapy?
14 A.  I couldn't answer that question, and I
15 have to tell you that I think -- and I am pretty
16 sure you perceive this.
17      I am completely uninterested because I
18 don't regard their skill set as anything but
19 miniscule in the management of a seriously ill
20 off and on suicidal patient.
21 Q.  Could Syrrus Powell have even met the
22 standard of care in your mind?
23 A.  Based on her deposition testimony and
24 her statement --



**Page 113**

1  least they would insult him and say, listen, we
2  respect the referral, we appreciate the
3  referral, we will give her high quality care.
4     And he had every reason to think that
5  they would know what they were doing. Obviously
6  they didn't know what they were doing.
7     They were irresponsible. They didn't
8  supervise their employees. They didn't
9  supervise Powell. They didn't know Powell's
10 level of skill -- level of ability and skill set
11 which I believe were inferior.
12    They didn't -- they knew what they had
13 with Smith, and they sent a mentally troubled
14 lady to a woman who could hardly speak English
15 and could hardly write English. And I criticize
16 them for that.
17    Q.  Okay. So now we are going to be
18 xenophobic?
19    A.  Who? Xenophobic?
20    Q.  Yeah.
21    MR. ELLIS: Objection. It's argumentative
22 and hostile.
23    THE WITNESS: I am not being xenophobic.
24    MR. ELLIS: Comments about whether somebody

**Page 114**

1  can communicate clearly in the English language
2  for mental health treatment I don't think are
3  xenophobic. It's part of the job to be able to
4  communicate.
5     MS. WATTS: All right.
6     THE WITNESS: If you are a surgeon, you
7  don't have to speak English.
8  BY MS. WATTS:
9     Q.  Is there any evidence in this case that
10 Ms. Borum couldn't understand Dr. Smith?
11    A.  Yeah. You know what, there is evidence
12 that the medical director could not
13 understand --
14    Q.  That wasn't my question.
15    A.  But it's an important thing, eh
16 couldn't her, that's why he sent her to English
17 language classes.
18    Q.  Not my question.
19    A.  That's my answer.
20    Q.  We are going to miss our flight --
21    A.  Please don't put that on me.
22    Q.  -- if you don't answer my question.
23    A.  Please don't put that on me.
24    Q.  Is there any evidence in this case that

**Page 115**

1  Ms. Borum did not understand Dr. Smith?
2     A.  I don't think the question was asked,
3  and I don't recall an answer that she gave.
4     Q.  If Ms. Borum couldn't understand
5  Dr. Smith, would she have gone back to her two
6  more times?
7     A.  You know, I think she liked her.
8     Q.  I think she did, too.
9     A.  And sadly, I bet she has a nice
10 personality. I will bet she is a sweetheart. I
11 will bet she is a fine wife and mother, but she
12 shouldn't be practicing psychiatry.
13    Q.  Okay. Most mental health disorders --
14 you will agree with me that most mental health
15 disorders are treated by family medicine
16 physicians or other primary care physicians,
17 correct?
18    A.  Where are you reading that from?
19    Q.  From my outline.
20    A.  Oh, okay. No, I don't think that's
21 true.
22    Q.  Okay. Do you agree with Dr. Goldstein
23 that primary care physicians provide up to
24 75 percent of the mental health care in the

**Page 116**

1  United States?
2     A.  I don't know if that's true either.
3  That seems high to me.
4     Q.  Okay. Do you agree that primary care
5  physicians are qualified to treat and manage
6  general mental health illnesses such as
7  depression, anxiety and adjustment disorder?
8     A.  Yes.
9     Q.  Do you agree that depression is the
10 most common mental health illness in the United
11 States?
12    A.  That might be true. It's close.
13    Q.  Closely followed by anxiety probably?
14    A.  Everybody is depressed which has some
15 anxiety component, and everybody is anxious
16 which has a depressive component pretty much so
17 they kind of go together.
18    Q.  Yeah. Do you agree with Dr. Goldstein
19 that a fairly large percentage of patients with
20 major depression will not have a significant
21 improvement even with treatment whether it's
22 psychotherapy or medication or some
23 combination?
24    A.  Would you read that back?

**Page 129**

1  antidepressant medicines work to correct brain
2  hormone levels?
3     A.   Neuro transmitter levels is the answer.
4     Q.   Okay.  And the standard treatment is to
5  push the dose until the symptoms are gone?
6     A.   Yes.
7     Q.   All right.  Do you agree with me that
8  no side effects were reported by Nicole Borum at
9  initiation of Lexapro?
10    A.   None documented.
11    Q.   Okay.  Did any of her friends or family
12 members report that she had had -- that she
13 reported any side effects?
14    A.   I don't recall.
15    Q.   Nicole reported --
16    A.   And I don't think they were asked.
17    Q.   Okay.  Nicole reported to Dr. Smith
18 that the Lexapro was working well for her?
19    A.   Apparently so.
20    Q.   Okay.
21    A.   Except why did she come back in and ask
22 for more Lexapro?  Because she wasn't healed.
23 She wasn't well.
24    Q.   Because her symptoms weren't all gone.

**Page 130**

1  She still had some anxiety?
2     A.   I think she had more than that.
3     Q.   If we look to Dr. Smith record what it
4  is she still had some anxiety that was her
5  complain that day.  I am feeling a lot better
6  but I still have some anxiety?
7     A.   Please give me more medicine is what
8  she said, yeah.
9     Q.   Is that what she said, please give me
10 more medicine?
11    A.   I think that's what she was saying by
12 saying can I get more drugs.
13    Q.   And if a patient's symptoms aren't all
14 gone, then the standard treatment is to push the
15 dose until the symptoms are gone?
16    A.   Unless the manufacturer of the drug
17 says max therapeutic effect occurs at ten
18 milligrams and you don't get more therapeutic
19 effect at 20 milligrams.
20    Q.   Let's talk about the manufacturer's
21 package insert.  Sir, you have testified that
22 physician's prescription methods and use of a
23 drug are not defined by the prejudiced weighted
24 document put out by the manufacturer and the

**Page 131**

1  marketer of an individual drug, have you not?
2     A.   I believe that's sometimes true,
3  sometimes not true.
4     Q.   Okay.  How about this one?
5         Question, "Would the standard of care
6  in whole or in part be defined by the PDR?"
7         Answer, "Oh, never ever.  In a million
8  years, no."
9         Do you agree with that?
10    A.   I believe --
11    Q.   That doesn't seem like sometimes true,
12 sometimes not.
13    A.   I believe that was a misstatement if I
14 said that.
15    Q.   That's a pretty strong misstatement
16 "Never ever.  In a million years, no."
17    A.   I think there are situations where
18 that's an overstatement, no question about it.
19 If I said that, not only I take it back, but I
20 apologize profusely.
21    Q.   And in that case you were defending a
22 family practice doctor in a suicide case, and in
23 this one you are on the other side.  So I guess
24 you take an opposite position when you are on

**Page 132**

1  the opposite side?
2     A.   No.  You know, every word that I say is
3  recorded in perpetuity, witness the last 60
4  seconds, so I am very careful about what I say.
5         I got -- I made that statement, and I
6  need to see the context in which I made that
7  statement to see if there is a better
8  explanation for why I said it the way I did.
9         I bet I was provoked, but if you are
10 reading my words correctly, I need to see the
11 context.
12    Q.   I will give you one more and then I
13 will show you all of the context.
14        Question, "In your opinion does the
15 standard of care for a family practitioner
16 prescribing Doxepin, an antidepressant, require
17 him to consult the package insert?"
18        "No."
19        "In your opinion does the standard of
20 care for a family practitioner prescribing
21 Doxepin require him to look at the current PDR?"
22        "No."
23        Start at page 137 to 139.
24    MR. ELLIS:  So the records reflect this



**Page 145**

1  A.  Well, there was a previous document.
2  This is a fresh one. There is nothing new here.
3  Q.  The previous one was from 2003.
4  A.  It all says the same thing.
5  Q.  Do you know what the 2003 one says?
6  A.  I haven't memorized it, but I am sure
7  it says pretty much the same thing.
8  Q.  You didn't pull the 2003 one, did you?
9  A.  I have it somewhere in here actually.
10 Q.  Okay. So other than the 2016 APA
11 guidelines, all of the other things you have
12 given me are documents that plaintiff's counsel
13 gave to you, correct?
14 A.  100 percent true.
15 Q.  Okay.
16 A.  And previously mentioned to you.
17 Q.  Yes. So in your practice where do you
18 go to figure out what your psychiatric
19 assessment is supposed to be?
20 A.  What I do is do what all reasonably
21 competent and reasonably qualify family
22 physicians do, they refer the patient to a
23 psychiatrist.
24 Q.  Okay. All right.

**Page 146**

1  A.  Should I keep these and then give them
2  back to you?
3  Q.  Sure. Have you seen any evidence in
4  this case as to what the wait time for Nicole to
5  see a psychiatrist would have been?
6  A.  Since I am both a clinician in private
7  practice and an academic put on courses for
8  doctors from around the country who also
9  practices in a busy city where sometimes it's
10 hard to get in to see a psychiatrist, in every
11 city in the country if you have a patient that
12 has a potentially life-threatening disease who
13 needs to see a psychiatrist, if a doctor makes a
14 call either to psychiatric friend or if he is on
15 staff of the hospital that has a mental health
16 hospital and said, look, I have got a suicidal
17 23-year-old still having suicidal ideation, I
18 need her seen by a psychiatrist in the next few
19 days, with 100 percent certainty it gets done.
20 Q.  Was Nicole having suicidal ideation at
21 any time -- at any of the visits when she saw
22 Dr. Smith?
23 A.  You can't tell from the records because
24 the record's incomplete. But she had it when

**Page 147**

1  she saw Powell, and she saw Smith two days
2  later.
3  Q.  When she saw Dr. Smith, Dr. Smith
4  documented each time that she had no suicidal
5  ideation, correct?
6  MR. ELLIS: Objection.
7  THE WITNESS: I don't believe that's
8  correct. Dr. Smith said at office visit number
9  one on 6-19 of '16 with respect to the review of
10 systems on psychiatric behavioral, she said it
11 was negative.
12      I mean, is that laughable? I am
13 telling you it is laughable. She described her
14 as having major depressive disorder, single
15 episode, severe without psychotic features. I
16 believe that requires a psychiatric
17 consultation.
18 BY MS. WATTS:
19 Q.  Do you remember what my question was?
20 A.  Yeah, I do. Hold on. Here's a gal
21 that three days -- two days earlier had suicidal
22 ideation, and in the history of present illness
23 Dr. Smith writes down that she is here to
24 evaluate her liver enzymes.

**Page 148**

1      what? She is excited about her venture
2  for future and not to do well. I think that's
3  dwell. For some reason it came out not to do
4  well. Of course she didn't correct this note.
5  She spoke to her counselor.
6  Q.  Wait, wait. You skipped a sentence.
7  Not depressed but a little anxious.
8  A.  Well, not depressed? I don't believe
9  that's factually correct. I think with a high
10 degree of anxiety she had anxiety and
11 depression. If she had suicidal thoughts two
12 days later, can that possibly be true in this
13 note written by a gal who doesn't communicate
14 well in the English or written word.
15      She said she was able to briefly
16 summarize what happened. She recognized it was
17 on reasonable. She denies any previous medical
18 history or other psychiatric problems.
19      That means she took a poor history.
20 That means she didn't discover -- she didn't
21 notice on her physical exam that she had cutting
22 scars on her arms.
23      She didn't get the history that her
24 grandmother suffered from anxiety or depression.



<a>
<s>
</s>
</a>

**Page 205**

1  maybe. That's what it means. I don't know.
2  Q. We have already learned what no SI
3  means.
4  A. Well, there's no question about that.
5  So still stressed with previous event, still
6  distressed, the history of near normal, still
7  feels sad, not feeling good. I stand by what I
8  said before.
9  Q. Okay. This patient with no suicidal
10 ideation needs to be put in an ambulance and
11 taken to the hospital?
12 A. She tried to commit suicide a month
13 earlier, three weeks earlier. She is not
14 getting -- she is not seeing the psychotherapist
15 anymore.
16    She had these -- she has these cutting
17 issues on her arms. She has dysphoria. I mean,
18 I think the reasonably competent, reasonably
19 qualified physician in this case would go I am
20 not a psychiatrist. I am still worried you are
21 having these feelings and send her to a
22 psychiatrist.
23    And the best way to get her to a
24 psychiatrist is to send her over to Deaconess

**Page 206**

1  Cross Pointe.
2  Q. Okay. You're critical of Dr. Smith's
3  informed consent. Dr. Smith testified that she
4  listed the side effects of Lexapro to Ms. Borum
5  including the black box warning for increased
6  thoughts of suicide in young adults. Do you
7  remember that testimony?
8  A. Yeah, if it's not written down, it
9  wasn't done. Number two it will be she says she
10 said that. I am saying when I am saying with
11 respect to the critical importance of
12 documenting that, it's for a jury to decide.
13 Q. Okay. If she did that, does that meet
14 the standard of care for informed consent?
15 A. If she went through all of the hazards
16 and risks?
17 Q. Yes.
18 A. Yes.
19 Q. Okay. If a jury believes her that she
20 did that, then that meets the standard of care?
21 A. With respect to the --
22 Q. Informed consent.
23 A. With respect to the prescription of
24 Lexapro, yeah.

**Page 207**

1  Q. Okay. As of the last visit with
2  Dr. Smith, it was on August 17, 2015, correct?
3  A. Yes, ma'am.
4  Q. Nicole had just completed a five-week
5  initiation of Lexapro and reported that she
6  liked the medication and it was working well,
7  correct?
8  A. Not so well that she didn't want the
9  medicine increased.
10 Q. All right. Did she report that she
11 liked the medication and it was working well?
12 A. It says depression and anxiety much
13 better with Lexapro, however she wants to
14 increase her medication.
15 Q. "But med works great." Do you see
16 that?
17 A. No, I don't see that.
18 Q. Very top. "Med works, but it can be
19 better. Still feels a little anxious at times
20 but med works great."
21 A. I don't know what page you are on.
22 Must be on a different page than me. Hang on.
23 Q. I feel like we have been like that all
24 day, Doctor.

**Page 208**

1  MR. ELLIS: Come on now.
2  THE WITNESS: That wasn't that cryptic. Do
3  you see you are on that page, and I am looking
4  on this page.
5  MS. WATTS: Let me help you.
6  THE WITNESS: I see where you are now.
7  BY MS. WATTS:
8  Q. Okay. "Med works but it can be better.
9  Still feels a little anxious at times, but med
10 works great"?
11 A. I see that.
12 Q. Okay. She recently had been on
13 vacation with a friend and had just completed an
14 eight-weak financial planning internship"?
15 A. I see that.
16 Q. She was about to return to college to
17 complete her last semester and was looking
18 forward to job prospects in the future?
19 A. Uh-huh.
20 Q. Okay. By all accounts she was doing
21 well, right?
22 A. It says, "Patient went to the beach,
23 worse two weeks ago in South Carolina." I don't
24 know what that means exactly. That might mean

