UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT OWENSBORO

CYNTHIA GAY BORUM, as            )
Administratrix of the Estate      )
of Nicole Alyce Borum             )
                                  )
    PLAINTIFF                   )
                                  )
v.                                )     CASE NO.: 4:17-cv–00017-JHM-HBB
                                  )
JUNG WOOK KANG SMITH, MD.,        )
DEACONESS CLINIC, INC.,           )
DEACONESS HOSPITAL, INC.          )
DEACONESS HEALTH SYSTEM, INC.     )
                                  )
    DEFENDANTS                  )

_____

**DEFENDANTS' *DAUBERT* MOTION TO STRIKE
FAMILY MEDICINE STANDARD OF CARE OPINIONS
OF DR. ROBERT GOLDSTEIN**
_____

The Defendants, by counsel, pursuant to FRE 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny, move this Court to the strike the disclosed expert opinions of psychiatrist Dr. Robert Goldstein related to alleged deviations from the standard of care by family medicine physician Dr. Jung Smith. Dr. Goldstein, a psychiatrist, neither meets the qualification standards to render these specific opinions, nor are his opinions scientifically reliable.

**I.     BRIEF STATEMENT OF FACTS**

This is a medical malpractice case arising out of the suicide of 23-year-old Nicole Borum, committed three weeks after she moved to Bowling Green, Kentucky, 100 miles away from the Defendant medical providers who had cared for her over an eight-week period during the summer of 2015 when she resided in Henderson, Kentucky.

While in the care of Dr. Jung Smith, a family medicine physician employed by Deaconess Clinic, Inc. who saw her three times, Nicole was prescribed an anti-depressant, Lexapro, to treat

depression and anxiety that arose following her break-up with her fiancé, a break-up which had precipitated a suicide attempt in June 2015 before Nicole moved home to Henderson for the summer. Nicole also saw a Deaconess Hospital, Inc. licensed clinical social worker for a counseling session but elected to cancel her second counseling appointment and never returned. During the summer, Nicole completed an 8-week internship at a financial planning company, visited frequently with friends, took multiple trips, got a new tattoo, purchased a motorcycle, and attended a three-day music festival.

On her final visit to Dr. Smith on August 17, 2015, Nicole reported that the antidepressant medication was helping and that she was feeling better, but that she continued to have some anxiety.  As Nicole was experiencing a therapeutic effect from the medication with no reported side effects, Dr. Smith increased her dose and instructed her to establish care with a new physician following her planned move to Bowling Green for her final semester of college.

However, upon returning to Bowling Green in late August 2015, she did not seek follow-up care as instructed.  Nicole started a new waitressing job but did not attend any of her classes. She used cocaine and other illicit drugs regularly, and she purchased a gun at Gander Mountain, which she used to commit suicide two weeks later, just hours after having dinner with her mother, and with cocaine and marijuana in her blood stream.

Nicole's Estate brought this lawsuit against Dr. Smith; Deaconess Clinic, Inc.; Deaconess Hospital, Inc.; and Deaconess Healthcare, Inc.; alleging that these healthcare providers failed to meet the standard of care in their care and treatment of Nicole during the summer of 2015, causing her suicide.

## II.     CHALLENGED OPINIONS OF DR. ROBERT GOLDSTEIN

The Defendants challenge the opinions of Plaintiff's expert, psychiatrist Dr. Robert Goldstein regarding the care provided by family medicine physician Dr. Jung Smith.

In his written FRCP 26((b)(2) report, Dr. Goldstein levies the following criticisms of Dr. Smith's care and treatment of Nicole Borum:

1. failure to take note of important clinical information from review of the Bowling Green inpatient records;

2. failure to obtain an adequate psychiatric history and perform an adequate mental status examination, resulting in failure to make an accurate diagnosis;

3. failure to conduct a formal systematic suicide risk assessment[,] resulting in an erroneous assessment that the suicide risk was low;

4. failure to formulate and implement a treatment plan that provided for close monitoring and combined treatment (therapy and medication treatment) over the next few months;

5. failure to inform the patient of the critical importance of continuing combined treatment and close monitoring even if she moved away;

6. failure to communicate and exchange information with the therapist/counselor and coordinate combined treatment, or even learn that the patient wasn't attending counseling [];

7. increasing the dose of Lexapro at the patient's behest…;

8. failure to closely monitor the patient (every 1-2 weeks) who had just been discharged from psychiatric inpatient care after a suicide attempt;

9. failure to closely monitor the patient at times of increased suicide risk with SSRI antidepressant treatment: during the initial few months, at times of dose changes, or at discontinuation;

10. failure to recognize the increased suicide risk associated with a history of repeated self-harm, especially in young women;

11. instructing her how to wean herself off Lexapro, failing to recognize the risks associated with having a patient wean herself off an SSRI antidepressant without close medical consultation or supervision;

12. failure to give the patient specific instructions to go to the E.R. or call Dr. Smith if she felt suicidal or impulsive;

13. failure to undertake measures for an appropriate transfer of care, with no gap in treatment, in the event the patient moved away, in order to ensure continuing close monitoring, evaluation, and combined treatment (including referral to specific providers);

14. failure to ensure that the patient did not have access to firearms; and

15. exposing the patient to unacceptable risks by prescribing a six month supply of antidepressant medication (during a period the patient was not being closely monitored and evaluated).

(Goldstein Report, Exhibit A.)

However, of these opinions, Dr. Goldstein testified that only _____ were causally related to Ms. Borum's suicide. (Cite)

### III. PERTINENT TESTIMONY OF DR. ROBERT GOLDSTEIN

Plaintiff's expert Dr. Robert Goldstein is a Manhattan psychiatrist. Dr. Goldstein issued an Expert Report pursuant to Federal Rule of Civil Procedure 26(b)(2) on May 6, 2019. Dr. Goldstein was deposed on July 8, 2019 in Manhattan about opinions contained within that report.

#### a. Dr. Goldstein's background and work experience

Dr. Goldstein earned his medical degree at the University of Chicago in 1965. (Goldstein depo., Exhibit B, at p. 12.) He completed an internal medicine internship in 1966, followed by a two-year psychiatric residency at Kingsborough in Brooklyn. He then completed his third year of residency with a contemporaneous child and adolescent psychiatry fellowship at NYU Bellevue, followed by a two-year fellowship in psychoanalytic psychotherapy. (p. 13-14.)

From 1970 to 1974, Dr. Goldstein served as the medical director of the forensic psychiatric clinic of the New York state trial court and as Clinical Assistant Professor at NYU, an unpaid academic appointment in which he directed a multi-disciplinary clinic of psychiatrists, psychologists, social workers, and paralegals to perform competency evaluations of individuals appearing before the court as well as pre-sentencing evaluations. He did not provide any patient care in that position. (p. 27-28.)

In 1974, Dr. Goldstein was hired as the deputy director of the forensic psychiatric inpatient service at Bellevue Hospital where criminal defendants were sent for evaluation and treatment. (p. 29-30.) In 1975, Dr. Goldstein left Bellevue to become the director of outpatient psychiatry at the New York VA Medical Center, where he oversaw treatment and evaluation of veterans suffering from various psychiatric conditions, supervised a multi-disciplinary clinic, provided some direct patient care (only 20% of his professional time), and participated in research and teaching. (p. 32-33.)

Dr. Goldstein left the VA in 1981 to attend law school, earning his law degree in 1984 from New York College of Law. (p. 37.) Following law school, he worked part-time for a plaintiff's firm that represented individuals who filed malpractice and products liability actions for about a year while maintaining a private psychiatric practice. (p. 38.) It was a "fantasy" of his to become a plaintiff's attorney. (p. 18.)

In 1984, Dr. Goldstein joined the Columbia University College of Physicians and Surgeons as a Clinical Professor of forensic psychiatry. (p. 39-40.) He taught a program for psychiatric residents to introduce them to legal issues in psychiatry such as informed consent, confidentiality, risk management with suicidal or violent patients, and "the standard of care/malpractice." He taught this course two or three times per year from 1984 until 2004 or 2005. (p. 40-41.)

Dr. Goldstein has maintained a private practice of psychiatry, at least in a part-time capacity, since the early 1970s, even while working in other full-time positions and while attending law school. (p. 35.) If one of Dr. Goldstein's patients needs psychotherapy in addition to medication management, Dr. Goldstein himself provides the psychotherapy instead of referring the patient to a counselor. He recognizes that "split treatment" occurs frequently in psychiatric practice, but he prefers to provide both aspects of care to his patients. (p. 73.)

Dr. Goldstein has had one patient who suicided while under his care. (p. 64.) He was treating a female patient for psychotic depression with outpatient psychotherapy and medication management. The patient had a history of suicidal ideation but no history of suicide attempt. Dr. Goldstein was monitoring her closely. (p. 65.) Despite providing her with appropriate care, Dr. Goldstein's patient committed suicide, which he testified was "obviously not" preventable. (p. 66.)

Dr. Goldstein has never referred a patient to their primary care physician for management of psychotropic medication. (p. 78.) Even if he had a patient who had been stable on an antidepressant for a lengthy period of time who was doing well, he would continue to see that patient for medication management rather than refer them to a primary care physician. (p. 78-79.)

<u>Dr. Goldstein is not familiar with the training and education that family medicine physicians receive regarding how to conduct mental health assessments, how to recognize mental health conditions that should be referred to psychiatrists, and how to triage mental health illnesses and provide first-line treatments to treat modifiable risk factors in patients.</u> (p. 110-112.) <u>He only ever talks to his patients' family medicine physicians about those patients' medical issues; he never discusses a patient's mental health with family medicine physicians.</u> (p. 71.)

### b. Dr. Goldstein's family practice standard of care opinions

In Dr. Goldstein's opinion, if a family medicine physician chooses to manage the treatment of a patient with a psychiatric condition, then the standard of care applicable to the family medicine physician is identical to that of a psychiatrist. (p. 106.) Dr. Goldstein conceded that family medicine physicians provide up to 75% of mental health care in the United States. (p. 107.) Nevertheless, he testified, "the standard of care for treating and assessing the psychiatric patient … should be the same as any mental health practitioner," be they a social worker, psychiatrist, or family physician. (p. 121-22.)

In this case, despite testifying that a family practice physician has the same standard of care of a psychiatrist when treating a patient with a psychiatric condition, Dr. Goldstein felt that the standard of care required Dr. Smith to refer Nicole Borum to a psychiatrist for treatment.[1] (p. 117.) Dr. Goldstein believes that an appointment with an outpatient psychiatrist could have been obtained "expeditiously," although he has seen no evidence regarding the availability of psychiatrists in the Evansville area. (p. 117-18.)

Dr. Goldstein criticized Dr. Smith's failure to elicit information about Nicole's family history and history of self-harm and Dr. Smith's diagnosis of major depressive disorder without documentation of its defining characteristics (p. 243), though he conceded that Nicole's treatment

---

[1] Dr. Goldstein apparently believes the standard of care would have required a psychiatrist to refer to a psychiatrist, since the standards of care are the same for all practitioners treating a patient's mental health.

6

plan would have remained the same: combination therapy of medication and psychotherapy. (p. 232.)

Dr. Goldstein is critical of Dr. Smith's follow-up intervals; he believes Nicole should have been seen every 1-2 weeks both for medication management and psychotherapy (p. 242), but he agreed that there was no causal link between this criticism and Nicole's suicide until after her final visit with Dr. Smith. Dr. Goldstein also claimed that it was "grossly negligent" for Dr. Smith to give Nicole a prescription for six-months of Lexapro at her last visit (p. 260), but he conceded that this prescription did not cause Nicole any harm, as she did not overdose on Lexapro. (p. 261-2.)

Dr. Goldstein's primary standard of care criticism of Dr. Smith is her discharge of Nicole from treatment without close monitoring and serial evaluations in light of her "very high risk for suicide." (p. 170.) In his opinion, Nicole was at a high risk of suicide due to multiple risk factors including her age, gender, history of suicide attempt, family history of depression, history of self-harm, history of depression, and recent loss of relationship, compounded by the institution of Lexapro and doubling of the dose just prior to her discharge. (p. 170.) Given these considerations, Dr. Smith should have ensured that Nicole had appointments for follow-up in Bowling Green prior to discharging her from care. (p. 174.)

Dr. Goldstein is not critical of Dr. Smith's prescription of Lexapro to Nicole (p. 249-250); however, he believes that the dosage should not have been increased. He claims that there is no demonstrated increase in effectiveness of Lexapro at 20mg versus 10 mg, and the increased dosage only exposed Nicole to an enhanced suicide risk with no added benefit. (p. 250.)

Dr. Smith last evaluated Nicole on August 17, 2015. Nicole had just completed a five-week initiation of Lexapro and reported that she liked the medication and it was working well. (p. 178.) Nicole reported that she still had some anxiety at times. She had recently been on vacation with a friend and had just completed an eight-week financial planning internship. She was about to return to college to complete her last semester and was looking forward to her job prospects in

the future. (p. 177-78.) By all accounts, on August 17, 2015, Nicole was doing well, but in Dr. Goldstein's opinion, not enough time had passed to call her "stable." (p. 177.)

Dr. Goldstein was not familiar with the distance between Bowling Green and Henderson; he thought it was "less than a half hour" drive. (p. 171.) (The two towns are 100 miles apart.) He saw no reason why Nicole could not continue to follow up with Dr. Smith, but in the alternative, Dr. Smith had an obligation to warn Nicole about the need to continue treatment, to make a referral, and to ensure that the referral was followed up on. (p. 171-72.) Dr. Goldstein conceded that Nicole has a right to select her own physicians and make her own medical choices, but he maintained that Dr. Smith had a duty to make sure that a transfer of care occurred without a gap in treatment. (p. 174.) In Dr. Goldstein's opinion, Dr. Smith "abandoned Nicole." (p. 175.)

## IV.    ARGUMENT

District courts have a "gatekeeping role" in screening the reliability of expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The party proffering such testimony must show, by a preponderance of the evidence, that it is relevant and reliable. *Id.* at 592, n. 10. FRE 702 guides the court in its gatekeeping function. It provides that an expert witness, qualified by knowledge, skill, experience, training, or education, may testify to scientific, technical, or other specialized knowledge that assists a trier of fact to determine a fact in issue, if:

(1)    The testimony is based upon sufficient facts or data;
(2)    The testimony is the product of reliable principles and methods; and
(3)    The witness has applied the principles and methods reliably to the facts of the case.

*Id.* Where the subject of an expert's testimony is "scientific knowledge," "scientific" implies a grounding in the procedures of science, and "knowledge" connotes more than subjective belief or unsupported speculation. *Daubert*, 509 U.S. at 590.

### A.    Dr. Robert Goldstein does not meet FRE 702's qualification standards to provide the challenged opinions.

Dr. Robert Goldstein is unqualified to render family practice standard of care opinions related to Dr. Smith's care and treatment of Nicole Borum.

8

### 1. The Qualifications Inquiry

An expert must be qualified through knowledge, skill, experience, training, or education. An expert's qualifications must provide a foundation for the witness not as an expert in the abstract, but the inquiry is whether the expert is qualified to answer a specific question and applies separately to each opinion given by the expert. *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994); *Elswick v. Nichols*, 144 F. Supp.2d 758,766 (E.D. Ky. 2001). A court should exclude proffered testimony if the subject lies outside the witness's area of expertise. *Ashburn v. General Nutrition Centers, Inc.*, 2007 WL 4225493 at *1 (N.D. Ohio Nov. 27, 2007) (*quoting* 4 WEINSTEIN'S FED. EVID. §702.06[1] at 702-52 (2000)).

The qualifications inquiry involves comparing the expert's professional background with his proffered area(s) of testimony to determine if the expert has the appropriate professional experience to provide the opinions stated in the expert's report. *See Burgett v. Troy-Bilt* LLC, 2013 WL 3566355, at *2-3 (E.D.Ky. 2013). The Sixth Circuit Court of Appeals has held that physician experts who "stray from [their] professional experience" are "less reliable, and more likely to be excluded under Rule 702." *Madej v. Maiden*, 951 F.3d 364 (6th Cir. 2020), *see also Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 426 (6th Cir. 2009).

### 2. Dr. Goldstein's Specific Qualifications

Dr. Goldstein has no knowledge, skill, experience, training, or education whatsoever in family medicine or specifically in family medicine practitioners' care and treatment of patients with mental health issues including depression and recent history of suicide attempt. He is admittedly unfamiliar with the training and education that family medicine physicians receive regarding how to conduct mental health assessments, how to recognize mental health conditions that should be referred to psychiatrists, and how to triage mental health illnesses and provide first-line treatments to treat modifiable risk factors in patients.

Dr. Goldstein has never worked closely with family practice providers and refuses to refer his patients to them, even when his patients are stable, and he has never taught them or

supervised them in the course of his academic positions. No individual without a basic understanding of a family medicine physician's education, training, or day-to-day practice – in other words, what the family medicine physician is expected to be able to do – is qualified to opine on the family medicine physician's standard of care. In criticizing Dr. Smith, he is "stray[ing] from his professional experience."

The fact that their patient base might overlap or that *some* treatment might be the same does not make Dr. Goldstein qualified to opine on Dr. Smith's standard of care; a dentist and an emergency medicine physician might both prescribe antibiotics for an oral infection, but it would be absurd to suggest that their standards of care are the same. The Eighth Circuit has addressed a situation even closer to the case at bar; it affirmed a district court finding that a psychologist was not qualified to offer standard of care criticisms against a family practice physician *or* against a psychiatrist. *Porter v. Welsh*, 71 F. App'x 612, 613 (8th Cir. 2003). In short, Dr. Goldstein is not "qualified by knowledge, skill, experience, training, or education" to offer standard of care criticisms of Dr. Smith. Allowing him to do so would not assist the trier of fact in any way.

**B. Dr. Robert Goldstein does not meet FRE 702's reliability standards to provide the challenged opinions.**

In addition to Dr. Goldstein's lack of qualifications to render the challenged opinions, Dr. Goldstein's opinions are not reliable under a *Daubert* analysis, as his opinions are nothing more than unsupported speculations.

### 1. The Reliability Inquiry

Federal Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses, on the assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline. *Daubert*, 509 U.S. at 592. To be reliable, testimony must be supported by appropriate validation ("good grounds"), based on what is known. *Id*. at 590. FRE 702 only permits relevant testimony from a qualified witness if it is based upon (1) sufficient facts

and data, (2) the product of reliable principles and methods, and (3) the witness applies the principles and methods reliably to the facts of the case.

Not everything a knowledgeable person says is "knowledge" under Rule 702, no more than everything a scientist says is "scientific." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665 (6th Cir. 2010). The court must determine whether the evidence is "genuinely scientific," as distinct from "speculation offered by a genuine scientist." *Id*. (*quoting Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996)). Where a party brings forth a theory crafted by a witness lacking the expertise to craft it, it should be excluded. *EEOC v. Kaplan Higher Education Corp.*, 748 F.3d 749, 754 (6th Cir. 2014).

The first inquiry regarding the reliability of an expert's opinion is whether the expert employs the same "rigor" as an expert in *the relevant field*. *Kumho Tire*, 526 U.S. at 152. Pertinent considerations include whether the expert has taken action to verify or substantiate the factual or scientific bases for his or her conclusions, and whether the expert has made any assumptions (and if so, whether they are reasonable). *Coffey v. Dowley Manufacturing, Inc.*, 187 F.Supp.2d 958, 973-74 (M.D. Tenn. 2002). The courtroom is not the place for scientific guesswork, even of the inspired sort. *Tamraz*, 620 F.3d at 671. No matter how good experts' credentials may be, they may not be permitted to speculate. *Id*.

Second, a reliable expert opinion is the product of scientifically valid principles and methods; an expert's subjective belief or unsupported speculation will not satisfy Rule 702. *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997). If an expert uses and relies upon an analysis that is the product of "guesstimations" and speculation, once that house of cards is disproved as a foundation, the whole analysis collapses. *Coffey*, 187 F.Supp.2d at 976. Moreover, if an expert relies solely and primarily on experience, he or she must explain how that experience leads to the conclusion reached, and how that experience is reliably applied to the facts. *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005). A district court abuses its discretion by admitting testimony when those generalizations are too speculative and attenuated to support the

expert's conclusion. *Barnette v. Grizzly Processing, LLC*, 2012 WL 293305 at *4 (E.D. Ky. Jan. 31, 2012). Similarly, testimony based on personal opinion, rather than science, is inadmissible. *Turpin v. Merrell Down Pharm., Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992).

Finally, the court must consider whether the expert applied scientifically valid principles and methodology to the facts of the case. *Coffey*, 187 F.Supp.2d at 977. Where an expert simply forms a hypothesis based on his observations, but neither supports it through reference to existing scientific literature or conducts his own tests to prove its reliability, these methodological shortcomings favor exclusion. *Downs v. Perstorp Components, Inc.*, 26 Fed. Appx. 472 (6th Cir. 2002).

### 2. The Unreliability of Dr. Goldstein's Opinions

Dr. Goldstein's opinions regarding Dr. Smith's standard of care is unreliable. Not only does Dr. Goldstein not have any education, training, or experience in this area, but he did not undertake any research or investigation to verify or substantiate the bases of his conclusions.

Dr. Goldstein's family medicine standard of care opinions are not based upon *anything*, let alone based upon sufficient facts or data as required by FRE 702. To support his opinion that the standard of care is the same for a psychiatrist as it is for a family practice physician, Dr. Goldstein produced no literature, performed no research, consulted no family medicine physicians, and has no personal experience training as or practicing alongside family medicine physicians to make such a claim.

Furthermore, Dr. Goldstein's opinion that the standard of care is the same for a psychiatrist and family medicine physician is irreconcilable with his opinion that Dr. Smith should have referred Nicole to a psychiatrist. If the standard of care – i.e., the scope of appropriate care and treatment – from these two specialties are the same, there would be no need for one to refer to the other.

Dr. Goldstein cannot "close the analytical gap between the data and the opinion offered," because his conclusions resort only to unsupported speculation His opinions are "based on

personal opinion, rather than science" and are therefore inadmissible. *Turpin v. Merrell Down Pharm., Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992).

## V. CONCLUSION

For the reasons stated above, the Defendants respectfully ask that Dr. Robert Goldstein's family practice standard of care opinions be stricken from the trial of this matter.

PHILLIPS PARKER ORBERSON & ARNETT, PLC

/s/ Katherine T. Watts
KATHERINE T. WATTS
COLLEEN O. DAVIS
716 West Main Street, Suite 300
Louisville, Kentucky 40202
(502) 583-9900
kwatts@ppoalaw.com
cdavis@ppoalaw.com
cpotts@ppoalaw.com
dchurchman@ppoalaw.com
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

It is hereby certified that a true and accurate copy of the foregoing was forwarded via email, this 30th day of October, 2020, to:

William D. Nefzger, Esq.
BAHE COOK CANTLEY & NEFZGER, PLC
1041 Goss Avenue
Louisville, Kentucky 40217
will@bccnlaw.com
*Co-Counsel for Plaintiff*

Samuel J. Bach, Esq.
Bach & Armstrong LLC
312 First Street
P.O. Box 881
Henderson, Kentucky 42419
Sam@bacharmstrong.com
*Co-Counsel for Plaintiff*

/s/Katherine T. Watts
Katherine T. Watts