UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT OWENSBORO

| | |
|---|---|
| CYNTHIA GAY BORUM, as )<br>Administratrix of the Estate )<br>of Nicole Alyce Borum )<br>         ) <br>   PLAINTIFF ) <br>         ) <br>v.        )    CASE NO.: 4:17-cv–00017-JHM-HBB <br>         ) <br>JUNG WOOK KANG SMITH, MD., ) <br>DEACONESS CLINIC, INC., ) <br>DEACONESS HOSPITAL, INC. ) <br>DEACONESS HEALTH SYSTEM, INC. ) <br>         ) <br>   DEFENDANTS ) | |

**DEFENDANTS' *DAUBERT* MOTION TO STRIKE OPINIONS
OF DR. FINLEY BROWN**

The Defendants, by counsel, pursuant to FRE 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny, move this Court to the strike the disclosed expert opinions of Dr. Finley Brown related to alleged deviations from the standard of care by corporate entities Deaconess Cross Pointe and Deaconess Clinic and by licensed clinical social worker Syrrus Powell.  Dr. Brown, a family medicine physician, neither meets the qualification standards to render these specific opinions, nor are his opinions scientifically reliable.

I.     **BRIEF STATEMENT OF FACTS**

This is a medical malpractice case arising out of the suicide of 23-year-old Nicole Borum, committed three weeks after she moved to Bowling Green, Kentucky, 100 miles away from the Defendant medical providers who had cared for her over an eight-week period during the summer of 2015 when she resided in Henderson, Kentucky.

While in the care of Dr. Jung Smith, a family medicine physician employed by Deaconess Clinic, Inc. who saw her three times, Nicole was prescribed an anti-depressant, Lexapro, to treat

depression and anxiety that arose following her break-up with her fiancé, a break-up which had precipitated a suicide attempt in June 2015 before Nicole moved home to Henderson for the summer. Nicole also saw a Deaconess Hospital, Inc. licensed clinical social worker for a counseling session but elected to cancel her second counseling appointment and never returned. During the summer, Nicole completed an 8-week internship at a financial planning company, visited frequently with friends, took multiple trips, got a new tattoo, purchased a motorcycle, and attended a three-day music festival.

On her final visit to Dr. Smith on August 17, 2015, Nicole reported that the antidepressant medication was helping and that she was feeling better, but that she continued to have some anxiety. As Nicole was experiencing a therapeutic effect from the medication with no reported side effects, Dr. Smith increased her dose and instructed her to establish care with a new physician following her planned move to Bowling Green for her final semester of college.

However, upon returning to Bowling Green in late August 2015, she did not seek follow-up care as instructed. Nicole started a new waitressing job but did not attend any of her classes. She used cocaine and other illicit drugs regularly, and she purchased a gun at Gander Mountain, which she used to commit suicide two weeks later, just hours after having dinner with her mother, and with cocaine and marijuana in her blood stream.

Nicole's Estate brought this lawsuit against Dr. Smith; Deaconess Clinic, Inc.; Deaconess Hospital, Inc.; and Deaconess Healthcare, Inc.; alleging that these healthcare providers failed to meet the standard of care in their care and treatment of Nicole during the summer of 2015, causing her suicide.

## II.  CHALLENGED OPINIONS OF DR. FINLEY BROWN

The Defendants challenge the following opinions of Plaintiff's expert, family medicine physician Dr. Finley Brown:

### A.  Dr. Browns' Opinions regarding Corporate Negligence

Plaintiff's expert Dr. Finley Brown disclosed the following opinion in his written FRCP 26((b)(2) report:

> 6. Deaconess Cross Pointe and Deaconess Clinic deviated from the standard of care in failing to have a system in place to track and monitor patients who were at a moderate to high risk of suicide and ensure that they received adequate care and treatment from individuals skilled in treating suicide risk.
>
> 7. Had Deaconess Cross Pointe and Deaconess Clinic complied with the standard of care, its more likely than not Ms. Borum would not have committed suicide. Their breaches of the standard of care were, in my view, a substantial factor in Ms. Borum's death.

. . .

**Deaconess Clinic and Cross Pointe**

Any institution that accepts and treats patients with severe and complex mental health illnesses, including suicidal patients, has a duty to ensure that a process is in place to identify such patients and ensure that they are properly monitored and treated by professionals with the training and expertise to treat a suicidal patient. Based on the available evidence, neither Dr. Smith's office nor Ms. Powell's office was structured in such a way to ensure that such patients were adequately monitored and that proper precautions were in place to ensure that care was obtained and coordinated. There was no process or policy in place to ensure that the relevant care providers communicated concerning the patient. No was there any policy or process in place to ensure that such patients were contacted concerning any missed appointments or follow up appointments. Nor did either entity have a specific policy or guideline concerning the treatment of suicidal patients. It is well known and recognized in the literature that suicidal patients in particular often fail to follow discharge instructions or keep appointments because of the feelings of hopelessness and mental impairments associated with such suicidal patients. Accordingly, such policies and processes are essential and required.

### B.     Dr. Brown's Opinions regarding Syrrus Powell, LCSW's Care

Dr. Brown disclosed the following opinions regarding the care provided to Nicole Borum by licensed clinical social worker Syrrus Powell in his FRCP 26(b)(2) expert report:

> 4. Syrrus Powell deviated from the standard of care in connection with her treatment of Ms. Borum in the following ways:
>
>    a. Failing to conduct a comprehensive suicide risk assessment and determine a suicide risk level, and incorrectly diagnosing Ms. Borum as a low risk of suicide;
>
>    b. Failing to develop and implement a comprehensive suicide treatment plan;

      c.    Failing to follow up with Ms. Borum after the initial visit, and at any point between the initial visit and Ms. Borum's death; and

      d.    Failing to communicate and coordinate with Dr. Smith concerning Ms. Borum's care and treatment.

5.    Had Ms. Powell provided care that complied with the standard of care, it is more likely that not that Ms. Borum would not have committed suicide. Her breaches of the standard of care were, in my view, a substantial factor in Ms. Borum's death.

**C.**    **Standard of Care Opinions against Dr. Jung Smith other than that Dr. Smith should have referred Nicole to a Psychiatrist**

Dr. Brown's Expert Report and deposition testimony list numerous standard of care criticisms against Dr. Jung Smith in her care and treatment of Nicole Borum as a family medicine expert. Among those opinions, Dr. Brown is critical of Dr. Smith for failing to refer Nicole to a psychiatrist for a higher level of care. As described below, this is the only opinion that Dr. Brown can reliably provide with regard to Dr. Smith's care of Nicole under *Daubert* standards.

**D.**    **Opinion that Dr. Smith and Syrrus Powell "Abandoned" Nicole which Caused Nicole's Suicide**

At his deposition, Dr. Brown testified that Nicole had feelings of abandonment and/or hopelessness after being discharged from Dr. Smith's care and that those feelings are "what killed her." When asked what evidence he had that Nicole had feelings of abandonment due to Dr. Smith, Dr. Brown could only cite to her death by suicide. (p. 176-178.)

**III.  PERTINENT TESTIMONY OF DR. FINLEY BROWN**

Plaintiff's expert Dr. Finley Brown is a Chicago, Illinois family medicine physician. Dr. Brown issued an Expert Report pursuant to Federal Rule of Civil Procedure 26(b)(2) on May 6, 2019. Dr. Brown was deposed on October 16, 2019 in Chicago about opinions contained within that report, which he testified was authored by Plaintiff's counsel Anthony Ellis and contained quotations from depositions that Dr. Brown had no recollection of reviewing. (Exhibit A, pp. 98-99.)

Dr. Brown completed his four-year medical degree in 1970 and immediately entered the private practice of family medicine. (p. 5.) He did not complete a residency in family practice, internal medicine, or any other medical discipline. (p. 5.) Dr. Brown has been engaged in the

private practice of family medicine since 1970. (p. 5.) He currently maintains a "concierge" practice of approximately 200 patients, and he sees 0 – 8 patients per day. (p. 52.)

While he was previously board-certified by the American Board of Family Practice for over 40 years, Dr. Brown has not been board-certified by that organization since December 31, 2016. (p. 7.) Instead, in 2016, he obtained "board certification" through the National Board of Physicians and Surgeons, an organization that does not require an examination for certification. (p. 7-8.)

With regard to training in mental health, Dr. Brown testified that "like all family physicians I get involved in the emotional health of my patients so I have some basic primitive psychiatry like all family doctors." (p. 13.) He also stated that he has taken continuing medical education courses on mental health issues and has read journal articles on topics related to mental health. (p. 13.) However, Dr. Brown could not recall any continuing medical education on mental health that he had undertaken in the past five years. (p. 14-15.) Additionally, he did not receive the education and training in mental health provided to those family medicine physicians who complete a family medicine residency. (p. 5.)

Dr. Brown joined the medical staff at St. Joseph Hospital in Chicago in 1987 to admit his patients to that hospital and was automatically given a "clinical instructor of family practice" title when he agreed to admit patients to the teaching service. (p. 21-22.) The family practice residency at St. Joseph Hospital is a free-standing residency program with no direct affiliation to a medical school. (p. 22.) The residency program has a one-month intensive rotation on behavioral and community medicine; family medicine residents participate as co-therapists in a counseling clinic where they provide evidence-based cognitive behavioral therapy; residents work at Harborview Recovery Center practicing addiction medicine; and the residents participate in an intensive outpatient psychiatry program with home visits with faculty to learn crisis intervention skills with the crisis psychiatry team from the emergency department. (p. 22-26.) Dr. Brown is not involved *at all* in any of these aspects of the family medicine residents' education and training in mental

health; in fact, he quipped that the training in the counseling clinic "sounds scary to me." (p. 22-26.)

Dr. Brown's family medicine practice has never been owned or affiliated with any hospital or health care system. (p. 37.) Dr. Brown has never been affiliated with a hospital or health care system that provided resources or oversight to his family medicine practice. (p. 37.) No entity, organization, administrator, or physician oversees Dr. Brown's practice of medicine. (p. 44-45: "I am the physician, and I am the administrator.")

Dr. Brown has admitting privileges at Amita St. Joseph Hospital and limited admitting privileges at Advocate Illinois Masonic Medical Center. (p. 38.) Neither of these hospitals or health systems have affiliated outpatient primary care offices. (p. 41.) Dr. Brown has not served on any committee at either hospital in over five years. (p. 40.) When he previously served on committees at St. Joseph Hospital, Dr. Brown was on the physician recruitment committee and the nurse-physician liaison committee at various times, neither of which involved clinical practices, policies, or procedures. (p. 40).

Dr. Brown has never provided input on hospital or health system policies and procedures except potentially regarding recruiting physicians and patients to the hospital. (p. 40.) Dr. Brown has never assisted, provided input, or been consulted by any hospital or health system in developing or implementing policies and procedures for clinical medical practice. (p. 40-41.) He has never advised a hospital or health care system regarding patient safety policies, procedures, or practices. (p. 41.)

Dr. Brown does not use electronic medical records. (p. 42.) Instead, he uses paper, pen, a fax machine, and a scanner. (p. 42-43.) Dr. Brown has never advised or consulted with a hospital or health care system regarding the implementation of electronic medical records. (p. 42.) He has never been involved in the implementation of systems for monitoring or tracking patients within a health care system. (p. 43.)

Dr. Brown does not refer any of his patients to mental health professionals other than M.D. psychiatrists. (p. 63.) He does not refer patients to licensed clinical social workers, psychotherapists, psychologists, or any other licensed counselors for psychotherapy or counseling services. (p. 62-63: "I refer patients to psychiatrists. I never refer patients to an LCSW.") Short of referring a patient to a psychiatrist, Dr. Brown will provide a patient with "some office counseling from me." (p. 64.) However, Dr. Brown concedes that he is not qualified to provide psychotherapy. (p. 65.)

Dr. Brown testified about his procedure in his office for monitoring and tracking patients:

> In my solo private office my procedure is that if I havegot a sick patient, somebody who is not stable, somebody who potentially their life is at risk, I write my note, and I put the file on my desk. And it never leaves my desk until the problem is resolved one way or another. So in a way I do, yes. . . . That's the way I do it. Of course I don't have the sophisticated software. I mean, I have a bunch of computers and so forth, but I write my notes on paper. I have little stickies that I put on the outside with the problem. If it's somebody that I need to talk to that night, I will have their cellphone or home phone number on a piece of paper, and I put it in my pocket. I always look in my pocket to see what piece of paper I have got, what duty I have to do. It works pretty well. I've never had a problem.

(p. 67-68.)

However, Dr. Brown explained that this procedure he has in place for monitoring and tracking patients would not have applied to Nicole Borum - - she "would not have been a stickie note on his desk" - - because he would have referred her to a psychiatrist for management rather than managing her care himself. (p. 70-72.) **Dr. Brown stated that he does not consider himself to be qualified to manage a patient like Nicole Borum;** he will only manage patients will "run-of-the mill anxiety or depression." (p. 155, 189.)

Dr. Brown conceded that he has never had training as a licensed clinical social worker, nor has he been trained in psychotherapy. (p. 100-101.) If any of his hospitalized patients received psychotherapy, he does not oversee or supervise those mental health professionals who provide the psychotherapy to his patients. (p. 102.) In fact, he has never supervised or overseen the

practice of a licensed clinical social worker or psychotherapist. (p. 102.) He himself is not qualified or trained in conducting cognitive behavioral therapy. (p. 65.)

Dr. Brown does not know what training or education a licensed clinical social worker has or how they are trained and instructed to conduct their therapy sessions. (p. 102.) Despite this, Dr. Brown testified that he has "always thought that licensed clinical social workers were at the bottom of the totem pole, the least skilled, the least qualified, the least able to manage a patient with mental health issues." (p. 102-103.) Furthermore, Dr. Brown stated that he was "completely uninterested" in how licensed clinical social workers are trained to provide psychotherapy to patients "because [he doesn't] regard their skill set as anything but miniscule in the management of a seriously ill off and on suicidal patient." (p. 104.)

Despite opining that LCSW Syrrus Powell's care of Nicole Borum was below the standard of care, Dr. Brown did not do any research to educate himself as to the standard practice of licensed clinical social workers or psychotherapists, and of course he has no personal knowledge of their standard practices since he refuses to work with them. (p. 108.) He stated that he expects licensed clinical social workers to follow the guidelines of the American Psychiatric Association in their care of patients. (p. 107.) However, he conceded that licensed clinical social workers cannot be members of the American Psychiatric Association; it is available only to MD psychiatrists. (p. 107.) Dr. Brown stated that the standard of care applicable to LCSW Syrrus Powell in her care of Nicole Borum was the same as the standard of care applicable to a family practice physician or an MD psychiatrist. (p. 108.)

Dr. Brown opined that both Dr. Smith and LCSW Powell should have referred Nicole Borum to a psychiatrist: "Both Smith and Powell knew or should have known they weren't qualified to manage this patient and should have immediately referred her to a psychiatrist." (p. 189.) Further, he testified:

> Q. Okay. A psychiatrist is the only one who is qualified to manage Nicole Borum?

> A. Apparently so certainly based on the medical records and the deposition testimony of Powell and Smith. In this case that's exactly true.
>
> Q. Was Finley Brown qualified to manage Nicole Borum?
>
> A. No.

(p. 189.) Dr. Brown testified that he would have referred Nicole to a psychiatrist, and he believed the standard of care required Dr. Smith to do so as well. (p. 155.)

## IV. ARGUMENT

The district courts have a "gatekeeping role" in screening the reliability of expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The party proffering such testimony must show, by a preponderance of the evidence, that it is relevant and reliable. *Id.* at 592, n. 10. FRE 702 guides the court in its gatekeeping function. It provides that an expert witness, qualified by knowledge, skill, experience, training, or education, may testify to scientific, technical, or other specialized knowledge that assists a trier of fact to determine a fact in issue, if:

> (1) The testimony is based upon sufficient facts or data;
> (2) The testimony is the product of reliable principles and methods; and
> (3) The witness has applied the principles and methods reliably to the facts of the case.

*Id.* Where the subject of an expert's testimony is "scientific knowledge," "scientific" implies a grounding in the procedures of science, and "knowledge" connotes more than subjective belief or unsupported speculation. *Daubert*, 509 U.S. at 590.

### A. Dr. Finley Brown does not meet FRE 702's qualification standards to provide the challenged opinions.

Dr. Finley Brown is demonstrably unqualified to render standard of care opinions related to the administrative policies and procedures that hospital and health care systems should have in place for the monitoring and tracking of patients, and he is similarly unqualified to testify regarding the standard of care applicable to licensed clinical social workers, who he describes as "lowly" and "the bottom of the totem pole."

### 1. The Qualifications Inquiry

An expert must be qualified through knowledge, skill, experience, training, or education. An expert's qualifications must provide a foundation for the witness not as an expert in the abstract, but the inquiry is whether the expert is qualified to answer a specific question and applies separately to each opinion given by the expert. *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994); *Elswick v. Nichols*, 144 F. Supp.2d 758,766 (E.D. Ky. 2001). A court should exclude proffered testimony if the subject lies outside the witness's area of expertise. *Ashburn v. General Nutrition Centers, Inc.*, 2007 WL 4225493 at *1 (N.D. Ohio Nov. 27, 2007)(*quoting* 4 WEINSTEIN'S FED. EVID. §702.06[1] at 702-52 (2000)).

The qualifications inquiry involves comparing the expert's professional background with his proffered area(s) of testimony to determine if the expert has the appropriate professional experience to provide the opinions stated in the expert's report. *See Burgett v. Troy-Bilt* LLC, 2013 WL 3566355, at *2-3 (E.D.Ky. 2013). The Sixth Circuit Court of Appeals has held that physician experts who "stray from [their] professional experience" are "less reliable, and more likely to be excluded under Rule 702." *Madej v. Maiden*, 951 F.3d 364 (6th Cir. 2020), *see also Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 426 (6th Cir. 2009).

### 2. Dr. Brown's Specific Qualifications

#### i. Corporate Negligence Opinions

First, Dr. Brown opined that Deaconess Cross Pointe (a mental health facility) and Deaconess Clinic (a multi-site multi-specialty medical clinic) "deviated from the standard of care in failing to have a system in place to track and monitor patients who were at a moderate to high risk of suicide and ensure that they received adequate care and treatment from individuals skilled in treating suicide risk."

Dr. Brown has no knowledge, skill, experience, training, or education whatsoever in healthcare administration or in the development, implementation, or standards for healthcare systems with regard to tracking and monitoring patients in any capacity. Dr. Brown has

maintained a solo private family medicine practice for his entire career. His practice has never been owned or affiliated with a hospital or health system; he has never received oversight, administration, or resources from a hospital or health care system in his family medicine practice. No entity, organization, administrator, or physician has overseen Dr. Brown's practice of medicine, and he has never served in an administrative capacity for any hospital or healthcare system.

While Dr. Brown has had admitting privileges at two hospitals, he has only ever served on two committees (physician recruitment and nurse-physician liaison), neither of which involved providing input on hospital or health system policies or procedures. To be clear, Dr. Brown testified that he has never assisted, provided input, or been consulted by any hospital or health system in developing or implementing policies and procedure for clinical medical practice or oversight of clinical practices. He has never advised a hospital or health care system regarding patient safety policies, procedures, or practices.

### ii.   Licensed Clinical Social Worker (LCSW) Opinions

Dr. Brown is equally unqualified to testify regarding the standard of care applicable to licensed clinical social worker Syrrus Powell in her care and treatment of Nicole Borum. Dr. Brown has no knowledge, skill, experience, training, or education to qualify him to render opinions regarding the degree of care and skill of a reasonably prudent licensed clinical social worker in the same or similar circumstances. Dr. Brown conceded that he himself is not qualified or trained in providing psychotherapy or cognitive behavioral therapy as a LCSW would be. (p. 65.)

Dr. Brown had no knowledge whatsoever of the education, training, or practice of licensed clinical social workers. He does not oversee or supervise the mental health professions who provide psychotherapy to his patients, and he has never supervised or overseen the practice of an LCSW or psychotherapist. He did not know what training or education an LCSW had or how they are trained to conduct their therapy sessions, yet he opined that LCSW Powell's psychotherapy of

Nicole Borum and the way in which she conducted the therapy session was below the standard of care.

Appallingly, Dr. Brown denigrated licensed clinical social workers as an entire profession. He testified that he has "always thought that licensed clinical social workers were at the bottom of the totem pole, the least skilled, the least qualified, the least able to manage a patient with mental health issues." (p. 102-103.)   He referred to LCSWs as "lowly" and stated that he doesn't regard their skill set "as anything but miniscule." (p. 104.)

>   2.   **Dr. Finley Brown does not meet FRE 702's reliability standards to provide the challenged opinions.**

In addition to Dr. Brown's complete lack of qualifications to render the challenged opinions, Dr. Brown's opinions are not reliable under a *Daubert* analysis; the opinions are not the product of appropriately applied scientific principles, but rather are Dr. Brown's speculative musings and unsupported edicts.

>   A.   <u>The Reliability Inquiry</u>

Federal Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses, on the assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline. *Daubert*, 509 U.S. at 592.  To be reliable, testimony must be supported by appropriate validation ("good grounds"), based on what is known. *Id.* at 590.  FRE 702 only permits relevant testimony from a qualified witness if it is based upon (1) sufficient facts and data, (2) the product of reliable principles and methods, and (3) the witness applies the principles and methods reliably to the facts of the case.

Not everything a knowledgeable person says is "knowledge" under Rule 702, no more than everything a scientist says is "scientific." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665 (6th Cir. 2010). The court must determine whether the evidence is "genuinely scientific," as distinct from "speculation offered by a genuine scientist." *Id.* (*quoting Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996).  Where a party brings forth a theory crafted by a witness with no particular

expertise to craft it, it should be excluded. *EEOC v. Kaplan Higher Education Corp.*, 748 F.3d 749, 754 (6th Cir. 2014). A low threshold for making a decision may serve physicians well in the clinic, but not in the courtroom; and what medicine treats as a useful but untested hypothesis, the law should generally treat as inadmissible speculation. *Tamraz*, 620 F.3d at 673, 677.

      The first inquiry regarding the reliability of an expert's opinion is whether the expert employs the same "rigor" as an expert in the relevant field. *Kumho Tire*, 526 U.S. at 152. Pertinent considerations may be whether the expert has taken action to verify or substantiate the factual or scientific bases for his or her conclusions, and whether the expert has made any assumptions (and if so, whether they are reasonable). *Coffey v. Dowley Manufacturing, Inc.*, 187 F.Supp.2d 958, 973-74 (M.D. Tenn. 2002). The courtroom is not the place for scientific guesswork, even of the inspired sort. *Tamraz*, 620 F.3d at 671. No matter how good experts' credentials may be, they may not be permitted to speculate. *Id.*

      Second, a reliable expert opinion is the product of scientifically valid principles and methods; an expert's subjective belief or unsupported speculation will not satisfy Rule 702. *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997). If an expert uses and relies upon an analysis that is the product of "guesstimations" and speculation, once that house of cards is disproved as a foundation, the whole analysis collapses. *Coffey*, 187 F.Supp.2d at 976. Moreover, if an expert relies solely and primarily on experience, he or she must explain how that experience leads to the conclusion reached, and how that experience is reliably applied to the facts. *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005). A district court abuses its discretion by admitting testimony when those generalizations are too speculative and attenuated to support the expert's conclusion. *Barnette v. Grizzly Processing, LLC*, 2012 WL 293305 at *4 (E.D. Ky. Jan. 31, 2012). Similarly, testimony based on personal opinion, rather than science, is inadmissible. *Turpin v. Merrell Down Pharm., Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992).

      Importantly, expert opinions based upon noting more than the logical fallacy of *post hoc ergo propter hoc* ("after this, therefore because of this"), typically do not pass muster. *Rolen v.*

*Hansen Beverage Co.*, 193 Fed.Appx. 468 (6th Cir. 2006)(citations omitted). The court should not rely upon litigants to correct an expert's conclusions and reasoning by cross-examination when those conclusions and that reasoning fails to "close the analytical gap between the data and the opinion offered;" the *ipse dixit* of the expert alone is not sufficient. *Greenwell v. Boatright*, 184 F.3d 492, 502 (6th Cir. 1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). A glittery resumé and an impressive career do not necessarily open the door to federal court, and the court must determine whether the witness's testimony is sufficiently reliable to allow the jury to deem it "expert." *Coffey*, 187 F.Supp.2d at 975; *Barnette*, 2012 WL 293305 at *2.

Finally, the court must consider whether the expert applied scientifically valid principles and methodology to the facts of the case. *Coffey*, 187 F.Supp.2d at 977. With regard to scientific testimony, courts often consider whether the methodology used: (1) has been tested and subjected to peer review; (2) has a known error rate and whether standards controlling the technique's operation exist; and (3) is generally accepted within the relevant scientific community. *Barnette*, at *2. Where an expert simply forms a hypothesis based on his observations, but neither supports it through reference to existing scientific literature or conducts his own tests to prove its reliability, these methodological shortcomings favor exclusion. *Downs v. Perstorp Components, Inc.*, 26 Fed. Appx. 472 (6th Cir. 2002).

### B. The Unreliability of Dr. Brown's Opinions

#### i. Corporate Negligence Opinions

Dr. Brown's opinions regarding corporate negligence, i.e. Deaconess' failure to have systems, policies and procedures in place for monitoring and tracking patients at risk for suicide, is unreliable, as Dr. Brown failed to employ the same rigor as an expert in the relevant field. Not only does Dr. Brown not have any education, training, or experience in this area, but he did not undertake any research or investigation to verify of substantiate the bases of his conclusions.

Dr. Brown has never used an electronic medical record system in his practice, nor has he ever advised or consulted with a hospital or health care system regarding the implementation of

electronic medical records. He has never been involved in the implementation of systems for monitoring or tracking patients within a health care system. Deaconess Health System, including Deaconess Clinic and Deaconess Cross Pointe, utilizes the EPIC electronic medical record system.

In contrast, Dr. Brown's own practice regarding monitoring and tracking patients is illuminating. In his solo office practice, when Dr. Brown has a patient who is "not stable" or whose "life is at risk," he leaves their paper file on his desk and write a "little sticky note" on the outside, which he then sticks in his pocket at the end of the night to follow up with the patient if needed. (p. 67-68.) However, Dr. Brown explained that Nicole Borum would not have even qualified for this "system" because he would have referred her to a psychiatrist for treatment.

It is undeniably clear from the above testimony that Dr. Brown's opinions regarding the corporate negligence of Deaconess Clinic, Inc. and Deaconess Hospital, Inc./Deaconess Cross Pointe are nothing more than unsupported speculation as to what the standard of care might be, or in his opinion should be, for such health care systems. However, these opinions are not the result of scientifically valid principles and methods, and the methods employed by Dr. Brown do not result in reliable opinions. For these reasons, these opinions must be excluded.

### ii. Licensed Clinical Social Worker Opinions

As described above, Dr. Brown is woefully unqualified to testify regarding the standard of care applicable to licensed clinical social workers. But even further, Dr. Brown's opinions in this regard are unreliable, as he did not employ the same rigor as an expert in the relevant field.

In analyzing the reliability of an expert's opinion, courts look to whether the expert has taken action to verify or substantiate the factual or scientific bases for his or her conclusions, and whether the expert has made any assumptions (and if so, whether they are reasonable). *Coffey*, 187 F.Supp.2d at 973. Here, having no education or training as an LCSW and no knowledge or even interest in how LCSWs are trained, Dr. Brown did not do any research to educate himself as to the standard practice of licensed clinical social workers. (p. 108.) Instead, he expects LCSWs to follow the guidelines of the American Psychiatric Association, a group that LCSWs cannot even

become members of, as it is only available to MD psychiatrists. (p. 107.) Finally, Dr. Brown stated that LCSWs are held to the same standard of care as family medicine physicians and MD psychiatrists in their care of patients like Nicole Borum. (p. 108.) In other words, Dr. Brown testified that the standard of care – i.e., the scope of reasonable treatment – is the same for a provider who can prescribe medications and one who cannot.

These opinions are clearly unreliable and if true, would subject LCSWs to the unlawful practice of medicine. Dr. Brown is doing nothing more than throwing off-the-cuff criticisms at a mental health professional and mental health discipline of which he has no knowledge and took no interest in investigating their standards of care, standards of practice, their prevailing practice guidelines, or their education and training. Dr. Brown did not apply **any** principles or methods of science in arriving at his ad hoc conclusions, much less scientifically reliable ones.For these reasons, his opinions regarding the standard of care applicable to LCSW Syrrus Powell must be excluded.

### iii. Standard of Care Opinions other than Psychiatric Referral

An expert's guesswork or speculation is not permitted in the courtroom, even of the inspired sort. *Tamraz*, 620 F.3d at 671. An expert must reliably apply his knowledge, skill, training, experience, and scientific principles to the facts of the case in rendering his opinions; a glittery resumé and an impressive career are not enough. *Coffey*, 187 F.Supp.2d at 975; *Barnette*, 2012 WL 293305 at *2. In this case, Dr. Brown lacks even the glittery resume.

Dr. Brown opined that the standard of care required Dr. Smith to refer Nicole Borum to a psychiatrist instead of attempting to manage the care herself. To support that opinion, Dr. Brown testified that he refers every mental health patient to a psychiatrist other than those suffering "run-of-the-mill anxiety, depression." (p. 156.) Importantly, Dr. Brown testified that **he himself was not qualified to manage Nicole Borum's care**. (p. 189.)

If Dr. Brown is not qualified to manage Nicole Borum's mental health care; he would have referred her immediately to a psychiatrist; and in his opinion, Dr. Smith should have referred her to a psychiatrist, then Dr. Brown's remaining opinions regarding the appropriateness of the care that Dr. Smith <u>did</u> provide when she managed Nicole's mental health herself are unreliable. For example, Dr. Brown is critical of Dr. Smith's lack of involvement of Nicole's family in her treatment process; of Dr. Smith's monitoring of Nicole after her prescription of Lexapro, etc. However, he would not have undertaken this care - - for Nicole or any patient under the same or similar circumstances - - and he judged himself <u>unqualified</u> to render such care; therefore, his opinions regarding Dr. Smith's care of Nicole beyond the failure to refer her to a psychiatrist are beyond the scope of that which Dr. Brown can reliably apply scientific principles and experience. For those reasons, these opinions should be excluded.

### iv. Abandonment Opinion

Dr. Brown's opinion that Dr. Smith "abandoned" Nicole and that feelings of abandonment caused Nicole to commit suicide is the essence of the *post hoc ergo propter hoc* expert opinions that *Daubert* and its progeny seek to prevent.

Dr. Brown testified that the **only** evidence that Nicole experienced any "feelings of abandonment" from Dr. Smith when Nicole chose to move 100 miles to Bowling Green to finish college is her death by suicide. That is the definition of "after this, therefore because of this;" Nicole committed suicide after discontinuing care with Dr. Smith, therefore her suicide must have been because she discontinued that care. Dr. Brown has **no other evidence** or support for his opinion that Nicole experienced feelings of abandonment or hopelessness from discontinuing care with Dr. Smith when she moved to Bowling Green.

This lack of evidence and data cannot possibly form the basis for a reliable expert opinion under the extensive case law cited above. Dr. Brown cannot "close the analytical gap between the data and the opinion offered," because his conclusions resort only to unsupported speculation. A dogmatic and unproven statement - - the *ipse dixit* - - is not a sufficient foundation for a reliable

expert opinion. As Dr. Brown has no other basis for this opinion than the fact that Nicole died by suicide three weeks after moving back to Bowling Green, such a speculative opinion should be excluded as unreliable.

## V. CONCLUSION

For the reasons stated above, the Defendants respectfully ask that Dr. Brown's purported expert opinions be stricken from the trial of this matter.

PHILLIPS PARKER ORBERSON & ARNETT, PLC

/s/ Katherine T. Watts
KATHERINE T. WATTS
COLLEEN O. DAVIS
716 West Main Street, Suite 300
Louisville, Kentucky 40202
(502) 583-9900
kwatts@ppoalaw.com
cdavis@ppoalaw.com
cpotts@ppoalaw.com
dchurchman@ppoalaw.com
*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

It is hereby certified that a true and accurate copy of the foregoing was forwarded via email, this 30th day of October, 2020, to:

William D. Nefzger, Esq.
BAHE COOK CANTLEY & NEFZGER, PLC
1041 Goss Avenue
Louisville, Kentucky 40217
will@bccnlaw.com
*Co-Counsel for Plaintiff*
Samuel J. Bach, Esq.
Bach & Armstrong LLC
312 First Street
P.O. Box 881
Henderson, Kentucky 42419
Sam@bacharmstrong.com
*Co-Counsel for Plaintiff*

/s/Katherine T. Watts
Katherine T. Watts