**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              WESTERN DISTRICT OF KENTUCKY
 3                    AT OWENSBORO
 4              4:17-cv-00017-JHM-HBB
 5  CYNTHIA GAY BORUM, as Administratrix)
 6  of the Estate of Nicole Alyce Borum,)
 7       Plaintiff,              )
 8       vs.                     )
 9  JUNG WOOK KANG SMITH, MD, DEACONESS )
10  CLINIC, INC., DEACONESS HOSPITAL,  )
11  INC., DEACONESS HEALTH SYSTEM, INC.,)
12       Defendants.             )
13          The discovery deposition of
14  FINLEY BROWN, MD, taken in the above-entitled
15  cause, before Barbara Manning, on the 16th day
16  of October, 2019, at the hour of 2:12 p.m. at
17  200 North LaSalle Street, Suite 2900, Chicago,
18  Illinois, pursuant to notice.
19
20
21
22
23  Reported by:  Barbara Manning, CSR
24  License No.:  084-003277
```

**Page 2**

```
 1  APPEARANCES:
 2      THE ELLIS LAW GROUP, PLLC
 3      BY:  MR. ANTHONY P. ELLIS
 4      aellis@theellislawgroup.com
 5      517 W. Ormsby Avenue
 6      Louisville, Kentucky  40203
 7      (502) 255-1076
 8          Representing the Plaintiff;
 9
10      PHILLIPS PARKER ORBERSON ARNETT, PLC
11      BY:  MS. KATHERINE T. WATTS
12      kwatts@ppoalaw.com
13      716 West Main Street, Suite 300
14      Louisville, Kentucky  40202
15      (502) 583-9900
16          Representing the Defendants.
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1                    I N D E X
 2  WITNESS                      EXAMINATION
 3  FINLEY BROWN, MD
 4      BY MS. WATTS               4, 224
 5      BY MR. ELLIS                221
 6
 7
 8
 9
10
11              E X H I B I T S
12  NUMBER                   MARKED FOR ID
13  Defendants'
14      Exhibit No. 1              12
15      Exhibit No. 2              77
16      Exhibit No. 3              86
17      Exhibit No. 4              97
18      Exhibit No. 5             221
19
20
21
22
23
24
```

**Page 4**

```
 1                (Witness sworn)
 2              FINLEY BROWN, MD,
 3  called as a witness herein, having been first
 4  duly sworn, was examined and testified as
 5  follows:
 6                 EXAMINATION
 7  BY MS. WATTS:
 8      Q.  Good afternoon, Dr. Brown.
 9      A.  Good afternoon, ma'am.
10      Q.  My name is Katie Watts, and we just met
11  a moment ago off the record.  I represent
12  Dr. Jung Smith and Deaconess Health System and
13  its related entities in a lawsuit that has been
14  filed by the Estate of Nicole Borum.
15          I understand you have been named as an
16  expert in this lawsuit.  Is that your
17  understanding as well?
18      A.  Yes.
19      Q.  Okay.  You have been named as an expert
20  for the plaintiff; is that correct?
21      A.  True.
22      Q.  Okay.  And could you state your
23  business address for me?
24      A.  2511 North Kedzie Boulevard, Chicago,
```

EXHIBIT C

1   Illinois 60647.
2      Q.   All right.  And your occupation is a
3   family medicine physician?
4      A.   Right.  In Illinois I'm licensed as a
5   physician and surgeon, and I am board certified
6   in family practice in the specialty of general
7   practice.
8      Q.   Okay.  I read several of your prior
9   depositions.  My office just deposed you back in
10  May so I am not going to belabor a lot of your
11  education and things like that that I already
12  have on record.  Okay?
13     A.   Excellent.
14     Q.   Just briefly you went into private
15  practice in 1970; is that correct?
16     A.   That's true.
17     Q.   You have been in private practice since
18  that time?
19     A.   True.
20     Q.   Okay.  You did not complete a residency
21  in family practice, internal medicine or
22  anything else?
23     A.   That's true.
24     Q.   Okay.  All right.  You just told me a

5

1   too.  I contacted them and got a verification of
2   your board certification, and they have verified
3   that you are not board certified.
4           So that comports with your
5   understanding that as of December 31 of 2016,
6   your board certification has lapsed?
7      A.   That's correct.
8      Q.   Okay.  And was it the running of that
9   board certification that prompted you to seek
10  board certification through the National Board
11  of Physicians and Surgeons?
12     A.   You know what, about 10 or 15 years ago
13  the American Board had a ten-year option for
14  renewal.  I thought I was doing that ten-year
15  option and then I found out I wasn't.
16          Simultaneous with that over the last
17  five or ten years in family medicine, internal
18  medicine and just about every specialty there
19  has been a modest outcry against the
20  recertification process because there is a lot
21  of evidence saying that people who in the past
22  that are board certified don't really do a
23  better job than people who aren't board
24  certified.

7

1   moment ago that you're board certified.  What
2   board are you board certified by?
3      A.   Originally I was originally board
4   certified by the American Board of Family
5   Medicine in 1974 which was the first time I was
6   eligible to take it.
7           And then I was -- family practice
8   requires recertification every seven years so I
9   did that every seven years, '81, '88, '95, 2002,
10  2009.
11          I was due to be recertified by the
12  American Board somewhere between 2006 and 2009.
13  I got board certified by the National
14  Association of Physicians and Surgeons in 2016
15  and 2018.
16          I still have a chance to take the
17  American Board of Family Medicine exam.  I think
18  it's next month.  I'm not sure I am going to do
19  it.
20     Q.   Okay.  So you are not currently board
21  certified by the American Board of Family
22  Practice?
23     A.   I believe that's correct.
24     Q.   Okay.  And I believe that's correct,

6

1           Number two, the cost has gotten -- has
2   become increasingly painful for many physicians
3   and so there are a lot of people who are
4   questioning whether it makes sense to spend
5   $2,000 or $3,000 to get recertified by a group
6   that is more interested in sustaining their
7   board and their little fiefdom than in enhancing
8   the practice of medicine.
9           Early on board certification was just a
10  matter of personal pride.  I'd say in the last
11  10 or 20 years many hospitals require board
12  certification in order to get on staff.  Many
13  insurance companies can require it the same way.
14          The national board to a certain degree
15  in response to all of this ferment came into
16  existence in the last six or eight years.
17          To get recertified by them I think
18  requires 300 hours of continuing medical
19  education.
20          As much as I think that the ABFM -- for
21  all those reasons I protected myself with board
22  certification in 2016 and '18.  I really have
23  been thinking that I would take the examination
24  this year, but probably I'm not going to do it.

**EXHIBIT C**

8



1      Q.   Okay.  I want to break that down.  That
2  was a long-winded response.  Please forgive me.
3  I want to break that down a little bit.
4      A.   No problem.
5      Q.   The American Board of Family Practice
6  is the preeminent family medicine board in the
7  United States?
8      A.   I disagree.
9      Q.   Okay.
10     A.   I think anybody in any other board
11 would say we are the preeminent.
12     Q.   Okay.  Are more family medicine
13 practitioners board licensed or board certified
14 by the American Board of Family Practice than
15 any other board?
16     A.   My guess is probably, but I don't know
17 that.
18     Q.   Okay.  The American Board of Family
19 Practice is the board that you were certified
20 under for 30 plus years?
21     A.   True.
22     Q.   Okay.  And you recertified last in
23 2009, correct?
24     A.   I did.

9

1      A.   True.
2      MR. ELLIS:  Objection.  You can answer.
3  Okay.
4  BY MS. WATTS:
5      Q.   Instead you chose to pursue
6  certification through a different agency, the
7  National Board of Physicians and Surgeons?
8      A.   True.
9      Q.   Okay.  And that different agency does
10 not require a test, an examination?
11     A.   Correct.
12     Q.   All right.  The National Board of
13 Physicians and Surgeons requires that you pay a
14 fee and meet a continuing medical education
15 requirement?
16     A.   Correct.
17     Q.   And their continuing medical education
18 requirement is the same continuing medical
19 education requirement as the American Board of
20 Family Practice?
21     A.   The National Board is.
22     Q.   Yes.  That was my question.
23     THE WITNESS:  Would you read that?
24          (Record read)

11

1      Q.   And at that time you did not pass the
2  certification test on your first try?
3      A.   For the first time that's true.
4      Q.   Okay.  You took it again and then
5  passed?
6      A.   That's true.
7      Q.   All right.  So you had the opportunity
8  to take that examination again to recertify in
9  2016 and you opted not to?
10     A.   I would say right up til 2016 I thought
11 I was meeting the requirements so I could delay
12 it to 2019.  I found out otherwise.  And so I
13 took the other exam.
14     Q.   So the answer to my question is, yes,
15 you had an opportunity in 2016 to recertify by
16 taking the American Board of Family Practice
17 exam, and you chose not to?
18     A.   I prefer the way I said it actually.
19     Q.   Yeah.  The way you said it didn't
20 answer my question.
21     A.   I thought it did.
22     Q.   It didn't.  You had an opportunity in
23 2016 to take the American Board of Family
24 Practice exam to recertify, and you did not?

10

1      THE WITNESS:  I thought that was true.
2  Apparently so.
3  BY MS. WATTS:
4      Q.   Okay.  So the only difference between
5  the two boards in terms of what it takes to
6  become board certified is an examination for the
7  American Board of Family Practice?
8      A.   And cost.  No question.
9      Q.   And cost?
10     A.   Correct.
11     Q.   Okay.  Have you known since December of
12 2016 that you were not board certified by the
13 American Board of Family Practice?
14     A.   Yes.
15     Q.   Have you testified since that time that
16 you were board certified by the American Board
17 of Family Practice?
18     A.   I think -- I don't think I did.  If I
19 so testified, I wasn't correct.
20     Q.   Okay.  I am going to make this
21 verification letter Exhibit 1.
22          (Whereupon, Exhibit
23          No. 1 was marked for
24          identification.)

**EXHIBIT C** 12

BY MS. WATTS:

Q. As we sit here today, it's not your intention to take the exam next month for the American Board of Family Medicine?

A. Correct.

Q. Okay. You are not trained in psychiatry; is that correct?

A. Well, I have some -- I have some psychiatry training, but I'm not a psychiatrist -- I am not a board certified psychiatrist. I don't have a psychiatric residency.

But like all family physicians I get involved in the emotional health of my patients so I have some basic primitive psychiatry like all family doctors.

Q. Okay. The only formal education that you received in the treatment of mental health would have been what you learned during medical school?

A. No, incorrect. I have taken countless continuing medical education courses. I read tons of journals. Many of my patients see psychiatrists, have mental health problems.

13

Many of my colleagues -- I have some colleagues who are psychiatrists who while managing my patients educate me to some degree on psychiatry. I refer to a couple of top psychiatrists at Northwestern who do the same for me.

Q. Okay. And that's why my question was the only formal education that you have received --

A. Well, certainly if I take --

Q. CME?

A. -- CME or a weeklong course or do a CMA course on the Internet, there is some psychiatry on there.

Q. Okay. Do you remember the last time you took a CME on mental health?

A. No.

Q. Okay. Has it been in the last five years?

A. Formal?

Q. A CME course.

A. That had some psychiatry on it?

Q. Yeah. Or was geared towards mental health care.

14

A. I would say I don't recall.

Q. Do you recall a timeframe when the last CME that you can remember that you took that had a mental health component to it may have been?

A. Well, you know, the journals that I read often have articles that have components or are all mental health related. Sometimes they have questions at the end.

Usually I don't answer those questions or I don't have time to do that, but I get a fair exposure for a family doctor on mental health issues including anxiety, depression and the risk of suicide.

Q. Yes, sir. My question was as to CME's. Do you remember a timeframe of the last time you went to a CME or had a CME that had a mental health component to it?

A. I don't.

Q. Okay. All right. Academic appointments, you don't hold -- you don't currently hold any academic appointments; is that correct?

A. That's correct.

Q. Your CV lists things like instructor in

15

clinical family practice at Northwestern Medical School, 1987 to present, and Rush Medical College, but that's not current?

A. You know, sometime in the last couple, three, four years my title of instructor in clinical family practice at Northwestern disappeared, and nobody told me.

Q. Okay.

A. And I am pretty sure if I asked them to restate it, they would, but I might be wrong there.

Q. Okay. So you no longer hold that title?

A. I have no -- as we stated, I am no longer an instructor in clinical family practice.

Q. All right. When was the last time that you acted as an instructor in clinical family practice?

A. Well, I admit to the family practice teaching service at St. Joe's Hospital and Illinois Masonic Medical Center where my patients are managed by residents, family practice residents and medical students under my

16

**EXHIBIT C**

1  direct supervision and under the full-time --
2  and under the supervision of full-time faculty,
3  family practice faculty, of those two hospitals.
4     Q.   Okay.  And that currently happens?
5     A.   Yes.
6     Q.   All right.
7     A.   Mostly I currently admit my patients to
8  St. Joseph Hospital, now known as Amita
9  St. Joseph Hospital.
10    Q.   Okay.  So when you have a patient who
11 is admitted to Amita St. Joseph Hospital, you
12 personally round on that patient?
13    A.   I do.
14    Q.   And when you request to round on that
15 patient, is there sometimes, always or never a
16 resident who rounds with you?
17    A.   I would say sometimes is the answer.
18    Q.   Okay.  Now, when you aren't there
19 physically at the hospital, residents and other
20 attendings are also rounding on your patients;
21 is that correct?
22    A.   That's correct.  And then of course
23 when the residents do their history and physical
24 examination on the patient, they must call me.

17

1     Q.   Okay.  So if something happens to your
2  patient say in the middle of the night, the
3  hospitalist may see them?
4     A.   The residents see them.
5     Q.   The residents see them?
6     A.   Right.
7     Q.   But there are --
8     A.   I don't think I am on -- when I admit
9  the patient, I don't think I am on the
10 hospitalist service, but I have family practice
11 resident coverage which is nice.
12    Q.   Okay.  I understand.  Okay.  All right.
13 Any academic appointments that you have ever
14 held have all been voluntary and unpaid?
15    A.   Actually do you have a copy of my CV?
16    Q.   I do.
17    A.   Tremendous.  So when I ran the family
18 practice courses for the Cook County Graduate
19 School of Medicine, that was paid.
20    Q.   That was back in the '70's?
21    A.   That was actually -- I will tell you
22 exactly here.  Coordinator all family practice
23 courses for the National Center for Advanced
24 Medical Education formerly the Cook County

19

1  Graduate School of Medicine, 1986 to 2002.
2     Q.   Okay.
3     A.   And that was paid.
4     Q.   All right.  And tell me what you did in
5  that role?
6     A.   What I did is I was asked to try to
7  shape up the moribund family practice offering
8  that the Cook County Graduates School of
9  Medicine renamed the National Center for
10 Advanced Medical Education had.  I agreed to do
11 that.
12         So I ran a course, a two-week course,
13 specialty review and family practice.  I ran a
14 four-and-a-half day course advances in family
15 medicine, and I ran a two-and-a-half day course
16 medical and surgical procedures for the primary
17 care physician.
18    Q.   Okay.  All right.  Since -- and that
19 ended in 2002?
20    A.   That's true.
21    Q.   And you were doing the didactic
22 teaching?
23    A.   No.  I was the -- I did give some
24 lectures, but mostly I recruited -- I picked the

20

1         When there is a change in the patient's
2  condition, they call me.  If we haven't
3  interfaced when I am ducking in and out of the
4  hospital or they are on their coffee break or
5  whatever they are doing, mostly they will call
6  me or I will call them to see what's going on.
7  They always of course call me on the day of
8  discharge.
9     Q.   Okay.  And this is -- and this process
10 that you are describing is only as to your
11 patients who come from your practice that you
12 admit to the hospital?
13    A.   Correct.  I don't -- I don't take ER
14 call.
15    Q.   You don't have a hospitalist shift or
16 anything like that?
17    A.   No.  I'm not a hospitalist.  We have
18 hospitalists at both of my hospitals.  I have
19 used the hospitalist once so far.
20         So if my patients go to the hospital,
21 they know I will be there.
22    Q.   Okay.  And you see your patients in the
23 hospital once a day?
24    A.   I usually do.

18

EXHIBIT C

1  core subjects, recruited faculty from the five
2  medical schools here in Chicago, mostly
3  assistant professors and up.
4        I proctored those courses and sort of
5  nurtured the process so that they were fairly
6  successful in an environment where continuing
7  medical education was slowly going out of
8  business, and that's what happened at the
9  national center in 2002.
10   Q.   Okay.  So you were more in an
11  administrative role overseeing the didactic
12  teaching that was going on?
13   A.   No.  I think I would stand by the way I
14  said it which is I picked up the subject
15  matter, hired the faculty, told them basically
16  that these were internists and family doctors
17  that mostly came to our course, that they were
18  seasoned pros, that they didn't need to hear
19  about their research or their special projects.
20        And I told them exactly how I wanted
21  their hour or two-hour lecture to go.  So it was
22  a hands-on job.
23   Q.   Okay.  All right.  Now, you told me
24  about St. Joe's.  You joined the staff at

21

1  that describes the mental health behavioral
2  science training that their family medicine
3  residents receive.
4        And it describes, "Behavioral sciences
5  is longitudinally integrated throughout the
6  residency including a one-month intensive
7  behavioral and community medicine rotation.
8  This rotation is dedicated to skill building and
9  the assessment and treatment of mental health
10  and substance abuse issues, crisis intervention
11  and outpatient psychotherapy with children,
12  adolescents, adults and families."
13        Are you involved at all in that
14  behavioral and community medicine rotation of
15  those residents?
16   A.   Only indirectly.
17   Q.   How are you indirectly involved in
18  that?
19   A.   Well, many of my patients have
20  emotional issues, psychiatric issues which the
21  residents and I address and in our discussions
22  and communications we deal with that.
23        I would say that's an excellent bit of
24  creative writing which I am going to if I get a

23

1  St. Joe's residency, family medicine residency,
2  in 1987; is that correct?
3   A.   Actually I got on the staff at
4  St. Joe's Hospital in 1987 and then --
5   Q.   And you agreed to admit patients to the
6  teaching service there?
7   A.   To the teaching service.
8   Q.   Which automatically gave you a clinical
9  instructor and family practice title?
10   A.   Beautifully stated.
11   Q.   It came from you.  Now St. Joe's --
12   A.   I said that in one of my previous
13  testimonies?
14   Q.   You did.  You are going to hear a lot
15  of your words today.
16   A.   I bet I will.  You will probably hear
17  the words you have already read about today as
18  well.
19   Q.   The family practice residency at
20  St. Joe's is a free-standing residency program?
21   A.   True.
22   Q.   Okay.  And, let's see, I did a little
23  looking at St. Joe's residency program, and they
24  have -- they have a little blurb on the web site

22

1  chance applaud the director of our program,
2  Louis Garcia.  Whoever did that I think did a
3  good job.
4   Q.   Were you aware that they have a
5  one-month intensive rotation on behavioral and
6  community medicine?
7   A.   I am glad to hear they do.
8   Q.   You weren't previously aware of that?
9   A.   I don't think I could break down the
10  residency and say what they spend their time
11  doing.
12   Q.   Okay.  As far as when they are on their
13  one-month rotation in that intensive behavioral
14  and community medicine, that's not one month
15  following Dr. Brown around to learn behavioral
16  and community medicine, correct?
17   A.   Very true.  We have got a number of
18  psychiatrists.  We have got a lot of psychiatric
19  unit, open psych unit at St. Joe's.  So they --
20  I imagine their experience is related to them
21  somehow.
22   Q.   Okay.  It also states residents
23  participate as co-therapists in counseling
24  clinic where they become adept in providing

EXHIBIT C   24



Finley Brown, MD 10/16/2019

1  evidence-based cognitive behavioral therapy
2  along with motivational interviewing?
3      A.  That sounds be scary to me.
4      Q.  Okay.  So you are not involved with the
5  counseling clinic and -- I was a psychology
6  major in college.  It sounds interesting to me.
7      You weren't involved in the counseling,
8  clinic or evidence-based cognitive behavioral
9  therapy?
10     A.  No.
11     Q.  You don't provide that type of
12  education to the residents at St. Joe?
13     A.  True.
14     Q.  They work in our Harborview Recovery
15  Center practicing addiction medicine.  That's
16  not something you provide?
17     A.  Harborview is one of the city's best
18  alcohol and drug treatment inpatient facilities.
19     Q.  Okay.  And you are not involved in --
20     A.  Well, I have patients occasionally
21  there.  I refer a fair number of patients to the
22  director of that program.
23     Q.  Okay.  And you're not involved in the
24  training of the residents when they are working

25

1  in the Harborview Recovery Center practicing
2  addiction medicine?
3      A.  True.
4      Q.  Okay.  Additionally they participate in
5  our intensive outpatient psychiatry program, go
6  on home visits with faculty and learn crisis
7  intervention skills with the crisis psych team
8  in the Amita Health St. Joseph Hospital
9  emergency department.
10     Are you involved with any of the
11  residents' training in those programs?
12     A.  No.
13     Q.  So it sounds from that paragraph to me
14  like the residents in this family residency
15  program at St. Joe's receive a -- I would say a
16  focused attention towards mental health training
17  and that that -- those focused trainings are
18  generally not something you are involved in.
19     Any training you would be involved in
20  as far as mental health would be in relation to
21  patients that you have in the hospital that may
22  arise when residents are with you?
23     A.  Correct me if I am wrong, but I think
24  you said this is a one-month session that they

26

1  get, and that's good to hear.
2      That makes -- hardly qualifies them to
3  be responsible for psychotherapy or to be
4  psychotherapists.  All family doctors to a
5  certain degree practice some level -- some
6  primitive level of psychotherapy trying to do
7  the best for their patients.  But knowing a
8  patient has a serious problem, they refer them
9  to a psychiatrist.
10     Q.  Okay.  Having not completed a family
11  medicine residency yourself you have not had
12  these types of intensive trainings?
13     A.  I think I have had more intensive
14  training.  Actually when I had finished my
15  internship, there were very few family practice
16  residency programs.
17     It was my intention to go out and
18  practice medicine for two or three years and
19  then go on to do specialty work.
20     Q.  Ophthalmology?
21     A.  Yeah.  And what happened is I love
22  being a real doctor, a Marcus Welby if you will,
23  and then I decided not to do that, to stay as a
24  primary care physician.

27

1      I didn't just spend my time practicing
2  medicine, but I spent my time educating myself,
3  getting better, getting skilled as a primary
4  care physician.
5      So I would say the training and
6  experience I have had over the last 49 years
7  practicing medicine has been enormous,
8  substantial, way beyond what I would have gotten
9  in a residency.
10     Just like what happens to our residents
11  when they go out and practice and they go oh, my
12  gosh, I finished residency, but I don't know
13  much about this, this, this and that.
14     But they acquire those skills or they
15  100 percent refer patients who have problems in
16  an area where they don't have any skills to a
17  specialist who knows what they are doing.
18     Q.  All right.  I am going to go back to my
19  question.  Having not completed a family
20  medicine residency you did not get the intensive
21  training in behavioral and community medicine
22  such as those residents at St. Joe's receive?
23     A.  I disagree.
24     Q.  Okay.  What intensive training and

**EXHIBIT C**  28



1  behavioral and community medicine did you
2  receive?
3     A.  Well, I think in that long-winded
4  answer that didn't apparently answer your
5  question what I said is that interfacing with
6  internists, pediatricians, psychologist,
7  psychiatrists, licensed clinical social workers,
8  managing my patients I acquired more skill,
9  training and experience than any of these
10  residents who spend one month in the kind of
11  training program this tome from St. Joseph's
12  describes.
13     So I would say my skill, training and
14  experience, my knowledge, my savoir faire wildly
15  exceeds any family practice resident who
16  finishes his three-year program and goes out
17  into practice.
18     Q.  When you were three years into your
19  practice, you would not have had the same level
20  of skill and knowledge as to mental health care
21  as those who have completed St. Joe's family
22  medicine residency?
23     MR. ELLIS:  Objection.  You can answer.
24     THE WITNESS:  Well, you know, I know our

29

1  familiar practice residents at St. Joe's.  I
2  know the quality of individuals that are there.
3  I know what their skill set is, and I would
4  disagree with you and so I would disagree with
5  you.
6  BY MS. WATTS:
7     Q.  They are not very good?
8     A.  So, comma.  Can we go off the record.
9     Q.  They are not very good?
10     A.  No comment.
11     Q.  I will stay in Louisville for my health
12  care.  As I cross things off, that's good.  All
13  right.
14         Doctor, what professional journals do
15  you subscribe to?
16     A.  I get the AFP, the family practice
17  thing.  I get the National Lipid Association's
18  regular journals.  I get I would say six, seven
19  or eight throw-away journals.
20         I used to subscribe to the New England
21  Journal of Medicine.  I no longer subscribe to
22  it.  I read it occasionally.  I get the AMA
23  journal which comes out two or three times a
24  month, JAMA.

30

1     Q.  JAMA, that's the AMA?
2     A.  That's completes my answer.
3     Q.  Okay.  So the AFP journal, the JAMA and
4  the National Lipid Association Journal, those
5  are the journals that you routinely review?
6     A.  I routinely get a bunch of other ones.
7  I get a couple of other family practice journals
8  whose names I've forgotten that often have some
9  good articles.  I read those, look through every
10  one of them.
11     Q.  You don't remember what they are?
12     A.  I get a couple dermatologic journals,
13  Cutis, C-u-t-i-s.  That's the best I can do from
14  memory.
15     Q.  Do you subscribe to any psychiatric or
16  psychological journals?
17     A.  I do not.
18     Q.  Do you routinely review any psychiatric
19  or psychological journals.
20     A.  I would say no.
21     Q.  So certainly you would agree that it's
22  not standard of care for a family practice
23  doctor to routinely review psychiatric or
24  psychological journals?

31

1     A.  If a physician takes on the care of a
2  patient where the standard of care is set by
3  the APA like if a physician gets involved in
4  quarterbacking the care and treatment of a
5  patient who is trying to commit suicide and was
6  unsuccessful and has anxiety, depression,
7  occasional suicidal ideation and if that
8  doctor's managing that patient and where the
9  requirement is to follow APA guidelines, I think
10  that physician needs to be up-to-date to some
11  degree on psychology and psychiatry.
12         If that patient is quick to call in a
13  psychiatric consultation, understands his or her
14  limitations and knows and recognizes a patient
15  who has attempted suicide and has spent four or
16  five days in the hospital and comes home off
17  medications, that that patient ought to see a
18  psychiatrist as soon as possible and get in
19  counseling either with the psychiatrist or a PhD
20  psychologist or really skilled other
21  psychotherapist.
22         If that physician understands that,
23  then I would say his requirement for keeping up
24  with the psychiatric journals, with the

EXHIBIT C  32

1 psychiatric literature, that requirement isn't
2 very high.
3        On the other hand, if he goes where he
4 shouldn't go in my opinion, if he takes on a job
5 that he is not qualified to take on, then he
6 better be somewhat up-to-date on the psychiatric
7 literature so that the care and treatment he
8 provides a patient will meet the standard of
9 care.
10    Q.   Okay.  Are family medicine residents
11 taught how to evaluate patients with depression,
12 anxiety, prior suicide attempts and possible
13 suicide evaluation -- ideation?
14    A.   Yeah, I'm sure they are.
15    Q.   So to you whether the standard of care
16 requires a primary -- a family medicine
17 physician to routinely review psychiatric or
18 psychological journals depends upon whatever
19 patient that doctor is seeing?
20    A.   No.  I think it depends on whether that
21 family physician knows that a patient who has
22 attempted to commit suicide and still has
23 suicidal ideation needs a sophisticated skill,
24 training and experience of a psychiatrist.

33

1        I believe the family physician
2 should -- knows or should know that the
3 appropriate referral of such a patient is to a
4 psychiatrist.
5        If he doesn't know that but he wants to
6 manage such a patient, then he needs to get his
7 hands dirty, do the hard work, review the
8 literature.
9        I brought with me a couple of articles,
10 one from the AFP magazine or journal.  Another
11 one on rural health that describes how you
12 manage a patient who has previously attempted
13 suicide who still has suicidal ideation, society
14 problems and whatever other mental health
15 problems they have.
16        And it's perfectly appropriate for such
17 a family physician to acquire the skill and do
18 the hard work and do the documentation that
19 shows that he or she has asked the questions,
20 got the answers and proceeds in a manner that
21 meets APA guidelines.
22        If they do that, I have no problem with
23 it.  If they don't want to do that, if they
24 don't have the time, then they need to refer

34

1 that patient to a psychiatrist.
2        I would say in the case that we are
3 here about, Dr. Smith had all of the time in the
4 world.  She was seeing one, two, three patients
5 a day.  Most of them had mental health problems
6 as far as I could tell.
7        She had the time to do the work if
8 she -- if she wanted to.  I see no evidence that
9 she did.  Her record suggests that she didn't
10 understand what APA guidelines were and I fault
11 her for that.
12    Q.   Okay.  We might miss our flight if the
13 answers keep going like this.  I promise you we
14 are going to get to Dr. Smith's care.  All
15 right.  I will move on to the next question.
16    A.   Bless you.
17    Q.   Are there any family medicine textbooks
18 or publications that you consider to be
19 authoritative in the practice of family
20 medicine?
21    A.   You know, I love a lot of medicine
22 textbooks.  Harrison's --
23    Q.   Harrison's, Cecil's Textbook of
24 Medicine.  Cecil's is a particular favorite of

35

1 yours, isn't it?
2    A.   It is.  How insightful of you.  What I
3 would say is that the reputation of both of
4 those journals, and there is some other great --
5 I am sorry, textbooks.
6        And there are certainly other great
7 family medicine textbooks that are out there.
8 But my habit over the last 49 years is to never
9 say anything authoritative unless I read it.
10 And then I can tell if I think it's
11 authoritative or not.
12    Q.   Okay.  So you are authoritative?
13    A.   I am authoritative, yes, ma'am.
14    Q.   All right.  How do you become
15 authoritative without reading authoritative
16 texts?
17    A.   Well, that's a great question.  Is
18 there any such thing as absolute knowledge?  I
19 believe there is.
20    Q.   And you hold it, right?
21    A.   Is there such a thing as absolute
22 truth?  Yes.  Is the practice of medicine
23 scientifically based?  100 percent.
24        So I know what I know, and I know what

36

**EXHIBIT C**



1  I don't know.  And if I don't know, I would say,
2  gosh, I don't.
3       But I can evaluate a textbook article
4  and tell you if I think it's authoritative or
5  not.  Somebody else may say it's not
6  authoritative, and then it would be for a jury
7  to decide.
8       Q.  Okay.  Your primary care practice has
9  never been owned or affiliated with any hospital
10 or health care system; is that correct?
11      A.  Correct.
12      Q.  All right.  You don't have a hospital
13 or health care system that provides resources to
14 your practice?
15      A.  Sadly, no.
16      Q.  Okay.
17      A.  You would think they would considering
18 I admit all of my patients to the hospitals.
19 But hospitals don't get that so I am okay with
20 that.
21      Q.  Have you ever been offered to be bought
22 by a health system?
23      A.  I believe I have, and I declined.
24      Q.  Okay.  Your CV lists two medical staff

37

1  affiliations at Advocate, Illinois Masonic
2  Medical Center and Amita St. Joseph Hospital.
3  Does that just mean you have admitting
4  privileges there?
5       A.  Generally, yes.  I'm on the staff.  I
6  have full admitting privileges at St. Joe's.  At
7  Illinois Masonic I have limited admitting
8  privileges to my knowledge.
9       Q.  What are limited admitting privileges?
10      A.  I am invited to use the chairman of
11 family medicine at Illinois Masonic and admit my
12 patients to his service or use the hospitalist
13 service.
14      Q.  Okay.  When was the last time you were
15 recredentialed at St. Joe's?
16      A.  I think it's every three years or so.
17      Q.  Do they know that you are not board
18 certified by the American Board of Family
19 Practice?
20      A.  I am pretty sure they do.  They
21 probably did the same thing you did.
22      Q.  Do you currently have patients admitted
23 to St. Joe?
24      A.  Currently I do not have a patient at

38

1  St. Joe's.
2       Q.  When was the last time you had a
3  patient admitted to St. Joe's?
4       A.  A week ago maybe.  Be 50 percent of the
5  time I have somebody in the house.  About
6  50 percent I don't.  This last week I have a
7  lady in the hospital, the old Resurrection
8  Hospital.
9       She got sick.  The ambulance came, and
10 they took her there.  And her family are trying
11 to get her out of there and over to St. Joe's,
12 but they haven't been able to do that.  She is
13 stuck in the intensive care unit.
14      Q.  Okay.  When was the last time you had
15 more than one patient in the hospital?
16      A.  Oh, it's frequent.  I would say
17 currently it's zero to four.  It's pretty
18 uncommon for me to have three or four.
19      Sometimes I will have one or two
20 patients.  Mostly it's I would say one patient
21 at a time.
22      Q.  And that's --
23      A.  Which makes it painful to run over to
24 the hospital for one patient as you can

39

1  imagine.
2       Q.  That's only about 50 percent of the
3  time you have anybody?
4       A.  Yes.
5       Q.  Got it.  Do you serve on any committees
6  at either hospital?
7       A.  Currently, no.
8       Q.  When was the last time you served on a
9  committee?
10      A.  Probably five plus years ago.
11      Q.  Have you ever had responsibility for
12 drafting policies and procedures for any
13 hospital?
14      A.  I have been on committees, physician
15 recruitment committee, nurse physician liaison
16 committee.  At St. Joe's when I first got on
17 staff, I was advising administration on
18 physician recruitment.
19      So I think I had some input on policies
20 to see if they could get more doctors and maybe
21 more patients to the hospital.
22      Q.  Okay.  How about policies and
23 procedures for clinical practice?
24      A.  No, I don't think I have ever done

EXHIBIT C  40

1  that.

2      Q.   Okay.  Have you ever been employed by

3  or affiliated with a health system that has

4  outpatient primary care offices?

5      A.   No, I have never -- you know, I have

6  never -- I have always --

7      Q.   Always wanted to, never have been?

8      A.   I never wanted to.  You know, if you

9  are -- I think if you are in solo private

10  practice for a while, the thought of going to

11  work for somebody is intolerable.

12          If you are -- I imagine the same as if

13  you're a lawyer and there are certain advantages

14  to being in a group.  But there is a lot of

15  disadvantages.

16          And I think most of the guys that are

17  in solo or a small group practice wouldn't enjoy

18  being in a big institution.

19      Q.   Have you ever advised a health care

20  system regarding patient safety policies and

21  practices?

22      A.   No.  I don't think anybody needs me to

23  advise them on that.  Possibly, yes, some

24  institutions do.  Mine don't.

41

1      Q.   Okay.

2      A.   I would say Deaconess could use my

3  services.

4      Q.   Right.  You have never served in that

5  role?

6      A.   I have not.

7      Q.   For any health system?

8      A.   That's true.

9      Q.   Have you ever advised or consulted with

10  a health care system regarding implementation of

11  electronic medical records?

12      A.   No.

13      Q.   Do you use electronic medical records?

14      A.   I don't.  Actually I don't believe

15  in --

16      Q.   You don't believe in them?

17      A.   In electronic medical records for a

18  solo practicing physician makes no practical

19  sense, economic sense.  For big groups, part of

20  the systems, I think it works.

21      Q.   Okay.  So you use paper and pen?

22      A.   Yes.  And we have never --

23      Q.   And a fax machine?

24      A.   And we have never had -- actually we

42

1  scan too now.

2      Q.   Scan and email?

3      A.   Yeah.

4      Q.   All right.  Do you have a fax machine

5  then?

6      A.   Yeah, we do, and I know how to use that

7  one.

8      Q.   Have you ever worked in any type of

9  administrative capacity related to the

10  implementation of systems for monitoring and

11  tracking patients within a health care system?

12      A.   I have never been asked to do that, no.

13      Q.   Okay.  You are entirely unpublished?

14      A.   I am.

15      Q.   All right.  All right.  Let's talk

16  about your practice now.  You are a one-man

17  show?

18      A.   I am.

19      Q.   I think you have an assistant, right,

20  or --

21      A.   I have.

22      Q.   Kind of a one-woman show?

23      A.   Yes.  She keeps it going.  She is a

24  receptionist, biller, puts my patients in the

43

1  room, takes their pulse and temperature and then

2  turns me loose.

3      Q.   Does she have a medical background?

4      A.   Yes.  She has worked in medical offices

5  for 25 years, but she is not a --

6      Q.   She is not an MA?

7      A.   She is not a medical assistant or an

8  LPN or RN, no.

9      Q.   You have been --

10      A.   But she is a mother of two so she is

11  pretty savvy.

12      Q.   I'm a mother of two also so you can

13  tell how savvy I am.

14      A.   I bet you're pretty savvy, too.

15      MR. ELLIS:  She is.  Don't let her fool you.

16      THE WITNESS:  I know that.

17  BY MS. WATTS:

18      Q.   You have been on your own since 1985.

19  Prior to that you worked --

20      A.   I have been in solo practice since

21  1985, yes.

22      Q.   Okay.  There is no entity or

23  organization that oversees your practice of

24  medicine?

44

EXHIBIT C

Finley Brown, MD 10/16/2019

1    A.   No.
2    Q.   There is no --
3    A.   That's true.
4    Q.   There's no physician or administrator
5  who oversees your practice of medicine?
6    A.   I am the physician, and I am the
7  administrator.
8    Q.   All right.  No one performs chart
9  reviews of your patients or peer reviews?
10    A.   Yeah.  I know, the ISME, the Illinois
11  State Medical Insurance Exchange who is my
12  malpractice provider did that in the last 12
13  months, came out and can did a fairly
14  substantial chart review.
15    Q.   What did they find?
16    A.   They were wildly excited about how high
17  quality my records were.  I think an insurance
18  company -- I think one of the insurance
19  companies did that, too.  They went bananas
20  also.
21    Q.   All right.
22    A.   That would be the medical expression.
23    Q.   Currently you are 77 years old?
24    A.   Am I?  Yes, I am.
                                          45

1    Q.   Are you still maintaining a full-time
2  office practice?
3    A.   I am.
4    Q.   All right.
5    A.   My office is open 9:00 to 5:30 Monday,
6  Tuesday, Wednesday, Thursday and Friday.
7    Q.   Which begs the question when do you
8  golf?
9    A.   I am one of a huge number of
10  individuals that find that work interferes with
11  my golf game, probably like your husband,
12  probably every single person.
13       So working is a lot of fun.  I have a
14  lot of fun doing what I am doing, but I get to
15  the golf course.  I sneak out every once in a
16  while.
17    Q.   About how many rounds a month do you
18  play?
19    A.   I probably do something at least twice
20  a week which is why my handicap is 5.9 instead
21  of 2.9.
22    Q.   I got somebody who could give you
23  lessons.
24    A.   I know.  I am excited about that.
                                          46

1    Q.   All right.  In around 2015 you
2  transitioned your practice to a concierge or a
3  boutique type practice?
4    A.   True.
5    Q.   And that means that your patients pay
6  you a flat fee per year to provide all of their
7  primary care to them?
8    A.   Actually what it means is that they pay
9  a membership fee to join my practice, and then
10  they have 24/7 access to me.  They have my
11  cellphone number and my home number, same day
12  appointments, unlimited time and annual
13  physical.
14       They can see me every single day or
15  twice a day if they want.  I charge $50 for an
16  office visit.  I will bill their insurance if
17  their insurance pays me at least $50.  They
18  never have to pay me.
19       Let's say they have a deductible
20  insurance, and they would pay me $50 for the
21  office visit.  If they pay that day, it's $40,
22  20 percent off.
23    Q.   What's the membership fee?
24    A.   If you are under 46 it's $1,600 a year.
                                          47

1  If you are 46 and over it's $2,000 a year.  And
2  if a husband and wife join, there is a ten
3  percent discount.
4    Q.   It's kind of like going to Costco?
5    A.   Sadly true.  According to your regular
6  doctor that's owned by a big medical center,
7  it's sort of like going to Costco, too.  Only
8  you can spend all the time you want at Costco.
9  At your regular doctor you're lucky to get 15
10  minutes.  Sad but true.
11    Q.   All right.  So if I read all your prior
12  depositions correctly, even prior to
13  transitioning to this concierge type practice
14  you generally maintained a low volume practice?
15    A.   Yeah.  I had a concierge practice
16  basically, but I never charged for it.  And the
17  environment is so difficult for internists and
18  family practice doctors.
19       In Chicago more than 80 percent of
20  internists and family practice doctors are
21  employed.  They have had to sell their practice.
22  And when they are employed --
23    Q.   Or go concierge.
24    A.   Yeah.  So at Northwestern Memorial
                                          48

EXHIBIT C

1  Hospital there are 24 concierge internists, and
2  there are 20 internists who are still in private
3  practice.
4       And I talked to a top guy over there in
5  the last year-and-a-half, and I said what do you
6  think Northwestern's goal is.  And he looked at
7  me like I was an idiot.
8       He said their goal is to have
9  100 percent of the doctors employed.  They can't
10 do anything about the concierge doctors.
11      They can't boot them off the hospital
12 stuff, but they don't want anybody that's not
13 employed by them.  And I think that's at most
14 medical centers I think around the country.
15 Q.   So prior to this official concierge
16 type practice would you -- did you cap your
17 patient population at a certain number?
18 A.   No, I never had to do that.
19 Q.   They just stopped coming to you at a
20 certain number?
21 A.   No.  I think I was as busy as I could
22 be.  You know, I have new patients that would
23 see me, and then I had some patients that moved
24 out of town or --

49

1  Q.   But it was generally a low volume
2  practice?
3  A.   Yeah.  I would see -- I would say I
4  would see 6 or 8 to 20 or 22 patients, mostly 8
5  to 15 patients a day.
6  Q.   8 to 15 a day.  Okay.  My brother is a
7  pediatrician, and he sees like 25 to 30 a day.
8  A.   That's hard work.
9  Q.   All right.  Currently how many patients
10 do you think you have in your practice?
11 A.   About 200.
12 Q.   And in an average day you might see
13 zero patients?
14 A.   True, like today.
15 Q.   Or up to ten patients, less than that?
16 A.   I think I -- I think maybe let's say
17 seven or eight.  I mean, I can handle ten, but
18 if I am trying to provide personal service, it's
19 hard to do it if you have three or four people
20 waiting to see you.
21 Q.   All right.  So today you saw no
22 patients?
23 A.   True.
24 Q.   How many did you see yesterday?

50

1  A.   I think I saw two patients yesterday.
2  Q.   What's today, Wednesday?  How many did
3  you see Monday?
4  A.   Monday I was out of town.
5  Q.   All right.  Hopefully for fun, not
6  business.
7  A.   I was consulting in Sea Island, Georgia
8  on an important matter.
9  Q.   Very important golf.  So the answer to
10 my question of when do you play golf --
11 A.   I got invited.
12 Q.   Monday he was playing golf.
13 A.   My wife and I got invited to a dear
14 friend's wedding and, mercy, it was in Sea
15 Island which was so nice.
16 Q.   Okay.  Do you know how many patients
17 you have scheduled for tomorrow?
18 A.   I did it at one -- I did yesterday, but
19 I don't remember.  I probably have three or four
20 patients scheduled.
21 Q.   Okay.  There are days you come into the
22 office and don't see a single person other than
23 Miriam?
24 A.   That is true, although I usually have

51

1  phone calls, prescription refills, patients who
2  want to tell me about a consultant they have
3  seen, consultant reports that come in.  Somehow
4  I can be pretty busy seeing zero to two or three
5  patients.
6  Q.   Okay.  Transitioning to a concierge
7  practice allows you to spend more time reviewing
8  charts, keeping up with patients because you
9  have less appointments during the day and fewer
10 phone calls to answer; is that true?
11 A.   That sounds exactly right.
12 Q.   You now schedule patients an hour apart
13 whereas previously you were scheduling anywhere
14 from 15 minutes to an hour apart?
15 A.   Yes.
16 Q.   Okay.  92 to 96 percent of your
17 professional time is spent in private practice
18 with four to eight percent of your time being
19 spent on expert forensic work?
20 A.   Yes.
21 Q.   All right.  I want to dive a little
22 deeper into your patient population here.  How
23 many patients of yours are college students or
24 do you have patients that are college students?

EXHIBIT C

52



Finley Brown, MD 10/16/2019

1      A.   I do.  I probably have -- I might have
2   six or eight patients who are college students.
3      Q.   Are these patients that you have seen
4   as they have grown up and they are now in
5   college like long-term patients of yours or are
6   they patients who are new to the area because
7   they are in college here?
8      A.   It would be the former.
9      Q.   Are any of those patients gone away to
10  college?
11     A.   Yes.
12     Q.   All right.  Have you coordinated care
13  for any of those patients in their new location
14  at college?
15     A.   If they had a special problem that
16  required my help, I would do that.  If --
17  otherwise, most all colleges have student health
18  centers and most college students are pretty
19  healthy so that's not much of a problem for me.
20     Q.   Here is my question.  Did you
21  coordinate health care for any of your college
22  student patients when they left to go to
23  college?
24     A.   I have done that.

53

1   school?
2      A.   Yeah, maybe, yes.
3      Q.   Have you ever helped a patient
4   establish primary care when they moved away for
5   college?
6      A.   I think most of them I -- I would think
7   over the years probably I did it, but mostly I
8   would have relied on their school's health
9   center.
10     Q.   Okay.  Have you had any patients commit
11  suicide?
12     A.   Yes.
13     Q.   Okay.
14     A.   I have.
15     Q.   Tell me about that.  How many?
16     A.   I would say probably less than ten.  I
17  certainly have had a bunch of friends who have
18  committed suicide.  I have had sadly a number of
19  friends of my wife's and mine who have had
20  children that committed suicide.
21          As I sit here today, I can't think of
22  the name or remember a face of a patient that's
23  committed suicide, but I believe I have had
24  people in my practice who have committed

55

1   that somebody you have done that for.
1      Q.   Okay.  Give me an example of somebody
2   that you have done that for.
3      A.   I can't think of a -- let me just try
4   to think of a patient like that.  I had a young
5   man who was on the B.C. golf team who injured
6   himself, another kid who was on the Georgetown
7   golf team who injured himself, came back for a
8   holiday and came to see me.  I made a diagnosis.
9          I think both times I sent him to an
10  orthopedist, and then I coordinated his care
11  when he got back to college making certain he
12  did what he was supposed to do.
13     Q.   Okay.
14     A.   But those would be two examples.
15     Q.   So you found an orthopedist near their
16  school or you followed up with the patient to
17  make sure they found an orthopedist?
18     A.   Probably the latter.  Probably most of
19  their care, their diagnosis and initial
20  treatment was here in Chicago and then their
21  follow-up care, maybe physical therapy and
22  whatever, was back at Georgetown or back at B.C.
23     Q.   And probably would have been through
24  the school if they were an athlete at the

54

1   suicide.
2      Q.   Are any of the people in your practice
3   who have committed suicide patients who you were
4   treating for mental illness at the time?
5      A.   I would say no.
6      Q.   Okay.  Are they -- were any of them
7   being treated by somebody for mental illness at
8   the time?
9      A.   I don't recall.
10     Q.   All right.  Were they active patients
11  in your practice at the time of their suicide?
12     A.   I don't recall.
13     Q.   Have you had patients in your practice
14  attempt suicide but not complete?
15     A.   I am sure I have.  I don't recall a
16  name or a face.
17     Q.   Have you had any patients in your
18  practice attempt suicide who you were treating
19  for mental health issues?
20     A.   I don't believe so.
21     Q.   Have you had any patients in your
22  practice attempt suicide what were being treated
23  by someone be it a psychiatrist or someone for
24  mental health issues?

**EXHIBIT C** 56



1    A.   I believe that would have been the
2  situation.
3    Q.   Okay.  Do you have patients who have
4  come to you with a history of suicide attempt in
5  their past?
6    A.   I am sure I have.
7    Q.   Okay.  That's not an uncommon thing for
8  a person to present with?
9    A.   I think it's uncommon in a family
10 practice office to see suicidal patients or to
11 see a patient who has had a history of previous
12 suicide attempt.  I think that's pretty uncommon
13 for a family doctor.
14   Q.   Okay.  And this could get confusing so
15 I want to make sure we have our language set
16 before we get into some of the clinical aspects
17 of this.
18        When we refer to a suicidal patient,
19 when you refer to a suicidal patient, are you
20 referring to somebody who is acutely suicidal
21 such that they need immediate hospitalization in
22 a locked psychiatry unit?
23   A.   That could be one of the people that
24 would fit under the suicidal synonym or verb or

57

1  whatever it is.
2    Q.   How else would you -- when you use the
3  term suicidal patient --
4    A.   So somebody who -- a suicidal patient
5  might be a patient who has some level of
6  depression.  I think most suicidal patients are
7  depressed to some degree, and they could have
8  suicidal ideation.  They could have transient
9  suicidal thoughts.
10        A patient who has attempted suicide in
11 the past and not been successful at it might be
12 completely recovered or might still have
13 occasional suicidal thoughts.
14        And I believe a reasonable and
15 competent family physician should either require
16 the skills to manage such a patient using APA
17 guidelines or refer that patient to a
18 psychiatrist.
19   Q.   Okay.  So somebody who has previously
20 attempted suicide under your definition is
21 always a suicidal patient?
22   A.   No, I never said that.
23   Q.   Okay.  And I guess that's what I am
24 trying to figure out.  When you say a suicidal

58

1  patient, what is a suicidal patient?
2    A.   Well --
3    Q.   Someone who is --
4    A.   I think that's a basket term that I
5  think you could be more precise and say that a
6  patient who has tried to commit suicide would
7  have at one time been a suicidal patient, had
8  suicidal thoughts.
9        Maybe that patient is completely
10 recovered and has no suicidal thoughts, but that
11 patient however is at complete risk for suicide
12 in the future.
13        Some people are depressed, get
14 transient suicidal thoughts.  Some people are
15 having personal problems, financial problems,
16 business problems who might have a transient
17 thought about, wow, should I end it all?  Can I
18 handle this?
19        I think the duty of a physician is to
20 take anybody who says that seriously and then
21 deal with it using and following APA guidelines.
22        I practice in a city of five medical
23 schools.  I can get -- are there great
24 psychiatrists all over Chicago?  Absolutely not.

59

1  Have I found a four-man group of psychiatrists
2  that are top flight?  Yes.  Can I get patients
3  in to see them?  Sometimes it's really hard to
4  do but mostly I can.  If I tell them a patient's
5  suicidal, they find a way to see the patient
6  right away.
7    Q.   Okay.  That leads to my next question.
8  Under what circumstances do you, Dr. Brown,
9  refer a patient to a psychiatrist versus
10 managing their treatment yourself?
11   A.   Is that a general question?
12   Q.   Sure.  That's a general question.  Do
13 you have certain criteria where if a patient --
14 let's say I always refer schizophrenic patients
15 to a psychiatrist --
16   A.   Are we talking about mental health
17 issues?
18   Q.   I assume those are the only ones you --
19   A.   Let's just say melanoma, a squamous
20 cell cancer --
21   Q.   I don't think that you would refer
22 those to a psychiatrist.
23   A.   No, no, no.  You are talking about the
24 psychiatric -- you gave me an open-ended

**EXHIBIT C** 60



1  question.
2      Q.   Listen to my question.  Under what
3  circumstances would you refer a patient to a
4  psychiatrist versus managing the treatment
5  yourself?
6      A.   If a patient had -- I would say
7  100 percent of patients who express suicidal
8  ideation to me I'd refer to a psychiatrist.
9      Q.   Is that all?
10     A.   Yes.
11     Q.   Okay.  All of the rest of the patients
12 you would manage yourself?
13     A.   No, no, no.  You know, if a patient
14 came in to me with mild anxiety and depression,
15 I might -- I think I'd offer them a
16 psychiatrist.
17          But I might say -- you know, I might
18 say, you know, two pots of coffee a day might
19 be -- the over-caffeination might be causing
20 your anxiety.
21          I might say, wow, you hate your job.
22 You hate your boss.  You hate your husband.
23 Maybe you should think about doing something
24 about that.

61

1          Most of that would involve seeing a
2  psychiatrist.  I might -- I frequently prescribe
3  patients SSRI's.  I think if a patient has
4  lingering problems and if they are not getting
5  better and if their problem isn't completely
6  resolved, 100 percent of those patients I refer
7  to a psychiatrist.
8      Q.   Okay.  Do you refer patients to
9  counselors or psychotherapists?
10     A.   I refer patients to psychiatrists.  I
11 never refer patients to an LCSW.  I never refer
12 a patient -- what was the other word you said,
13 counselor?
14     Q.   Counselor, psychotherapist.
15     A.   Well, you know, it's a garbage can
16 expression that covers what I would refer.  I
17 have a high quality PhD psychologist who can't
18 prescribe drugs.  He's a great psychotherapist,
19 and a lot of patients see him.  These patients
20 need direct therapy.
21          They either send them to my
22 psychiatrist or they have a psychiatrist.  So I
23 think -- what was your question again?
24     Q.   We will get through this faster if you

62

1  listen to my questions.  Do you ever refer
2  patients to psychotherapists or counselors?
3      A.   Same answer.  I refer patients to
4  psychiatrists, and then I gave you a long-winded
5  answer.  I only refer patients to psychiatrists.
6          If I think a patient can be managed by
7  a PhD psychologist or an LC, a skilled high
8  quality LCSW that knows their limitations and
9  has a level of professionalism which would make
10 them follow up, follow through with a patient
11 that didn't follow through with them, I would
12 defer that decision to a psychiatrist.
13          This is high stakes important care that
14 a psychiatrist needs to be involved in.
15     Q.   Do you agree that depression is
16 generally treated with medication, psychotherapy
17 or a combination of the two?
18     A.   Yes.
19     Q.   Okay.  In those patients that you are
20 prescribing their SSRI, their medication therapy
21 for, where are they getting their psychotherapy?
22     A.   Oh, well, I would say a patient --
23 frequently a patient with mild dysphoria, mild
24 depression, situational anxiety/depression, they

63

1  might respond to an SSRI and some office
2  counseling from me.
3          If that didn't 100 percent solve the
4  problem, I'd send them to a psychiatrist.  Many
5  patients don't want to go to a psychiatrist.
6          I think that's overkill.  They think
7  it's too expensive, and sometimes they are
8  right.  But if a patient has serious and
9  life-threatening disease because a doctor's
10 first duty is to protect his patient against
11 serious and life-threatening disease and because
12 early diagnosis leads to early treatment and the
13 best chance for cure, you better be seeing a
14 psychiatrist sooner rather than later.
15     Q.   So to answer my question, if you are
16 treating a patient for depression and you are
17 providing their medication therapy, then you are
18 also providing some level of psychotherapy to
19 them?
20     MR. ELLIS:  Objection.
21 BY MS. WATTS:
22     Q.   If that's what they need.  You are not
23 going to send them to somebody else for the
24 psychotherapy unless you send that patient to a

EXHIBIT C 64



Finley Brown, MD 10/16/2019

1  psychiatrist for the totality of their care?
2      A.   I think I answered that question.
3      Q.   Okay.  Are you qualified to provide
4  psychotherapy?
5      A.   No.
6      Q.   All right.  So unless you refer a
7  patient to a psychiatrist, none of your patients
8  who are suffering from depression are getting
9  psychotherapy?
10     A.   Well, I talk about the talk therapy
11  that I can occasionally give to a patient, and
12  they realize all of a sudden that they are in a
13  dead end job with a horrible boss and they have
14  been fighting themselves and not realizing what
15  they need to do.
16          They do and they go solve that problem,
17  and, bam, they don't need anything.  That
18  happens a lot.  100 percent of the time if I
19  have a patient that has significant depression
20  who needs -- all patients don't need medicine,
21  and all patients don't need psychotherapy.
22          Some patients need just medicine.  Some
23  patients need medicine and psychotherapy.  If
24  there is any question in my mind on what to do,

65

1  I send them to a psychiatrist.
2          I am willing sometimes to give people a
3  chance at behavioral modification alone or a
4  short course of antidepressants.
5          If that solves their problem, fabulous.
6  If that doesn't, sometimes by that time they are
7  willing to go see a psychiatrist.
8      Q.   You're talk counseling, talk therapy,
9  is not the same thing as psychotherapy?
10     A.   Sometimes it is.  Sometimes it's not.
11     Q.   Well, you just told me you are not
12  qualified to provide psychotherapy.
13     A.   That's why I used the word talk
14  therapy, but talk therapy sometimes is kind of
15  the psychotherapy a wife gives a husband or a
16  mother gives a child.
17          It's direct, blunt, often very
18  effective, but you don't get paid like a
19  therapist giving advice.
20     Q.   It's not based on cognitive behavioral
21  therapy techniques?
22     A.   Of course.
23     MS. WATTS:  Let's take a break.
24               (Recess taken)

66

1  BY MS. WATTS:
2      Q.   Do you maintain policies and procedures
3  in your office?
4      A.   I do.
5      Q.   Okay.  Are they written?
6      A.   Yes.
7      Q.   Do they relate to clinical practice or
8  just administration?
9      A.   I think both actually.  I haven't
10  looked at it in a while.  It's in a blue binder,
11  eight, ten, twelve pages.
12     Q.   All right.  Do you have a policy or
13  procedure in place for monitoring and tracking
14  patients who are at risk for suicide?
15     A.   In my solo private office my procedure
16  is that if I have got a sick patient, somebody
17  who is not stable, somebody who potential their
18  life is at risk, I write my note, and I put the
19  file on my desk.  And it never leaves my desk
20  until the problem is resolved one way or
21  another.  So in a way I do, yes.
22     Q.   Okay.  So that's your practice?
23     A.   That's the way I do it.  Of course I
24  don't have the sophisticated software.  I mean,

67

1  I have a bunch of computers and so forth, but I
2  write my notes on paper.  I have little stickies
3  that I put on the outside with the problem.
4          If it's somebody that I need to talk to
5  that night, I will have their cellphone or home
6  phone number on a piece of paper, and I put it
7  in my pocket.
8          I always look in my pocket to see what
9  piece of paper I have got, what duty I have to
10  do.  It works pretty well.  I've never had a
11  problem.
12     Q.   Okay.  You said you put the chart on
13  your desk when a person's life is at risk.  What
14  defines when a person's life is at risk?
15     A.   Okay.  So let's say I have got a
16  patient who comes to my office with equivocal
17  signs and symptoms of appendicitis.
18          I'm a real good clinician so if I
19  really had any serious thought that they might
20  have appendicitis, I'd send him to the ER.
21          If on the other hand it's close to the
22  gray area, I give them my cellphone number, my
23  home phone number, my answering service number.
24  I tell them what to watch out for.

EXHIBIT C  68

1    I put the chart aside, and that's how I
2  would handle it. With respect to a patient who
3  had suicide ideation, 100 percent of those
4  patients got to see a psychiatrist.
5    And if I can't get them over to a
6  psychiatrist right away, they have to go to the
7  ER at St. Joe's where we have got a psych unit,
8  where they have got some level of
9  interventionists that if you come down, make a
10 psychiatric assessment and admit the patient to
11 the hospital if they need to be admitted.
12   Q.   If they are in imminent danger?
13   A.   Yeah.
14   Q.   What if you had a patient who was
15 recently discharged from an inpatient
16 psychiatric but doesn't have current suicidal
17 ideation and you are treating them for their
18 underlying mental illness, the depression,
19 anxiety?
20   A.   I would --
21   MR. ELLIS: Objection. You can answer.
22   THE WITNESS: Would it be my first time
23 seeing the patient?
24   MS. WATTS: Sure.

69

1  to their friends and alert everybody and that
2  you have got to see a psychiatrist.
3    I'd talk to them about the incidents of
4  suicide attempts, the fact that if you try to
5  commit suicide, you have got 100 times greater
6  chance of trying again than the average
7  population.
8    And I would do all of the things that
9  would be important to do, mostly getting that
10 patient into the hands of a psychiatrist who
11 could take over and make a decision on medicine,
12 therapy, psychotherapy, and so forth.
13   Q.   Okay. So what I hear you say is it's
14 probably not going to make it to your desk
15 because you are going to get him to a
16 psychiatrist; is that fair?
17   A.   Correct. It's not going to be -- it's
18 not going to be a patient.
19   Q.   It's not going to be a stickie note on
20 your desk?
21   A.   I wouldn't need to because I will make
22 the decision before that patient leaves the
23 office.
24   Q.   All right. So I take it that if Nicole

71

1  THE WITNESS: I would find -- I would follow
2  APA guidelines and get all of the details.
3  BY MS. WATTS:
4    Q.   No. I am talking about would that fall
5  into your chart system? Would that person's
6  chart make it to your desk?
7    A.   No. I think I have to make a decision
8  on that patient at that time by myself or call
9  an ambulance and have them sent over to the
10 hospital or call their family and have them take
11 him over and say, listen, I am aware that you
12 are suicidal; I am worried that your life might
13 be in danger.
14   Q.   Okay. Take the hypothetical a little
15 bit further. You do an assessment of them and
16 you find they don't have suicidal ideation.
17 Okay. They are not suicidal at that time.
18   A.   And this is patient who had committed
19 suicide -- attempted --
20   Q.   Attempted suicide, came out of the
21 hospitalization and was seeing you in follow-up.
22   A.   I'd get a psychiatrist on the phone,
23 talk to the patient, talk to their family
24 member, tell the family member they got to talk

70

1  Borum walked into your office instead of
2  Dr. Smith's office, you would have referred her
3  to a psychiatrist?
4    A.   Correct. And that's what Dr. Goldstein
5  said her duty was, too, and I agree with him.
6    Q.   Do you agree with Dr. Goldstein that
7  the appropriate treatment for Nicole Borum
8  during the summer of 2015 was medication therapy
9  and psychotherapy?
10   A.   Yes.
11   Q.   Okay. If you have a patient who let's
12 say just has regular depression, that you are
13 going to provide their medication therapy for
14 them, no history of suicide attempt or anything
15 and you have initiated an antidepressant for
16 them, is that somebody whose chart is going to
17 go on your desk?
18   A.   No.
19   Q.   Okay. Do you have a policy or
20 procedure for calling them to see how they are
21 doing after you initiate that antidepressant?
22   A.   That's certainly something that I more
23 likely than not would do. I would also give
24 them a short course of medication. I wouldn't

EXHIBIT C    72

---

**Page 73**

1  give them 100 pills.

2      Q.   But you give them a month?

3      A.   I might give them a month, yeah.

4      Q.   And have them come back in a month and

5  see how they are doing, right?

6      A.   Yeah.  I'd probably have them come back

7  sooner than a month.

8      Q.   Okay.  How much sooner would you have

9  them come back?

10      A.   I think it would vary depending on

11  the -- how I assess the patient.  But I could

12  have them come back weekly.

13      Q.   Okay.  Let's talk about what you are

14  doing here today, expert work.

15      A.   Yes.

16      Q.   Briefly because I have most of this

17  information.

18      A.   Can we skip it then?

19      Q.   No.

20      A.   I was sworn to tell the truth and I

21  think I did.

22      Q.   I know.  But I have a little bit of new

23  stuff maybe.

24      A.   Okay.

---

**Page 74**

1      Q.   You have been testifying as an expert

2  since 1986?

3      A.   Yes.

4      Q.   You currently review 20 to 30 plus

5  cases a year.  Is that still true?

6      A.   I think the last couple, three years

7  it's less.  I think I have seen -- I have seen

8  16 or 18 new cases this year so far which is

9  down a little.

10      Q.   Okay.  Is that because Mr. Franklin

11  passed away?

12      A.   No.

13      Q.   At least as of the last time you sat

14  down and calculated it back in 2005 or so, the

15  most money you have made in any one year doing

16  this kind of work was over $700,000?

17      A.   True.

18      Q.   Have you calculated it since then?

19      A.   No.

20      Q.   All right.  Since then you would

21  estimate that you earn around or at least

22  $300,000 to $400,000 a year doing this work?

23      A.   I don't think I ever testified to that.

24  I would say that I would say that the

---

**Page 75**

1  medical/legal of my total income, 50 to

2  66 percent of all my income, comes from

3  medical/legal work.

4      Q.   I won't pull it out because if you

5  testified to it, you testified to it.  You

6  provided us with a testimonial list in this case

7  and I --

8      A.   Painfully.

9      Q.   I know.  I am sorry.  Back in the '80's

10  and '90's about 90 percent of your expert work

11  was on behalf of defendants?

12      A.   It was.  I actually prefer that work.

13      Q.   You do?

14      A.   Yes.

15      Q.   Lately in the last 15 years or so it's

16  been almost exclusively for plaintiffs?

17      A.   90/10, I believe.

18      Q.   90/10.  All right.

19      A.   For plaintiffs.  Again, I prefer the

20  defense work, and I just got a notice -- I was

21  telling Tony that a defense case that I was

22  helping on some guys in Palm Beach, that they

23  won the case.  I just heard that three weeks ago

24  or so.

---

**Page 76**

1      Q.   You were helping them.  Did you testify

2  in it?

3      A.   No.  I provided -- I think I was

4  deposed.  I provided a report.

5      Q.   According to the testimony list that

6  you provided to us, you have not testified on

7  behalf of a defendant in any case since 2013; is

8  that correct?

9      A.   Are those all plaintiffs cases do you

10  think?

11      Q.   They all say plaintiff.  You can look

12  at it.

13      MR. ELLIS:  For the record we filled in a

14  lot of those details.

15      MS. WATTS:  Okay.  He can correct them.

16      MR. ELLIS:  So I don't know -- we did not go

17  through and figure out if they are plaintiff or

18  defendant.

19      MS. WATTS:  You just assumed.

20      MR. ELLIS:  Given the time constraints that

21  we were under.

22      MS. WATTS:  I understand your assumption,

23  Tony.  I understand your assumption.

24      MR. ELLIS:  I didn't put plaintiff for

EXHIBIT C

1  everything.  So if there are cases on that
2  list -- because he may not remember them now.
3  We will go through and see if any of them are
4  defendant.
5      THE WITNESS:  No.  These are all plaintiffs
6  cases.
7      MR. ELLIS:  That makes it easy.
8  BY MS. WATTS:
9      Q.   So since 2013 you have not testified on
10  behalf of a defendant?
11     A.   Apparently so.
12     MS. WATTS:  We will mark that Exhibit 2 to
13  the deposition.
14                  (Whereupon, Exhibit
15                  No. 2 was marked for
16                  identification.)
17  BY MS. WATTS:
18     Q.   Do you know plaintiff's psychiatry
19  expert Dr. Robert Goldstein?
20     A.   I don't.
21     Q.   I take it you reviewed his deposition?
22     A.   Yes.
23     Q.   You probably feel like you know me from
24  reading his deposition.

                                            77

1      A.   Not really.  Well, no, no.
2      Q.   All right.  Have you ever testified in
3  a case involving the suicide of a patient?
4      A.   I believe I have, but I can't think of
5  it, the case.  But my guess is I would have.
6      Q.   Okay.  Do you know if you were on the
7  defense side or the plaintiff side?
8      A.   You know, I don't have a memory of a
9  case.  But my belief is probably I have been
10  involved in such a case, but it's speculation.
11     Q.   Okay.  Have you ever testified against
12  a licensed clinical social worker or a
13  psychotherapist before?
14     A.   I don't recall.
15     Q.   Are you aware that your testimony has
16  been excluded by a court when you have testified
17  against pharmacists and other medical providers
18  other than family medicine physicians?
19     A.   I don't believe that's factual.  You
20  would have to show me a case on that.
21     Q.   I will make sure I bring that material
22  to trial then.
23     A.   That would be great.
24     Q.   Have you tried to testify against

                                            78

1  pharmacists before?
2      A.   I have been involved in a number of
3  cases where the pharmacist didn't do their job,
4  where they gave large numbers of crazy amounts
5  of say narcotics to patients they shouldn't have
6  done that to.  And I have testified that that's
7  outside the standard of care.
8      Q.   Okay.
9      A.   As an example.
10     Q.   All right.  Let's move on to this case.
11  When were you first contacted in this case?
12     A.   I think early this year, February or so
13  if I am not mistaken.
14     Q.   Okay.  And what were you asked to do?
15     A.   I believe Tony called me and he said he
16  had a case he'd like me to look at.  And he sent
17  me some records.  And I said I'd be -- he asked
18  me if I had time to do so.
19         I said I did, and he sent me some
20  records and said please let me know what you
21  think.
22     Q.   Okay.  Did he tell you what the case
23  was about?
24     A.   I don't recall.

                                            79

1      Q.   All right.  What records did you
2  initially receive?
3      A.   I initially --
4      Q.   You have this up here, too.
5      A.   This is what I was looking for.  You
6  know, if you -- I brought my billing and my
7  billing reflects.
8      Q.   That would help, yeah.
9      A.   My billing reflects the records that I
10  looked at.  So I reviewed the Bowling Green
11  Medical Center Hospital records, Deaconess Cross
12  Pointe medical records for the licensed clinical
13  social worker, Deaconess clinical medical
14  records of Dr. Smith, associated billing and
15  calendar records, a copy of the PDR on Lexapro,
16  Nicole's mom's, Cynthia Borum's, calendar of
17  events, the deposition of Dr. Smith, the
18  deposition of Powell, the LCSW, the deposition
19  of Alan White, the vice president of Deaconess
20  Hospital.
21         I also reviewed documents from the APA
22  Guidelines for Assessment and Treatment of
23  Suicide Behaviors.
24     Q.   Were those provided to you?

**EXHIBIT C**   80

Finley Brown, MD 10/16/2019

1      A.   They were provided to me by Mr. Ellis.
2   I reviewed a document titled Managing Suicide
3   Attempts, Guidelines for the PCP.
4          I reviewed another document entitled
5   Contemplating Suicide: A Physicians Guideline
6   for Dealing With a Suicide Patient, another
7   document entitled Evaluation and Treatment of
8   the Suicidal Patient from the AFP magazine,
9   another document entitled Suicidal Prevention in
10  Youth and Young Adults, another document which
11  was the citation from the Perez versus United
12  States case of 2012.
13     Q.   Hang on.  The five prior to that, those
14  were all provided by Mr. Ellis?
15     A.   All of these were provided by
16  Mr. Ellis.
17     Q.   Okay.
18     A.   A document entitled Assessing and
19  Managing Suicide's Risks from the Suicide
20  Prevention Resource Center, the deposition of
21  Cynthia K. Borum, the mother, a letter of
22  8-25-15 from Dr. Smith I think describing her
23  move of her office, another list of 518 voice
24  mail messages, cellphone messages.  I think
                                                    81

1   that's what I received initially.
2      Q.   Okay.  Did you receive anything else
3   after that -- or hang on.
4          Did you then -- did you then formulate
5   your opinions or did you receive other materials
6   prior to formulating your opinions?
7      A.   I believe those materials were enough
8   for me to formulate the opinions I have today.
9      Q.   Okay.
10     A.   Which are reflected in my expert
11  document.
12     Q.   Okay.  Did you draft your expert
13  document based upon those materials or based
14  upon those materials plus other materials?
15     A.   I would say based on my review of those
16  materials and based on my 40 plus years in the
17  practice of medicine, my training, knowledge and
18  experience.
19     Q.   Okay.  Did you do any independent
20  research prior to drafting your report?
21     A.   I didn't need to do any independent
22  research.
23     Q.   Okay.  So the answer is, no, you didn't
24  do any?
                                                    82

1      A.   I prefer the way I said it.
2      Q.   Since drafting your report have you
3   reviewed additional documents?
4      A.   I have.
5      Q.   Okay.  What have you reviewed?
6      A.   I hand to you a list of additional
7   documents that I got.
8      Q.   Okay.  So this is your expert
9   disclosure, the medical literature that you just
10  listed earlier, two UpToDate articles, one is
11  not titled, the other one is titled Suicidal
12  Ideation and Behavior in Children and
13  Adolescents Evaluation and Management, Perez
14  versus the United States 883 F. Supp. 2d, 1257,
15  another case that is T-o-m-a-s-i-e-q-i-c-z
16  versus Tyler and then all of the defendant
17  expert disclosures.
18         Do you know why these two legal cases
19  were provided to you?
20     A.   I have no idea.  I haven't had time to
21  ask that.
22     Q.   Did you read them?
23     A.   I looked at the Tomasieqicz case,
24  horrible case, and the other one I have no idea.
                                                    83

1      Q.   Did you ask the attorneys for any
2   explanation as to the law on any particular
3   subject?
4      A.   No.
5      Q.   All right.  And the next binder is the
6   depositions of Shelby Duncan, Loni Decker, Maria
7   Goff, Oscar Trevino and Gracie Peter and then
8   the deposition of Mark Boling and Robert
9   Goldstein?
10     MR. ELLIS:  Katie, just for the record, I am
11  not sure that those two cases were shown -- were
12  supposed to be in that binder.
13     MS. WATTS:  They are suspiciously --
14     MR. ELLIS:  I'm not sure -- I am not saying
15  that they are not things that I had.  I am just
16  not sure they were supposed to go to Dr. Brown
17  or anyone for that matter.
18     MS. WATTS:  Well, they did.
19     MR. ELLIS:  So we will take a look at that,
20  but that could easily just be our new assistant
21  developing a --
22  BY MS. WATTS:
23     Q.   All right.  Doctor, you have reviewed
24  all of those materials; is that correct?
                                                    84

EXHIBIT C

1    A.   I did review these materials, yes,
2  ma'am.
3    Q.   Did any of them change any of your
4  opinions?
5    A.   No.
6    Q.   All right.  And then you have
7  another -- a couple more piles with you here.
8  Did you do some research after your report?
9  What is this?
10   A.   Well, this is -- I will show you.  This
11 is the UpToDate article.
12   Q.   Okay.
13   A.   Which has some important information
14 about suicide and --
15   Q.   Let me ask you, is this all literature
16 that plaintiff's counsel provided to you?
17   A.   Yes, ma'am.
18   Q.   Okay.
19   MR. ELLIS:  And some of those -- as you can
20 see, the UpToDate article that you saw was
21 untitled in there.
22   MS. WATTS:  It has a title now.
23   MR. ELLIS:  It has a title because you can
24 see he ripped it out of the -- you could see the

85

1  frayed edges.
2    THE WITNESS:  You can see why this is all so
3  messy.  So, yes, these -- let me give you those.
4  BY MS. WATTS:
5    Q.   So the one that was entitled is titled
6  Suicidal Ideation and Behavior in Adults?
7    MR. ELLIS:  I believe that's the PowerPoint
8  that you guys gave us.
9    MS. WATTS:  It is.  I am going to ask for
10 color copies of these as Exhibit 3, collective
11 Exhibit 3.  Can we get that?
12   COURT REPORTER:  Sure.
13            (Whereupon, Exhibit
14            No. 3 was marked for
15            identification.)
16 BY MS. WATTS:
17   Q.   What else have you got?
18   A.   I have all my depositions.
19   Q.   Are they marked?
20   A.   I see two little red stickers on them.
21   Q.   That's okay.  I don't need them.
22   A.   You don't need them?
23   Q.   No.
24   A.   Okay.  I have a couple very important

86

1  in my own mind tomes here, one entitled
2  Unfortunate Statements from the Deposition of
3  William Allen White, MD, a Deaconess employee.
4    I have another one entitled Unfortunate
5  Statements from the Deposition of Syrrus Powell,
6  LCSW.
7    And then I have another one,
8  Unfortunate Statements, two-page document,
9  actually three-page document, entitled
10 Unfortunate Statements from the Deposition of
11 J.W.K. Smith.  Okay.
12   I then have notes on the video
13 deposition of the defendant, Dr. Smith, another
14 one entitled Continued Notes on the Deposition
15 of Dr. Smith, another one entitled Redictation
16 of My Notes on the Deposition of Cynthia K.
17 Borum, the mother, another one entitled
18 Redictation of My Notes on the Deposition of
19 William Allen White, MD, another one entitled
20 Redictation of the Videotaped Deposition of
21 Syrrus Powell, LCSW.  I got those.
22   I have a little paper here to remind
23 myself that Gracie Peters -- actually Gracie
24 Peter is her last name who is a friend from

87

1  2011, that she did -- she testified in her
2  deposition that she did know that Gracie had
3  bought a gun "for safety reasons".
4    The reason I thought that was important
5  was that if Smith or Powell had met the APA
6  guidelines and gotten her friends involved in
7  this post suicide care, they would have known to
8  look for guns, and they would have known to say
9  to her, hey, you shouldn't have a gun, give me
10 that gun and take it away from her.
11   And I believe more likely than not if
12 she had been involved, Nicole would be alive
13 today.
14   Q.   Do you know where Gracie Peter lived?
15   A.   I have it written down someplace.  I
16 don't recall.
17   Q.   Do you remember Gracie Peter's
18 testimony that she didn't believe Nicole when
19 she said she bought it for safety?
20   A.   I do remember that.  But, you know, she
21 hadn't been recruited.  She hadn't been
22 informed.  She hadn't been educated which was
23 the duty of Powell, Smith and would have been
24 the duty of the psychiatrist.

EXHIBIT C  88

1      It would have been done if the
2  psychiatrist had been involved in this case, and
3  she wouldn't have just said, God, I didn't
4  believe her, but I didn't want to say anything.
5      She would have said give me that gun
6  and called her mother, called her doctor.  And
7  she would be alive today in my opinion.
8      Q.  Was it the duty of the medical
9  providers to track down all of Nicole's friends
10 throughout the country and let them know that if
11 this girl who her friends knew had attempted
12 suicide bought a gun, that if they didn't
13 believe her reason for buying a gun, that they
14 should alert someone?
15     A.  I think what I would say is that Gracie
16 Peter knew Trevino, said that Nicole didn't have
17 any esteem issues, was enough in contact with
18 her that she knew she had a gun and could have
19 intervened if she had been recruited.
20     Because what would have happened is if
21 she had individually been recruited, all of
22 their friends would have got -- the word would
23 have gotten out.
24     They would have been supportive.  It

89

1  will have been a network of support that more
2  likely than not would have saved her life.  And
3  I blame Powell and I blame Smith and I blame
4  Deaconess for not making that happen.
5      Q.  Okay.  So you wanted Dr. Smith to
6  contact Nicole's ex-fiance, Oscar Trevino, to
7  recruit him into her care?
8      MR. ELLIS:  Objection.
9      THE WITNESS:  I think I stand by what I
10 said, and I think it includes as many people
11 that were involved with her.  Trevino wasn't
12 involved with her.
13     He didn't -- I don't think they ever
14 saw each other after the rest of that summer,
15 and he stayed away.  He testified he stayed
16 away.
17 BY MS. WATTS:
18     Q.  Right.  And do you know how many times
19 Nicole saw or talked to Gracie Peter that
20 summer?
21     A.  Enough so that Gracie Peter could make
22 a comment about Trevino, make a comment about
23 the state of her mental health and make a
24 comment about that she knew about the gun.  That

90

1  was enough, wasn't it?
2      Q.  And Gracie Peter knew that Nicole had
3  attempted suicide three months prior?
4      A.  I don't know if she did or not.
5      Q.  You don't remember that from her
6  deposition?
7      A.  You know, I don't, but, you know, the
8  important thing is if somebody -- a lot of
9  people who know people who have suicide don't
10 understand the critical parts of how you prevent
11 people from suiciding again.
12     And she didn't get that information
13 because she had two incompetents, Powell and
14 Smith, involved in her care.
15     And she had an institution that didn't
16 keep track of the people they hired and didn't
17 even have a system to bring those people back if
18 they didn't show up for an appointment.
19     Q.  Okay.
20     A.  Should I go on?
21     Q.  Please.
22     A.  So I have some certain notes on my
23 UpToDate article which you have in that pile.
24     Q.  Okay.

91

1      A.  And then I have my notes on the
2  depositions of Duncan, Loni Becker, the dentist
3  Maria Goff, Oscar Trevino and Gracie Peter.
4      Q.  Okay.
5      A.  And then I have some important notes.
6  I haven't numbered these pages, but there is
7  seven points that I listed which I think are
8  important in this case and speak for themselves.
9      Q.  Okay.
10     A.  I have another document which is a
11 little packet of material with APA Practice
12 Guidelines and Recommendations Regarding
13 Assessment of Suicide as part of the initial
14 psychiatric assessment from 2016, another
15 article from 2014 on APA Guidelines with Respect
16 to Suicidal Patients and some material I pulled
17 out -- could I show you this?
18     Q.  Sure.
19     A.  I pulled out of the -- I recognized
20 these things, and then I summarized some of this
21 in APA guidelines and other requirements numbers
22 1 through 11.
23     Q.  Okay.
24     A.  I hand that to you now.

**EXHIBIT C** 92

1    Q.   Sure.
2    A.   So in addition to my expert report --
3    Q.   What else we got?
4    A.   In addition to my expert report I also
5 for my own benefit and for yours wrote down
6 Deaconess Gross Pointe and Deaconess Clinic
7 deviations from the standard of care one to
8 three.  I now have 13 deviations from the
9 standard of care by Syrrus Powell, the social
10 worker.
11   Q.   If they are not in your report, I am
12 not going to ask you about them.  You have four
13 in your report so you can't add --
14   A.   These are additional --
15   Q.   You can't add nine more today.  Sorry.
16   A.   Well, I think these are additional
17 opinions I have.  I am telling you what my
18 additional opinions are.  You can do what you
19 want with them.
20        And, you know, when I originally read
21 the material, I spend a lot of time putting it
22 all together and coming up with my opinions
23 which I talked to Mr. Ellis about, and then he
24 put together my expert disclosure.
                                              93

1        As I review and re-review these
2 materials, I come up with other insights and
3 other opinions which I am allowed to do.
4    Q.   Not in Federal court you are not, sir.
5 Your disclosure is your -- your report is your
6 disclosure in Federal court?
7    A.   Say no more.  I have my expert
8 disclosures here, and I have some further points
9 about Bowling Green Kentucky Medical Center, the
10 communications and a split treatment scenario
11 between a social worker and a family physician
12 like Smith, standard of care for suicide
13 treatment, a note I wrote on the issue of the
14 availability of the psychiatric referral --
15 referrals, the issue of abandonment, notes on
16 SSRI's, a note on a statement that suicide is
17 preventable.  They speak for themselves I would
18 say.
19   MR. ELLIS:  And for the record I haven't
20 seen his list of 13 criticisms of Powell, but I
21 know he has a number of criticisms for Powell in
22 his report in both the summary section and in
23 the text of the report where he identifies
24 various breaches and factual deviations.
                                              94

1        So it may be that his list of 13 items
2 is just the detailed allegations that he
3 identifies in his written report.
4        So to the extent they have already been
5 disclosed or track what's already been disclosed
6 in his expert opinion, he has now produced that
7 list to you which --
8    MS. WATTS:  I am prepared for his expert
9 report.  To the extent there is new things in
10 there, they are not --
11   MR. ELLIS:  But all I am saying is I believe
12 the Federal standard is he has to provide a
13 summary and the details of his opinions.
14   MS. WATTS:  Correct.
15   MR. ELLIS:  And to the extent his list
16 before what he just gave you is a summary of
17 what's in his report or consistent with the
18 disclosures and opinions he has in his report,
19 although he may have numbered them 1 through 13
20 in that document and may have numbered them 1
21 through 4 --
22   MS. WATTS:  I don't care what they are
23 numbered.  If it's not in his report, that's not
24 his opinion.
                                              95

1    MR. ELLIS:  That's what we can take up with
2 the Court.  To the extent that the list he just
3 gave you, if you choose not to ask about it, I
4 get that.
5        That's a pretty lengthy disclosure, and
6 there are a number of criticisms of Powell.  I
7 don't think we are willing to concede that those
8 are new criticisms as much as they might be
9 slightly different words of the same criticisms
10 that he expresses in his report.
11   MS. WATTS:  Yeah.  And I am not going to sit
12 here and take my time that I have to depose him
13 to go line by line through his report which is
14 supposed to contain all of his opinions to see
15 if they are new or not.
16        I am going to go by his report which
17 under the Federal rules is supposed to contain
18 all of his opinions and which I am prepared to
19 cross-examine him on today.  It may --
20   MR. ELLIS:  Those are his notes so he is
21 just giving you what he brought with him.
22   MS. WATTS:  That's fine.
23   THE WITNESS:  I don't think I got anything
24 else.  I think I just gave you these.  I have a
                                              96



EXHIBIT C

Finley Brown, MD 10/16/2019

```
 1  document which is a problem list I made, and
 2  then I have a little timeline.
 3  BY MS. WATTS:
 4      Q.   What's that?  You said say that's your
 5  report with all your notes on it?
 6      A.   Yeah, this is my report.
 7      MS. WATTS:  Okay.  I am going to mark this
 8  as Exhibit 4, and I am going to want color
 9  copies of it all including this.  And then I
10  will want to add that, but I understand you may
11  need it to answer questions.
12      MR. ELLIS:  He needs all of that.
13                      (whereupon, Exhibit
14                      No. 4 was marked for
15                      identification.)
16  BY MS. WATTS:
17      Q.   All right.  Sir, are you aware of
18  Dr. Goldstein's opinions prior to authoring your
19  report?
20      A.   I don't believe I was.
21      Q.   Okay.  You had not been told what his
22  opinions were?
23      A.   Correct.
24      Q.   And I believe you said you did not
```
97

```
 1  actually author the report.  It was authored by
 2  Mr. Ellis?
 3      A.   Well, no.  Mr. Ellis and I talked about
 4  this case at length for a long period of time,
 5  and he wrote notes.
 6           He had a pretty good handle on the
 7  case, and based on our lengthy communication he
 8  prepared this.
 9           He sent it to me for my review, and I
10  found it to be an excellent document.  I don't
11  remember if I had some changes or -- every time
12  I read it, I see some new things or I pick up a
13  spelling error.
14      MR. ELLIS:  Before you disclose any of our
15  communications, this is Federal court.  The
16  drafts or any contents or discussions about the
17  drafts are prohibited by or protected by work
18  product for your experts as well.
19      MS. WATTS:  Uh-huh.
20      MR. ELLIS:  So I am going to instruct him
21  not to answer anything about drafts or how the
22  report was drafted.  That's a full and complete
23  summary of his opinions.
24      MS. WATTS:  Yeah.  I just wondered who
```
98

```
 1  drafted it.
 2  BY MS. WATTS:
 3      Q.   Have you reviewed the deposition of
 4  Erin Heim?
 5      A.   Refresh my memory on who Erin Heim is.
 6      Q.   She is a corporate representative of
 7  Deaconess Hospital?
 8      A.   I don't believe I had that.
 9      Q.   Okay.  So to the extent that Erin Heim
10  is extensively quoted -- her deposition is
11  extensively quoted in your report, you would not
12  have authored that section then?
13      MR. ELLIS:  Again, I am going to instruct
14  him not to answer who authored the provisions of
15  the drafts.  I do believe we produced him the
16  deposition Erin Heim.
17      MS. WATTS:  He just said he didn't review
18  it.
19      THE WITNESS:  Well, I asked you who she was.
20  Frankly, I don't remember.  If he said he
21  provided it to me, it must be in one of my
22  piles.
23      MS. WATTS:  Tony doesn't get to answer
24  questions today.
```
99

```
 1      THE WITNESS:  Well, I think he just did.
 2  BY MS. WATTS:
 3      Q.   Let me know if you can find the
 4  deposition of Erin Heim in there.
 5      A.   Yeah, I am looking right now.  Thank
 6  you.  Might be a suggestion, but now that he
 7  mentions that maybe I did see it.  I can't seem
 8  to locate it though.
 9      Q.   Okay.  So you don't have it with you in
10  the materials you brought today which are all
11  your materials?
12      A.   They are surely supposed to be in
13  this -- it was my intent to bring everything
14  along, yes, it's true.
15      Q.   All right.  All right.  Let's talk
16  about psychotherapists and licensed clinical
17  social workers.  They are not physicians,
18  correct?
19      A.   True.
20      Q.   You have never had training as a
21  licensed clinical social worker?
22      A.   No.  I don't need training as a
23  licensed clinical social worker.  I know more
24  about medicine than they do of course.
```
100

EXHIBIT C

1    Q.   Right.  You have never had training in
2  psychotherapy?
3    A.   Yes.  I am not a trained
4  psychotherapist.
5    Q.   Okay.  You never worked in or been
6  affiliated in any way with a mental health
7  facility?
8    A.   I have worked around and in a mental
9  health facility when my patients were
10  hospitalized there, treated there.  I am very
11  familiar with mental health facilities.
12    Q.   Yeah.  What mental health facilities
13  have you worked in?
14    A.   Well, we had an open and closed psych
15  ward at Illinois Masonic.  I don't think we
16  still do.  There is both at St. Joe's.
17        So over the years I followed my
18  patients.  I actually sought consultations for
19  psychiatrists who asked me to see patients for
20  medical issues that they had so I am familiar
21  with such an institution.
22    Q.   Okay.  And in those locked psych wards
23  at those two hospitals, those patients would be
24  followed by psychiatrists?

101

1    A.   True.
2    Q.   You would be treating them for medical
3  problems?
4    A.   True.
5    Q.   And if anybody was providing
6  psychotherapy to them it wasn't you?
7    A.   True.
8    Q.   You would not be overseeing or
9  supervising in any way those who would be
10  providing psychotherapy to the patients?
11    A.   Correct.
12    Q.   You have never supervised or overseen
13  the practice of a licensed clinical social
14  worker or psychotherapist?
15    A.   Correct.
16    Q.   Do you know what their training
17  entails?
18    A.   I think an LCSW often has a Master's
19  degree and that I can't -- I don't recall as we
20  sit here.
21    Q.   Do you know how they are instructed to
22  conduct their therapy sessions?
23    A.   No.  I have always thought that
24  licensed clinical social workers were at the

102

1  bottom of the totem pole, the least skilled, the
2  least qualified, the least able to manage a
3  patient with mental health issues.
4        I think there is wide consensus that
5  that's correct.  In today's mileau where
6  insurance companies don't want to pay for
7  anything, it seems that more and more
8  psychotherapy is delegated to LCSW's.
9        From my perspective as a sophisticated
10  family physician, I have very little to no
11  regard for the sophistication of an LCSW and
12  their ability to provide quality psychotherapy.
13        It's almost -- it's not quite
14  laughable, but it's almost in my opinion
15  laughable to think that, you know, a life and
16  death situation in a patient who tried to commit
17  suicide who took a serious drug overdose, to
18  give a psychotherapeutic job to an LCSW who
19  didn't even think that she had a duty to that
20  suicidal patient if she never came back for a
21  second visit, that there was no client
22  patient/relationship and that the fact that she
23  had suicidal ideation didn't make her
24  circumstance to the level of importance that she

103

1  felt a need to call the patient much less
2  consider the patient really had a relationship
3  with her.
4    Q.   Do you remember what my question was?
5    A.   She could read it back if she --
6    Q.   I could tell you what it was.
7    A.   Please.  That will be easy for us.
8    Q.   Do you know how psychotherapists are
9  instructed to conduct their therapy sessions?
10    A.   That was my answer to that question.
11    Q.   That didn't even remotely answer that
12  question.  Are you aware of how they are trained
13  to provide psychotherapy?
14    A.   I couldn't answer that question, and I
15  have to tell you that I think -- and I am pretty
16  sure you perceive this.
17        I am completely uninterested because I
18  don't regard their skill set as anything but
19  miniscule in the management of a seriously ill
20  off and on suicidal patient.
21    Q.   Could Syrrus Powell have even met the
22  standard of care in your mind?
23    A.   Based on her deposition testimony and
24  her statement --

**EXHIBIT C** 104

Finley Brown, MD 10/16/2019

---

**Page 105**

1  Q.   Based on the fact that she is an LCSW.

2  A.   No.  You know, everybody -- I mean,

3  there are a lot of chefs out there, but you

4  probably couldn't eat the food of half of them.

5       And I am saying that based on her

6  pitiful deposition that I don't think she has

7  the skill, training and experience and the

8  ability to do even reasonable work.

9  Q.   So she isn't meeting the standard of

10  care in any of her patients?

11  A.   She did not meet the standard of care.

12  That's exactly what I have said.

13  Q.   She is not meeting the standard of care

14  in any of her patients?

15  A.   I don't know.  Maybe she is lucky.

16  Q.   She is worthless?

17  A.   I wouldn't say she is worthless.  She

18  is a human being.  But she was put in -- she was

19  put by Deaconess Hospital and Deaconess Cross

20  Pointe in an impossible situation.

21       And she was -- she knew or should have

22  known that she wasn't qualified to manage such a

23  patient, and she should have referred that

24  patient immediately to a psychiatrist.

---

**Page 106**

1       She wasn't smart enough to know that.

2  She didn't have the insight, and she didn't have

3  the regard for this patient as she expressed

4  blatantly in her deposition testimony.

5  Q.   What did Ms. Borum say that Nicole

6  reported after the counseling session with

7  Ms. Powell?

8  A.   I don't recall.

9  Q.   You don't recall that Nicole felt

10  better and really enjoyed talking to Ms. Powell

11  and got a lot of things off her chest?

12  A.   I think that's great.  I think that's

13  admirable.  I think that's -- I think that's

14  phenomenal.  Oh, and we are talking about a girl

15  that killed herself three months later and never

16  saw her more than once.

17       So maybe she suffered from lack of

18  insight or maybe the talk therapy whatever it

19  was that was so casually given by Powell did

20  help her.  It's possible.

21  Q.   All right.  We will get back to my

22  questions.  Do you know how LCSW's are taught to

23  perform mental status examinations and suicide

24  assessments?

---

**Page 107**

1  A.   Well, they didn't meet -- certainly the

2  notes that -- as a general statement, I would

3  expect them to follow APA guidelines.

4       It's clear from the notes and

5  deposition of Powell that she didn't know much

6  about that and that she did not follow APA

7  guidelines.

8  Q.   Okay.  So you expect LCSW's in

9  providing psychotherapy to act as psychiatrists?

10  A.   No.  I expect them to follow APA

11  guidelines.

12  Q.   What does APA stand for?

13  A.   American Psychiatric Association.

14  Q.   So you expect them to follow

15  psychiatric guidelines?

16  A.   I think I expect them to follow APA

17  practice guidelines regarding the assessment of

18  suicide as part of the initial psychiatric

19  assessment and as part of each follow-up

20  assessment which should be done weekly.

21  Q.   Can LCSW's be members of the APA?

22  A.   I think you have to be a psychiatrist.

23  Q.   Right.  Okay.  All right.  Did you do

24  any research to educate yourself as to the

---

**Page 108**

1  standard practice of LCSW's or psychotherapists?

2  A.   No, I didn't need to do that.

3  Q.   You didn't need to?

4  A.   I don't feel I needed to do that.

5  Q.   Because you know what their standard of

6  practice is?

7  A.   No.  I know the standard of practice is

8  to take care -- what the standard of care

9  requires of any level health care provider

10  providing care to a post suicidal patient with

11  suicidal ideation.

12       And it involves assessment of the

13  suicide and the asking of the whole list of

14  questions and making a whole list of actions and

15  documenting same.  It's a lengthy, detailed,

16  work-intensive project.

17  Q.   Okay.  So the standard of care for the

18  care and treatment of a patient with a recent

19  suicide attempt is the same for a family

20  practice doctor and an LCSW and a psychiatrist?

21  A.   With respect to following APA suicidal

22  care guidelines who -- whatever you are, an

23  LCSW, a psychologist, a psychiatrist, a family

24  physician, you have to do exactly this.

EXHIBIT C

---

1    You all have to do exactly the same
2  thing, and it would take somebody a couple or
3  three hours if they were sophisticated person to
4  read through these guidelines and then ask the
5  questions, document the answers and provide care
6  and treatment so as to meet APA practice
7  guidelines.
8      Q.   Okay.  Nicole was hospitalized at
9  Medical Center of Bowling Green following her
10 first suicide attempt?
11     A.   She was.
12     Q.   Do you agree that the psychiatrists who
13 saw her at Medical Center of Bowling Green did
14 not follow APA guidelines in their care and
15 treatment of her?
16     A.   I agree with that.
17     Q.   So every psychiatrist that saw her
18 there breached the standard of care in her care
19 and treatment of her?
20     A.   No.  I think what they didn't do is
21 they didn't follow APA guidelines.  They did
22 great work.  They stabilized her.  They saw her
23 on a regular basis.  They kept her in the
24 hospital from the 11th to the 16th.

109

1  psychiatrist.  Do you agree with me on that?
2      A.   I think from one hospital to another,
3  from one psychiatrist to a mental health
4  hospital, I don't believe they needed to tell
5  them how to suck eggs.
6          I think because they weren't
7  response -- what they did is they did perfect
8  work.  They got her stabilized.  They got her --
9  they set her up with a mental health hospital
10 who knew or should have known they should have a
11 psychiatrist first see the patient.
12         How do you get a situation -- first of
13 all, this is a mental health hospital that has
14 no policies with respect to suicidal patients
15 with respect to suicidal care.
16         It's not for Bowling Green to do a Dun
17 & Bradstreet survey and see if a mental
18 health -- a billion dollar mental health
19 hospital and health care facility knows what
20 they are doing.
21         They should be able to count on them to
22 do what should be done.  So it wasn't Bowling
23 Green who killed her.  Bowling Green saved her
24 life, stabilized her and got her to Deaconess

111

1      They made a call to a mental health
2  hospital, Deaconess Cross Pointe.  They have
3  a suicidal -- a young under-24-year-old white
4  female who is a college student.  She needs
5  care.  Can we send her to you.
6      And then they made the arrangements,
7  and it was Deaconess Cross Pointe who said we
8  accept her and will set her up with the LCSW on
9  the 17th and Dr. Smith the 19th I believe --
10     Q.   Sir, where did you get that information
11 that you just gave me, that they called
12 Deaconess Cross Pointe and said we want to send
13 this girl to you for care and that it was
14 Deaconess's choice to put her with a
15 psychotherapist?
16     A.   Are you telling me you think Bowling
17 Green knew about the great skills of Powell and
18 Smith and found those people?  No.
19     Q.   I am telling you Bowling Green made an
20 appointment for outpatient therapy at Deaconess.
21     A.   Yes.  And Deaconess accepted them, and
22 then they fired her out to two incompetents.
23     Q.   Okay.  What Bowling Green didn't do is
24 call Cross Pointe and say she needs to see a

110

1  Cross Pointe.
2      And it's Deaconess who did the deed
3  with respect to Smith and with respect to
4  Powell.  I think that's common knowledge.
5  Everybody knows that.  I am not telling you
6  something you don't know in my opinion
7  respectfully.
8      Q.   It certainly is your opinion.
9  Discharge summary, "Patient is cleared for
10 release to home.  She was instructed to follow
11 up with her primary care physicians within one
12 week of discharge.  Wants to go home with mom
13 after discharge to follow up with outpatient
14 therapist.  Patient was cleared from release
15 from a psychiatric standpoint."
16         Do you see anywhere in the Bowling
17 Green records where they said we are discharging
18 her and she needs to follow up with a
19 psychiatrist?
20     A.   I think when you refer a patient to
21 Deaconess Cross Pointe whatever level, you are
22 including the chief of psychiatry.  If he called
23 over there and told Deaconess Cross Pointe how
24 to suck eggs, they would hang up on him or at

EXHIBIT C  112

1  least they would insult him and say, listen, we
2  respect the referral, we appreciate the
3  referral, we will give her high quality care.
4       And he had every reason to think that
5  they would know what they were doing.  Obviously
6  they didn't know what they were doing.
7       They were irresponsible.  They didn't
8  supervise their employees.  They didn't
9  supervise Powell.  They didn't know Powell's
10 level of skill -- level of ability and skill set
11 which I believe were inferior.
12      They didn't -- they knew what they had
13 with Smith, and they sent a mentally troubled
14 lady to a woman who could hardly speak English
15 and could hardly write English.  And I criticize
16 them for that.
17  Q.   Okay.  So now we are going to be
18 xenophobic?
19  A.   Who?  Xenophobic?
20  Q.   Yeah.
21  MR. ELLIS:  Objection.  It's argumentative
22 and hostile.
23  THE WITNESS:  I am not being xenophobic.
24  MR. ELLIS:  Comments about whether somebody

113

1  can communicate clearly in the English language
2  for mental health treatment I don't think are
3  xenophobic.  It's part of the job to be able to
4  communicate.
5  MS. WATTS:  All right.
6  THE WITNESS:  If you are a surgeon, you
7  don't have to speak English.
8  BY MS. WATTS:
9  Q.   Is there any evidence in this case that
10 Ms. Borum couldn't understand Dr. Smith?
11  A.   Yeah.  You know what, there is evidence
12 that the medical director could not
13 understand --
14  Q.   That wasn't my question.
15  A.   But it's an important thing, eh
16 couldn't her, that's why he sent her to English
17 language classes.
18  Q.   Not my question.
19  A.   That's my answer.
20  Q.   We are going to miss our flight --
21  A.   Please don't put that on me.
22  Q.   -- if you don't answer my question.
23  A.   Please don't put that on me.
24  Q.   Is there any evidence in this case that

114

1  Ms. Borum did not understand Dr. Smith?
2  A.   I don't think the question was asked,
3  and I don't recall an answer that she gave.
4  Q.   If Ms. Borum couldn't understand
5  Dr. Smith, would she have gone back to her two
6  more times?
7  A.   You know, I think she liked her.
8  Q.   I think she did, too.
9  A.   And sadly, I bet she has a nice
10 personality.  I will bet she is a sweetheart.  I
11 will bet she is a fine wife and mother, but she
12 shouldn't be practicing psychiatry.
13  Q.   Okay.  Most mental health disorders --
14 you will agree with me that most mental health
15 disorders are treated by family medicine
16 physicians or other primary care physicians,
17 correct?
18  A.   Where are you reading that from?
19  Q.   From my outline.
20  A.   Oh, okay.  No, I don't think that's
21 true.
22  Q.   Okay.  Do you agree with Dr. Goldstein
23 that primary care physicians provide up to
24 75 percent of the mental health care in the

115

1  United States?
2  A.   I don't know if that's true either.
3  That seems high to me.
4  Q.   Okay.  Do you agree that primary care
5  physicians are qualified to treat and manage
6  general mental health illnesses such as
7  depression, anxiety and adjustment disorder?
8  A.   Yes.
9  Q.   Do you agree that depression is the
10 most common mental health illness in the United
11 States?
12  A.   That might be true.  It's close.
13  Q.   Closely followed by anxiety probably?
14  A.   Everybody is depressed which has some
15 anxiety component, and everybody is anxious
16 which has a depressive component pretty much so
17 they kind of go together.
18  Q.   Yeah.  Do you agree with Dr. Goldstein
19 that a fairly large percentage of patients with
20 major depression will not have a significant
21 improvement even with treatment whether it's
22 psychotherapy or medication or some
23 combination?
24  A.   Would you read that back?

116

EXHIBIT C

1        (Record read)
2     THE WITNESS:  I don't know what fairly
3   large -- I think it's true that some patients
4   don't respond.  I think there is a bunch of new
5   drugs and a bunch of old modalities that help a
6   few to some patients are treatment resistant,
7   most are not.  That's my opinion.
8   BY MS. WATTS:
9     Q.   So you would disagree with fairly large
10  percentage?  You would say some are --
11    A.   I don't know what fairly large is.  I
12  would have to ask him that question, and perhaps
13  we could have an interchange.  Then I could tell
14  you if I agreed, but I stand by my answer which
15  is I think it's some small number to some -- I
16  don't think it's fairly large.
17    Q.   Okay.  Do you agree with Dr. Goldstein
18  that the standard of care does not require
19  family medicine practitioners to utilize
20  particular guidelines -- checklists or screening
21  tools to screen for depression or suicide?
22    A.   I 100 percent believe that if a family
23  physician is managing a depressed suicidal
24  patient, that he must acquire the skills to

117

1   follow APA guidelines or refer the patient to a
2   psychiatrist.  So I think that statement means I
3   disagree with him to some degree.
4     Q.   My question is a little bit different.
5   There are certain screening tools or checklists
6   of questions so to speak to ask every patient
7   that comes with depression.
8         Do you agree with Dr. Goldstein that
9   it's not the standard of care that a family
10  medicine physician has to use those certain
11  checklists or screening tools?
12    A.   No.  If he has them in mind, if he
13  knows what the questions are, he doesn't have to
14  use those tools.
15        But if you are not doing this every day
16  all day, you are not going to remember them, and
17  it's important to remember them.  And an easy
18  way to remember them is to take a list.
19        But you don't have to -- the key is to
20  get the -- ask the questions and write down the
21  answers with 100 percent completeness.  You
22  can't miss any of them in order to meet APA
23  guidelines.  I think that's what he was saying.
24    Q.   Do you agree that suicide rates are

118

1   increasing across all demographics in the United
2   States?
3     A.   I don't know the answer to that.
4     Q.   Okay.  Do you agree that suicide rates
5   are increasing in the United States?
6     A.   I think they are fairly high today,
7   45,000 people in the U.S., more than 800,000
8   people worldwide.  That's the best I can do.
9     Q.   Okay.  I have a document from the CDC
10  that I referred to with Dr. Goldstein called
11  Vital Signs, Trends and State Suicide Rates in
12  the United States from 1999 to 2016.
13        And you can see whatever part of this
14  you want, but this states that, "Suicide intent
15  was disclosed by 22.4 percent and 24.5 percent
16  of persons without and with known mental health
17  conditions respectively."
18        Are you aware of that statistic, that
19  only about 25 percent of patients disclose their
20  suicidal intent?
21    A.   I don't think that's what this sentence
22  case.  It says that when asked 22 -- 22.4 and
23  24.5 percent of people without and with known
24  mental health conditions said they had suicide

119

1   attempts.
2         It doesn't say how many with suicide
3   intent didn't tell anybody.  That's not what
4   that says respectfully.
5     Q.   All right.  Decedents without known
6   mental health conditions were significantly less
7   likely to have a history of suicidal ideation or
8   prior suicide attempts compared to those with
9   known mental health conditions.  Suicide intent
10  was disclosed by 22 and 24 percent of persons
11  without and with known mental health conditions
12  respectively.  That's decedents.
13    A.   I don't think that's --
14    Q.   You can disagree with it.
15    A.   No, no, I don't disagree.  I am saying
16  everybody knows that.  There's nothing profound
17  about that.
18    Q.   Okay.  Are you aware of the statistics
19  that more than half of those who commit suicide
20  are in treatment when they die?
21    A.   That's not surprising to me.
22    Q.   Okay.  Despite a focus on determining
23  the degree of suicide risk in individual
24  patients in improving the effectiveness of

120

**EXHIBIT C**



1  suicide prevention methods through psychiatry
2  and primary care medicine, in general suicide
3  rates have continued to increase." Is that
4  fair?
5       A.   I don't know the answer to that. That
6  seems high to me. That doesn't seem quite
7  right, but I think with respect to something
8  that you just said in one of my piles here --
9  ah-hah. I found it.
10       On page two of the Deaconess Cross
11  Pointe pamphlet on suicide part one recognizing
12  warning signs, it says suicide facts. Suicide
13  is preventable. Deaconess knows that. I know
14  that. Every health care worker knows or should
15  know that.
16       I agree that there is a suicide in the
17  U.S. every 15 minutes, the whole idea of course
18  you can't prevent every suicide.
19       Q.   So not every suicide is preventable?
20       A.   Absolutely correct. But --
21       Q.   We'd like to believe --
22       A.   But if you do the right thing, if you
23  meet APA guidelines, if you have competent
24  people caring for a patient that's referred to

121

1  sounds high to me. I don't believe that.
2       Q.   You don't believe suicide rates have
3  continued to increase?
4       A.   No.
5       MR. ELLIS: Objection. Asked and answered.
6  BY MS. WATTS:
7       Q.   Okay. Do you think suicide rates are
8  decreasing?
9       A.   I don't know the answer to that.
10       Q.   All right.
11       A.   Somebody knows though. I don't.
12       Q.   So you told me suicide is not always
13  preventible, correct? Or is it?
14       A.   Suicide -- patients vulnerable to
15  suicide require intensive follow-up and care
16  according to APA guidelines. The team doing
17  that work should be led by a psychiatrist.
18       If everything is done properly, some
19  patients still suicide, yes, I believe that's
20  true. If you don't follow APA guidelines,
21  patients don't do as well. More patient die
22  than if you do like in the case of Nicole Borum.
23       Q.   Okay. Care can reduce the risk of
24  suicide, but it cannot always prevent suicide.

123

1  you by another institution an hour-and-a-half
2  away and you do your best and you meet the
3  standard of care and the patient dies, hey, that
4  happens.
5       But you can't say that suicide is not
6  discoverable. She had every warning sign known
7  to man or woman for being vulnerable to suicide.
8       She had attempted suicide. And she
9  didn't get the -- she didn't get weekly
10  psychotherapy. She didn't get weekly visits
11  with her LCSW. She didn't get followed on a
12  weekly basis by Smith.
13       And then she was abandoned by Smith at
14  a time when she doubled the dose of a drug that
15  has no therapeutic benefit after the original
16  dose.
17       Q.   We are going to get there. I want an
18  answer to my question first. Despite a focus on
19  determining degree of suicide in individual
20  patients and improving the effectiveness of
21  suicide prevention methods both in psychiatry
22  and primary care medicine, suicide rates have
23  continued to increase, right?
24       A.   I already answered that. I said that

122

1  Is that fair?
2       A.   I think the better way to say it --
3       Q.   Is the way you said it?
4       A.   -- is the way I said it.
5       Q.   All right. Do you agree with
6  Dr. Goldstein that the goal of treating a
7  patient who is at risk of suicide is to treat
8  and reduce the modifiable risk factors that that
9  patient has?
10       A.   That makes sense to me.
11       Q.   Okay. So when we talk about suicide
12  risk factors, some of those risk factors are
13  modifiable and some of them are stagnant,
14  correct? For example, a family history of
15  suicide, that's a stagnant risk factor?
16       A.   I don't think stagnant is the word, but
17  something like stagnant.
18       Q.   Chronic? It's not going to change?
19       A.   It's an unchangeable unmodifiable fact.
20       Q.   Okay. It's not something you can
21  modify?
22       A.   No. It can't be -- you can't change
23  your history. You can't say you are a Navajo
24  Indian if you are not an Indian.

124

**EXHIBIT C**

**Page 125**

1    Q.   History of suicide --
2    A.   In most cases you can't do that.
3    MR. ELLIS:  Can we take a five-minute
4 bathroom break?
5    MS. WATTS:  Sure.
6                    (Recess taken)
7 BY MS. WATTS:
8    Q.   We were talking about risk factors for
9 suicide, how some are modifiable and some are in
10 my words stagnant or not modifiable.
11         And you agreed that the clinician's
12 goal is to treat those risk factors that are
13 modifiable, and you agree we do that through
14 medication or psychotherapy or both?
15    A.   Yes.
16    Q.   Okay.  There is also an idea in the
17 literature, and I had this discussion with
18 Dr. Goldstein, of warning signs of suicide.  Are
19 you familiar with warning signs of suicide?
20    A.   I am.
21    Q.   And those would be things that occur in
22 the minutes, hours, maybe days prior to a
23 suicide, correct?
24    A.   Yes.

**Page 126**

1    Q.   And those include seeking access to
2 lethal means, acting recklessly or engaging in
3 risk activities, increasing alcohol and drug
4 use, feeling trapped, rage, anger, withdrawing
5 from family and friends and dramatic changes in
6 mood?
7    A.   These are risk factors.
8    Q.   Warning signs?
9    A.   Okay.
10    Q.   Do you agree that those are warning
11 signs for suicide?
12    A.   I agree.
13    Q.   Okay.  Let's see.  You agree there is
14 no objective test for suicidality?
15    MR. ELLIS:  Objection.  You can answer.
16    THE WITNESS:  There is no simple blood test,
17 no simple straightforward test, yes.
18 BY MS. WATTS:
19    Q.   Okay.  Do you agree that for a
20 physician to act and intervene on a patient who
21 becomes suicidal requires the patient to
22 communicate such a need and ask for help or
23 requires caregivers, family or friends who
24 observe a patient in an emotional crisis to

**Page 127**

1 notify doctors and psychiatrists that something
2 has changed?
3    A.   Or the doctor asks the appropriate
4 questions that elucidates the suicidal state.
5    Q.   That's if the patient is at the
6 doctor's office?
7    A.   Correct.
8    Q.   Okay.  If the patient's not at the
9 doctor's office while they are suicidal, then
10 for a physician to act and intervene on a
11 patient who becomes suicidal, it requires the
12 patient to communicate that need and ask for
13 help or it requires caregivers, family and
14 friends who observe a patient in an emotional
15 crisis to notify doctors and psychiatrists
16 something has changed?
17    A.   Yes.
18    Q.   And that's because doctors don't
19 operate in a vacuum.  If doctors don't know
20 there is a change and there is a problem, you
21 can't do anything about it?
22    A.   Yes.
23    Q.   Okay.  All right.  Let's talk about
24 SSRI's.  SSRI's are a first-line treatment for

**Page 128**

1 many mental health diagnoses including
2 depression?
3    A.   Yes.
4    Q.   Okay.  The vast majority of SSRI's are
5 prescribed by primary care physicians?
6    A.   Yes.
7    Q.   They can also be used to treat anxiety?
8    A.   Yes.
9    Q.   The overall risk of suicide is reduced
10 when depression is treated with SSRI's?
11    A.   Yes.
12    Q.   There is a startup time for SSRI's to
13 become therapeutic after initiation?
14    A.   It's variable.
15    Q.   It's variable.  Dr. Goldstein said in
16 his experience it's three to six weeks.  Do you
17 agree with that?
18    A.   It may be less.
19    Q.   May be less.  And do you agree with
20 Dr. Goldstein that side effects if they occur
21 generally occur in the first couple weeks of
22 taking the medication?
23    A.   Yes.
24    Q.   Okay.  All right.  Generally all

EXHIBIT C

1  antidepressant medicines work to correct brain
2  hormone levels?
3      A.   Neuro transmitter levels is the answer.
4      Q.   Okay.  And the standard treatment is to
5  push the dose until the symptoms are gone?
6      A.   Yes.
7      Q.   All right.  Do you agree with me that
8  no side effects were reported by Nicole Borum at
9  initiation of Lexapro?
10     A.   None documented.
11     Q.   Okay.  Did any of her friends or family
12 members report that she had had -- that she
13 reported any side effects?
14     A.   I don't recall.
15     Q.   Nicole reported --
16     A.   And I don't think they were asked.
17     Q.   Okay.  Nicole reported to Dr. Smith
18 that the Lexapro was working well for her?
19     A.   Apparently so.
20     Q.   Okay.
21     A.   Except why did she come back in and ask
22 for more Lexapro?  Because she wasn't healed.
23 She wasn't well.
24     Q.   Because her symptoms weren't all gone.

129

1  She still had some anxiety?
2      A.   I think she had more than that.
3      Q.   If we look to Dr. Smith record what it
4  is she still had some anxiety that was her
5  complain that day.  I am feeling a lot better
6  but I still have some anxiety?
7      A.   Please give me more medicine is what
8  she said, yeah.
9      Q.   Is that what she said, please give me
10 more medicine?
11     A.   I think that's what she was saying by
12 saying can I get more drugs.
13     Q.   And if a patient's symptoms aren't all
14 gone, then the standard treatment is to push the
15 dose until the symptoms are gone?
16     A.   Unless the manufacturer of the drug
17 says max therapeutic effect occurs at ten
18 milligrams and you don't get more therapeutic
19 effect at 20 milligrams.
20     Q.   Let's talk about the manufacturer's
21 package insert.  Sir, you have testified that
22 physician's prescription methods and use of a
23 drug are not defined by the prejudiced weighted
24 document put out by the manufacturer and the

130

1  marketer of an individual drug, have you not?
2      A.   I believe that's sometimes true,
3  sometimes not true.
4      Q.   Okay.  How about this one?
5           Question, "Would the standard of care
6  in whole or in part be defined by the PDR?"
7           Answer, "Oh, never ever.  In a million
8  years, no."
9           Do you agree with that?
10     A.   I believe --
11     Q.   That doesn't seem like sometimes true,
12 sometimes not.
13     A.   I believe that was a misstatement if I
14 said that.
15     Q.   That's a pretty strong misstatement
16 "Never ever.  In a million years, no."
17     A.   I think there are situations where
18 that's an overstatement, no question about it.
19 If I said that, not only I take it back, but I
20 apologize profusely.
21     Q.   And in that case you were defending a
22 family practice doctor in a suicide case, and in
23 this one you are on the other side.  So I guess
24 you take an opposite position when you are on

131

1  the opposite side?
2      A.   No.  You know, every word that I say is
3  recorded in perpetuity, witness the last 60
4  seconds, so I am very careful about what I say.
5           I got -- I made that statement, and I
6  need to see the context in which I made that
7  statement to see if there is a better
8  explanation for why I said it the way I did.
9           I bet I was provoked, but if you are
10 reading my words correctly, I need to see the
11 context.
12     Q.   I will give you one more and then I
13 will show you all of the context.
14          Question, "In your opinion does the
15 standard of care for a family practitioner
16 prescribing Doxepin, an antidepressant, require
17 him to consult the package insert?"
18          "No."
19          "In your opinion does the standard of
20 care for a family practitioner prescribing
21 Doxepin require him to look at the current PDR?"
22          "No."
23          Start at page 137 to 139.
24     MR. ELLIS:  So the records reflect this

**EXHIBIT C**

132

1 appears to be a deposition taken of Dr. Brown in
2 1994 in the Circuit Court of Cook County
3 Illinois. So this is 25 years ago.
4    MS. WATTS: Which is less than a million
5 years.
6    MR. ELLIS: Do you want him to read this
7 entire deposition now and familiarize --
8    MS. WATTS: No.
9    MR. ELLIS: Because if you just want him to
10 read those two sections, that not really going
11 to give him an opportunity to provide a context.
12 We are happy to take a copy of the --
13    MS. WATTS: I just want to know if he agrees
14 with his words that the standard of care in
15 whole or in part could be defined by the PDR?
16 Never ever. In a million years, no.
17    MR. ELLIS: Katie, are you talking about the
18 standard of care back in 1994 or are you talking
19 about --
20    MS. WATTS: Well, he says never in a million
21 years.
22    MR. ELLIS: -- the standard of care that we
23 have now in 2019 and the knowledge we have
24 because back in 1994 was there even a black box
133

1 warning on the --
2    MS. WATTS: I am talking about the standard
3 of care, and he says in a million years it will
4 never be defined by the PDR.
5    MR. ELLIS: Got you. This is the 1994
6 version of the PDR?
7    MS. WATTS: I am sure.
8    MR. ELLIS: Okay. I mean, how long do you
9 want him to read it?
10    THE WITNESS: I'm done. Let me see say the
11 following. That there is no reason to look at
12 the PDR if you know the appropriate use of
13 Doxepin, the side effects, the hazards and risks
14 of prescribing a drug.
15    The PDR is acknowledged to be helpful.
16 It's written by the manufacturer. Mostly it's
17 correct. Sometimes it's incomplete.
18    I don't think the standard of care is
19 defined by the PDR and the drug use is
20 necessarily limited in the world of the practice
21 of medicine by what the PDR says.
22    So having read this and seeing the
23 context, the point is you need to do the right
24 thing. You need to be aware of the side
134

1 effects, hazards and risks and the appropriate
2 dose of the drug.
3    You don't need the -- if you already
4 know that, you don't need the PDR. So in that
5 context I take back my taking back.
6    Q. Okay. So you stand by your words?
7    A. I do.
8    MR. ELLIS: Let me just see that real quick.
9 So this is.
10 BY MS. WATTS:
11    Q. And you still refer to the package
12 insert as the prejudiced weighted document put
13 out by the manufacturer?
14    A. I would take those words back. I think
15 that's cruel.
16    Q. I like them. I'd keep them.
17 Dr. Brown, do you now remember that you ever
18 testified in a suicide case previously?
19    A. Apparently so. You tricked me, you
20 crafty person. So the plaintiff's firm was the
21 two twin brothers, Goldberg & Goldberg.
22    MR. ELLIS: We don't need to get into this
23 unless you want to get into this.
24    THE WITNESS: They are a couple of crafty
135

1 individuals.
2 BY MS. WATTS:
3    Q. Do you agree that Lexapro is a commonly
4 prescribed SSRI?
5    A. Yes.
6    Q. Do you agree it does not carry a higher
7 risk of suicidality than any other SSRI?
8    A. I believe that's true.
9    Q. Okay. It contains a black box warning
10 related to an increased risk of suicidality in
11 patients younger than 24?
12    A. Yes.
13    Q. Do you agree with Dr. Goldstein's
14 definition of suicidality as serious
15 preoccupation with suicidal behavior or intent
16 to attempt suicide but not completed suicide?
17        (Record read)
18    THE WITNESS: I can't have suicidal ideation
19 or suicidality if you are already dead
20 obviously.
21 BY MS. WATTS:
22    Q. That's a yes or no question, sir. Do
23 you agree with that definition or do you have a
24 different definition?
136

EXHIBIT C

Finley Brown, MD 10/16/2019

---

1    A.  I couldn't argue with that definition.
2    Q.  Okay.  The FDA's black box warning, do
3  you agree that the FDA's black box warning was
4  based upon a metal analysis of medical studies
5  which showed a modest increase in suicidality in
6  patients under age 24 at initiation of therapy?
7    A.  Apparently so.
8    Q.  Okay.  And do you agree that in 2007
9  the FDA softened its warning, and some
10  psychiatrists have written that the warning
11  should be removed altogether?
12    MR. ELLIS:  Objection.  You can answer.
13  BY MS. WATTS:
14    Q.  Do you agree with that?
15    A.  I don't know the answer to that.
16    Q.  Okay.  Do you know whether the FDA
17  softened its warning in 2007?
18    A.  There is some argument about that.  I
19  would defer to a pharmacologist or somebody more
20  knowledgeable than myself.
21    Q.  Okay.  Are you aware that the studies
22  underlying the black box warning there were no
23  completed suicides in those studies?
24    A.  I don't know if that's true or not.

137

---

1  That would surprise me.
2    Q.  Okay.  Are you aware of any medical
3  literature or studies even those that underlie
4  or support the black box warning that show an
5  increased risk of suicidality in young adults at
6  dose change of SSRI?
7    A.  Read that please.
8          (Record read)
9    THE WITNESS:  I believe that might be true.
10  BY MS. WATTS:
11    Q.  Can you cite me to any?
12    A.  No, I can't cite you to any literature.
13  I would defer to a pharmacologist or quality
14  psychiatrist.
15    Q.  Okay.  I am guessing likewise you
16  couldn't cite me to any literature that shows an
17  increased risk of suicidality in young adults at
18  dose change when the patient did not experience
19  any side effects at initiation of the
20  medication?
21    A.  True.
22    Q.  Okay.  Are you aware of the theories,
23  the different theories, behind the increase --
24  the purported increase in suicidality in young

138

---

1  adults at initiation of SSRI, why they think
2  this might happen?
3    A.  It's not clear to me.  I think there is
4  some decrease in inhibition.  Perhaps some
5  secondary increase in alcohol and drug use that
6  might account for that.
7    Q.  Okay.  Is it your opinion that Nicole's
8  suicide was caused by a side effect of Lexapro?
9    A.  No.  I believe her suicide was caused
10  by her abandonment by Smith and Powell
11  basically.
12    Q.  Okay.  So you don't believe she had
13  suffered a side effect of Lexapro?
14    A.  I think she did have a side effect of
15  Lexapro, but what caused her suicide I believe
16  was the abandonment of this patient by the two
17  individuals just mentioned.
18    Q.  Okay.  Did the side effects of Lexapro
19  have any causal relationship to her suicide?
20    A.  I think it decreased her inhibitions,
21  made her more vulnerable to mind-altering
22  substances like alcohol and drugs.
23    Q.  Are you aware of any medical literature
24  that indicates that Lexapro decreases

139

---

1  inhibitions or makes us more vulnerable to
2  mind-altering substances?
3    A.  I'm not able to provide you any -- I
4  haven't done a literature search on that.  I
5  believe it's factual.
6    Q.  If Dr. Smith had not prescribed Lexapro
7  to Nicole, would Nicole still be alive?
8    A.  No.  Because she didn't see Nicole
9  weekly.  And after that August number three
10  visit never saw her again.  She gave her six
11  months of a drug which was so inappropriate and
12  told her to come back in 11 months and told her
13  if she felt better, she could taper herself the
14  Lexapro.
15    Q.  Right.  I said if Dr. Smith had not
16  prescribed Lexapro to Nicole, would Nicole still
17  be alive, and you gave me an answer about her
18  prescribing Lexapro to Nicole?
19    A.  Well, I think Dr. Smith's care and
20  treatment was substandard and deviated from the
21  standard of care.
22    If she hadn't given her Lexapro, I
23  think the care would have been still
24  substandard, and I think she more likely than

EXHIBIT C
140

---

1  not would still have suicide.
2      Q.   It would have been worse if she hadn't
3  given her Lexapro?
4      A.   There is a question of whether -- if
5  she stayed at ten milligrams that maybe she
6  wouldn't have the increase in side effect with
7  no increase of efficacy of the drug which may
8  have caused what happened to happen.
9      Q.   Are you aware of any medical literature
10  that supports your contention that there is no
11  increase in efficacy at 20 milligrams?
12      A.   I am not prepared to provide that
13  today.  I will at trial.
14      Q.   Okay.  All that's referred to in your
15  report is the prejudiced weighted document put
16  out by the manufacturer.  You are not currently
17  aware of anything else other than that?
18      A.   Well, if they said that, I think you
19  can believe it.
20      Q.   Okay.  All right.  Suicide risk
21  assessments, you are critical of Dr. Smith and
22  Ms. Powell for not performing comprehensive
23  suicide risk assessments.
24           What in your opinion does the standard

141

1  of care require in the performance of a
2  comprehensive suicide risk assessment?
3      A.   I have a document that summarizes APA
4  practice guidelines regarding assessment of
5  suicide as part of the initial psychiatric exam
6  which I hand to you.
7           I also hand to you the AFP document on
8  the evaluation of treatment on the suicidal
9  patient from the American Family Physician
10  March, 2012 lecture which describes the kinds of
11  questions you need to ask with respect to risk
12  factors associated with suicide, biologic,
13  psychologic, environmental and then questions to
14  ask in the assessment of suicidal intent, about
15  15 questions.
16           And then it has a document and a couple
17  statements on short-term management.  I hand you
18  this document right now.
19           I also have another document Suicide
20  Prevention in Youth and Young Adults from the
21  September 10, 2013 Oregon Council of Child and
22  Adolescent Psychiatry which lists a series of
23  important things that need to be done.
24           And the comprehensive risk assessment

142

1  including interviewing the family to obtain
2  additional history, obtaining information from
3  all previous treatment providers which of course
4  wasn't done in this case.
5           Reviewing the medical records carefully
6  wasn't done.  She didn't have the -- Smith did
7  not have the psychiatric records, neither did
8  Powell.
9           And then it discusses following the
10  initial evaluation, the communication with the
11  patient, the need to explicitly inform the
12  family in the presence of the patient of all
13  safety issues, discussion of available community
14  resources, involve the patient and family in the
15  planning process, assure follow-up is in place
16  with a specific and timely appointment and
17  confirming that the patient has attended the
18  follow-up appointment.
19           In this case Smith never knew that
20  Nicole only went to one visit.  Powell never
21  talked importantly to Smith and let her know.
22           Smith never thought to call Powell.
23  They both acknowledged they never talked to each
24  other, and of course Smith could have

143

1  discovered she never came back with a 30 second
2  look at the electronic medical record which
3  would have --
4      Q.   Does this --
5      A.   -- proved that.
6      Q.   -- document from the Oregon
7  Psychiatric Association set the standard of care
8  for a primary care physician in Evansville,
9  Indiana?
10      A.   Yes, I think it reflects the standard
11  of care, no question about it.  And what's in
12  the AFP thing --
13      Q.   Let's talk about the APA?
14      A.   -- the APA and what's in the Oregon,
15  they are all saying the same thing.  We believe
16  the vast majority of treatment scenarios with
17  the involvement of the family will enhance care,
18  reduce both the risk of suicide and other odious
19  problems.
20      Q.   Okay.  The APA practice guidelines you
21  have given me are from 2016, correct?
22      A.   Sure.
23      Q.   So these came out after Dr. Smith's
24  care of Nicole?

**EXHIBIT C** 144



Finley Brown, MD 10/16/2019

1     A.   Well, there was a previous document.
2  This is a fresh one.  There is nothing new here.
3     Q.   The previous one was from 2003.
4     A.   It all says the same thing.
5     Q.   Do you know what the 2003 one says?
6     A.   I haven't memorized it, but I am sure
7  it says pretty much the same thing.
8     Q.   You didn't pull the 2003 one, did you?
9     A.   I have it somewhere in here actually.
10    Q.   Okay.  So other than the 2016 APA
11  guidelines, all of the other things you have
12  given me are documents that plaintiff's counsel
13  gave to you, correct?
14    A.   100 percent true.
15    Q.   Okay.
16    A.   And previously mentioned to you.
17    Q.   Yes.  So in your practice where do you
18  go to figure out what your psychiatric
19  assessment is supposed to be?
20    A.   What I do is do what all reasonably
21  competent and reasonably qualify family
22  physicians do, they refer the patient to a
23  psychiatrist.
24    Q.   Okay.  All right.

145

1     A.   Should I keep these and then give them
2  back to you?
3     Q.   Sure.  Have you seen any evidence in
4  this case as to what the wait time for Nicole to
5  see a psychiatrist would have been?
6     A.   Since I am both a clinician in private
7  practice and an academic put on courses for
8  doctors from around the country who also
9  practices in a busy city where sometimes it's
10  hard to get in to see a psychiatrist, in every
11  city in the country if you have a patient that
12  has a potentially life-threatening disease who
13  needs to see a psychiatrist, if a doctor makes a
14  call either to psychiatric friend or if he is on
15  staff of the hospital that has a mental health
16  hospital and said, look, I have got a suicidal
17  23-year-old still having suicidal ideation, I
18  need her seen by a psychiatrist in the next few
19  days, with 100 percent certainty it gets done.
20    Q.   Was Nicole having suicidal ideation at
21  any time -- at any of the visits when she saw
22  Dr. Smith?
23    A.   You can't tell from the records because
24  the record's incomplete.  But she had it when

146

1  she saw Powell, and she saw Smith two days
2  later.
3     Q.   When she saw Dr. Smith, Dr. Smith
4  documented each time that she had no suicidal
5  ideation, correct?
6     MR. ELLIS:  Objection.
7     THE WITNESS:  I don't believe that's
8  correct.  Dr. Smith said at office visit number
9  one on 6-19 of '16 with respect to the review of
10  systems on psychiatric behavioral, she said it
11  was negative.
12         I mean, is that laughable?  I am
13  telling you it is laughable.  She described her
14  as having major depressive disorder, single
15  episode, severe without psychotic features.  I
16  believe that requires a psychiatric
17  consultation.
18  BY MS. WATTS:
19    Q.   Do you remember what my question was?
20    A.   Yeah, I do.  Hold on.  Here's a gal
21  that three days -- two days earlier had suicidal
22  ideation, and in the history of present illness
23  Dr. Smith writes down that she is here to
24  evaluate her liver enzymes.

147

1         what?  She is excited about her venture
2  for future and not to do well.  I think that's
3  dwell.  For some reason it came out not to do
4  well.  Of course she didn't correct this note.
5  She spoke to her counselor.
6     Q.   Wait, wait.  You skipped a sentence.
7  Not depressed but a little anxious.
8     A.   Well, not depressed?  I don't believe
9  that's factually correct.  I think with a high
10  degree of anxiety she had anxiety and
11  depression.  If she had suicidal thoughts two
12  days later, can that possibly be true in this
13  note written by a gal who doesn't communicate
14  well in the English or written word.
15         She said she was able to briefly
16  summarize what happened.  She recognized it was
17  on reasonable.  She denies any previous medical
18  history or other psychiatric problems.
19         That means she took a poor history.
20  That means she didn't discover -- she didn't
21  notice on her physical exam that she had cutting
22  scars on her arms.
23         She didn't get the history that her
24  grandmother suffered from anxiety or depression.

EXHIBIT C  148

1    Q.   Did anybody at Bowling Green notice
2  scars on her arms or get a history of cutting?
3    A.   No.  But they did the right thing.
4  They sent her to Deaconess Cross Pointe hoping
5  that this mental hospital would do what they are
6  really expert at which they did not do.
7    Q.   She was inpatient psychiatric, and they
8  didn't discover she had a history of self-harm,
9  correct?
10   MR. ELLIS:  Objection, misstates the record.
11 There is nothing in the record that says they
12 didn't discover.  They actually say that she has
13 got a history of depression.
14   MS. WATTS:  Right.  And I said they didn't
15 discover she had a history of self-harm.
16   MR. ELLIS:  How do you know?  Objection,
17 misstates the record.
18   MS. WATTS:  It's not in the records, and
19 according to your experts if it's not written
20 down, it didn't happen.
21   THE WITNESS:  Additionally Dr. Smith wrote
22 under her plan, "Her depression has been
23 improved with the continuous counseling.  Follow
24 up in two weeks."

149

1      She didn't make an appointment.  She
2  just told her approximately 7-3-2015.
3  Apparently she didn't make an appointment which
4  is outside the standard of care.  Is there a
5  causation issue there?  No.
6  BY MS. WATTS:
7    Q.   I am going back to my question.  Did
8  Nicole Borum have suicidal ideation at any of
9  the three visits with Dr. Smith?
10   A.   The question of suicidal ideation isn't
11 addressed in this record.
12   Q.   Okay.  Let's see what is addressed.
13 She says, "Not depressed but a little anxious,
14 and her depression has improved with continued
15 counseling."
16   A.   What about suicidal ideation?  They
17 didn't ask the question.
18   Q.   Okay.
19   A.   Bong.
20   Q.   Well, when you were defending Dr. Shin
21 you --
22   MR. ELLIS:  Is this the 1995?
23   MS. WATTS:  It sure is.  Because you do
24 things way different when you are defending a

150

1  doctor than when you are testifying against one.
2    THE WITNESS:  Not true.
3    MS. WATTS:  Very true.
4    THE WITNESS:  Not true.
5  BY MS. WATTS:
6    Q.   Question, "You are inferring from the
7  12-21-88 note that the patient presented without
8  suicidal ideation from the references that she
9  was feeling better and her depression was
10 better; is that correct?"
11      Answer, "That's correct."
12      Question, "But the note itself does not
13 specifically state no suicidal risk or no
14 suicidal ideation?"
15      Answer, "That's correct."
16      Question, "Now, Dr. Shin testified at
17 his deposition that when she presented on
18 12-21-88, she was without suicidal ideation; is
19 that correct?"
20      Answer, "That's correct."
21      Question, "But this is not a fact that
22 Dr. Shin wrote down in those words on 12-21-88;
23 is that correct?"
24      Answer, "That's correct."

151

1      So in that case you inferred from a
2  note that the patient presented without suicidal
3  ideation from references that she was feeling
4  better and her depression was better.  But you
5  refuse to infer that in this case.
6    MR. ELLIS:  Objection, argumentative.
7  BY MS. WATTS:
8    Q.   Is that correct?
9    A.   What I would say is that not writing
10 down that in this case from 1995 was
11 substandard.  That's what I think today.
12   Q.   Okay.  So we should go back and tell
13 that plaintiff that actually that doctor
14 breached the standard of care and that you were
15 untruthful in your deposition testimony?
16   MR. ELLIS:  Objection, argumentative.
17   MS. WATTS:  It's not argumentative.
18   THE WITNESS:  I think the Goldberg boys lost
19 this case so it wouldn't be helpful.
20   MS. WATTS:  Well, it would be if they had
21 the defense expert conceding that he breached
22 the standard of care.
23   THE WITNESS:  What I am saying is that --
24   MR. ELLIS:  Objection.  That's talking about

152

EXHIBIT C

1  the standard of care from 25 years ago before a
2  lot of this documentation and literature even
3  existed.
4      MS. WATTS:  It's credibility and bias and
5  you know it.  Please stop.
6      MR. ELLIS:  It's not credibility and bias,
7  and I know it.  The guidelines are from 2003.
8  In 1999 the Surgeon General issued a giant
9  report saying we need to do this differently
10 so --
11     MS. WATTS:  You can stop.  I'm talking about
12 his credibility as an expert when he is
13 testifying for one side versus the other.
14     THE WITNESS:  What I just said is that if he
15 didn't write down -- what I am saying today in
16 this case nobody asked me if it was a deviation
17 from the standard of care not to write down that
18 she didn't have -- she had or did not have
19 suicidal ideation.  If they had asked me that, I
20 would say that was substandard.
21 BY MS. WATTS:
22     Q.   Okay.  And I am not asking you whether
23 it was a deviation from the standard of care in
24 either case.

153

1      What I am asking you is if we can infer
2  that Nicole Borum didn't have suicidal ideation
3  from her depression being improved and being not
4  depressed but a little anxious when we could
5  infer that Katherine Hobart presented without
6  suicidal ideation from notations that she was
7  feeling better and her depression was better.
8      A.   I am saying that it's my opinion that
9  without that specifically being said, you don't
10 know.  Now, did anybody come back and ask me
11 that?  No, they did not.
12     Q.   No.  You said you were inferring it.
13 But you are not inferring it here.
14     A.   What I am saying is that the follow --
15 I am saying if you want to follow APA
16 guidelines, you have got to ask the questions
17 and write down the answers.
18     Q.   I am going to make this real clear.
19 Are you inferring from the notation that her
20 depression was improved and she was not
21 depressed but a little anxious, that she did not
22 have suicidal ideation on that date?
23     A.   I am suggesting since she had it two
24 days before she probably still had it,

154

1  especially since she killed herself a couple
2  months later.
3      Q.   Okay.  That's good.  By the way,
4  Katherine Hobart killed herself like two weeks
5  later.
6      A.   Which is why he should have written it
7  down and gotten the answer to that question.
8      MR. ELLIS:  Does that cut out some of the
9  subsequent pages of the outline?
10     MS. WATTS:  I skipped ahead.  So, yeah.
11     THE WITNESS:  Thank you.
12 BY MS. WATTS:
13     Q.   Do you agree with Dr. Goldstein that
14 whether a patient is stratified as low, moderate
15 or high risk for suicide the treatment is the
16 same, it's medication and psychotherapy?
17     A.   Yes.
18     Q.   Okay.  Do you use any particular
19 checklists, screening tools, psychometrics in
20 your practice with patients with mental health
21 problems or do you just refer them all to a
22 psychiatrist?
23     A.   I will ask the questions with respect
24 to anxiety and depression.  Otherwise, I refer

155

1  them to a psychiatrist.
2      Q.   Okay.  So generally you're handling run
3  of the mill anxiety, depression.  Anything else
4  you are going to refer?
5      A.   Yes.
6      Q.   Okay.  All right.  Ultimately patients
7  can make their own health care decisions,
8  correct?
9      A.   A glittering generality.  Sometimes
10 yes, sometimes no.
11     Q.   That's one of your favorite phrases
12 glittering generality?
13     A.   It should be adopted by more people.  I
14 am pretty sure it is.
15     Q.   All right.  When can patients not make
16 their own health care decisions?
17     A.   Well, that's such an open-ended
18 question.  I couldn't answer.
19     Q.   All right.  Can adult patients make
20 their own health care decisions?
21     A.   Well, of course, but if they come to
22 the doctor and the doctor is the medical expert,
23 the doctor needs to act in a way that meets the
24 standard of care and addresses the patient's

EXHIBIT C
156

1  concerns which are I don't want to die, diagnose
2  me so I don't suffer from pain and die and also
3  because they know the sooner you diagnose them
4  the better they will be.
5      Q.   Okay.  So you as a doctor make
6  recommendations to your patients?
7      A.   I do.
8      Q.   And they have the choice whether to
9  follow them or not?
10     A.   As a glittering generality, yes, they
11 do.  If I know they are going to kill themselves
12 or if they're suicidal, I have to do more.
13     Q.   There is a process to have them
14 involuntarily committed in those situations?
15     A.   Mostly it's voluntary, but rarely you
16 have to snatch the patient and have them taken,
17 call the police and have them forcefully taken.
18     Almost never does that have to occur
19 though at least in my experience.  I have had a
20 couple of really ill patients where I have had
21 to do that, but mostly I haven't had to do that.
22     Q.   Short of psychiatric hospitalization,
23 patients have a choice whether to follow your
24 recommendations or not?  For example, you can
                                                    157

1  prescribe a medication, and they can choose to
2  take it or not?
3      A.   Of course.  They can also go find
4  another doctor, however, if they are in my -- if
5  they come to see me and I am engaged in the
6  physician/patient relationship, I have a duty to
7  do the right thing.
8      And if they have serious or
9  life-threatening disease, I have to make sure
10 they get taken care of.
11     Let's say for some reason they said no
12 I don't have an appendicitis.  It's not going to
13 rupture.  I am going to go home.  I have to call
14 the wife, call the children, call the police.  I
15 have to do something.  Same with somebody who is
16 suicidal.
17     Q.   Right.  That's somebody who is acutely
18 suicidal who is showing you suicidal warning
19 signs?
20     A.   I don't think whether it's -- it
21 doesn't have to be -- it doesn't -- I don't care
22 whether the adjective is acute, subacute or
23 chronic.  If they are suicidal, you have to do
24 the right thing, same thing.
                                                    158

1      Q.   Okay.  If you have a patient with high
2  blood pressure, you can prescribe them high
3  blood pressure pills, but you are not going to
4  call them every night to make sure they are
5  taking their high blood pressure medication?
6      A.   Well, you know, if somebody has mild to
7  moderate high blood pressure, Cecil's Textbook
8  says that them come back in a month and check it
9  again.
10     You don't have to really -- you know,
11 if it's 240 over 180, you have to do something.
12 But mostly you just have them come back.
13     Q.   Okay.
14     A.   You educate them.
15     Q.   Maybe that was a bad example.
16     A.   Possibly.
17     Q.   Okay.  If somebody has strep throat and
18 you put them on an antibiotic, you are not going
19 to call them every night and make sure they take
20 their antibiotic?
21     A.   Absolutely not, but I tell my patients
22 if you're worse or no better, call me.
23     Q.   Sure.  Okay.  You cannot force a
24 patient to go see a psychiatrist?
                                                    159

1      A.   Yes, you can if they are suicidal.
2      Q.   If they are suicidal.  So if they meet
3  the criteria for inpatient hospitalization, you
4  can force them to, correct?
5      A.   I don't think -- if somebody has
6  suicidal thoughts, it's for the psychiatrist to
7  decide if they need to be admitted.  It's not
8  for me.
9      It's for me to say you have to go to
10 the hospital, and you need to be screened.
11     Q.   Right.  You can't say I made you an
12 appointment with this psychiatrist, Dr. Jones.
13 You need to go see him.  You can't force that
14 patient to go see Dr. Jones.  That's the
15 patient's choice?
16     A.   That's true unless the patient is
17 suicidal in which case they have to see
18 Dr. Jones, and they have to see him at the
19 hospital.  And I have to have an ambulance or
20 the police take you there.
21     Q.   Yes.  And I am trying to -- well,
22 let's --
23     A.   I know what you are trying to do.
24     Q.   No.  We will put this --

**EXHIBIT C** 160



1    A.   I am joking.

2    Q.   In this way we will get rid of that

3  scenario.  At any time during the period of

4  time -- at any of the three visits that Nicole

5  Borum had with Dr. Smith did Nicole need to be

6  put in an ambulance and taken to the emergency

7  room to see a psychiatrist?

8    MR. ELLIS:  I am sorry.  What was that time

9  period again?

10    MS. WATTS:  The three visits.

11    MR. ELLIS:  So from just the date between

12  the three visits?

13    THE WITNESS:  6-19-15 to 8-17-15.  Well,

14  let's look at this primitive note from 7-10-15

15  offices, number two.  On the one hand she says

16  well adult with dysphoric.  I don't know what

17  dysphoric is.  Probably dysphoria.  She says she

18  is back to normal.  No, she couldn't be back to

19  normal.

20    MS. WATTS:  That's liver function back to

21  normal.

22    THE WITNESS:  It doesn't say -- lab

23  reviewed, back to normal -- to near normal.

24  Feels still sad, but there is no detail

161

1  provided.  Went out last night with people from

2  work and was not feeling good, feels still sad,

3  not feeling good.  Positive for dysphoric mood,

4  negative for suicidal thoughts, ideas.

5    But there is no documentation of what

6  questions were asked and what exactly her

7  answers were which does not meet APA guidelines,

8  especially when under the physical exam it says

9  she feels distressed.

10    So she was uncomfortable the night

11  before with her work friends.  She still feels

12  sad.  She appears to be distressed.

13    She needs to go to the hospital or see

14  a psychiatrist that day is what I would say from

15  this.

16    But then at the bottom under

17  psychiatric she says -- she writes, "She has a

18  normal mood and affect."  That means -- that

19  means that Dr. Smith is an incompetent.

20    You can't say all of these mixed

21  messages in the written form and have reasonable

22  people look at it and not go wow.  I wonder if

23  Dr. Smith -- I mean, what's going on with her?

24    She certainly is not doing the job.  So

162

1  she says physically well but still stressed.

2  Trial of medication for depression.  Call if not

3  working or side effects.  Seeing counselor.

4    It's not true.  She is not seeing the

5  counselor.  She saw her one time and never went

6  back.  So she didn't get her an appointment.

7    Q.   This is the day before -- this is two

8  days before she is supposed to see the counselor

9  the second time?

10    A.   The counselor is supposed to see her --

11  the counselor is supposed to see her weekly.

12    Q.   According to who?

13    A.   According to -- every one to two weeks

14  according to the APA.  I mean, there is enough

15  in here that makes you think, my God, is this

16  gal about to kill herself again?

17    I don't think what she wrote fits with,

18  one, a competent physician.  I think it fits

19  with an incompetent physician.  And it put her

20  life at risk, specifically when she writes that

21  the problem list as of 7-10-2015, she writes,

22  "Well adult."

23    So your original question was wasn't

24  she doing pretty well or what --

163

1    Q.   That was not my original question.

2    A.   What was your hint that maybe things

3  weren't going so well?

4    Q.   No, also not my original question.

5    A.   Tell me what your original question

6  was.

7    Q.   My original question was at any of

8  those three visits did Dr. Smith need to put her

9  in an ambulance and send her to the emergency

10  room?

11    A.   Probably more likely than not on the

12  second office visit, and I don't think on the

13  third visit except when Dr. Smith wrote that she

14  wants to increase her medicine.

15    That means she doesn't feel well.  She

16  is not well.  She is not better.  She is not

17  cured.  Although she does, Smith does, write,

18  "She feels much better with the Lexapro, however

19  she wants to increase her medication."

20    That means she is not really well.  She

21  is hoping the drug will do more.  And then of

22  course Dr. Smith didn't tell her because

23  Dr. Smith probably didn't know that increasing

24  the dose only increases the side effects.  It

164

EXHIBIT C

1   doesn't improve the efficacy.
2         And then what she does is she abandons
3   the patient on that date, a deviation from the
4   standard of care.
5     Q.   Okay.  So do you think she needed -- on
6   the second visit she needed to go straight to
7   the hospital to be evaluated for inpatient
8   hospitalization?
9     A.   I think I would stand by my answer to
10  that question a couple minutes ago which is not
11  exactly what you said.
12    Q.   In your opinion when she arrives at the
13  hospital, what would have been done for her?
14    A.   The psychiatrist would have seen her,
15  and they would have said, my God, you are not
16  seeing -- you haven't seen a -- had a visit with
17  your "psychotherapist".  You are still having
18  these symptoms.
19        And then I think they would have made
20  the right decision which was she would have seen
21  a psychiatrist.
22        The psychiatrist would have taken over
23  her care.  Psychotherapy would have been resumed
24  by somebody.  And if all the -- if the family

165

1   supportive in her life?
2     A.   Yeah, but I don't think they knew she
3   was -- I don't think they were educated about
4   suicide and suicide prevention.
5     Q.   Does it take education to know that
6   your friend who just attempted suicide shouldn't
7   have a gun?
8     A.   Apparently so.
9     Q.   Or does it mean her friends dropped the
10  ball?
11    A.   Well, the easiest thing to do is blame
12  the friends, her loyal, caring friends.
13    Q.   Easier thing to do is blame her doctor
14  that's 100 miles away?
15    A.   Well, blame the friends, blame the
16  call.  Don't blame Dr. Smith who by every
17  objective bit of evidence was an incompetent and
18  who absolutely abandoned her.
19    Q.   Okay.  You can't force patients to be
20  honest with you, can you?
21    A.   That's another glittering generality.
22    Q.   We call those questions in my line of
23  work.
24    A.   I call it a loaded question.  I mean,

167

1   would have been informed, if the mother would
2   have been informed, her friends would have been
3   informed, she would have been informed, informed
4   consent would have been provided to everybody
5   and more likely than not she'd be alive today.
6     Q.   What would happen one month later when
7   she moves back down to Bowling Green?
8     A.   I think a psychiatrist involved in her
9   care would have said it's insane for you to go
10  back to Bowling Green.  It's insane for you to
11  move into the house where you caught your
12  boyfriend and where you tried to kill yourself.
13        It's insane to go there and live alone
14  which would increase her isolation.  And it's
15  insane to go down there without having a
16  psychiatrist set up to follow you, treat you,
17  who would then also inform her of the need that
18  her friends be involved, be supportive.
19        They would all be educated so when they
20  saw she had a gun, they would have called the
21  psychiatrist.  When they saw this happen or that
22  happen, they would have done what needed to be
23  done.
24    Q.   Were her friends not involved and

166

1   you know, superficially you can't tell patients
2   to wash their hands before they eat, say thank
3   you and be polite.
4         But in the doctor/patient relationship
5   it's reasonable to assume the patient is telling
6   you the truth because sometimes patients hold
7   things back, and doctors know how to figure that
8   out.
9     Q.   Okay.  What is a comprehensive suicide
10  plan?
11    A.   When developing a treatment plan for a
12  suicidal patient, a clinician should first
13  involve the immediate -- correction, should
14  first ensure the immediate safety of the
15  patient.
16        Patients seen in an emergency setting
17  may go from one-to-one monitoring or continuous
18  closed-circuit television monitoring and
19  considering the treatment setting for a patient
20  who is suicidal should consider the setting that
21  is least restrictive while also maintaining
22  safety and effectiveness.  Current guidelines
23  support psychotherapy for patients with suicidal
24  tendencies, alone or with pharmacologic therapy.

**EXHIBIT C** 168

1  I think generally psychotherapy and
2  pharmacologic therapy work best.
3      Q.   You didn't read that.  That's your
4  own --
5      A.   Yeah.  But it's so easy.  It's my cheat
6  sheet.
7      Q.   Right.  All right.  So a comprehensive
8  suicide plan is ensuring immediate safety and
9  then medication therapy with psychotherapy?
10     A.   I think -- I think I would stand by
11  what I said.
12     Q.   I am trying to figure out what you
13  said.  You were talking about closed-circuit
14  television and -- all right.
15          Did Dr. Smith ensure Nicole's immediate
16  safety on her three visits?
17     A.   Apparently so.
18     Q.   Okay.  And did Dr. Smith provide
19  medication therapy?
20     A.   At the second visit, yes.  At the third
21  visit, I believe doubling the dose was
22  unwarranted.
23     Q.   Okay.  But she provided --
24     A.   And outside the standard of care.

169

1      Q.   But she provided medication therapy,
2  correct?
3      A.   She started Lexapro at the second
4  office visit.
5      Q.   Okay.  And Dr. Smith believed that
6  Nicole was in psychotherapy?
7      A.   Mistakenly, yes.
8      Q.   Okay.  So she at least had the right
9  plan in place?
10     A.   No.  She didn't have a complete plan in
11  place.  She never activated support networks
12  like the mother, never informed the mother,
13  never realized the mother had no idea what to do
14  like many people, never ensured patient safety
15  and medical stabilization, never ensured that
16  psychotherapy was continuous and never referred
17  her to see a psychiatrist.
18     Q.   Sir, have you testified that the
19  standard of care for a family practitioner
20  treating a depressed patient with a prior
21  history of attempted suicide and presenting with
22  potential suicidal ideations does not require
23  that the family practitioner brief the family
24  members on how to handle any crisis that might

170

1  trigger suicidal ideations?
2      A.   I can't imagine that I said that.  If I
3  said that, I misspoke.
4      Q.   You were wrong again in the 1994
5  deposition?
6      A.   Which deposition?
7      Q.   The 1994 deposition.
8      A.   I can't imagine I said that.  I'd need
9  to see the source document in the context in
10  which it was given.
11     Q.   At the very bottom of that page.
12     A.   Thank you.  On the page prior to this
13  on page 206 a question was asked if Dr. Miller
14  gave specific discharge instructions to the
15  Hobart family or any follow-up instructions,
16  would that be material to your opinion regarding
17  the responsibility of the Hobart family?
18          Answer, "No.  I think most people know
19  what to do with potentially suicide individuals.
20  This is not something that is great science.
21  This isn't rocket science, particularly a family
22  whose daughter had already had two suicidal
23  attempts and psychiatric hospitalizations even
24  more so in a family who ignored previous

171

1  psychiatric advice to their daughter's great
2  detriment and I am sure to their own psychic
3  detriment when their daughter tried to kill
4  herself in 1992.  No, this isn't rocket science.
5  They knew what to do.  They should have known
6  what to do.  Most people know what to do.  They
7  didn't do it."
8          Question, "Would the standard of care
9  for a family practitioner in the situation
10  require the family practitioner to brief the
11  family members as how to handle any crisis that
12  might trigger suicidal ideation?"
13          Answer, "No, I don't think it was
14  needed.  And I said that in the context of what
15  I just said earlier.  Further, the patient or
16  the doctors who were mainly managing her
17  depression were Dr. Miller and Dr. Ferguson and
18  certainly Dr. Shin had been involved.  No mental
19  health workers, psychiatric, social workers,
20  LPN's, RN, psychiatrist and the entire staff of
21  the psychiatric unit at the U of I would have
22  apprized the patient and the family of all of
23  those details if in fact they needed it which I
24  doubt they did.

**EXHIBIT C** 172



1    This is not taken down correct because
2 what it should say is all mental health workers
3 would have apprized the family. So I think
4 that --
5    Q.   Good. I like the part you read even
6 better.
7    A.   Perfect.
8    Q.   Everybody knows, and it's not rocket
9 science, right?
10    MR. ELLIS:  Objection. That's not what he
11 said. He said most people know. And this is
12 from 1994 so this is before a lot of these
13 standards were addressed in the literature.
14    MS. WATTS:  And suicide awareness is much
15 broader now than it was in 1994.
16    MR. ELLIS:  Definitely is. You are asking
17 me?
18    MS. WATTS:  I'm not.
19    MR. ELLIS:  Surgeon General's report didn't
20 even come out until the late '90's.
21 BY MS. WATTS:
22    Q.   Let's see. Let's talk about Nicole
23 broadly. She first attempted suicide on
24 June 11, 2015, correct?

173

1 called the mental health hospital at Deaconess,
2 Deaconess Cross Pointe, referred this patient
3 and the Deaconess Cross Pointe people set her up
4 with Powell and Smith. I believe that's --
5 those are the facts.
6    Q.   That's not a fact. Bowling Green
7 Medical Center called Deaconess Clinic seeking
8 primary care for Nicole because she needed her
9 liver enzyme function rechecked after her
10 discharge.
11    That's in the Deaconess records. We
12 don't have to argue about that, but we can if we
13 need to. I don't know that it's really
14 pertinent.
15    A.   I have no -- I don't think that's
16 really the part of the case that we are
17 discussing.
18    Q.   All right. During the three visits
19 that Nicole had with Dr. Smith her mental health
20 improved. Would you agree with that?
21    A.   She might have been slightly better,
22 yes.
23    Q.   Slightly better?
24    A.   Yes, slightly better.

175

1    A.   Yes.
2    Q.   You agree with me that that suicide
3 attempt was not caused by Dr. Smith, correct?
4    A.   Yes.
5    Q.   All right. And you also agree it was
6 not caused by any effect of Lexapro?
7    A.   Yes.
8    Q.   All right. If she had completed that
9 suicide attempt instead of her second attempt,
10 we wouldn't be sitting here?
11    A.   True.
12    Q.   What was the cause of her first suicide
13 attempt?
14    A.   Hysteria when she discovered her fiance
15 in his boxer shorts in the house of her
16 girlfriend.
17    Q.   Okay. Nicole then came -- well, she
18 was hospitalized at Medical Center of Bowling
19 Green for five days?
20    A.   Yes.
21    Q.   She then came under the primary care of
22 Dr. Smith, correct?
23    A.   Actually, the sequence was that she was
24 discharged from Bowling Green Medical Center who

174

1    Q.   Okay. Nicole moved down to Bowling
2 Green on August 21. You agree with that?
3    A.   Yeah, I think that was the date.
4    Q.   We know that in retrospect after that
5 date her mental health began to deteriorate. Do
6 you agree?
7    A.   I think her -- I think I would say that
8 her dose of Lexapro was increased on the 17th.
9 And on that day she suffered abandonment when
10 she realized she didn't have a psychotherapist.
11    And Smith told her come back in 11
12 months and wrote out a six-month prescription,
13 180 20-milligram tablets of Lexapro and told her
14 if she felt better, she could just taper the
15 medicine and taper herself off.
16    Q.   Do you have any evidence at all that
17 Nicole had feelings of abandonment or
18 hopelessness from Dr. Smith?
19    A.   Absolutely. I think that's what killed
20 her. I think that's what threw her over the
21 edge along with the Lexapro, the side effects of
22 which made her more vulnerable to abuse alcohol
23 and drugs.
24    And I think the lack of advice from

EXHIBIT C

176

1  Dr. Smith about -- first of all, the failure of
2  Dr. Smith to involve her friends in Henderson
3  and her mother in her case, her failure to set
4  her up with a psychiatrist in Bowling Green, to
5  involve her friends, to educate her and provide
6  informed consent to her about the importance of
7  care and how high risk she was to have another
8  suicide attempt and what she could do about it.
9          Yes, I think all of those things were
10  the result of the abandonment, the increased
11  Lexapro dose, the effect on her and the fact she
12  moved back alone into the house where she lived
13  with her boyfriend where he snatched the TV off
14  the wall and certain other things.
15          And then she purchased a gun on the
16  26th.  None of her friends knew what a flashing
17  red light that was.  They weren't able to
18  intervene, and she killed herself.
19      Q.  Yeah.  Do you have any evidence that
20  Ms. Borum had feelings of abandonment due to
21  Dr. Smith?  Any evidence?
22      A.  Her death, yes.
23      Q.  That's the only evidence?
24      A.  That's pretty strong --

177

1  she hadn't been educated.  She was afraid to
2  intervene in this 23-year-old daughter of hers.
3          Dr. Smith -- because Dr. Smith had no
4  idea and didn't tell her anything about how high
5  risk she was and how important not being
6  isolated, not living alone, not living in a
7  house where she used to be with her boyfriend.
8  They told her none of that, never involved her
9  friends and all of this literature from the
10  American Family Physician from the Oregon group,
11  all of this suicide information and also the
12  executive summary of recommendations from
13  the APA on the treatment of suicide behavior
14  talk about how important involving family and
15  friends is and Smith never did that.
16      Q.  Did you see the testimony from her
17  friend that Nicole wanted to go finish her last
18  semester of school and then get the hell out of
19  Bowling Green, that Nicole wanted to go down to
20  Bowling Green.  She wanted to move down there
21  and finish school?
22      A.  I think that was admirable of her.
23      Q.  Right.
24      A.  Was it naive?

179

1  Q.  She didn't tell anybody?  She didn't
2  write it down anywhere?  Just the fact that she
3  killed herself?
4      A.  I think she went into a horrible
5  situation.  Any psychiatrist, psychologist, any
6  reasonably competent careful physician would say
7  what?  You are still feeling lousy at your third
8  office visit with Dr. Smith?
9          And she says don't come back for 11
10  months?  I think the circumstantial evidence is
11  strong.  The facts are strong, and her death is
12  absolute proof.
13      Q.  Did Dr. Smith say don't come back for
14  11 months?
15      A.  Basically.
16      Q.  Whose choice was it to move to Bowling
17  Green?
18      A.  She wanted to finish school.  Nobody
19  told her that that was in her current state
20  maybe not such a good idea.
21      Q.  Really.  Her mom told her it wasn't
22  such a good idea.  Did you see that in her
23  deposition?
24      A.  But her mom didn't do anything because

178

1  Q.  Was Dr. Smith supposed to take her car
2  keys away from her?
3      A.  No.  Dr. Smith was supposed to tell her
4  in front of her family about all of the hazards
5  and risks, bring her friends in and talk to them
6  at the same time, let her mother know what's
7  going on and let the school know that they have
8  got a suicidal gal at 100 times greater risk
9  than the average population for suicide.
10          She had to do that.  That's your duty.
11  The APA says that.
12      Q.  Okay.  All right.
13      A.  By the way --
14      MR. ELLIS:  There is no question pending.
15  BY MS. WATTS:
16      Q.  Nicole had cocaine and marijuana in her
17  system when she committed suicide, correct?
18      A.  She did.
19      Q.  When Nicole was hospitalized at Medical
20  Center of Bowling Green prior to that
21  hospital -- strike that.
22          Prior to Nicole's first suicide attempt
23  she would have been considered a low risk for
24  suicide.  Do you agree with Dr. Goldstein on

**EXHIBIT C**  180



Finley Brown, MD 10/16/2019

1  that?
2      A.   Prior?
3      Q.   Prior to her first suicide attempt.
4      A.   Well, having had -- having acted out as
5  a high school student and having a history of
6  dysphoria and having the scars from cutting
7  herself and never seeing a psychotherapist, no,
8  I wouldn't agree with that.
9           And the evidence is she suicide.  She
10  tried to commit suicide.  So, no, respectfully I
11  would disagree with that.
12      Q.   So you think she was a moderate risk of
13  suicide prior to her first attempt?
14      A.   Yeah.
15      Q.   Okay.  You think she should have sought
16  care for that?
17      A.   I don't think she knew.
18      Q.   You don't think she knew that she cut
19  herself?
20      A.   No.  I think she was coping.  She never
21  saw a therapist apparently, never saw a
22  psychologist or psychiatrist.
23           The evidence is from all of those
24  family depositions or friend depositions that
                                            181

1  she was mostly a hard working upbeat gal whose
2  finance department liked her.  All of the people
3  that she worked for liked her.  She had a lot of
4  virtues, and I think she was doing pretty well.
5      Q.   All right.  Do you agree that none of
6  the psychiatrists at Medical Center of Bowling
7  Green who provided care to Nicole performed or
8  documented a suicide risk assessment of her?
9      A.   I believe that's correct, and they got
10  away with it.
11      Q.   Do you agree that none of the
12  psychiatrists who provided care to Nicole at
13  Medical Center of Bowling Green performed or
14  documented a comprehensive suicide plan?
15      A.   I also criticized that, but they got
16  away with it.
17      Q.   All right.
18      A.   The summation is they did an excellent
19  job of getting her to Deaconess Cross Pointe.
20      Q.   Right.  They did an excellent job of
21  providing poor care.
22      A.   I think the facts are otherwise.
23      Q.   At Medical Center of Bowling Green she
24  was not labeled as a low, moderate or high risk
                                            182

1  of suicide?
2      A.   That was a mistake.  I agree.
3      Q.   Even upon her discharge the psychiatric
4  service did not evaluate her risk of suicide?
5      A.   I criticized that.  Interestingly there
6  is no causation.
7      Q.   Right.  In a medical/legal sense there
8  is no causation.  But in your opinion they
9  provided excellent care, although they did not
10  evaluate her risk of suicide when they
11  discharged her from a hospitalization for
12  suicide attempt.
13      A.   I criticized that.  I criticized every
14  point that you made, but I said they got away
15  with it.
16      Q.   Right.
17      A.   The sum is that luckily she got out of
18  there into what should have been the hands of a
19  quality mental health hospital and its
20  operation.  But then that didn't happen.
21      Q.   Dr. Mullick, her primary psychiatrist
22  during the hospitalization, discussed
23  antidepressant therapy with her, correct?
24      A.   Apparently so.
                                            183

1      Q.   He also stated he would provide
2  individual psychotherapy to her?  Do you
3  remember that?
4      A.   No.  I think what he said is he would
5  consider -- he would address the issue of
6  medications later is the way I recall it, and
7  with respect to psychotherapy he would deal with
8  that as well.
9      Q.   I don't like being wrong so we can
10  look.  Psychopharmacological treatment.  "I
11  discussed the various treatment options with the
12  patient.  Will hold off on any psychotropic
13  medications at this time, and we will explore
14  the use of psychotropic medications."  So he
15  discussed those with her.
16      A.   Right.  But what I said I think was
17  correct, too.
18      Q.   Okay.  Psychotherapeutic interventions,
19  "We will provide supportive individual
20  psychotherapy to the patient"?
21      A.   That's what he wrote.
22      Q.   That's pretty clear.  Did you see
23  anywhere in there that they provided
24  psychotherapy to her during the hospitalization?
                               EXHIBIT C  184

1    A.   N-o.

2    Q.   Okay.  All right.  Would that be a

3  breach of the standard of care?

4    A.   If the care didn't meet the standard of

5  care but there was no harm, I don't think there

6  is a foul.  From a legal point of view it's a

7  nonissue because she left the hospital and

8  improved and referred to what was supposed to be

9  a quality mental health hospital.

10    Q.   Wasn't it vitally important for her to

11  understand the importance of psychotherapy to

12  her treatment?

13    A.   Right, which is why I criticized

14  Deaconess, Smith and Powell.

15    Q.   And when Bowling Green tells her they

16  are going to provide it to her and they just

17  don't, didn't they abandon her and make her feel

18  hopeless and abandoned?

19    A.   No.  I think that's why the people who

20  took over her care the 16th on had a duty to

21  address that, and if they had addressed it and

22  done their job, it would be no harm, no foul.

23         Unfortunately, they didn't do the best

24  they could either.

185

1    Q.   Did any of the psychiatrists at Bowling

2  Green discover Nicole's history of cutting

3  herself in high school?

4    A.   Apparently not.

5    Q.   So we can infer that she was pretty

6  good at hiding that?

7    A.   I don't think she was hiding it.  I

8  think she -- I am pretty sure she was pretty

9  vulnerable in the hospital and nobody asked her.

10    Q.   Okay.

11    A.   Which is the importance of the APA

12  guidelines.

13    Q.   All right.  Moving forward to the visit

14  with Syrrus Powell, let me see if there is

15  anything here we haven't talked about.

16    MR. ELLIS:  I can't imagine there is.

17    MS. WATTS:  You never know.

18  BY MS. WATTS:

19    Q.   All right.  Your first criticism is

20  that she failed to conduct a comprehensive

21  suicide risk assessment and determine a suicide

22  risk level and incorrectly diagnosed Ms. Borum

23  as a low suicide risk.

24    A.   True.

186

1    Q.   Let's take the second part, incorrectly

2  diagnosing Ms. Borum as a low suicide risk, you

3  have agreed with me that regardless of whether

4  they're stratified as low, moderate or high the

5  treatment is the same.  It's pharmacology and

6  psychotherapy, correct?

7    A.   Right.  But the vigilance level has to

8  be higher, and it's just bad form for Syrrus

9  Powell to call her low risk when she wasn't low

10  risk.

11    Q.   Did Ms. Powell's failure to conduct a

12  comprehensive suicide risk assessment and

13  diagnosing Ms. Borum as low suicide risk, does

14  that have a causative link to Nicole's suicide?

15    A.   Well, she obviously didn't bond with

16  the patient, inform the patient, inform

17  Dr. Smith, talk to Dr. Smith, coordinate all her

18  care, talked to her mother, talked to her

19  friends and do the minimal work necessary to

20  meet APA guidelines and engage the patient in

21  the importance of doing the right thing, and so

22  I believe it has a causation basis.

23    Q.   So Ms. Powell had a duty to contact

24  Nicole's friends, right?

187

1    A.   I would stand by the way I said it.

2  And I don't want to --

3    Q.   No.  I am asking you new questions.

4  What did the standard of care require Ms. Powell

5  to do to meet the standard of care?

6    A.   Do a comprehensive suicide risk

7  assessment, determine a suicide risk level, and

8  then implement a comprehensive suicide treatment

9  plan.

10         And that would involve the mother, the

11  friends in Henderson, her friends in Bowling

12  Green and Nicole, educate her, in a proper and

13  thorough way to empower her.

14         It would also include saying to her,

15  listen, I am just a lowly licensed clinical

16  social worker.  I have got five years of

17  schooling.

18         You just tried to commit suicide.  You

19  have had suicide attempts or suicide actions in

20  the past.  You have had some issues with

21  depression.

22         You need to know that I am not a

23  psychiatrist, and you have the choice to see a

24  board certified psychiatrist and not see just a

188

EXHIBIT C

1  licensed clinical social worker.
2        I think she has a duty to do that.  And
3  by the way, Smith had a duty to do the same.
4  Neither of them were qualified to manage the
5  suicidal patient.
6        Both Smith and Powell knew or should
7  have known they weren't qualified to manage this
8  patient and should have immediately refer her to
9  a psychiatrist.
10     Q.   Okay.  A psychiatrist is the only one
11  who is qualified to manage Nicole Borum?
12     A.   Apparently so certainly based on the
13  medical records and the deposition testimony of
14  Powell and Smith.  In this case that's exactly
15  true.
16     Q.   Was Finley Brown qualified to manage
17  Nicole Borum?
18     A.   No.
19     Q.   All right.  Let's talk about some good
20  things Ms. Powell did.  She instructed Nicole to
21  go to the ER or call the office if she felt
22  suicidal or impulsive, correct?
23     A.   That's good advice.
24     Q.   She counseled Nicole how to increase

189

1  her use of social support and taught her coping
2  skills to manage her depression?
3     A.   In that short visit?  I doubt it.
4     Q.   Okay.  So you just don't believe her?
5     A.   I don't believe it.
6     Q.   Okay.  And she set Nicole up with a
7  follow-up appointment?
8     A.   Yes.
9     Q.   Okay.  I understand it's your opinion
10  that when Nicole canceled her second
11  appointment, that Ms. Powell had a duty to call
12  her, track her down, ask her why she didn't come
13  back.
14     A.   That's 100 percent true.
15     Q.   How many times does the standard of
16  care require Ms. Powell to reach out to Nicole
17  and persuade her to return?
18     A.   Whatever it takes.
19     Q.   So until she comes back?
20     A.   Until she comes back or you call the
21  police or you call her mother.  You tell the
22  mother how high risk she is.
23     Q.   Can you contact a patient's -- an adult
24  patient's mother without their consent?

190

1     A.   Absolutely.  And actually in the APA
2  guidelines it says, listen, if it's patient
3  safety and the patient's life and the issue of
4  confidentiality, err on the patient's side and
5  do whatever it takes including not worrying
6  about patient confidentiality.  This is life or
7  death.
8     Q.   Right.  That's when somebody's
9  suicidal, right?
10     A.   Well, she was suicidal.  She was
11  suicidal and failed in her suicidal attempt.
12  She still had suicidal thoughts when Powell saw
13  her.
14        Did Powell send her over to the
15  hospital, send her to a psychiatrist, send her
16  to Smith?  No.  Powell didn't do anything.
17     Q.   So you think she was acutely suicidal
18  when Powell saw her?
19     A.   She still had suicidal thoughts.  Do I
20  think Powell was qualified to say she was safe?
21  I mean, she wrote, "Recent discharge from
22  inpatient psychiatric unit.  Client reports
23  feeling sad partly due to all of the plans they
24  had.  Moments when the" -- let's see.

191

1        "Therapist explored coping strategy for
2  moments when client is feeling overwhelmed with
3  sadness."
4     Q.   In your opinion does every patient who
5  has suicidal thoughts or suicidal ideation even
6  if it's without intent or plan need to go to the
7  hospital immediately?
8     A.   Needs to -- and have a psychiatrist see
9  if they need to be readmitted.  She had
10  intermittent thoughts and voices, but she says
11  she will not follow through.
12     Q.   Right.
13     A.   Can you count on that in a patient who
14  a week before followed through?  No, I don't
15  think you can.  I think you got to get a
16  psychiatrist.
17        Did this LCSW take charge, act like a
18  physician and make that decision based on her
19  primitive education, training and experience?
20        That's what she did.  She -- that's an
21  egregious deviation from the standard of care.
22  It's a reckless act, and it directly caused her
23  harm.
24     Q.   Okay.  All right.  We will move on from

192

EXHIBIT C

Finley Brown, MD 10/16/2019

1   that.  You agree that family medicine physicians
2   who have completed a family medicine residency
3   are qualified and able to assess depressed
4   patients and determine if they are suicidal even
5   if the patients have just completed inpatient
6   psychiatric hospitalization and have a history
7   of prior suicide attempts?
8       A.   Sometimes yes, sometimes no.  In
9   Smith's case, no.
10      Q.   Okay.  All right.  Let's go to
11  Dr. Smith's first visit with Nicole.
12      A.   I have those notes in front of me.
13      Q.   You state she didn't perform a
14  comprehensive suicide risk assessment.  What
15  information did she fail to gather from Nicole?
16      A.   Well, you know, there are a whole list
17  of questions which we have gone over before from
18  the AFP article.
19      Q.   I know she didn't ask your list of
20  questions.  I want to know what information she
21  failed to gather that was important?
22      A.   She should have had all of those
23  questions asked and the answers written down.
24      Q.   And which ones did she not is the

193

1   question I am asking you.
2       A.   At the first office visit?
3       Q.   Yes, sir.
4       A.   There is no detailed documentation of
5   whether -- how much presentation currently there
6   was of suicidality quantifying -- asking the
7   question of presence or absence or how much
8   suicidal or self-harming thoughts, plans,
9   behavior and intent, asking her questions about
10  when she has the suicidal thoughts how she was
11  going to do it, whether firearms were
12  accessible.
13           She described psychiatric and
14  behavioral under the review of systems as
15  negative, but obviously that wasn't true.
16           There is no documentation of the
17  presence or absence of hopelessness,
18  impulsiveness, panic attacks or anxiety.  There
19  is no review of what her --
20      Q.   There is anxious.  She is a little
21  anxious.
22      A.   She is anxious, correct.  I misspoke.
23  Documentation of what her reasons for living and
24  plans for the future were.

194

1       Q.   There is a lot of documentation of
2   that.
3       A.   I don't see it.
4       Q.   In the first three paragraphs.
5       A.   Actually --
6       Q.   The third paragraph.
7       A.   Well, I would not --
8       Q.   You don't count that?
9       A.   No, I think there is some.  There is
10  some there, but I don't think -- the rigid
11  protocol that the American Psychiatric
12  Association describes is there for a purpose.
13           And I don't think she -- I don't think
14  she had the experience to know what questions to
15  ask.  She didn't do the legwork to consult any
16  of these journals so she could just go down the
17  list and ask the questions.
18           She was dictating so she could record
19  the answer.  It might be less burdensome because
20  of that.  There is no detail -- with respect to
21  her psychiatric history it says negative, but we
22  know she had had -- the grandmother had a psych
23  history.
24      Q.   It says, "She denies any previous

195

1   medical history or any other psychiatric
2   problems."
3       A.   Under review of systems it says,
4   "Psychiatric behavioral negative."  It's
5   obviously not true.  I mean, she says that, but
6   did she ask the question?  I don't think she
7   did.
8       Q.   You don't think she asked if she had a
9   psychiatric history where it says she denies --
10      A.   She had a psychiatric history for
11  Christ sake.  She just tried to kill herself.
12      Q.   It says right here, "She denies any
13  previous medical history or any other
14  psychiatric problems.  States she has been
15  healthy."
16      A.   What kind of examination did she do if
17  they missed all of the scars on her arms?
18      Q.   Probably not as good as they did in
19  Bowling Green?
20      A.   But Bowling Green is not in this suit.
21  She is the last person to have the chance to do
22  the right thing, and she screwed up.
23      Q.   All right.  I am not going to sit here
24  and argue with you.  I want to know what

**EXHIBIT C**

196

1  information she didn't elicit that you think she
2  should have elicited?
3     A.  The previous history of suicide
4  attempts, aborted suicide attempts or other
5  self-harming behavior, certainly the
6  self-harming behavior.
7        She didn't -- let me just see here.  It
8  does have past medical history of depression and
9  anxiety.  The family history doesn't give the
10  grandmother's history.
11        She has diabetes and heart failure on
12  the father.  It says under social history, main
13  topics under alcohol drug use/sexual activity,
14  "Not on file."  Why?  What do you mean not on
15  file?
16        This is the first time you saw her.
17  Why didn't you ask the question?  Why don't you
18  record the answer?  If you got a 23-year-old
19  girl and it says alcohol use, "No," what's the
20  chance of that?
21        The chance of that is zero.  I don't
22  think she asked the question.  Same with respect
23  to drug use.  I ask these questions all of the
24  time.

197

1        I know how to get a reasonable answer,
2  but I can speak fluent English.  And I have some
3  ability to relate to a patient unlike -- and I
4  am not being critical.  It's great that this
5  lady immigrated to this country and is trying to
6  make a life here.
7        But she can't communicate.  She doesn't
8  have personal skills.  She is not able to elicit
9  a history in a 23-year-old who drinks and
10  occasionally uses drugs.  She can't get that
11  history?  It's important to get.
12        Psychosocial, situation, I don't see
13  any documentation of chronic psychosocial
14  stressors.  I don't see any answers to questions
15  about family discord past or present or current
16  sexual abuse or physical abuse or neglect.
17        There is no comment about the quality
18  of family relationships.  There is no comment
19  about cultural or religious beliefs about death
20  or suicide.
21        There is no documentation of what she
22  feels her strengths and vulnerabilities are.
23  Documentation of what coping skills were advised
24  is not written down.

198

1     Q.  Really?  She instructed her to utilize
2  hobbies, music to distract herself, relax,
3  exercise to improve mood and relax.
4     A.  Really?  She wrote it down.  Maybe she
5  did.  Maybe she didn't.
6     Q.  Okay.  If they don't write it down,
7  then they didn't do it.  But if they do write it
8  down, then they also didn't do it?
9     A.  Well, look --
10     Q.  Is that how it works?
11     A.  No.  The way it works is if you tell
12  somebody about coping skills and you act as a
13  family physician and don't do the work, don't do
14  the research, don't document the answers to a
15  lot of questions, do document the answers to
16  that, are not a psychiatrist, are a -- if you
17  are a family physician semi brand new and didn't
18  practice who has one to three patients a day who
19  are mostly mental health patients and your
20  patient then after three visits kills themself
21  and you have never sent the patient to a
22  psychiatrist, you have got a serious problem as
23  a family physician.
24     Q.  That wasn't my question.

199

1     A.  That's the point I am making which is
2  really the thing that needs to be done, and you
3  have access to all of these things.  And there
4  are all these questions that she did not ask and
5  that she did not put the answers to.
6     Q.  The thing that needs to be done is you
7  need to answer my questions.
8     A.  I agree with that.
9     Q.  Okay.  And my question was you say that
10  if it's not written down, it's not done, right?
11     A.  I have said that.
12     Q.  Okay.  And now you are telling me if it
13  is written down, it's also not done?
14     A.  No.  What I am saying is based on my
15  review of the -- this patient's work and her
16  records, if she wrote it down, one has to assume
17  she asked the question.
18     Q.  Thank you.  So if she wrote down that
19  she told her these coping mechanisms of
20  utilizing hobbies and utilizing music to
21  distract herself and relax and exercise, we can
22  infer that she actually said those things?
23     A.  Yes.
24     Q.  Okay.  And if she wrote down continue

EXHIBIT C 200



Finley Brown, MD 10/16/2019

1  counseling for a while, we can infer that she
2  talked to Nicole about continuing counseling for
3  a while?
4     A.   Correct.
5     Q.   Okay.  All right.  Do you agree with
6  Dr. Goldstein that this information that
7  Dr. Smith failed to elicit at the first visit
8  would not have changed her treatment plan?
9     A.   I disagree.
10    Q.   Okay.  How did it change her treatment
11 plan?
12    A.   It would have gotten her to a
13 psychiatrist which is what Goldstein said she
14 needed --
15    Q.   Okay.
16    A.   -- to do in the first place.
17    Q.   And Goldstein said her treatment plan
18 would have been the same, right, medication and
19 therapy?
20    A.   Except under a psychiatrist she would
21 have gotten weekly or every two week
22 psychotherapy which she did not get, and a
23 psychiatrist would not have doubled the dose on
24 the Lexapro more likely than not.

201

1     Q.   Okay.  Dr. Smith instructed Nicole to
2  go to the ER or call her clinic if she felt
3  suicidal or impulsive.  That's something a
4  family practitioner should do, correct?
5     A.   It's good advice.
6     Q.   And Nicole had just been told the same
7  thing by Ms. Powell two days earlier, right?
8     A.   When she was experiencing suicidal
9  ideation, yes.
10    Q.   All right.  Let's talk about the second
11 visit briefly.  This is a visit you told me that
12 Nicole should have been put in an ambulance to
13 go to the hospital.
14         Dr. Smith records that, "Nicole still
15 feels sad at times, has no suicidal ideation, no
16 homicidal ideation.  She is positive for
17 dysphoric mood, negative for suicidal ideas,"
18 correct?
19    A.   Where did you get the negative for
20 homicidal or suicidal --
21    Q.   No SI, no HI in the HPI, the big
22 paragraph at the beginning of the visit?
23    A.   Yeah, I didn't realize what that meant.
24    Q.   You didn't know what no SI, no HI

202

1  meant?
2     A.   I have never seen that ever in 49 years
3  in the practice of medicine and reviewing tens
4  of thousands of records.
5     Q.   Really?
6     A.   Correct.
7     Q.   Well, now does that change your opinion
8  as to whether Nicole should have been put in an
9  ambulance that day?
10    A.   "Still feels sad, details not provided.
11 Went out last night, still not feeling good.
12 Positive for dysphoric, negative for suicidal
13 ideas," but no documentation of what questions
14 were asked.
15    Q.   Do you write down the questions that
16 you ask patients?
17    A.   Well, I think that's what APA --
18    Q.   Or do you just write down the answers?
19    A.   Yeah.  You need evidence of, you know,
20 she was asked this and she answered that.
21    Q.   Where in the APA guidelines does it say
22 to write down the questions?
23    A.   It doesn't say write down the
24 questions.  But you have got to -- I mean, you

203

1  could write down if she answers yes or no.  What
2  is yes or no to unless you put the question
3  down?
4     Q.   You say no suicidal ideation.  That's
5  where you ask her do you have suicidal ideation.
6  No suicidal ideation.
7     A.   Let me try to go back to your question
8  which is so rare for me.  Under physical exam
9  she appears distressed on her psychiatric.  It
10 says she has normal mood and.  Affect under
11 assessments it says she is well adult.  What
12 is she?
13    Q.   It's a well adult visit.  You know what
14 these are, don't you?
15    A.   No.  The assessment is what's her
16 diagnosis.  She wrote down well adult.
17    Q.   Do you know what medical coding is for
18 medical billing purposes, well adult visits?
19    A.   Yeah.  But look, under subjective it
20 says, "Chief complaint.  Well adult with
21 dysphoria."
22    Q.   Yeah.  It's a well adult visit, but I
23 am not going to argue with you.
24    A.   I am not going to argue with you either

204

**EXHIBIT C**



1    maybe.  That's what it means.  I don't know.
2        Q.   We have already learned what no SI
3    means.
4        A.   Well, there's no question about that.
5    So still stressed with previous event, still
6    distressed, the history of near normal, still
7    feels sad, not feeling good.  I stand by what I
8    said before.
9        Q.   Okay.  This patient with no suicidal
10   ideation needs to be put in an ambulance and
11   taken to the hospital?
12       A.   She tried to commit suicide a month
13   earlier, three weeks earlier.  She is not
14   getting -- she is not seeing the psychotherapist
15   anymore.
16            She had these -- she has these cutting
17   issues on her arms.  She has dysphoria.  I mean,
18   I think the reasonably competent, reasonably
19   qualified physician in this case would go I am
20   not a psychiatrist.  I am still worried you are
21   having these feelings and send her to a
22   psychiatrist.
23            And the best way to get her to a
24   psychiatrist is to send her over to Deaconess

205

1        Q.   Okay.  As of the last visit with
2    Dr. Smith, it was on August 17, 2015, correct?
3        A.   Yes, ma'am.
4        Q.   Nicole had just completed a five-week
5    initiation of Lexapro and reported that she
6    liked the medication and it was working well,
7    correct?
8        A.   Not so well that she didn't want the
9    medicine increased.
10       Q.   All right.  Did she report that she
11   liked the medication and it was working well?
12       A.   It says depression and anxiety much
13   better with Lexapro, however she wants to
14   increase her medication.
15       Q.   "But med works great."  Do you see
16   that?
17       A.   No, I don't see that.
18       Q.   Very top.  "Med works, but it can be
19   better.  Still feels a little anxious at times
20   but med works great."
21       A.   I don't know what page you are on.
22   Must be on a different page than me.  Hang on.
23       Q.   I feel like we have been like that all
24   day, Doctor.

207

1    Cross Pointe.
2        Q.   Okay.  You're critical of Dr. Smith's
3    informed consent.  Dr. Smith testified that she
4    listed the side effects of Lexapro to Ms. Borum
5    including the black box warning for increased
6    thoughts of suicide in young adults.  Do you
7    remember that testimony?
8        A.   Yeah, if it's not written down, it
9    wasn't done.  Number two it will be she says she
10   said that.  I am saying when I am saying with
11   respect to the critical importance of
12   documenting that, it's for a jury to decide.
13       Q.   Okay.  If she did that, does that meet
14   the standard of care for informed consent?
15       A.   If she went through all of the hazards
16   and risks?
17       Q.   Yes.
18       A.   Yes.
19       Q.   Okay.  If a jury believes her that she
20   did that, then that meets the standard of care?
21       A.   With respect to the --
22       Q.   Informed consent.
23       A.   With respect to the prescription of
24   Lexapro, yeah.

206

1        MR. ELLIS:  Come on now.
2        THE WITNESS:  That wasn't that cryptic.  Do
3    you see you are on that page, and I am looking
4    on this page.
5        MS. WATTS:  Let me help you.
6        THE WITNESS:  I see where you are now.
7    BY MS. WATTS:
8        Q.   Okay.  "Med works but it can be better.
9    Still feels a little anxious at times, but med
10   works great"?
11       A.   I see that.
12       Q.   Okay.  She recently had been on
13   vacation with a friend and had just completed an
14   eight-weak financial planning internship"?
15       A.   I see that.
16       Q.   She was about to return to college to
17   complete her last semester and was looking
18   forward to job prospects in the future?
19       A.   Uh-huh.
20       Q.   Okay.  By all accounts she was doing
21   well, right?
22       A.   It says, "Patient went to the beach,
23   worse two weeks ago in South Carolina."  I don't
24   know what that means exactly.  That might mean

EXHIBIT C

208

1  something different.  Do you see where I am
2  talking about?
3      Q.   My summary has the spelling errors
4  corrected.
5      A.   Oh, really.  When was that done I
6  wonder.
7      Q.   That was by me.
8      A.   I did some of that myself.
9      Q.   It says, "Patient went to the beach,
10 worse two weeks ago in South Carolina.  Crushed
11 down by jelly fish on her right lower leg.  And
12 I think her mom's testimony was she got bit by a
13 jelly fish while she was in South Carolina.
14     A.   I think that's correct.
15     Q.   All right.  So by all accounts she was
16 doing well at the time of this visit other than
17 having a jelly fish sting?
18     A.   Well, she is better, but she is not
19 well.  She is not healed.  She is still
20 vulnerable.  She has still got 100 times average
21 risk for suicide.
22          And now they are going to increase a
23 drug whose efficacy doesn't improve just because
24 she said give me more medicine.

209

1      Q.   Okay.
2      A.   Which I thought was ill considered.
3      Q.   Okay.  And because standard treatment
4  is to push drug until symptoms resolve, right?
5      A.   Not if the drug has maximum effect at
6  ten milligrams you don't do that.
7      Q.   Well, why do they make a 20-milligram
8  dosage if it's not effective?
9      A.   I don't know.
10     Q.   Okay.  You agree with me that they make
11 a ten-milligram dosage and a 20-milligram
12 dosage?
13     A.   Apparently so.
14     Q.   The manufacturer makes that?
15     A.   Apparently so.
16     Q.   Okay.  Do you agree with Dr. Goldstein
17 that Nicole's only acute nonstatic suicide risk
18 factor at this visit was the dose change of her
19 Lexapro?
20              (Record read)
21     THE WITNESS:  I don't know what that
22 sentence actually means.
23 BY MS. WATTS:
24     Q.   She had no other modifiable risk

210

1  factors.  The only modifiable risk factors she
2  had for suicide was a dose change in Lexapro?
3      MR. ELLIS:  No.  Objection.  That misstates
4  that testimony.
5      MS. WATTS:  Well, it doesn't, but he can
6  disagree with it.
7      THE WITNESS:  I don't follow that so I don't
8  agree with it.
9  BY MS. WATTS:
10     Q.   Let's put it this way.  What modifiable
11 risk factors for suicide did Nicole have as of
12 that last visit?
13     A.   She had -- she still had -- hang on one
14 second.  She still had anxiety, and she wasn't
15 getting psychotherapy which is modifiable by
16 psychotherapy.
17     Q.   Is not getting psychotherapy a risk
18 factor for suicide?
19     A.   No.  But anxiety -- her major risk
20 factor is her cutting 15, her depression off and
21 on, and then her suicide attempt for which she
22 was hospitalized.
23     Q.   The suicide attempt is not modifiable.
24 The cutting is not modifiable, correct?

211

1      A.   Yeah, I don't think -- I mean, the fact
2  that she wants to increase her medication --
3  hold on a second.
4          It doesn't in this note describe
5  presence or absence of homelessness, insomnia,
6  irritability which is if present were modifiable
7  by psychotherapy involvement of the mother,
8  involvement of the friends.
9          It doesn't say whether on those dates
10 she was drinking, using drugs whatsoever,
11 although I think she had two drug tests that
12 were negative before she went to Bowling Green.
13          So she definitely changed her future
14 plans.  She wasn't getting married to
15 Mr. Trevino.
16     Q.   She had new future plans, right?
17     A.   Well, she was trying to graduate and do
18 her studies, but I don't think anybody was --
19 because she wasn't getting psychotherapy, they
20 weren't concentrating on all of the good things
21 that are going on.
22          I think it doesn't -- there is no
23 discussion about what her level of stress was
24 and what her social support was.  Her mother

212

EXHIBIT C

1   wasn't involve.  Her mother didn't know what to
2   do.  Nobody gave her informed consent.  So from
3   her mother's point of view she had limited
4   social support.
5          With respect her friends weren't
6   informed so they weren't able to support her
7   much less keep an eye on her.
8          And I think had she been properly
9   counseled and nurtured in a way that caused her
10  to emphasize the positive work on forgetting the
11  negative, whatever chance she had for
12  improvement was lost.
13         That's why you do combo therapy.
14  That's what Dr. Goldstein talked about
15  medication and counseling.  And she only got one
16  session of counseling.  For sure Smith couldn't
17  counsel her.  Smith could hardly talk to her.
18  Q.    Okay.  So the modifiable risk factors
19  that you identified were -- that we know of were
20  her anxiety that still existed, and then you
21  said there were others that aren't documented so
22  we don't know.
23  A.    No.  I just read it.
24  Q.    Yeah.  You just did a whole answer that

213

1   didn't answer the question.
2   A.    No.  Of course it does.  Listen, what I
3   read to you is from -- I mean, she is a member
4   of the American Academy of Family Physicians.
5   This is from the AFP evaluation and treatment of
6   suicidal patients.
7          And I just read to you, went right down
8   the list, on risk factors associated with
9   suicide, biologic, psychologic, environmental
10  and social.
11         And I went through every one of those.
12  And a lot of those could have been influenced by
13  proper counseling and involving friends and
14  family.
15  Q.    Right.  My question is as of that last
16  date, which modifiable risk factors did Nicole
17  actually have?
18  A.    All of those.
19  Q.    She had every risk factor on there?
20  A.    All of the ones that I just mentioned.
21  Q.    Okay.
22  A.    I mean, sure.
23  Q.    Then I must have fallen asleep.  I will
24  go back and read the answer when I get the

214

1   transcript.  All right.  Getting close to the
2   end here.
3   A.    I feel badly that I made you fall
4   asleep.
5   MR. ELLIS:  Let's just focus on getting this
6   done.
7   BY MS. WATTS:
8   Q.    Discontinuation of medications such as
9   SSRI's can have ill effects?
10  A.    I think that's true.
11  Q.    Okay.
12  A.    That's why you have to taper them.
13  Q.    Right.  You would want a patient to
14  taper off of them rather than stop them cold
15  turkey?
16  A.    Yes.
17  Q.    Okay.  Let's see.  You're critical of
18  Dr. Smith for giving Nicole a prescription of
19  Lexapro with five refills?
20  A.    No.  She didn't get five refills.  I
21  think she gave her the whole bunch all at once.
22  I thought that's what she did.
23  Q.    No.  There is a prescription with five
24  refills.

215

1   A.    Okay.  Sorry.
2   Q.    Does that change your opinion?
3   A.    No.
4   Q.    Okay.  You have testified previously
5   that it's within the standard of care to give a
6   months worth of medication with one refill.  Do
7   you stand by that?
8   A.    Sometimes yes, sometimes no.
9   Q.    Okay.  Would it have been appropriate
10  for Dr. Smith to give her a month worth of
11  prescription with one refill?
12  A.    No.
13  Q.    Why not?
14  A.    She need to be seen every week, one to
15  two weeks, to see what kind of side effects she
16  was having and with respect to all of the issues
17  associated with her suicide.
18  Q.    Okay.  Giving Nicole a month's worth of
19  Lexapro at five refills did not cause her to
20  commit suicide?  She didn't overdose on Lexapro?
21  A.    I agree with that.
22  Q.    Okay.  Nicole didn't start taking the
23  20 milligram dose of Lexapro until August 28
24  when her mom brought it down to her, correct?

EXHIBIT C 216

1    A.   I believe that's true.
2    Q.   Okay.  She actually purchased the gun
3  two days prior to that?
4    A.   I agree.
5    Q.   Okay.  Was her purchase of the gun --
6  that would not have been caused by a side effect
7  of Lexapro, correct?
8    A.   I don't know.
9    Q.   Okay.  Was it a suicidal gesture, a
10  suicidal warning sign?
11    A.   Apparently not.
12    Q.   Suicidal warning sign?
13    A.   Yes.
14    Q.   So she had a suicidal warning sign
15  before she even started taking the increased
16  dose of Lexapro?
17    A.   True.  Except everybody knew she was --
18  I mean, all reasonably competent, reasonably
19  careful caregivers knew she was increased 100
20  times the average citizen's risk for suicide.
21      And I think three times that risk in
22  the first year after you attempt suicide so she
23  was always at high risk for suicide and --
24  medium to high risk for suicide and the purchase

217

1  of the gun was just a -- which she didn't hide.
2  She told her friend about it.
3    Q.   Right.  She told her friend it was for
4  safety.  So she lied to her friend about it.
5    A.   I think she told her friend -- probably
6  unconsciously she wanted -- maybe she was
7  ambivalent.  So she told her friend -- if she
8  really didn't want her friend to stop her, she
9  would never have told her friend.
10      So I think that was a mixed message.  I
11  think we are saying, hey, I am thinking about
12  killing myself.  And I think the friend said now
13  I knew I should have said something or she knew
14  something might be wrong.  She knew it wasn't
15  for safety.
16    MS. WATTS:  Let the record reflect when he
17    said for safety he used air quotes.
18    THE WITNESS:  Yes.
19  BY MS. WATTS:
20    Q.   All right.  Nicole's classes started on
21  August 24th, but she never went to class?
22    A.   Yes.  Bad news, ominous sign also.
23    Q.   Okay.  Nobody from the school ever
24  thought to check on her?

218

1    A.   They would have if they had known -- if
2  Smith had done her job.
3    Q.   So Smith should have also contacted the
4  school?
5    A.   Of course they should have contacted
6  the school.  You got a girl that's coming to
7  class.  She needs to be seen at student health.
8  She needed to be followed by a psychiatrist.
9  You got to tell the school.  The administration
10  would want to know that, 100 percent sure.
11    Q.   All right.  Let's see.  She had dinner
12  with her mom the night before she committed
13  suicide?
14    A.   Yes.
15    Q.   And her mom did not notice anything
16  wrong with her other than she seemed a little
17  tired?
18    A.   Apparently so.
19    Q.   We know that from her deposition.  All
20  right.  Briefly let's talk about substance
21  abuse.
22      Do you agree that cocaine use is
23  related to an increase in suicidality?
24    A.   Sometimes yes.

219

1    Q.   Do you agree that the medical
2  literature links cocaine use to suicidality?
3    A.   Yes.
4    Q.   Do you agree that coming off the
5  cocaine high can create a depressive effect?
6    A.   I don't know.
7    Q.   All right.  Do you agree that
8  combining substances such as cocaine,
9  marijuana and alcohol with Lexapro is not ideal
10  and could create untoward effects on an
11  individual?
12    A.   I agree.
13    Q.   All right.  Doctor, let me just look.
14  I may be done.
15    A.   That's great.
16    Q.   Doctor, this is the deposition
17  transcript that you gave in 1994; is that
18  correct?
19    A.   Yes.
20    Q.   Has the standard of care and the
21  knowledge the physicians have gained about the
22  treatment and prevention of suicide changed in
23  the literature since that time?
24    A.   Yes.

220

**EXHIBIT C**

```
 1      Q.   Are some of the things that you would
 2  expect a family practice doctor to do today in
 3  2019 or even at the time Dr. Smith was treating
 4  Ms. Borum in 2015 and '16, 15, would it be
 5  different than what you would expect the
 6  standard of care to be in 1994?
 7      A.   Yes.
 8      MS. WATTS:  All right.  I am just going to
 9  mark this deposition as Exhibit 5.
10                  (Whereupon, Exhibit
11                   No. 5 was marked for
12                   identification.)
13      MR. ELLIS:  I just have a couple questions,
14  and I will be done with my questions and reserve
15  the rest for trial.
16                  EXAMINATION
17  BY MR. ELLIS:
18      Q.   One of the things that Ms. Watts asked
19  you was about modifiable risk factors.  All of
20  the risk factors that Nicole had that made her a
21  moderate to high risk of suicide, her
22  pre-existing suicide attempt, her history of
23  depression, all of these things, they were still
24  present as of Dr. Smith's last visit with her in
                                                 221
```

```
 1      A.   Yes.
 2      Q.   Is that something that was rapidly
 3  approaching?
 4      A.   Yes.
 5      Q.   And that's something that then would
 6  have passed and no longer been present,
 7  correct?
 8      A.   True.
 9      Q.   Is the place where you previously
10  attempted suicide that you lived with your
11  fiance for years, moving back in there alone, is
12  that a risk factor of suicide?
13      A.   It was.
14      Q.   Is that something that could have been
15  documented and referenced?
16      A.   Yes.
17      Q.   Do you have a reasonable belief whether
18  these things would have been captured in
19  discussions with Dr. Smith if she had followed
20  up in a week or two weeks after the medication
21  change?
22      A.   Yes.
23      MR. ELLIS:  Katie, I will pass it back to
24  you for any final questions you have.
                                                 223
```

```
 1  August, correct?
 2      A.   True.
 3      Q.   Okay.  And some of the other modifiable
 4  risk factors that you identify and that we
 5  talked about previously, I just want to go
 6  through them and ask you whether they are
 7  modifiable -- whether they are risk factors or
 8  not.
 9           Is moving to the same house where you
10  previously attempted suicide which was about to
11  happen a risk factor?
12      A.   Yes.
13      Q.   Is that something that could be
14  modified?
15      A.   Yes.
16      Q.   Is that something that could have been
17  discussed and documented?
18      A.   Yes.
19      Q.   Is the anniversary of her father's
20  death which occurred when she was younger a risk
21  factor for increased suicide risk?
22      A.   Yes.
23      Q.   Is that something that could have been
24  documented?
                                                 222
```

```
 1      MS. WATTS:  Sure.
 2                  EXAMINATION
 3  BY MS. WATTS:
 4      Q.   Dr. Brown, did you tell the truth in
 5  1994?
 6      A.   I did to the best of my ability.
 7      Q.   Did you tell the truth today?
 8      A.   I did.
 9      MS. WATTS:  Okay.  That's all I have.
10      MR. ELLIS:  Okay.
11      THE WITNESS:  I reserve signature.
12                  (Deposition concluded at
13                   7:08 p.m.)
14
15
16
17
18
19
20
21
22
23
24
                                                 224
```

EXHIBIT C

```
 1          UNITED STATES DISTRICT COURT
 2          WESTERN DISTRICT OF KENTUCKY
 3                 AT OWENSBORO
 4             4:17-cv-00017-JHM-HBB
 5   CYNTHIA GAY BORUM, as Administratrix)
 6   of the Estate of Nicole Alyce Borum,)
 7        Plaintiff,              )
 8        vs.                     )
 9   JUNG WOOK KANG SMITH, MD, DEACONESS )
10   CLINIC, INC., DEACONESS HOSPITAL,  )
11   INC., DEACONESS HEALTH SYSTEM, INC.,)
12        Defendants.             )
13          This is to certify that I have read the
14   transcript of my deposition taken in the
15   above-entitled cause by Barbara Manning,
16   Certified Shorthand Reporter, on October 16,
17   2019, and that the foregoing transcript
18   accurately states the questions asked and the
19   answers given by me as they now appear under
20   penalty of perjury.
21          _____
                   FINLEY BROWN, MD
22
     SUBSCRIBED AND SWORN TO
23   before me this _____ day
     of _____, 2019.
24   _____
                                               225
```

```
 1   foregoing deposition was not waived by counsel
 2   for the respective parties.
 3          I further certify that the taking of this
 4   deposition was pursuant to notice, and that
 5   there were present at the deposition the
 6   attorneys hereinbefore mentioned.
 7          I further certify that I am not counsel for
 8   nor in any way related to the parties to this
 9   suit, nor am I in any way interested in the
10   outcome thereof.
11          I have hereunto set my hand this 23rd day
12   of October, 2019.
13
14
15          Barbara Manning
16          _____
17                 BARBARA MANNING
18          CERTIFIED SHORTHAND REPORTER
19
20
21
22
23
24
                                               227
```

```
 1   STATE OF ILLINOIS    )
 2                        ) SS:
 3   COUNTY OF WILL       )
 4        I, BARBARA A. MANNING, do hereby certify
 5   that heretofore, to-wit, on the 16th day of
 6   October, 2019, personally appeared before me at
 7   200 North LaSalle Street, Suite 2900, Chicago,
 8   Illinois, FINLEY BROWN, MD, in a cause now
 9   pending and undetermined in the United States
10   District Court, Western District of Kentucky,
11   wherein CYNTHIA GAY BORUM is the Plaintiff and
12   JUNG WOOK KANG SMITH, MD, et al. are the
13   Defendants.
14        I further certify that the said witness was
15   first duly sworn to testify to the truth, the
16   whole truth and nothing but the truth in the
17   cause aforesaid; that the testimony then given
18   by said witness was reported stenographically by
19   me in the presence of the said witness, and
20   afterwards reduced to typewriting by
21   computer-aided transcription, and the foregoing
22   is a true and correct transcript of the
23   testimony so given by said witness as aforesaid.
24        I further certify that the signature to the
                                               226
```

```
 1          McCorkle Litigation Services
            200 N. LaSalle Street, Suite 2900
 2          Chicago, Illinois 60601-1014
 3   DATE:  October 23, 2019
     The Ellis Law Group, PLLC
 4   Mr. Anthony P. Ellis
 5   517 W. Ormsby Avenue
     Louisville, Kentucky  40203
 6
     IN RE:  Borum vs. Smith, et al.
 7   COURT NUMBER:  4:17-cv-00017
     DATE TAKEN:  October 16, 2019
 8   DEPONENT:  Finley Brown, MD
     Dear Mr. Ellis,
 9   Enclosed is the deposition transcript for the
10   aforementioned deponent in the above-entitled
     cause.  Also enclosed are additional signature
11   pages, if applicable, and errata sheets.
12
     Per your agreement to secure signature, please
13   submit the transcript to the deponent for review
     and signature.  All changes or corrections must
14   be made on the errata sheets, not on the
     transcript itself.  All errata sheets should be
15   signed and all signature pages need to be signed
     and notarized.
16
     After the deponent has completed the above,
17   please return all signature pages and errata
     sheets to me at the above address, and I will
18   handle distribution to the respective parties.
     If you have any questions, please call me at the
19   phone number below.
20
21
22   Sincerely,
23   Cindy Alicea                     Barbara Manning
     Signature Department             Court Reporter
24                                               228
```

EXHIBIT C

**Exhibits**

**Exhibit 1**
3:14 12:21,22,23
**Exhibit 2**
3:15 77:12,14,15
**Exhibit 3**
3:16 86:10,11,13,14
**Exhibit 4**
3:17 97:8,13,14
**Exhibit 5**
3:18 221:9,10,11

**$**

**$1,600**
47:24
**$2,000**
8:5 48:1
**$3,000**
8:5
**$300,000**
74:22
**$40**
47:21
**$400,000**
74:22
**$50**
47:15,17,20
**$700,000**
74:16

**1**

**1**
12:21,23 92:22
95:19,20
**10**
7:12 8:11 142:21
**100**
28:15 36:23 49:9
61:7 62:6 64:3 65:18
69:3 71:5 73:1
117:22 118:21
145:14 146:19
167:14 180:8 190:6
209:20 217:19
219:10
**11**
92:22 140:12 173:24
176:11 178:9,14
**11th**
109:24
**12**
45:12
**12-21-88**
151:7,18,22
**1257**
83:14
**13**
93:8 94:20 95:1,19
**137**
132:23
**139**
132:23
**15**
7:12 48:9 50:5,6
52:14 75:15 121:17
142:15 211:20 221:4
**16**
74:8 147:9 221:4
**16th**
109:24 185:20
**17**
207:2
**17th**
110:9 176:8
**18**
8:22 74:8

**180**
159:11 176:13
**1970**
5:15
**1974**
6:5
**1985**
44:18,21
**1986**
20:1 74:2
**1987**
16:2 22:2,4
**1992**
172:4
**1994**
133:2,18,24 134:5
171:4,7 173:12,15
220:17 221:6 224:5
**1995**
150:22 152:10
**1999**
119:12 153:8
**19th**
110:9

**2**

**2**
77:12,15
**2.9**
46:21
**20**
8:11 47:22 49:2 50:4
74:4 130:19 141:11
216:23
**20-milligram**
176:13 210:7,11
**200**
50:11
**2002**
6:9 20:1,19 21:9
**2003**
145:3,5,8 153:7
**2005**
74:14
**2006**
6:12
**2007**
137:8,17
**2009**
6:10,12 9:23
**2011**
88:1
**2012**
81:12 142:10
**2013**
76:7 77:9 142:21
**2014**
92:15
**2015**
47:1 72:8 173:24
207:2 221:4
**2016**
6:14 7:5 8:22 10:9,
10,15,23 12:12
92:14 119:12 144:21
145:10
**2018**
6:15
**2019**
10:12 133:23 221:3
**206**
171:13
**21**
176:2
**22**
50:4 119:22 120:10
**22.4**
119:15,22

**23-year-old**
146:17 179:2 197:18
198:9
**24**
49:1 120:10 136:11
137:6
**24.5**
119:15,23
**24/7**
47:10
**240**
159:11
**24th**
218:21
**25**
44:5 50:7 119:19
133:3 153:1
**2511**
4:24
**26th**
177:16
**28**
216:23
**2d**
83:14

**3**

**3**
86:10,11,14
**30**
9:20 50:7 74:4 144:1
**300**
8:18
**31**
7:5

**4**

**4**
95:21 97:8,14
**40**
82:16
**45,000**
119:7
**46**
47:24 48:1
**49**
28:6 36:8 203:2

**5**

**5**
221:9,11
**5.9**
46:20
**50**
39:4,6 40:2 75:1
**518**
81:23
**5:30**
46:5

**6**

**6**
50:4
**6-19**
147:9
**6-19-15**
161:13
**60**
132:3
**60647**
5:1
**66**
75:2

**7**

**7-10-15**
161:14
**7-10-2015**
163:21
**7-3-2015**
150:2
**70's**
19:20
**75**
115:24
**77**
45:23
**7:08**
224:13

**8**

**8**
50:4,6
**8-17-15**
161:13
**8-25-15**
81:22
**80**
48:19
**80's**
19:20
**800,000**
119:7
**81**
6:9
**88**
6:9
**883**
83:14

**9**

**90**
75:10
**90's**
75:10 173:20
**90/10**
75:17,18
**92**
6:9
**95**
6:9
**96**
52:16
**9:00**
46:5

**A**

**abandon**
185:17
**abandoned**
122:19 167:18
185:18
**abandonment**
94:15 139:10,16
176:9,17 177:10,20
**abandons**
165:2
**ABFM**
8:20
**ability**
103:12 105:8 113:10
198:3 224:6
**aborted**
197:4
**absence**
194:7,17 212:5
**absolute**
36:18,21 178:12

**absolutely**
59:24 121:20 159:21
167:18 176:19 191:1
**abuse**
23:10 176:22 198:16
219:21
**academic**
15:19,21 19:13
146:7
**Academy**
214:4
**accept**
110:8
**accepted**
110:21
**access**
47:10 126:1 200:3
**accessible**
194:12
**account**
139:6
**accounts**
208:20 209:15
**acknowledged**
134:15 143:23
**acquire**
28:14 34:17 117:24
**acquired**
29:8
**act**
107:9 126:20 127:10
156:23 192:17,22
199:12
**acted**
16:18 181:4
**acting**
126:2
**actions**
108:14 188:19
**activated**
170:11
**active**
56:10
**activities**
126:3
**activity**
197:13
**acute**
158:22 210:17
**acutely**
57:20 158:17 191:17
**add**
93:13,15 97:10
**addiction**
25:15 26:2
**addition**
93:2,4
**additional**
83:3,6 93:14,16,18
143:2
**Additionally**
26:4 149:21
**address**
4:23 23:21 184:5
185:21
**addressed**
150:11,12 173:13
185:21
**addresses**
156:24
**adept**
24:24
**adjective**
24:18
**adjustment**
116:7
**administration**
40:17 67:8 219:9
**administrative**
21:11 43:9

**administrator**
45:4,7
**admirable**
106:13 179:22
**admit**
16:20 17:7 18:12
19:8 22:5,7 37:18
38:11 69:10
**admitted**
17:11 38:22 39:3
69:11 160:7
**admitting**
38:3,6,7,9
**Adolescent**
142:22
**adolescents**
23:12 83:13
**adopted**
156:13
**adult**
156:19 161:16
163:22 190:23
204:11,13,16,18,20,
22
**adults**
23:12 81:10 86:6
138:5,17 139:1
142:20 206:6
**Advanced**
19:23 20:10
**advances**
20:14
**advantages**
41:13
**advice**
66:19 172:1 176:24
189:23 202:5
**advise**
41:23
**advised**
41:19 42:9 198:23
**advising**
40:17
**Advocate**
38:1
**affect**
162:18 204:10
**affiliated**
37:9 41:3 101:6
**affiliations**
38:1
**AFP**
30:16 31:3 34:10
81:8 142:7 144:12
193:18 214:5
**afraid**
179:1
**afternoon**
4:8,9
**age**
137:6
**agency**
11:6,9
**agree**
31:21 63:15 72:5,6
109:12,16 111:1
115:14,22 116:4,9,
18 117:17 118:8,24
119:4 121:16 124:5
125:13 126:10,12,
13,19 128:17,19
129:7 131:9 136:3,6,
13,23 137:3,8,14
155:13 174:2,5
175:20 176:2,6
180:24 181:8 182:5,
11 183:2 193:1
200:8 201:5 210:10,
16 211:8 216:21
217:4 219:22 220:1,
4,7,12


EXHIBIT C

agreed
20:10 22:5 117:14
125:11 187:3
agrees
133:13
ah-hah
121:9
ahead
155:10
air
218:17
Alan
80:19
alcohol
25:18 126:3 139:5,
22 176:22 197:13,19
220:9
alert
71:1 89:14
alive
88:12 89:7 140:7,17
166:5
allegations
95:2
Allen
87:3,19
allowed
94:3
altogether
137:11
AMA
30:22 31:1
ambivalent
218:7
ambulance
39:9 70:9 160:19
161:6 164:9 202:12
203:9 205:10
American
6:4,12,17,21 7:13
9:5,14,18 10:16,23
11:19 12:7,13,16
13:4 38:18 107:13
142:9 179:10 195:11
214:4
Amita
17:8,11 26:8 38:2
amounts
79:4
analysis
137:4
anger
126:4
anniversary
222:19
annual
47:12
answering
68:23
answers
34:20 35:13 109:5
118:21 154:17 162:7
193:23 198:14
199:14,15 200:5
203:18 204:1
antibiotic
159:18,20
antidepressant
72:15,21 129:1
132:16 183:23
antidepressants
66:4
anxiety
15:12 32:6 33:12
61:14,20 69:19
116:7,13,15 128:7
130:1,4,6 148:10,24
155:24 156:3 194:18
197:9 207:12
211:14,19 213:20

anxiety/
depression
63:24
anxious
116:15 148:7 150:13
154:4,21 194:20,21,
22 207:19 208:9
anymore
205:15
APA
32:3,9 34:21 35:10
58:16 59:21 70:2
80:21 88:5 92:11,15,
21 107:3,6,10,12,16,
21 108:21 109:6,14,
21 118:1,22 121:23
123:16,20 142:3
144:13,14,20 145:10
154:15 162:7 163:14
179:13 180:11
186:11 187:20 191:1
203:17,21
apologize
131:20
apparently
12:2 29:4 77:11
129:19 135:19 137:7
150:3 167:8 169:17
181:21 183:24 186:4
189:12 210:13,15
217:11 219:18
appears
133:1 162:12 204:9
appendicitis
68:17,20 158:12
applaud
24:1
appointment
91:18 110:20
143:16,18 150:1,3
160:12 163:6 190:7,
11
appointments
15:20,21 19:13
47:12 52:9
apprized
172:22 173:3
approaching
223:3
approximately
150:2
area
28:16 53:6 68:22
argue
137:1 175:12 196:24
204:23,24
argument
137:18
argumentative
113:21 152:6,16,17
arise
26:22
arms
148:22 149:2 196:17
205:17
arrangements
110:6
arrives
165:12
article
37:3 85:11,20 91:23
92:15 193:18
articles
15:6 31:9 34:9 83:10
asks
127:3
asleep
214:23 215:4
aspects
57:16

assess
73:11 193:3
Assessing
81:18
assessment
23:9 69:10 70:15
80:22 92:13,14
107:17,19,20 108:12
142:2,4,14,24
145:19 182:8 186:21
187:12 188:7 193:14
204:15
assessments
106:24 141:21,23
204:11
assistant
21:3 43:19 44:7
84:20
Association
6:14 31:4 107:13
144:7 195:12
Association's
30:17
assume
60:18 168:5 200:16
assumed
76:19
assumption
76:22,23
assure
143:15
athlete
54:24
attacks
194:18
attempt
56:14,18,22 57:4,12
72:14 108:19 109:10
136:16 174:3,9,13
177:8 180:22 181:3,
13 183:12 191:11
211:21,23 217:22
221:22
attempted
32:15 33:22 34:12
58:10,20 70:19,20
89:11 91:3 122:8
167:6 170:21 173:23
222:10 223:10
attempts
33:12 71:4 81:3
120:1,8 171:23
188:19 193:7 197:4
attended
143:17
attendings
17:20
attention
26:16
attorneys
84:1
August
140:9 176:2 207:2
216:23 218:21 222:1
author
98:1
authored
98:1 99:12,14
authoring
97:18
authoritative
35:19 36:9,11,12,13,
15 37:4,6
automatically
22:8
availability
94:14
average
50:12 71:6 180:9
209:20 217:20

aware
24:4,8 70:11 78:15
97:17 104:12 119:18
120:18 134:24
137:21 138:2,22
139:23 141:9,17
awareness
173:14

---

**B**

B.C.
54:5,22
back
12:9 30:20 28:18
54:7,11,22 73:4,6,9,
12 74:14 75:9 91:17
103:20 104:5 106:21
115:5 116:24 129:21
131:19 133:18,24
135:5,14 140:12
144:1 146:2 150:7
152:12 156:10
159:8,12 161:18,20,
23 163:6 166:7,10
168:7 176:11 177:12
178:9,13 190:13,19,
20 204:7 214:24
223:11,23
background
44:13
bad
159:15 187:8 218:22
badly
215:3
ball
167:10
bam
65:17
bananas
45:19
based
36:23 66:20 82:13,
15,16 98:7 104:23
105:1,5 137:4
189:12 192:18
200:14
basic
13:15
basically
21:15 48:16 139:11
178:15
basis
109:23 122:12
187:22
basket
59:4
bathroom
125:4
beach
75:22 208:22 209:9
Beautifully
22:10
Becker
92:2
began
176:5
beginning
202:22
begs
46:7
behalf
75:11 76:7 77:10
behavior
83:12 86:6 136:15
179:13 194:9 197:5,
6
behavioral
23:1,4,7,14 24:5,13,
15 25:1,8 28:21 29:1
66:3,20 147:10

194:14 196:4
Behaviors
80:23
belabor
5:10
belief
78:9 223:17
beliefs
198:19
believed
170:5
believes
206:19
benefit
93:5 122:15
bet
22:16 44:14 115:9,
10,11 132:9
bias
153:4,6
big
41:18 42:19 48:6
202:21
bill
47:16
biller
43:24
billing
80:6,7,9,14 204:18
billion
111:18
binder
67:10 84:5,12
biologic
142:12 214:9
bit
9:3 23:23 70:15
73:22 118:4 167:17
209:12
black
133:24 136:9 137:2,
3,22 138:4 206:5
blame
90:3 167:11,13,15,
16
blatantly
106:4
Bless
35:16
blood
126:16 159:2,3,5,7
blue
67:10
blunt
66:17
blurb
22:24
board
5:5 6:1,2,3,4,12,13,
17,20,21 7:2,3,6,9,
10,13,22,23 8:7,9,
11,14,21 9:5,6,10,
10:16,23 11:7,12,19,
21 12:6,7,12,13,16
13:4,10 38:17,18
188:24
boards
12:5
Boling
84:8
bond
187:15
Bong
150:19
boot
49:11
Borum
4:14 72:1,7 81:21
87:17 106:5 114:10

115:1,4 123:22
129:8 150:8 154:2
161:5 177:20 186:22
187:2,13 189:11,17
206:4 221:4
Borum's
80:16
boss
61:22 65:13
bottom
103:1 162:16 171:11
bought
37:21 88:3,19 89:12
Boulevard
4:24
boutique
47:3
Bowling
80:10 94:9 109:9,13
110:16,19,23
111:16,22,23 112:16
149:1 166:7,10
174:18,24 175:6
176:1 177:4 178:16
179:19,20 180:20
182:6,13,23 185:15
186:1 188:11
196:19,20 212:12
box
133:24 136:9 137:2,
3,22 138:4 206:5
boxer
174:15
boyfriend
166:12 177:13 179:7
boys
152:18
Bradstreet
111:17
brain
129:1
brand
199:17
breach
185:3
breached
109:18 152:14,21
breaches
94:24
break
9:1,3 18:4 24:9
66:23 125:4
briefly
5:14 73:16 148:15
202:11 219:20
bring
78:21 91:17 100:13
180:5
broader
173:15
broadly
173:23
brother
50:6
brothers
135:21
brought
34:9 80:6 96:21
100:10 216:24
Brown
4:2,8 24:15 60:8
84:16 133:1 135:17
189:16 224:4
building
23:8
bunch
31:6 55:17 68:1
117:4,5 215:21
burdensome
195:19



**EXHIBIT C**

Finley Brown, MD 10/16/2019

business
4:23 21:8 51:6 59:16
busy
49:21 52:4 146:9
buying
89:13

C

C-U-T-I-S
31:13
calculated
74:14,18
calendar
80:15,16
call
17:24 18:2,5,6,7,14
32:12 70:8,10 104:1
110:1,24 143:22
146:14 157:17
158:13,14 159:4,19,
22 163:2 167:16,22,
24 187:9 189:21
190:11,20,21 202:2
called
4:3 79:15 89:6
110:11 112:22
119:10 166:20
175:1,7
calling
72:20
calls
52:1,10
canceled
190:10
cancer
60:20
cap
49:16
capacity
43:9
captured
223:18
car
180:1
care
14:24 20:17 27:24
28:4 29:20 30:12
31:22 32:1,2,4 33:7,
9,15 35:14 37:8,10,
13 39:13 41:4,19
42:10 43:11 47:7
53:12,21 54:10,19,
21 55:4 63:13 65:1
79:7 88:7 90:7 91:14
93:7,9 94:12 95:22
104:22 105:10,11,13
108:8,9,10,17,18,22
109:5,14,18 110:5,
13 111:15,19 112:11
113:3 115:16,23,24
116:4 117:18 118:9
121:2,14 122:3,22
123:15,23 128:5
131:5 132:15,20
133:14,18,22 134:3,
18 140:19,21,23
142:1 144:7,8,11,17,
24 150:4 152:14,22
153:1,17,23 156:7,
16,20,24 158:10,21
165:4,23 166:9
169:24 170:19 172:8
174:21 175:8 177:7
181:16 182:7,12,21
183:9 185:3,4,5,20
187:18 188:4,5
190:16 192:21
206:14,20 216:5
220:20 221:6

careful
132:4 178:6 217:19
carefully
143:5
caregivers
126:23 127:13
217:19
caring
121:24 167:12
Carolina
208:23 209:10,13
carry
136:6
case
35:2 75:6,21,23 76:7
78:3,5,9,10,20
79:10,11,16,22
81:12 83:15,23,24
89:2 92:8 98:4,7
114:9,24 119:22
123:22 131:21,22
135:18 143:4,19
146:4 152:1,5,10,19
153:16,24 160:17
175:16 177:3 189:14
193:9 205:19
cases
74:5,8 76:9 77:1,6
79:3 83:18 84:11
125:2
casually
106:19
caught
166:11
causal
139:19
causation
150:5 183:6,8
187:22
causative
187:14
caused
139:8,9,15 141:8
174:3,6 192:22
213:9 217:6
causing
61:19
CDC
119:9
Cecil's
35:23,24 159:7
cell
60:20
cellphone
47:11 68:5,22 81:24
center
16:22 19:23 20:9
21:9 25:15 26:1 38:2
48:6 55:9 80:11
81:20 94:9 109:9,13
174:18,24 175:7
180:20 182:6,13,23
centers
49:14 53:18
certainty
146:19
certification
7:2,6,9,10 8:9,12,22
10:2 11:6
certified
5:5 6:1,2,4,13,21
7:3,22,24 9:13,19
12:6,12,16 13:10
38:18 188:24
chairman
38:10
chance
6:16 24:1 64:13 66:3
71:6 196:21 197:20,
21 213:11

change
18:1 85:3 124:18,22
127:20 138:6,18
201:10 203:7 210:18
211:2 216:2 223:21
changed
127:2,16 201:8
212:13 220:22
charge
47:15 192:17
charged
48:16
chart
45:8,14 68:12 69:1
70:5,6 72:16
charts
52:8
cheat
169:5
check
159:8 218:24
checklists
117:20 118:5,11
155:19
chefs
105:3
chest
106:11
Chicago
4:24 21:2 48:19
54:20 59:24
chief
112:22 204:20
child
66:16 142:21
children
23:11 55:20 83:12
158:14
choice
110:14 157:8,23
160:15 178:16
188:23
choose
96:3 168:1
Christ
196:11
chronic
124:18 158:23
198:13
Circuit
133:2
circumstance
103:24
circumstances
60:8 61:3
circumstantial
178:10
citation
81:11
cite
138:11,12,16
citizen's
217:20
city
59:22 146:9,11
city's
25:17
class
218:21 219:7
classes
114:17 218:20
clear
107:4 139:3 154:18
184:22
cleared
112:9,14
client
103:21 191:22 192:2

clinic
24:24 25:5,8 93:6
175:7 202:2
clinical
16:1,6,15,18 22:8
29:7 40:23 57:16
67:7 78:12 80:12,13
100:16,21,23
102:13,24 188:15
189:1
clinician
68:18 146:6 168:12
clinician's
125:11
close
68:21 116:12 215:1
closed
101:14
closed-circuit
168:18 169:13
Closely
116:13
CMA
14:12
CME
14:11,12,16,21 15:3,
16
CME's
15:14
co-therapists
24:23
cocaine
180:16 219:22
220:2,5,8
coding
204:17
coffee
18:4 61:18
cognitive
25:1,8 66:20
cold
215:14
colleagues
14:1,2
collective
86:10
college
16:3 25:6 52:23,24
53:2,5,7,10,14,18,
21,23 54:11 55:5
110:4 208:16
colleges
53:17
color
86:10 97:8
combination
63:17 116:23
combining
220:8
combo
213:13
comma
30:8
Comments
113:24
commit
32:5 33:22 55:10
59:6 71:5 103:16
120:19 181:10
188:18 205:12
216:20
committed
55:18,20,23,24 56:3
70:18 157:14 180:17
219:12
committee
40:9,15,16

committees
40:5,14
common
112:4 116:10
commonly
136:3
communicate
114:1,4 126:22
127:12 148:13 198:7
communication
98:7 143:10
communications
23:22 94:10 98:15
community
23:7,14 24:6,14,16
28:21 29:1 143:13
companies
8:13 45:19 103:6
company
45:18
compared
120:8
competent
58:15 121:23 145:21
163:18 178:6 205:18
217:18
complain
130:5
complaint
204:20
complete
5:20 56:14 59:11
98:22 170:10 208:17
completed
27:10 28:19 29:21
136:16 137:23 174:8
193:2,5 207:4
208:13
completely
58:12 59:9 62:5
104:17
completeness
118:21
completes
31:2
component
15:4,17 116:15,16
components
15:6
comports
7:4
comprehensive
141:22 142:2,24
168:9 169:7 182:14
186:20 187:12
188:6,8 193:14
computers
68:1
concede
96:7
conceding
152:21
concentrating
212:20
concerns
157:1
concierge
47:2 48:13,15,23
49:1,10,15 52:6
concluded
224:12
condition
18:2
conditions
119:17,24 120:6,9,
11
conduct
102:22 104:9 186:20
187:11

confidentiality
191:4,6
confirming
143:17
confusing
57:14
consensus
103:4
consent
166:4 177:6 190:24
206:3,14,22 213:2
considered
180:23 210:2
consistent
95:17
constraints
76:20
consult
132:17 195:15
consultant
52:2,3
consultation
32:13 147:17
consultations
101:18
consulted
42:9
consulting
51:7
contact
89:17 90:6 187:23
190:23
contacted
7:1 79:11 219:3,5
Contemplating
81:5
contention
141:10
contents
98:16
context
132:6,11,13 133:11
134:23 135:5 171:9
172:14
continue
200:24
continued
87:14 121:3 122:23
123:3 150:14
continuing
8:18 11:14,17,18
13:22 21:6 201:2
continuous
149:23 168:17
170:16
Cook
19:18,24 20:8 133:2
coordinate
53:21 187:17
coordinated
53:12 54:10
Coordinator
19:22
copies
86:10 97:9
coping
181:20 190:1 192:1
198:23 199:12
200:19
copy
19:15 80:15 133:12
core
21:1
corporate
99:6
correct
4:20 5:15 6:23,24
7:7 9:23 11:11,16
12:10,19 13:5,7
15:22,23 17:21,22



EXHIBIT C

18:13 22:2 24:16
26:23 37:10,11
71:17 72:4 76:8,15
84:24 95:14 97:23
100:18 102:11,15
103:5 115:17 121:20
123:13 124:14
125:23 127:7 129:1
134:17 144:21
145:13 147:5,8
148:4,9 149:9
151:10,11,15,19,20,
23,24 152:8 156:8
160:4 170:2 173:1,
24 174:3,22 180:17
182:9 183:23 184:17
187:6 189:22 194:22
201:4 202:4,18
203:6 207:2,7
209:14 211:24
216:24 217:7 220:18
222:1 223:7

**corrected**
209:4

**correction**
168:13

**correctly**
48:12 132:10

**cost**
8:1 12:8,9

**Costco**
48:4,7,8

**Council**
142:21

**counsel**
85:16 145:12 213:17

**counseled**
189:24 213:9

**counseling**
24:23 25:5,7 32:19
64:2 66:8 106:6
149:23 150:15
201:1,2 213:15,16
214:13

**counselor**
62:13,14 148:5
163:3,5,8,10,11

**counselors**
62:9 63:2

**count**
111:21 192:13 195:8

**countless**
13:21

**country**
49:14 89:10 146:8,
11 198:5

**County**
19:18,24 20:8 133:2

**couple**
14:4 16:4 31:7,12
34:9 74:6 85:7 86:24
109:2 128:21 135:24
142:16 155:1 157:20
165:10 221:13

**courses**
13:22 19:18,23 21:4
146:7

**court**
78:16 86:12 94:4,6
96:2 98:15 133:2

**coverage**
19:11

**covers**
62:16

**crafty**
135:20,24

**crazy**
79:4

**create**
220:5,10

**creative**
23:24

**credibility**
153:4,6,12

**crisis**
23:10 26:6,7 126:24
127:15 170:24
172:11

**criteria**
60:13 160:3

**critical**
91:10 141:21 198:4
206:2,11 215:17

**criticism**
186:19

**criticisms**
94:20,21 96:6,8,9

**criticize**
13:15

**criticized**
182:15 183:5,13
185:13

**cross**
30:12 80:11 105:19
110:2,7,12,24 112:1,
21,23 121:10 149:4
175:2,3 182:19
206:1

**cross-examine**
96:19

**cruel**
135:15

**Crushed**
209:10

**cryptic**
208:2

**cultural**
198:19

**cure**
64:13

**cured**
164:17

**current**
16:3 69:16 132:21
168:22 178:19
198:15

**cut**
155:8 181:18

**Cutis**
31:13

**cutting**
148:21 149:2 181:6
186:2 205:16
211:20,24

**CV**
15:24 19:15 37:24

**Cynthia**
80:16 81:21 87:16

---

**D**

**danger**
69:12 70:13

**date**
154:22 161:11 165:3
176:3,5 214:16

**dates**
212:9

**daughter**
171:22 172:3 179:2

**daughter's**
172:1

**day**
18:7,23 20:14,15
35:5 47:11,14,15,21
50:5,6,7,12 52:9
61:18 118:15,16
130:5 162:14 163:7
176:9 199:18 203:9
207:24

**days**
32:16 51:21 125:22
146:19 147:1,21
148:12 154:24 163:8
174:19 202:7 217:3

**Deaconess**
4:12 42:2 80:11,13,
19 87:3 90:4 93:6
99:7 105:19 110:2,7,
12,20,21 111:24
112:2,21,23 121:10,
13 149:4 175:1,5,2,
7,11 182:19 185:14
205:24

**Deaconess's**
110:14

**dead**
65:13 136:19

**deal**
23:22 59:21 184:7

**Dealing**
81:6

**dear**
51:13

**death**
103:16 177:22
178:11 191:7 198:19
222:20

**decedents**
120:5,12

**December**
7:5 12:11

**decide**
37:7 160:7 206:12

**decided**
27:23

**decision**
63:12 70:7 71:11,22
165:20 192:18

**decisions**
156:7,16,20

**Decker**
84:6

**declined**
37:23

**decrease**
139:4

**decreased**
139:20

**decreases**
139:24

**decreasing**
123:8

**dedicated**
47:19

**deductible**
47:19

**deed**
112:2

**deeper**
52:22

**defendant**
76:7,18 77:4,10
83:16 87:13

**defendants**
75:11

**defending**
131:21 150:20,24

**defense**
75:20,21 78:7
152:21

**defer**
63:12 137:19 138:13

**defined**
130:23 131:6 133:15
134:4,19

**defines**
68:14

**definition**
58:20 136:14,23,24
137:1

**degree**
8:14 14:3 27:5 32:11
58:7 102:19 118:3
120:23 122:19
148:10

**delay**
10:11

**delegated**
103:8

**demographics**
119:1

**denies**
148:17 195:24
196:9,12

**dentist**
92:2

**department**
26:9 182:2

**depending**
73:10

**depends**
33:18,20

**depose**
96:12

**deposed**
5:9 76:4

**deposition**
77:13,21,24 80:17,
18 81:20 84:8 87:2,
5,10,13,14,16,18,20
88:2 91:6 99:3,10,16
100:4 104:23 105:6
106:4 107:5 133:1,7
151:17 152:15
171:5,6,7 178:23
189:13 219:19
220:16 221:9 224:12

**depositions**
5:9 48:12 84:6 86:18
92:2 181:24

**depressed**
58:7 59:13 116:14
117:23 148:7,8
150:13 154:4,21
170:20 193:3

**depression**
15:12 32:6 33:11
58:6 61:14 63:15,24
64:16 65:8,19 69:18
72:12 116:7,9,20
117:21 118:7 128:2,
10 148:11,24
149:13,22 150:14
151:9 152:4 154:3,7,
20 155:24 156:3
163:2 172:17 188:21
190:2 197:8 207:12
211:20 221:23

**depressive**
116:16 147:14 220:5

**dermatologist**
31:12

**describe**
212:4

**describes**
23:1,4 29:12 34:11
142:10 195:12

**describing**
18:10 81:22

**desk**
67:19 68:13 70:6
71:14,20 72:17

**detail**
161:24 195:20

**detailed**
95:2 108:15 194:4

**details**
70:2 76:14 95:13
172:23 203:10

**deteriorate**
176:5

**degree** (col 5)
**determine**
186:21 188:7 193:4

**determining**
120:22 122:19

**detriment**
172:2,3

**developing**
84:21 168:11

**deviated**
140:20

**deviation**
153:16,23 165:3
192:21

**deviations**
93:7,8 94:24

**diabetes**
197:11

**diagnose**
157:1,3

**diagnosed**
186:22

**diagnoses**
128:1

**diagnosing**
187:2,13

**diagnosis**
54:8,19 64:12
204:16

**dictating**
195:18

**didactic**
20:21 21:11

**die**
120:20 123:21
157:1,2

**dies**
122:3

**difference**
12:4

**differently**
153:9

**difficult**
48:17

**dinner**
219:11

**direct**
17:1 62:20 66:17

**directly**
192:22

**director**
24:15 22:22 114:12

**dirty**
34:7

**disadvantages**
41:15

**disagree**
9:8 28:23 30:4 117:9
118:3 120:14,15
148:11 201:9 211:6

**disappeared**
16:7

**discharge**
18:8 112:9,12,13
171:14 175:10 183:3
191:21

**discharged**
69:15 174:24 183:11

**discharging**
112:17

**disclose**
98:14 119:19

**disclosed**
95:5 119:15 120:10

**disclosure**
83:9 93:24 94:5,6
96:5

**disclosures**
83:17 94:8 95:18

**Discontinuation**
215:8

**discord**
198:15

**discount**
48:3

**discover**
148:20 149:8,12,15
186:2

**discoverable**
122:6

**discovered**
144:1 174:14

**discussed**
183:22 184:11,15
222:17

**discusses**
143:9

**discussing**
175:17

**discussion**
125:17 143:13
212:23

**discussions**
23:21 98:16 223:19

**disease**
64:9,11 146:12
158:9

**disorder**
116:7 147:14

**disorders**
115:13,15

**distract**
199:2 200:21

**distressed**
162:9,12 204:9
205:6

**dive**
52:21

**doctor**
15:11 27:22 30:14
31:23 33:19 48:6,9
57:13 84:23 89:6
108:20 127:3 131:22
146:13 151:1 152:13
156:22,23 157:5
158:4 167:13 207:24
220:13,16 221:2

**doctor's**
32:8 64:9 127:6,9

**doctor/patient**
168:4

**doctors**
13:16 21:16 27:4
40:20 48:18,20 49:9,
10 127:1,15,18,19
146:8 168:7 172:16

**document**
81:2,4,7,9,10,18
82:11,13 87:8,9
92:10 95:20 97:1
98:10 109:5 119:9
130:24 135:12
141:15 142:3,7,16,
18,19 144:6 145:1
171:9 199:14,15

**documentation**
34:18 153:2 162:5
194:4,16,23 195:1
198:13,21,23 203:13

**documented**
129:10 147:4 182:8,
14 213:21 222:17,24
223:15

**documenting**
108:15 206:12

**documents**
80:21 83:3,7 145:12

**dollar**
111:18

**dosage**
210:8,11,12



EXHIBIT C

**dose**
122:14,16 129:5
130:15 135:2 138:6,
18 164:24 169:21
176:8 177:11 201:23
210:18 211:2 216:23
217:16
**doubled**
122:14 201:23
**doubling**
169:21
**doubt**
172:24 190:3
**Doxepin**
132:16,21 134:13
**draft**
82:12
**drafted**
98:22 99:1
**drafting**
40:12 82:20 83:2
**drafts**
98:16,17,21 99:15
**dramatic**
126:5
**drinking**
212:10
**drinks**
198:9
**dropped**
167:9
**drug**
25:18 103:17 122:14
126:3 130:16,23
131:1 134:14,19
135:2 139:5 140:11
141:7 164:21
197:13,23 209:23
210:4,5 212:11
**drugs**
62:18 117:5 130:12
139:22 176:23
198:10 212:10
**ducking**
18:3
**due**
6:11 177:20 191:23
**duly**
4:4
**Dun**
111:16
**Duncan**
84:6 92:2
**duty**
59:19 64:10 68:9
72:5 88:23,24 89:8
103:19 158:8 180:10
185:20 187:23
189:2,3 190:11
**dwell**
148:3
**dysphoria**
63:23 161:17 181:6
204:21 205:17
**dysphoric**
161:16,17 162:3
202:17 203:12

**E**

**earlier**
83:10 147:21 172:15
202:7 205:13
**early**
8:9 64:12 79:12
**earn**
74:21
**Easier**
167:13

**easiest**
167:11
**easily**
84:20
**easy**
77:7 104:7 118:17
169:5
**eat**
105:4 168:2
**economic**
42:19
**edge**
176:21
**edges**
86:1
**educate**
14:3 107:24 159:14
177:5 188:12
**educated**
88:22 166:19 167:3
179:1
**educating**
28:2
**education**
5:11 8:19 11:14,17,
19 13:17,22 14:8
19:24 20:10 21:7
25:12 167:5 192:19
**effect**
130:17,19 139:8,13,
14 141:6 174:6
177:11 210:5 217:6
220:5
**effective**
66:18 210:8
**effectiveness**
120:24 122:20
168:22
**effects**
128:20 129:8,13
134:13 135:1 138:19
139:18 163:3 164:24
176:21 206:4 215:9
216:15 220:10
**efficacy**
141:7,11 165:1
209:23
**eggs**
111:5 112:24
**egregious**
192:21
**eight-weak**
208:14
**electronic**
42:11,13,17 144:2
**elicit**
197:1 198:8 201:7
**elicited**
197:2
**eligible**
6:6
**Ellis**
11:2 29:23 44:15
64:20 69:21 76:13,
16,20,24 77:7 81:1,
14,16 84:10,14,19
85:19,23 86:7 90:8
93:23 94:19 95:11,
15 96:1,20 97:12
98:2,3,14,20 99:13
113:21,24 123:5
125:3 126:15 132:24
133:6,9,17,22 134:5,
8 135:8,22 137:12
147:6 149:10,16
150:22 152:6,16,24
153:6 155:8 161:8,
11 173:10,16,19
180:14 186:16 208:1
211:3 215:5 221:13,
17 223:23 224:10

**elucidates**
127:4
**email**
43:2
**emergency**
26:9 161:6 164:9
168:16
**emotional**
13:14 23:20 126:24
127:14
**emphasize**
213:10
**employed**
41:2 48:21,22 49:9,
13
**employee**
87:3
**employees**
113:8
**empower**
188:13
**end**
15:8 59:17 65:13
215:2
**ended**
20:19
**engage**
187:20
**engaged**
158:5
**engaging**
126:2
**England**
30:20
**English**
113:14,15 114:1,7,
16 148:14 198:2
**enhance**
144:17
**enhancing**
8:7
**enjoy**
41:17
**enjoyed**
106:10
**enormous**
28:7
**ensure**
168:14 169:15
**ensured**
170:14,15
**ensuring**
169:8
**entails**
102:17
**entire**
133:7 172:20
**entities**
4:13
**entitled**
81:4,7,9,18 86:5
87:1,4,9,14,15,17,19
**entity**
44:22
**environment**
21:6 48:17
**environmental**
142:13 214:9
**enzyme**
175:9
**enzymes**
147:24
**episode**
147:15
**equivocal**
68:16
**ER**
18:13 68:20 69:7
189:21 202:2

**Erin**
99:4,5,9,16 100:4
**err**
191:4
**error**
98:13
**errors**
209:3
**establish**
55:4
**Estate**
4:14
**esteem**
89:17
**estimate**
74:21
**evaluate**
33:11 37:3 147:24
183:4,10
**evaluated**
165:7
**evaluation**
33:13 81:7 83:13
142:8 143:10 214:5
**Evansville**
144:8
**event**
205:5
**events**
80:17
**evidence**
7:21 35:8 114:9,11,
24 146:3 167:17
176:16 177:19,21,23
178:10 181:9,23
203:19
**evidence-based**
25:1,8
**ex-fiance**
90:6
**exam**
6:17 10:13,17,24
13:3 142:5 148:21
162:8 204:8
**examination**
4:8 8:23 10:8 11:10
12:6 17:24 196:16
221:16 224:2
**examinations**
106:23
**examined**
4:4
**examples**
54:14
**exceeds**
29:15
**excellent**
5:13 23:23 98:10
182:18,20 183:9
**Exchange**
45:11
**excited**
45:16 46:24 148:1
**excluded**
78:16
**exclusively**
75:16
**executive**
179:12
**exercise**
199:3 200:21
**Exhibit**
12:21,22 77:12,14
86:10,11,13 97:8,13
221:9,10
**existed**
153:3 213:20
**existence**
8:16

**expect**
107:3,8,10,14,16
221:2,5
**expensive**
64:7
**experience**
24:20 28:6 29:9,14
33:24 82:18 105:7
128:16 138:18
157:19 192:19
195:14
**experiencing**
202:8
**expert**
4:16,19 52:19 73:14
74:1 75:10 77:19
82:10,12 83:8,17
93:2,4,24 94:7 95:6,
8 149:6 152:21
153:12 156:22
**experts**
98:18 149:19
**explanation**
84:2 132:8
**explicitly**
143:11
**explore**
184:13
**explored**
192:1
**exposure**
15:11
**express**
61:7
**expressed**
106:3
**expresses**
96:10
**expression**
45:22 62:16
**extensively**
99:10,11
**extent**
95:4,9,15 96:2 99:9
**eye**
213:7

**F**

**fabulous**
66:5
**face**
55:22 56:16
**facilities**
25:18 101:11,12
**facility**
101:7,9 111:19
**fact**
71:4 103:22 105:1
124:19 151:21
172:23 175:6 177:11
178:2 212:1
**factor**
124:15 210:18
211:18,20 214:19
222:11,21 223:12
**factors**
124:8,12 125:8,12
126:7 142:12 211:1,
11 213:18 214:8,16
221:19,20 222:4,7
**facts**
121:12 175:5 178:11
182:22
**factual**
78:19 94:24 140:5
**factually**
148:9
**faculty**
17:2,3 21:1,15 26:6

**fail**
193:15
**failed**
186:20 191:11
193:21 201:7
**failure**
177:1,3 187:11
197:11
**fair**
15:11 25:21 71:16
121:4 124:1
**faire**
29:14
**fairly**
21:5 45:13 116:19
117:2,9,11,16 119:6
**fall**
70:4 215:3
**fallen**
214:23
**familiar**
30:1 101:11,20
125:19
**familiarize**
133:7
**families**
23:12
**family**
5:3,6,21 6:4,7,17,21
7:17 9:5,6,12,14,18
10:16,23 11:20 12:7,
13,17 13:4,13,16
15:11 16:1,6,15,18,
20,23 17:3 19:10,17,
22 20:7,13,14 21:16
22:1,9,19 23:2 26:14
27:4,10,15 28:19
29:15,21 30:16 31:7,
22 33:10,16,21 34:1,
17 35:17,19 36:7
38:11,18 39:10
48:18,20 57:9,13
58:15 70:10,23,24
78:18 94:11 103:10
108:19,23 115:15
117:19,22 118:9
124:14 126:5,23
127:13 129:11
131:22 132:15,20
142:9 143:1,12,14
144:17 145:21
165:24 170:19,23
171:15,17,21,24
172:9,10,11,22
173:3 179:10,14
180:4 181:24 193:1,
2 197:9 198:15,18
199:13,17,23 202:4
214:4,14 221:2
**faster**
62:24
**father**
197:12
**father's**
222:19
**fault**
35:10
**favorite**
35:24 156:11
**fax**
42:23 43:4
**FDA**
137:9,16
**FDA's**
137:2,3
**features**
147:15
**February**
79:12
**Federal**
94:4,6 95:12 96:17

98:15
**fee**
11:14 47:6,9,23
**feel**
77:23 108:4 164:15
185:17 207:23 215:3
**feeling**
126:4 130:5 151:9
152:3 154:7 162:2,3
178:7 191:23 192:2
203:11 205:7
**feelings**
176:17 177:20
205:21
**feels**
161:24 162:2,9,11
164:18 198:22
202:15 203:10 205:7
207:19 208:9
**felt**
104:1 106:9 140:13
176:14 189:21 202:2
**female**
110:4
**Ferguson**
172:17
**ferment**
8:15
**fewer**
52:9
**fiance**
174:14 223:11
**fiefdom**
8:7
**fighting**
65:14
**figure**
58:24 76:17 145:18
168:7 169:12
**file**
67:19 197:14,15
**filed**
4:14
**filled**
76:13
**final**
223:24
**finance**
182:2
**financial**
59:15 208:14
**find**
45:15 46:10 60:5
70:1,16 100:3 158:3
**fine**
96:22 115:11
**finish**
178:18 179:17,21
**finished**
27:14 28:12
**finishes**
29:16
**Finley**
4:2 189:16
**firearms**
194:11
**fired**
110:22
**firm**
135:20
**first-line**
127:24
**fish**
209:11,13,17
**fit**
57:24
**fits**
163:17,18
**five-minute**
125:3

**five-week**
207:4
**flashing**
177:16
**flat**
47:6
**flight**
35:12 60:2 114:20
**fluent**
198:2
**focus**
120:22 122:18 215:5
**focused**
26:16,17
**follow**
32:9 63:10,11 70:1
107:3,6,10,14,16
109:14,21 112:10,
13,18 118:1 123:20
149:23 154:14,15
157:9,23 166:16
192:11 211:7
**follow-up**
54:21 70:21 107:19
123:15 143:15,18
171:15 190:7
**food**
105:4
**fool**
44:15
**force**
159:23 160:4,13
167:19
**forcefully**
157:17
**forensic**
52:19
**forgetting**
213:10
**forgive**
9:2
**forgotten**
31:8
**form**
162:21 187:8
**formal**
13:17 14:8,20
**formulate**
82:4,8
**formulating**
82:6
**forward**
186:13 208:18
**foul**
185:6,22
**found**
7:15 10:12 54:15,17
60:1 98:10 110:18
121:9
**four-and-a-half**
20:14
**four-man**
60:1
**Franklin**
74:10
**Frankly**
99:20
**frayed**
86:1
**free-standing**
22:20
**frequent**
39:16
**frequently**
62:2 63:23
**fresh**
145:2
**Friday**
46:6

**friend**
87:24 146:14 167:6
179:17 181:24
208:13 218:2,3,4,5,
7,8,9,12
**friend's**
51:14
**friends**
55:17,19 71:1 88:6
89:9,11,22 126:5,23
127:14 129:11
162:11 166:2,18,24
167:9,12,15 177:2,5,
16 179:9,15 180:5
187:19,24 188:11
212:8 213:5 214:13
**front**
180:4 193:12
**full**
38:6 98:22
**full-time**
17:1,2 46:1
**fun**
46:13,14 51:5
**function**
161:20 175:9
**future**
59:12 148:2 194:24
208:18 212:13,16

**G**

**gained**
220:21
**gal**
147:20 148:13
163:16 180:8 182:1
**game**
46:11
**garbage**
62:15
**Garcia**
24:2
**gather**
193:15,21
**gave**
22:8 60:24 63:4 79:4
86:8 95:16 96:3,24
110:11 115:3
140:10,17 145:13
171:14 213:2 215:21
220:17
**geared**
14:23
**general**
5:6 60:11,12 107:2
116:6 121:2 153:8
**General's**
173:19
**generality**
156:9,12 157:10
167:21
**generally**
26:18 38:5 48:14
50:1 63:16 128:21,
24 156:2 169:1
**Georgetown**
54:6,22
**Georgia**
51:7
**gesture**
217:9
**get all**
70:2
**giant**
153:8
**girl**
89:11 106:14 110:13
197:19 219:6
**girlfriend**
174:16

**give**
20:23 46:22 54:1
65:11 66:2 68:22
72:23 73:1,2,3 86:3
88:9 89:5 103:18
113:3 130:7,9
132:12 133:11 146:1
197:9 209:24 216:5,
10
**giving**
66:19 96:21 215:18
216:18
**glad**
24:7
**glittering**
156:9,12 157:10
167:21
**goal**
49:6,8 124:6 125:12
**God**
89:3 163:15 165:15
**Goff**
84:7 92:3
**Goldberg**
135:21 152:18
**Goldstein**
72:4,6 77:19 84:9
115:22 116:18
117:17 118:8 119:10
124:6 125:18
128:15,20 155:13
180:24 201:6,13,17
210:16 213:14
**Goldstein's**
97:18 136:13
**golf**
46:8,11,15 51:9,10,
12 54:5,7
**good**
4:8,9 24:3 27:1 30:7,
9,12 31:9 68:18 98:6
155:3 162:2,3 173:5
178:20,22 186:6
189:19,23 196:18
202:5 203:11 205:7
212:20
**gosh**
28:12 37:2
**Gracie**
84:7 87:23 88:2,14,
17 89:15 90:19,21
91:2 92:3
**graduate**
19:18 20:1 212:17
**Graduates**
20:8
**grandmother**
148:24 195:22
**grandmother's**
197:10
**gray**
68:22
**great**
36:4,6,17 59:23
62:18 78:23 106:12
109:22 110:17
171:20 172:1 198:4
197:15,20 208:10
220:15
**greater**
71:5 180:8
**Green**
80:10 94:9 109:9,13
110:17,19,23
111:16,23 112:17
149:1 166:7,10
174:19,24 175:6
176:2 177:4 178:17
179:19,20 180:20
182:7,13,23 185:15
186:2 188:12

196:19,20 212:12
**Gross**
93:6
**group**
8:9
8:15 41:14,17 60:1
179:10
**groups**
42:19
**grown**
53:4
**guess**
9:16 58:23 78:5
131:23
**guessing**
138:15
**Guideline**
81:5
**guidelines**
32:9 34:21 35:10
58:17 59:21 70:2
80:22 81:3 88:6
92:12,15,21 107:3,7,
11,15,17 108:22
109:4,7,14,21
117:20 118:1,23
121:23 123:16,20
142:4 144:20 145:11
153:7 154:16 162:7
168:22 186:12
187:20 191:2 203:21
**gun**
88:3,9,10 89:5,12,
13,18 90:24 166:20
167:7 177:15 217:2,
5 218:1
**guns**
88:8
**guy**
49:4
**guys**
41:16 75:22 86:8

**H**

**habit**
36:8
**half**
105:4 120:19
**hand**
33:3 68:21 83:6
92:24 142:6,7,17
161:15
**handicap**
46:20
**handle**
50:17 59:18 69:2
98:6 170:24 172:11
**handling**
156:2
**hands**
34:7 71:10 168:2
183:18
**hands-on**
21:22
**hang**
81:13 82:3 112:24
207:22 211:13
**happen**
90:4 139:2 141:8
149:20 166:6,21,22
183:20 222:11
**happened**
21:8 27:21 89:20
141:8 148:16
**happy**
133:12
**Harborview**
25:14,17 26:1
**hard**
34:7,18 50:8,19 60:3
146:10 182:1

**harm**
185:5,22 192:23
**Harrison's**
35:22,23
**hate**
61:21,22
**hazards**
134:13 135:1 180:4
206:15
**healed**
129:22 209:19
**health**
4:12 13:14,18,24
14:16,24 15:4,7,12,
17 23:1,9 26:8,16,20
29:20 30:11 34:11,
14 35:5 37:10,13,22
41:3,19 42:7,10
43:11 53:17,21 55:8
56:19,24 60:16
90:23 101:6,9,11,12
103:3 108:9 110:1
111:3,9,13,18,19
114:2 115:13,14,24
116:6,10 119:16,24
120:6,9,11 121:14
128:1 146:15 155:20
156:7,16,20 172:19
173:2 175:1,19
176:5 183:19 185:9
199:19 219:7
**healthy**
53:19 196:15
**hear**
21:18 22:14,16 24:7
27:1 71:13
**heard**
75:23
**heart**
197:11
**Helm**
99:4,5,9,16 100:4
**held**
19:14
**hell**
179:18
**helped**
55:3
**helpful**
134:15 152:19
**helping**
75:22 76:1
**Henderson**
177:2 188:11
**hey**
88:9 122:3 218:11
**hide**
218:1
**hiding**
186:6,7
**high**
33:2 45:16 62:17
63:7,13 113:3 116:3
119:6 121:6 123:1
148:9 155:15 159:1,
2,5,7 177:7 179:4
181:5 182:24 186:3
187:4 190:22
217:23,24 220:5
221:21
**higher**
136:6 187:8
**hint**
164:2
**hired**
21:15 91:16
**history**
17:23 57:4,11 72:14
120:7 124:14,23
125:1 143:2 147:22
148:18,19,23 149:2,



EXHIBIT C

8,13,15 170:21
181:5 186:2 193:6
195:21,23 196:1,9,
10,13 197:3,8,9,10,
12 198:9,11 205:6
221:22
**Hobart**
154:5 155:4 171:15,
17
**hobbies**
199:2 200:20
**hold**
15:20,21 16:12
36:20 147:20 168:6
184:12 212:3
**holiday**
54:8
**home**
26:6 32:16 47:11
68:5,23 112:10,12
158:13
**homelessness**
212:5
**homicidal**
202:16,20
**honest**
167:20
**hopeless**
185:18
**hopelessness**
176:18 194:17
**hoping**
149:4 164:21
**hormone**
129:2
**horrible**
65:13 83:24 178:4
**hospital**
16:21 17:8,9,11,19
18:4,12,20,23 22:4
26:8,21 32:16 37:9,
12 38:2 39:7,8,15,24
40:6,13,21 49:1,11
69:11 70:10 80:11,
20 99:7 105:19
109:24 110:2 111:2,
4,9,13,19 146:15,16
149:5 160:10,19
162:13 165:7,13
175:1 180:21 183:19
185:7,9 186:9
191:15 192:7 202:13
205:11
**hospitalist**
18:15,17,19 19:3,10
38:12
**hospitalists**
18:18
**hospitalization**
57:21 70:21 157:22
160:3 165:8 183:11,
22 184:24 193:6
**hospitalizations**
171:23
**hospitalized**
101:10 109:8 174:18
180:19 211:22
**hospitals**
8:11 17:3 18:18
37:18,19 101:23
**hostile**
113:22
**hour**
21:21 52:12,14
**hour-and-a-half**
122:1
**hours**
8:18 109:3 125:22
**house**
39:5 166:11 174:15
177:12 179:7 222:9

**HPI**
202:21
**huge**
46:9
**human**
105:18
**husband**
46:11 48:2 61:22
66:15
**hypothetical**
70:14
**Hysteria**
174:14

**I**

**idea**
83:20,24 121:17
125:16 170:13
178:20,22 179:4
**ideal**
220:9
**ideas**
162:4 202:17 203:13
**ideation**
32:7 33:13,23 34:13
58:8 61:8 69:3,17
70:16 83:12 86:6
103:23 108:11 120:7
136:18 146:17,20
147:5,22 150:8,10,
16 151:8,14,18
152:3 153:19 154:2,
6,22 172:12 192:5
202:9,15,16 204:4,5,
6 205:10
**ideations**
170:22 171:1
**identification**
12:24 77:16 86:15
97:15 221:12
**identified**
213:19
**identifies**
94:23 95:3
**identify**
222:4
**idiot**
49:7
**ill**
104:19 157:20 210:2
215:9
**Illinois**
5:1,4 16:22 38:1,7,
11 45:10 101:15
133:3
**illness**
56:4,7 69:18 116:10
147:22
**illnesses**
116:6
**imagine**
24:20 40:1 41:12
171:2,8 186:16
**immediately**
105:24 189:8 192:7
**immigrated**
198:5
**imminent**
69:12
**implement**
188:8
**implementation**
42:10 43:10
**importance**
103:24 177:6 185:11
186:11 187:21
206:11
**important**
51:8,9 63:13 71:9
85:13 86:24 88:4

91:8 92:5,8 114:15
118:17 142:23
179:5,14 185:10
193:21 198:11
**importantly**
143:21
**impossible**
105:20
**improve**
165:1 199:3 209:23
**improved**
149:23 150:14
154:3,20 175:20
185:8
**improvement**
116:21 213:12
**improving**
120:24 122:20
**impulsive**
189:22 202:3
**impulsiveness**
194:18
**inappropriate**
140:11
**incidents**
71:3
**include**
126:1 188:14
**includes**
90:10
**including**
15:12 23:6 97:9
112:22 128:1 143:1
191:5 206:5
**income**
75:1,2
**incompetent**
162:19 163:19
167:17
**incompetents**
91:13 110:22
**incomplete**
134:17 146:24
**incorrect**
13:21
**incorrectly**
186:22 187:1
**increase**
121:3 122:23 123:3
137:5 138:23,24
139:5 141:6,7,11
146:14,19 166:14
189:24 207:14
200:22 212:2 219:23
**increased**
136:10 138:5,17
176:8 177:10 206:5
207:9 217:15,19
222:21
**increases**
164:24
**increasing**
119:1,5 126:3
164:23
**increasingly**
8:2
**independent**
82:19,21
**Indian**
124:24
**Indiana**
144:9
**indirectly**
23:16,17
**individual**
120:23 122:19 131:1
184:2,19 220:11
**individually**
89:21

**individuals**
30:2 46:10 136:1
139:17 171:19
**infer**
152:5 154:1,5 186:5
200:22 201:1
**inferior**
41:10
**inferred**
152:1
**inferring**
151:6 154:12,13,19
**influenced**
214:12
**inform**
143:11 166:17
187:16
**information**
73:17 85:13 91:12
110:10 143:2 179:11
193:15,20 197:1
201:6
**informed**
88:22 166:1,2,3
170:12 177:6 206:3,
14,22 213:2,6
**inhibition**
139:4
**inhibitions**
139:20 140:1
**initial**
54:19 92:13 107:18
142:5 143:10
**initially**
80:2,3 82:1
**initiate**
72:21
**initiated**
72:15
**initiation**
128:13 129:9 137:6
138:19 139:1 207:5
**injured**
54:5,7
**inpatient**
25:18 69:15 149:7
160:3 165:7 191:22
193:5
**input**
40:19
**insane**
166:9,10,13,15
**insert**
130:21 132:17
135:12
**insight**
106:2,18
**insightful**
36:2
**insights**
94:2
**insomnia**
212:5
**institution**
41:18 91:15 101:21
122:1
**institutions**
41:24
**instruct**
98:20 99:13
**instructed**
102:21 104:9 112:10
189:20 199:1 202:1
**instructions**
171:14,15
**instructor**
15:24 16:5,15,18
22:9
**insult**
113:1

**insurance**
8:13 45:11,17,18
47:16,17,20 103:6
**integrated**
23:5
**intensive**
23:6 24:5,13 26:5
27:12,13 28:20,24
39:13 123:15
**intent**
100:13 119:14,20
120:3,9 136:15
142:14 192:6 194:9
**intention**
13:3 27:17
**interchange**
117:13
**interested**
8:6
**interesting**
25:6
**Interestingly**
183:5
**interfaced**
18:3
**interfacing**
29:5
**interferes**
46:10
**intermittent**
192:10
**internal**
5:21 7:17
**Internet**
14:13
**internists**
21:16 29:6 48:17,20
49:1,2
**internship**
27:15 208:14
**intervene**
126:20 127:10
177:18 179:2
**intervened**
89:19
**intervention**
23:10 26:7
**interventionists**
69:9
**interventions**
184:18
**interviewing**
25:2 143:1
**intolerable**
41:11
**invited**
38:10 51:11,13
**involuntarily**
157:14
**involve**
62:1 143:14 168:13
177:2,5 188:10
213:1
**involved**
13:14 23:13,17 25:4,
7,19,23 26:10,18,19
32:3 63:14 78:10
79:2 88:6,12 89:2
90:11,12 91:14
166:8,18,24 172:18
179:8
**involvement**
144:17 212:7,8
**involves**
108:12
**involving**
78:3 179:14 214:13
**irresponsible**
113:7

**irritability**
212:6
**Island**
51:7,15
**ISME**
45:10
**isolated**
179:6
**isolation**
166:14
**issue**
94:13,15 150:5
184:5 191:3
**issued**
153:8
**issues**
15:12 23:10,20
56:19,24 60:17
89:17 101:20 103:3
143:13 188:20
205:17 216:16
**items**
95:1

**J**

**J.W.K.**
87:11
**JAMA**
30:24 31:1,3
**jelly**
209:11,13,17
**job**
7:23 21:22 24:3 33:4
61:21 65:13 79:3
103:18 114:3 162:24
182:19,20 185:22
208:18 219:2
**Joe**
25:12 38:23
**Joe's**
16:21 21:24 22:1,4,
11,20,23 24:19
26:15 28:22 29:21
30:1 38:6,15 39:1,3,
11 40:16 69:7
101:16
**join**
47:9 48:2
**joined**
21:24
**joking**
161:1
**Jones**
160:12,14,18
**Joseph**
17:8,9,11 26:8 38:2
**Joseph's**
29:11
**journal**
30:21,23 31:3,4
34:10
**journals**
13:23 15:5 30:14,18,
19 31:5,7,12,16,19,
24 32:24 33:18 36:4
195:16
**June**
173:24
**Jung**
4:12
**jury**
37:6 206:12,19

**K**

**Katherine**
154:5 155:4
**Katie**
4:10 84:10 133:17


EXHIBIT C

223:23
Kedzie
4:24
keeping
32:23 52:8
Kentucky
94:9
keys
118:19
kid
54:6
kill
157:11 163:16
166:12 172:3 196:11
killed
106:15 111:23
155:1,4 176:19
177:18 178:3
killing
218:12
kills
199:20
kind
29:10 43:22 48:4
66:14 74:16 116:17
198:16 216:15
kinds
142:10
knew
89:11,16,18 90:24
91:2 105:21 110:17
111:10 113:12
143:19 167:2 172:5
177:16 181:17,18
189:6 217:17,19
218:13,14
knowing
27:7
knowledge
29:14,20 36:18 38:8
82:17 112:4 133:23
220:21
knowledgeable
137:20

L

lab
161:22
labeled
182:24
lack
106:17 176:24
lady
39:7 113:14 198:5
language
57:15 114:1,17
lapsed
7:6
large
79:4 116:19 117:3,9,
11,16
late
173:20
laughable
103:14,15 147:12,13
law
84:2
lawsuit
4:13,16
lawyer
41:13
LC
63:7
LCSW
62:11 63:8 80:18
87:6,21 102:18
103:11,18 105:1

108:20,23 110:8
122:11 192:17
LCSW's
103:8 106:22 107:8,
21 108:1
leads
60:7 64:12
learn
24:15 26:6
learned
13:19 205:2
leaves
67:19 71:22
lecture
21:21 142:10
lectures
20:24
led
123:17
left
53:22 185:7
leg
209:11
legal
83:18 185:6
legwork
195:15
length
98:4
lengthy
96:5 98:7 108:15
lessons
46:23
lethal
126:2
letter
121:8 121:21
level
27:5,6 29:19 58:5
63:9 64:18 69:8
103:24 108:9 112:21
113:10 186:22 187:7
188:7 212:23
levels
104:15
Lexapro
80:15 129:9,18,22
136:3 139:8,13,15,
18,24 140:6,14,16,
18,22 141:3 164:18
170:3 174:6 176:8,
13,21 177:11 201:24
210:19 211:2 215:19
216:19,20,23 217:7,
16 220:9
liaison
40:15
licensed
5:4 9:13 29:7 78:12
80:12 100:16,21,23
102:13,24 188:15
189:1
lied
218:4
life
67:18 68:13,14
70:12 90:2 103:15
111:24 163:20 167:1
191:3,8 198:6
life-threatening
64:9,11 146:12
158:9
light
177:17
likewise
138:15
limitations
32:14 63:8
limited
38:7,9 134:20 213:3

lingering
62:4
link
187:14
links
220:2
Lipid
30:17 31:4
list
75:6 76:5 77:2 81:23
83:6 94:20 95:1,7,15
96:2 97:1 108:13,14
118:18 163:21
193:16,19 195:17
214:8
listed
83:10 92:7 206:4
listen
61:2 63:1 70:11
113:1 188:15 191:2
214:2
lists
15:24 37:24 142:22
literature
33:1,7 34:8 83:9
85:15 125:17 138:3,
12,16 139:23 140:4
141:9 153:2 173:13
179:9 220:2,23
live
166:13
lived
88:14 177:12 223:10
liver
147:24 161:20 175:9
living
179:6 194:23
loaded
167:24
locate
100:8
location
53:13
locked
57:22 101:22
long
98:4 134:8
long-term
53:5
long-winded
9:2 29:3 63:4
longer
16:12,15 30:21
223:6
longitudinally
23:5
Loni
84:6 92:2
looked
49:6 67:10 80:10
83:23
loose
44:2
lost
152:18 213:12
lot
5:10 7:20 8:3 22:14
24:18 35:21 41:14
46:13,14 62:19
65:18 76:14 91:8
93:21 100:3 106:11
130:5 153:2 173:12
182:3 195:1 199:15
214:12
Louis
24:2
Louisville
30:11
lousy
178:7

love
27:21 35:21
low
48:14 50:1 155:14
180:23 182:24
186:23 187:2,4,9,13
lower
209:11
lowly
188:15
loyal
167:12
LPN
44:8
LPN's
172:20
luckily
183:17
lucky
48:9 105:15

M

MA
44:6
machine
42:23 43:4
made
54:8 74:15 97:1
110:1,6,19 132:5,6
139:21 160:11
165:19 176:22
183:14 215:3 221:20
magazine
34:10 81:8
mail
81:24
main
197:12
maintain
67:2
maintained
48:14
maintaining
46:1 168:21
major
25:6 116:20 147:14
211:19
majority
128:4 144:16
make
12:20 54:17 57:15
63:9 69:9 70:6,7
71:11,14,21 78:21
90:21,22,23 103:23
150:1,3 154:18
156:7,15,19 157:5
158:9 159:4,19
185:17 192:18 198:6
210:7,10
makes
47:20,22 39:23 42:18
77:7 124:10 140:1
146:13 163:15
210:14
making
54:11 90:4 108:14
200:1
malpractice
45:12
man
84:5 122:7
manage
34:6,12 58:16 61:12
103:2 105:22 116:5
189:4,7,11,16 190:2
managed
16:23 63:6
management
83:13 104:19 142:17

managing
14:3 29:8 32:8 60:10
61:4 81:2,19 117:23
172:16
manner
34:20
manufacturer
130:16,24 134:16
135:13 141:16
210:14
manufacturer's
130:20
March
142:10
Marcus
27:22
Maria
84:6 92:3
marijuana
180:16 220:9
mark
77:12 84:8 97:7
221:9
marked
12:23 77:15 86:14,
19 97:14 221:11
marketer
131:1
married
212:14
Masonic
16:22 38:1,7,11
101:15
Master's
102:18
material
78:21 92:11,16
93:21 171:16
materials
82:5,7,13,14,16
84:24 85:1 94:2
100:10,11
matter
8:10 21:15 51:8
84:17
max
130:17
maximum
210:5
MD
4:2 87:3,19
means
47:5,8 118:2 126:2
148:19,20 162:18,19
164:15,20 205:1,3
208:24 210:22
meant
202:23 203:1
mechanisms
200:19
med
207:15,18,20 208:8,
9
medical
8:18 11:14,17,18
13:19,22 16:1,2,22,
24 19:24 20:10,16
21:2,7 37:24 38:2
42:11,13,17 44:3,4,7
45:11,22 48:6 49:14
59:22 78:17 80:11,
12,13 83:9 89:8 94:9
101:20 102:2 109:9,
13 114:12 137:4
138:2 139:23 141:9
143:5 144:2 148:17
156:22 170:15
174:18,24 175:7
180:19 182:6,13,23
189:13 196:1,13
197:8 204:17,18

220:1
medical/legal
75:1,3 183:7
medication
63:16,20 64:17 72:8,
13,24 116:22 125:14
128:22 138:20
155:16 158:1 159:5
163:2 164:19 169:9,
19 170:1 201:18
207:6,11,14 212:2
213:15 216:6 223:20
medications
32:17 184:6,13,14
215:8
medicine
5:3,21 6:5,17 7:17,
18 8:8 9:6,12 13:4
19:19 20:1,9,15 22:1
23:2,7,14 24:6,14,16
25:15 26:2 27:11,18
28:2,7,20,21 29:1,22
30:21 33:10,16
35:17,20,21,24 36:7,
22 38:11 44:24 45:5
65:20,22,23 71:11
78:18 82:17 100:24
115:15 117:19
118:10 121:12 122:22
130:7,10 134:21
164:14 176:15
193:1,2 203:3 207:9
209:24
medicines
129:1
medium
217:24
meet
11:14 33:8 105:11
107:1 109:6 118:22
121:23 122:2 160:2
162:7 185:4 187:20
188:5 206:13
meeting
10:11 105:9,13
meets
34:21 156:23 206:20
melanoma
60:19
member
70:24 214:3
members
107:21 129:12
170:24 172:11
membership
47:9,23
Memorial
48:24
memorized
145:6
memory
31:14 78:8 99:5
mental
13:18,24 14:16,23
15:4,7,11,16 23:1,9
26:16,20 29:20
34:14 35:5 56:4,7,
19,24 60:16 69:18
90:23 101:6,8,11,12
103:3 106:23 110:1
111:3,9,13,17,18
114:2 115:13,14,24
116:6,10 119:16,24
120:6,9,11 128:1
146:15 149:5 155:20
172:18 173:2 175:1,
19 176:5 183:19
185:9 199:19
mentally
113:13

EXHIBIT C



mentioned
139:17 145:16
214:20
mentions
100:7
mercy
51:14
message
218:10
messages
81:24 162:21
messy
86:3
met
4:10 88:5 104:21
metal
137:4
methods
121:1 122:21 130:22
middle
19:2
mild
61:14 63:23 159:6
mileau
103:5
miles
167:14
mill
156:3
Miller
171:13 172:17
milligram
216:23
milligrams
130:18,19 141:5,11
210:6
million
131:7,16 133:4,16,
20 134:3
mind
65:24 87:1 104:22
118:12
mind-altering
139:21 140:2
mine
41:24 55:19
minimal
187:19
miniscule
104:19
minutes
48:10 52:14 121:17
125:22 165:10
Miriam
51:23
missed
196:17
misspoke
171:3 194:22
misstatement
131:13,15
misstates
149:10,17 211:3
mistake
183:2
mistaken
79:13
Mistakenly
170:7
mixed
162:20 218:10
modalities
117:5
moderate
155:14 159:7 181:12
182:24 187:4 221:21
modest
7:19 137:5
modifiable
124:8,13 125:9,10,

13 210:24 211:1,10,
15,23,24 212:6
213:18 214:16
221:19 222:3,7
modification
66:3
modified
222:14
modify
124:21
mom
112:12 178:21,24
216:24 219:12,15
mom's
80:16 209:12
moment
4:11 6:1
moments
191:24 192:2
Monday
46:5 51:3,4,12
money
74:15
monitoring
43:10 67:13 168:17,
18
month
6:18 13:3 24:14
29:10 30:24 46:17
73:2,3,4,7 159:8
166:6 205:12 216:10
month's
216:18
months
45:13 91:3 106:15
140:11,12 155:2
176:12 178:10,14
216:6
mood
126:6 162:3,18
199:3 202:17 204:10
moribund
20:7
mother
44:10,12 66:16
81:21 87:17 89:6
115:11 166:1
170:12,13 177:3
180:6 187:18 188:10
190:21,22,24 212:7,
24 213:1
mother's
213:3
motivational
25:2
move
35:15 79:10 81:23
166:11 178:16
179:20 192:24
moved
49:23 55:4 176:1
177:12
moves
166:7
moving
186:13 222:9 223:11
Mullick
183:21
music
199:2 200:20

N-O
185:1
naive
179:24
named
4:15,19

names
31:8
narcotics
79:5
national
6:13 7:10 8:14 11:7,
12,21 19:23 20:9
21:9 30:17 31:4
Navajo
124:23
necessarily
134:20
needed
108:4 111:4 165:5,6
166:22 172:14,23
175:8 201:14 219:8
negative
147:11 162:4 194:15
195:21 196:4
202:17,19 203:12
212:12 213:11
neglect
198:16
network
90:1
networks
170:11
Neuro
129:3
news
218:22
nice
19:11 51:15 115:9
Nicole
4:14 71:24 72:7
88:12,18 89:16
90:19 91:2 106:5,9
109:8 123:22 129:8,
15,17 140:7,8,16,18
143:20 144:24
146:4,20 150:8
154:2 161:4,5 170:6
173:22 174:17
175:8,19 176:1,17
179:17,19 180:16,19
182:7,12 188:12
189:11,17,20,24
190:6,10,16 193:11,
15 201:2 202:1,6,12,
21 211:1 214:16
215:18 216:18,22
221:20
Nicole's
80:16 89:9 90:6
139:7 169:15 180:22
186:2 187:14,24
210:17 218:20
night
19:2 68:5 159:4,19
162:1,10 203:11
219:12
nonissue
185:7
nonstatic
210:17
normal
161:18,19,21,23
162:18 204:10 205:6
North
4:24
Northwestern
14:5 16:1,6 48:24
Northwestern's
49:6
notation
154:19
notations
154:6
note
67:18 71:19 94:13,

16 148:4,13 151:7,
12 152:2 161:14
212:4
notes
68:2 87:12,14,16,18
91:22 92:1,5 94:15
96:20 97:5 98:5
107:2,4 193:12
notice
75:20 148:21 149:1
219:15
notify
127:1,15
number
8:1 24:17 25:21 46:9
47:11 49:17,20
55:18 68:6,22,23
79:2 94:21 96:6
117:15 140:9 147:8
161:15 206:9
numbered
92:6 95:19,20,23
numbers
79:4 92:21
nurse
40:15
nurtured
21:5 213:9

Objection
11:2 29:23 64:20
69:21 90:8 113:21
123:5 126:15 137:12
147:6 149:10,16
152:6,16,24 173:10
211:3
objective
126:14 167:17
observe
126:24 127:14
obtain
143:1
obtaining
143:2
occasional
32:7 58:13
occasionally
25:20 30:22 65:11
198:10
occupation
5:2
occur
125:21 128:20,21
157:18
occurred
222:20
occurs
130:17
odious
144:18
offer
61:15
offered
37:21
offering
20:7
office
5:9 46:2,5 47:16,21
51:22 57:10 64:1
67:3,15 68:16 71:23
72:1,2 81:23 127:6,9
147:8 164:12 170:4
178:8 189:21 194:2
offices
41:4 44:4 161:15
official
49:15
ominous
218:22

one-man
43:16
one-month
23:6 24:5,13 26:24
one-to-one
168:17
one-woman
43:22
open
24:19 46:5 101:14
open-ended
60:24 156:17
operate
127:19
operation
183:20
Ophthalmology
216:2
opinion
33:4 89:7 95:6,24
103:14 112:6,8
117:7 132:14,19
139:7 141:24 154:8
165:12 171:16 183:8
190:9 192:4 203:7
opinions
82:5,6,8 85:4 93:17,
18,22 94:3 95:13,18
96:14,18 97:18,22
98:23
opportunity
10:7,15,22 133:11
opposite
131:24 132:1
opted
10:9
option
7:13,15
options
184:11
order
8:12 118:22
Oregon
142:21 144:6,14
179:10
organization
44:23
original
122:15 163:23
164:1,4,5,7
originally
6:3 93:20
orthopedist
54:10,15,17
Oscar
84:7 90:6 92:3
outcry
7:19
outline
115:19 155:9
outpatient
23:11 26:5 41:4
110:20 112:13
over-caffeination
61:19
overdose
103:17 216:20
overkill
64:6
overseeing
21:11 102:8
overseen
102:12
oversees
44:23 45:5
overstatement
131:18
overwhelmed
192:2

owned
37:9 48:6

p.m.
224:13
package
130:21 132:17
135:11
packet
92:11
pages
67:11 92:6 155:9
paid
19:19 20:3 66:18
pain
157:2
painful
8:2 39:23
Painfully
75:8
Palm
75:22
pamphlet
121:11
panic
194:18
paper
42:21 68:2,6,9 87:22
paragraph
26:13 195:6 202:22
paragraphs
195:4
part
42:19 92:13 107:18,
19 114:3 119:13
121:11 131:6 133:15
142:5 173:5 175:16
187:1
participate
24:23 26:4
partly
191:23
parts
91:10
pass
10:1 223:23
passed
10:5 74:11 223:6
past
7:21 57:5 58:11
188:20 197:8 198:15
patient
17:10,12,15,24 19:2,
9 27:8 32:2,5,8,12,
14,17 33:8,19,21
34:3,6,12 35:1 38:24
39:3,15,20,24 41:20
49:17 52:22 54:4,16
55:3,22 57:11,18,19
58:3,4,5,10,16,17,21
59:1,6,7,9,11 60:5,9,
13 61:3,6,13 62:3,12
63:6,10,22,23 64:8,
10,16,24 65:7,11,19
67:16 68:16 69:2,10,
14,23 70:8,18,23
71:10,18,22 72:11
73:11 78:3 81:6,8
103:3,16,20 104:1,2,
20 105:23,24 106:3
108:10,18 111:11
112:9,14,20 117:24
118:1,6 121:24
122:3 123:21 124:7,
9 126:20,21,24
127:5,11,12,14
138:18 139:16 142:9
143:11,12,14,17
145:22 146:11 151:7



<span style="color:blue">EXHIBIT C</span>

152:2 155:14 157:16
159:1,24 160:14,16
165:3 168:5,12,15,
19 170:14,20
172:15,22 175:2
184:12,20 187:16,20
189:5,8 191:2,6
192:4,13 198:3
199:20,21 205:9
208:22 209:9 215:13

**patient's**
18:1 60:4 127:8
130:13 156:24
160:15 190:23,24
191:3,4 200:15

**patient/
relationship**
103:22

**patients**
13:14,23 14:3 16:23
17:7,20 18:11,20,22
22:5 23:19 25:20,21
26:21 27:7 28:15
29:8 33:11 35:4
37:18 38:12,22
39:20 40:21 43:11,
24 45:9 47:5 49:22,
23 50:4,5,9,13,15,22
51:1,16,20 52:1,5,8,
12,23,24 53:2,5,6,9,
9,13,22 55:10 56:3,
10,13,17,21 57:3,10
58:6 60:2,14 61:7,11
62:3,6,8,10,11,19
63:2,3,5,19 64:5
65:7,20,21,22,23
67:14 69:4 79:5
92:16 101:9,18,19,
23 102:10 105:10,14
111:14 116:19
117:3,6 119:19
120:24 122:20
123:14,19,21 136:11
137:6 155:20 156:6,
15,19 157:6,20,23
159:21 167:19
168:1,6,16,23 193:4,
5 199:18,19 203:16
214:6

**pay**
11:13 47:5,8,18,20,
21 103:6

**pays**
47:17

**PCP**
81:3

**PDR**
80:15 131:6 132:21
133:15 134:4,6,12,
15,19,21 135:4

**pediatrician**
50:7

**pediatricians**
29:6

**peer**
45:9

**pen**
42:21

**pending**
180:14

**people**
7:21,23 8:3 50:19
55:24 56:2 57:23
59:13,14 66:2 90:10
91:9,11,16,17
110:18 119:7,8,23
121:24 156:13
162:1,22 170:14
171:18 172:6 173:11
175:3 182:2 185:19

**perceive**
104:16

**percent**
28:15 36:23 39:4,6
40:2 47:22 48:3,19
49:9 52:16,18 61:7
62:6 64:3 65:18 69:3
75:2,10 115:24
117:22 118:21
119:15,19,23 120:10
145:14 146:19
190:14 219:10

**percentage**
116:19 117:10

**Perez**
81:11 83:13

**perfect**
111:7 173:7

**perfectly**
34:16

**perform**
106:23 193:13

**performance**
142:1

**performed**
182:7,13

**performing**
141:22

**performs**
45:8

**period**
98:4 161:3,9

**perpetuity**
132:3

**person**
46:12 51:22 57:8
109:3 135:20 196:21

**person's**
68:13,14 70:5

**personal**
8:10 50:18 59:15
198:8

**personality**
115:10

**personally**
17:12

**persons**
119:16 120:10

**perspective**
103:9

**persuade**
190:17

**pertinent**
175:14

**Peter**
84:7 87:24 88:14
89:16 90:19,21 91:2
92:3

**Peter's**
88:17

**Peters**
87:23

**pharmacist**
79:3

**pharmacists**
78:17 79:1

**pharmacologic**
168:24 169:2

**pharmacologist**
137:19 138:13

**pharmacology**
187:5

**Phd**
32:19 62:17 63:7

**phenomenal**
106:14

**phone**
52:1,10 68:6,23
70:22

**phrases**
156:11

**physical**
17:23 47:13 54:21
148:21 162:8 198:16
204:8

**physically**
17:19 163:1

**physician**
5:3,5 20:17 27:24
28:4 32:1,3,10,22
33:17,21 34:1,17
40:14,15,18 42:18
45:4,6 58:15 59:19
94:11 103:10 108:24
117:23 118:10
126:20 127:10 142:9
143:4 163:16,19
178:6 179:10 192:18
199:13,17,23 205:19

**physician's**
130:22

**physician/patient**
158:6

**physicians**
6:14 7:11 8:2 11:7,
13 13:13 78:18 81:5
100:17 112:11
115:16,23 116:5
128:5 145:22 193:1
214:4 220:21

**pick**
98:12

**picked**
20:24 21:14

**piece**
68:6,9

**pile**
91:23

**piles**
85:7 99:22 121:8

**pills**
73:1 159:3

**pitiful**
105:6

**place**
67:13 143:15 170:9,
11 201:16 223:9

**plaintiff**
4:20 76:11,17,24
78:7 152:13

**plaintiff's**
77:18 85:16 135:20
145:12

**plaintiffs**
75:16,19 76:9 77:5

**plan**
149:22 168:10,11
169:8 170:9,10
182:14 188:9 192:6
201:8,11,17

**planning**
143:16 208:14

**plans**
191:23 194:8,24
212:14,16

**play**
46:18 51:10

**playing**
51:12

**pocket**
68:7,8

**point**
134:23 183:14 185:6
200:1 213:3

**Pointe**
80:12 93:6 105:20
110:2,7,12,24 112:1,
21,23 121:11 149:4
175:2,3 182:19
206:1

**points**
92:7 94:8

**pole**
103:1

**police**
157:17 158:14
160:20 190:21

**policies**
40:12,19,22 41:20
67:2 111:14

**policy**
67:12 72:19

**polite**
168:3

**poor**
148:19 182:21

**population**
49:17 52:22 71:7
180:9

**position**
131:24

**positive**
162:3 202:16 203:12
213:10

**possibly**
41:23 148:12 159:16

**post**
88:7 108:10

**potential**
67:17 170:22

**potentially**
146:12 171:19

**pots**
61:18

**Powell**
80:18 87:5,21 88:5,
23 90:3 91:13 93:9
94:20,21 96:6
104:21 106:7,10,19
107:5 110:17 112:4
113:9 139:10 141:22
143:8,20,22 147:1
175:4 185:14 186:14
187:9,23 188:4
189:6,14,20 190:11,
16 191:12,14,16,18,
20 202:7

**Powell's**
113:9 187:11

**Powerpoint**
86:7

**practical**
42:18

**practice**
5:6,7,15,17,21 6:7,
22 8:8 9:5,14,19
10:16,24 11:20 12:7,
13,17 16:1,6,16,19,
20,24 17:3 18:1
19:10,18,22 20:7,13
22:9,19 27:5,15,18
28:11 29:15,17,19
30:1,16 31:7,22
35:19 36:22 37:8,14
38:19 40:23 41:10,
17 43:16 44:20,23
45:5 46:2 47:2,3,9
48:13,14,15,18,20,
21 49:3,16 50:2,10
52:7,17 55:24 56:2,
11,13,18,22 57:10
59:22 67:7,22 82:17
92:11 102:13 107:17
108:1,6,7,20 109:6
131:22 134:20 142:4
144:20 145:17 146:7
155:20 199:18 203:3
221:2

**practices**
41:21 146:9

**practicing**
25:15 26:1 28:1,7
42:18 115:12

**practitioner**
132:15,20 170:19,23
172:9,10 202:4

**practitioners**
9:13 117:19

**pre-existing**
221:22

**precise**
59:5

**preeminent**
9:6,11

**prefer**
10:18 75:12,19 83:1

**prejudiced**
130:23 135:12
141:15

**preoccupation**
136:15

**prepared**
95:8 96:18 98:8
117:12

**prescribe**
62:2,18 158:1 159:2

**prescribed**
128:5 136:4 140:6,
16

**prescribing**
63:20 132:16,20
134:14 140:18

**prescription**
52:1 130:22 176:12
206:23 215:18,23
216:11

**presence**
143:12 194:7,17

**present**
16:2 67:8 147:22
198:15 212:6 221:24
223:6

**presentation**
194:5

**presented**
151:7,17 152:2
154:5

**presenting**
170:21

**president**
80:19

**pressure**
159:2,3,5,7

**pretty**
16:9 38:20 39:17
44:11,14 52:4 53:18
57:12 68:10 96:5
98:6 104:15 116:16
131:15 145:7 156:14
163:24 177:24 182:4
184:22 186:5,8

**prevent**
91:10 121:18 123:24

**preventable**
94:17 121:13,19

**preventible**
123:13

**prevention**
81:9,20 121:1
122:21 142:20 167:4
220:22

**previous**
22:12 57:11 143:3
145:1,3 148:17
171:24 195:24
196:13 197:3 205:5

**previously**
24:8 34:12 52:13
58:19 135:18 145:16
216:4 222:5,10
223:9

**pride**
8:10

**primary**
20:16 27:24 28:3
33:16 37:8 41:4 47:7
55:4 112:11 115:16,
23 116:4 121:2
122:22 128:5 144:8
174:21 175:8 183:21

**primitive**
13:15 27:6 161:14
192:19

**prior**
5:8 33:12 44:19
48:11,12 49:15
81:13 82:6,20 91:3
97:18 120:8 125:22
170:20 171:12
180:20,22 181:2,3,
13 193:7 217:3

**private**
5:14,17 41:9 49:2
52:17 67:15 146:6

**privileges**
38:4,6,8,9

**problem**
9:4 27:8 34:22
53:15,19 62:5 64:4
65:16 66:5 67:20
68:3,11 97:1 127:20
163:21 199:22

**problems**
13:24 28:15 34:14,
15 35:5 59:15,16
62:4 102:3 144:19
148:18 155:21
196:2,14

**procedure**
67:13,15 72:20

**procedures**
20:16 40:12,23 67:2

**proceeds**
34:20

**process**
7:20 18:9 21:5
143:15 157:13

**proctored**
21:4

**produced**
95:6 99:15

**product**
98:18

**professional**
30:14 52:17

**professionalism**
63:9

**professors**
21:3

**profound**
120:16

**profusely**
131:20

**program**
22:20,23 24:1 25:22
26:5,15 29:11,16

**programs**
26:11 27:16

**prohibited**
98:17

**project**
108:16

**projects**
21:19

**promise**
35:13

**prompted**
7:9

**proof**
178:12

**proper**
188:12 214:13

**properly**
123:18 213:8

**EXHIBIT C**



pros
21:18
prospects
208:18
protect
64:10
protected
8:21 98:17
protocol
195:11
proved
144:5
provide
25:11,16 47:6 50:18
65:3 66:12 72:13
95:12 103:12 104:13
109:5 115:23 133:11
140:3 141:12 169:18
177:5 184:1,19
185:16
provided
75:6 76:3,4,6 80:24
81:1,14,15 83:19
85:16 99:21 162:1
166:4 169:23 170:1
182:7,12 183:9
184:23 203:10
provider
45:12 108:9
providers
78:17 89:9 143:3
providing
24:24 64:17,18
102:5,10 107:9
108:10 182:21
provisions
99:14
provoked
132:9
psych
24:19 26:7 69:7
101:14,22 195:22
psychiatric
13:11 23:20 24:18
31:15,18,23 32:13,
24 33:1,6,17 60:24
69:10,16 92:14
94:14 107:13,15,18
112:15 142:5 143:7
144:7 145:18 146:14
147:10,16 148:18
149:7 157:22 162:17
171:23 172:1,19,21
183:3 191:22 193:6
194:13 195:11,21
196:1,4,9,10,14
204:9
psychiatrist
13:10,11 27:9 32:18,
19 33:24 34:4 35:1
56:23 58:18 60:9,15,
22 61:4,8,16 62:2,7,
23 62:13,14 64:4,5,
14 65:1,7 66:1,7
69:4,6 70:22 71:2,
10,16 72:3 88:24
89:2 105:24 107:22
108:20,23 109:17
111:1,3,11 112:19
118:2 123:17 138:14
145:23 146:5,10,13,
18 155:22 156:1
159:24 160:6,12
161:7 162:14
165:14,21,22 166:8,
16,21 170:17 172:20
177:4 178:5 181:22
183:21 188:23,24
189:9,10 191:15
192:8,16 199:16,22
201:13,20,23
205:20,22,24 219:8

psychiatrists
13:24 14:2,5 24:18
29:7 59:24 60:1
62:10 63:4,5 101:19,
24 107:9 109:12
127:1,15 137:10
182:6,12 186:1
psychiatry
13:7,9,15 14:4,13,22
26:5 32:11 57:22
77:18 112:22 115:12
121:1 122:21 142:22
psychic
172:2
psychologic
142:13 214:9
psychological
31:16,19,24 33:18
psychologist
29:6 32:20 62:17
63:7 108:23 178:5
181:22
psychology
25:5 32:11
psychometrics
155:19
Psychopharmacol
ogical
184:10
psychosocial
198:12,13
psychotherapeutic
103:18 184:18
psychotherapist
32:21 62:14,18
78:13 101:4 102:14
110:15 165:17
176:10 181:7 205:14
psychotherapists
27:4 62:9 63:2
100:16 104:8 108:1
psychotherapy
23:11 27:3,6 63:16,
21 64:18,24 65:4,9,
21,23 66:9,12,15
71:12 72:9 101:2
102:6,10 103:8,12
104:13 107:9 116:22
122:10 125:14
155:16 165:23
168:23 169:1,9
170:6,16 184:2,7,20,
24 185:11 187:6
201:22 211:15,16,17
212:7,19
psychotic
147:15
psychotropic
184:12,14
publications
35:18
pull
75:4 145:8
pulled
92:16,19
pulse
44:1
purchase
217:5,24
purchased
177:15 217:2
purported
138:24
purpose
195:12
purposes
204:18
pursue
11:5
push
129:5 130:14 210:4

put
67:18 68:3,6,12 69:1
76:24 93:24 105:18,
19 110:14 114:21,23
130:24 135:12
141:15 146:7 159:18
160:24 161:6 163:19
164:8 200:5 202:12
203:8 204:2 205:10
211:10
puts
43:24
putting
93:21

Q

qualified
33:5 65:3 66:12
103:2 105:22 116:5
189:4,7,11,16
191:20 193:3 205:19
qualifies
27:2
qualify
145:21
quality
30:2 45:17 62:17
63:8 103:12 113:3
138:13 183:19 185:9
198:17
quantifying
194:6
quarterbacking
32:4
question
10:14,20 11:22 12:8
14:7 15:14 28:19
29:5 35:15 36:17
46:7 51:10 53:20
60:7,11,12 61:1,2
62:23 64:15 65:2,24
104:4,10,12,14
114:14,18,22 115:2
117:12 118:4 122:18
131:5,18 132:14
136:22 141:4 144:11
147:19 150:7,10,17
151:6,12,16,21
155:7 156:18 163:23
164:1,4,5,7 165:10
167:24 171:13 172:8
180:14 194:1,7
196:6 197:17,22
199:24 200:9,17
204:2,7 205:4 214:1,
15
questioning
8:4
questions
15:8,9 34:19 63:1
97:11 99:24 106:22
108:14 109:5 118:6,
13,20 127:4 142:11,
13,15 154:16 155:23
162:6 167:22 188:3
193:17,20,23 194:9
195:14,17 197:23
198:14 199:15
200:4,7 203:13,15,
22,24 221:13,14
223:24
quick
32:12 135:8
quoted
99:10,11
quotes
218:17

R

rage
126:4
ran
19:17 20:12,13,15
rapidly
223:2
rare
204:8
rarely
157:15
rates
118:24 119:4,11
121:3 122:22 123:2,
7
re-review
94:1
reach
190:16
read
5:8 11:23,24 13:22
15:6 22:17 30:22
31:9 36:9 48:11
83:22 93:20 98:12
104:5 109:4 116:24
117:1 133:6,10
134:9,22 136:17
138:7,8 169:3 173:5
210:20 213:23
214:3,7,24
reading
36:15 77:24 115:18
132:10
readmitted
192:9
real
27:22 68:18 135:8
154:18
realize
65:12 202:23
realized
170:13 176:10
realizing
65:14
reason
88:4 89:13 113:4
134:11 148:3 158:11
reasonable
58:14 105:8 148:17
162:21 168:5 198:1
223:17
reasons
8:21 88:3 194:23
recall
15:1,2 56:9,12,15
78:14 79:24 88:16
92:19 106:8,9
115:3 129:14 184:6
receive
23:3 26:15 28:22
29:2 80:2 82:2,5
received
13:18 14:9 82:1
recent
108:18 191:21
recently
69:15 208:12
receptionist
43:24
recertification
6:8 7:20
recertified
6:11 8:5,17 9:22
recertify
10:8,15,24
recess
66:24 125:6

rechecked
175:9
reckless
192:22
recklessly
126:2
recognized
92:19 148:16
recognizes
32:14
recognizing
121:11
recommendations
92:12 157:6,24
179:12
record
4:11 5:12 11:24 30:8
35:9 76:13 84:10
94:19 117:1 130:3
136:17 138:8 144:2
149:10,11,17 150:11
195:18 197:18
210:20 218:16
record's
146:24
recorded
132:3
records
42:11,13,17 45:17
79:17,20 80:1,9,11,
12,14,15 112:17
214:23 215:18
146:23 149:18
175:11 189:13
200:16 202:14 203:4
recovered
58:12 59:10
Recovery
25:14 26:1
recredentialed
38:15
recruit
90:7
recruited
20:24 21:1 88:21
89:19,21
recruitment
40:15,18
red
86:20 177:17
Redictation
87:15,18,20
reduce
123:23 124:8 144:18
reduced
128:9
refer
14:4 25:21 27:8
28:15 34:24 57:18,
19 58:17 60:9,14,21
61:3,8 62:6,8,10,11,
16 63:1,3,5 65:6
112:20 118:1 135:11
145:22 155:21,24
156:4 189:8
referenced
223:15
references
151:8 152:3
referral
34:3 94:14 113:2,3
referrals
94:15
referred
72:2 105:23 119:10
121:24 141:14
170:16 175:2 185:8
referring
57:20
refill
216:6,11

refills
52:1 215:19,20,24
216:19
reflect
132:24 218:16
reflected
82:10
reflects
80:7,9 144:10
Refresh
99:5
refuse
152:5
regard
103:11 104:18 106:3
regular
30:18 48:5,9 72:12
109:23
relate
67:7 198:3
related
4:13 15:7 24:20 43:9
136:10 219:23
relation
26:20
relationship
104:2 139:19 158:6
168:4
relationships
198:18
relax
199:2,3 200:21
release
112:10,14
relied
55:8
religious
198:19
remember
14:15 15:3,15 31:11
51:19 55:22 77:2
88:17,20 91:5 98:11
99:20 104:4 118:16,
17,18 135:17 147:19
184:3 206:7
remind
87:22
remotely
104:11
removed
137:11
renamed
20:9
renewal
7:14
report
76:4 82:20 83:2 85:8
93:2,4,11,13 94:5,
22,23 95:3,9,17,18,
23 96:10,13,16 97:5,
6,19 98:1,22 99:11
129:12 141:15 153:9
173:19 207:10
reported
106:6 129:8,13,15,
17 207:5
REPORTER
86:12
reports
52:3 191:22
represent
4:11
representative
99:6
reputation
36:3
request
17:14
require
8:11,13 11:10 58:15
117:18 123:15


EXHIBIT C

132:16,21 142:1
170:22 172:10 188:4
190:16
**required**
53:16
**requirement**
11:15,18,19 32:9,23
33:1
**requirements**
10:11 92:21
**requires**
6:8 8:18 11:13 33:16
108:9 126:21,23
127:11,13 147:16
**research**
21:19 82:20,22 85:8
107:24 199:14
**reserve**
221:14 224:11
**residency**
5:20 13:12 22:1,19,
20,23 23:6 24:10
26:14 27:11,16 28:9,
12,20 29:22 193:2
**resident**
17:16 19:11 29:15
**residents**
16:23,24 17:19,23
19:4,5 23:3,15,21
24:22 25:12,24
26:14,22 28:10,22
29:10 30:1 33:10
**residents'**
26:11
**resistant**
117:6
**resolve**
210:4
**resolved**
62:6 67:20
**Resource**
81:20
**resources**
37:13 143:14
**respect**
69:2 92:15 108:21
111:14,15 112:3
113:2 121:7 142:11
147:9 155:23 184:7
195:20 197:22
206:11,21,23 213:5
216:16
**respectfully**
112:7 120:4 181:10
**respond**
64:1 117:4
**response**
8:15 9:2 111:7
**responsibility**
40:11 171:17
**responsible**
27:3
**rest**
61:11 90:14 221:15
**restate**
16:10
**restrictive**
168:21
**result**
177:10
**resumed**
165:23
**Resurrection**
39:7
**retrospect**
176:4
**return**
190:17 208:16
**review**
20:13 31:5,18,23
33:17 34:7 45:14

74:4 82:15 85:1 94:1
98:9 99:17 147:9
194:14,19 196:3
200:15
**reviewed**
77:21 80:10,21 81:2,
4 83:3,5 84:23 99:3
81:23
**reviewing**
52:7 143:5 203:3
**reviews**
45:9
**rid**
161:2
**rigid**
195:10
**ripped**
85:24
**risk**
15:13 59:11 67:14,
18 68:13,14 120:23
123:23 124:7,8,12,
15 125:8,12 126:3,7
128:9 136:7,10
138:5,17 141:20,23
142:2,11,24 144:18
151:13 155:15
163:20 177:7 179:5
180:8,23 181:12
182:8,24 183:4,10
186:21,22,23 187:2,
9,10,12,13 188:6,7
190:22 193:14
209:21 210:17,24
211:1,11,17,19
213:18 214:8,16,19
217:20,21,23,24
221:19,20,21 222:4,
7,11,20,21 223:12
**risks**
81:19 134:13 135:1
180:5 206:16
**RN**
44:8 172:20
**Robert**
77:19 84:8
**rocket**
171:21 172:4 173:8
**role**
20:5 21:11 42:5
**room**
44:1 161:7 164:10
**rotation**
23:7,8,14 24:5,13
**round**
17:12,14
**rounding**
17:20
**rounds**
17:16 46:17
**routinely**
31:5,6,18,23 33:17
**rules**
96:17
**run**
39:23 156:2
**running**
7:8
**rupture**
158:13
**rural**
34:11
**Rush**
16:2

---

**S**

**sad**
48:10 161:24 162:2,
12 191:23 202:15
203:10 205:7

**sadly**
37:15 48:5 55:18
115:9
**sadness**
192:3
**safe**
191:20
**safety**
41:20 88:3,19
143:13 168:14,22
169:8,16 170:14
191:3 218:4,15,17
**sake**
196:11
**sat**
74:13
**saved**
90:2 111:23
**savoir**
29:14
**savvy**
44:11,13,14
**scan**
43:1,2
**scars**
148:22 149:2 181:6
196:17
**scary**
25:3
**scenario**
94:10 161:3
**scenarios**
144:16
**schedule**
52:12
**scheduled**
51:17,20
**scheduling**
52:13
**schizophrenic**
60:14
**school**
13:20 16:2 19:19
20:1,8 54:16,24 55:1
56:18 179:18,21
180:7 181:5 186:3
218:23 219:4,6,9
**school's**
55:8
**schooling**
188:17
**schools**
21:5 59:23
**science**
23:2 171:20,21
172:4 173:9
**sciences**
23:4
**scientifically**
36:23
**screen**
117:21
**screened**
160:10
**screening**
117:20 118:5,11
155:19
**screwed**
196:22
**Sea**
51:7,14
**search**
140:4
**seasoned**
21:18
**secondary**
139:5
**seconds**
132:4

**section**
94:22 99:12
**sections**
133:10
**seek**
7:9
**seeking**
126:1 175:7
**sees**
50:7
**self-harm**
149:8,15
**self-harming**
194:8 197:5,6
**sell**
48:21
**semester**
179:18 208:17
**semi**
199:17
**send**
62:21 64:4,23,24
66:1 68:20 110:5,12
164:9 191:14,15
205:21,24
**sense**
8:4 42:19 124:10
183:7
**sentence**
119:21 148:6 210:22
**September**
142:21
**sequence**
174:23
**series**
142:22
**serve**
40:5
**served**
40:8 42:4
**service**
16:21 19:10 22:6,7
38:12,13 50:18
68:23 183:4
**services**
42:3
**session**
26:24 106:6 213:16
**sessions**
102:22 104:9
**set**
30:3 32:2 57:15
104:18 110:8 111:9
113:10 144:7 166:16
175:3 177:3 190:6
**setting**
168:16,19,20
**severe**
147:15
**sexual**
198:16
**shape**
20:7
**she'd**
166:5
**sheet**
169:6
**Shelby**
84:6
**shift**
18:15
**Shin**
150:20 151:16,22
172:18
**short**
66:4 72:24 157:22
190:3
**short-term**
142:17

**shorts**
174:15
**show**
43:17,22 78:20
85:10 91:18 92:17
132:13 138:4
**showed**
137:5
**showing**
158:18
**shown**
84:11
**shows**
34:19 138:16
**SI**
202:21,24 205:2
**sick**
39:9 67:16
**side**
78:7 128:20 129:8,
13 131:23 132:1
134:13,24 138:19
139:8,13,14,18
141:6 153:13 163:3
164:24 176:21 194:2
206:4 216:15 217:6
**sign**
122:6 217:10,12,14
218:22
**signature**
224:11
**significant**
65:19 116:20
**significantly**
120:6
**signs**
68:17 119:11 121:12
125:18,19 126:8,11
158:19
**simple**
126:16,17
**Simultaneous**
7:16
**single**
46:12 47:14 51:22
147:14
**sir**
15:14 94:4 97:17
110:10 130:21
136:22 170:18 194:3
**sit**
13:2 55:21 96:11
102:20 196:23
**site**
22:24
**sitting**
174:10
**situation**
57:2 103:16 105:20
111:12 172:9 178:5
198:12
**situational**
63:24
**situations**
131:17 157:14
**six-month**
176:12
**skill**
23:8 29:8,13,20 30:3
33:23 34:17 104:18
105:7 113:10
**skilled**
28:3 32:20 63:7
103:1
**skills**
26:7 28:14,16 58:16
110:17 117:24 190:2
198:8,23 199:12
**skip**
73:18

**skipped**
148:6 155:10
**slightly**
96:9 175:21,23,24
**slowly**
21:7
**small**
41:17 117:15
**smart**
106:1
**Smith**
4:12 35:3 80:14,17
81:22 87:11,13,15
88:5,23 90:3,5,9 91:4
94:12 110:9,18
112:3 113:13 114:10
115:1,5 122:12,13
129:17 130:3 139:10
140:6,15 141:21
143:6,19,21,22,24
146:22 147:1,3,8,23
149:21 150:9 161:5
162:19,23 164:8,13,
17,22,23 167:16
169:15,18 170:5
174:3,22 175:4,19
176:11,18 177:1,2,
21 178:8,13 179:3,
15 180:1,3 185:14
187:17 189:3,6,14
191:16 201:7 202:1,
14 206:3 207:2
213:16,17 215:18
216:10 219:2,3
221:3 223:19
**Smith's**
35:14 72:2 140:19
144:23 193:9,11
206:2 221:24
**snatch**
157:16
**snatched**
177:13
**sneak**
46:15
**social**
29:7 78:12 80:13
93:9 94:11 100:7,
21,23 102:13,24
172:19 188:16 189:1
190:1 197:12 212:24
213:4 214:10
**society**
34:13
**softened**
137:9,17
**software**
67:24
**solo**
41:9,17 42:18 44:20
67:15
**solve**
64:3 65:16
**solves**
66:5
**somebody's**
191:8
**someplace**
88:15
**sooner**
64:14 73:7,8 157:3
**sophisticated**
33:23 67:24 103:9
109:3
**sophistication**
103:11
**sort**
21:4 48:7
**sought**
101:18 181:15

**EXHIBIT C**



sounds
25:3,6 26:13 52:11
123:1
source
171:9
South
208:23 209:10,13
speak
92:8 94:17 113:14
114:7 118:6 198:2
special
21:19 53:15
specialist
28:17
specialty
5:6 7:18 20:13 27:19
specific
143:16 171:14
specifically
151:13 154:9 163:20
speculation
78:10
spelling
98:13 209:3
spend
8:4 24:10 28:1 29:10
48:8 52:7 93:21
spent
28:2 32:15 52:17,19
split
94:10
spoke
148:5
squamous
60:19
SSRI
63:20 64:1 136:4,7
138:6 139:1
SSRI's
62:3 94:16 127:24
128:4,10,12 215:9
St
16:21 17:8,9,11
21:24 22:1,4,11,20,
23 24:19 25:12 26:8,
15 28:22 29:11,21
30:1 38:2,6,15,23
39:1,3,11 40:16 69:7
101:16
stabilization
170:15
stabilized
109:22 111:8,24
stable
67:17
staff
8:1,2 21:24 22:3
37:24 38:5 40:17
146:15 172:20
stagnant
124:13,15,16,17
125:10
stakes
63:13
stand
21:13 90:9 107:12
117:14 135:6 165:9
169:10 188:1 205:7
216:7
standard
31:22 32:2 33:8,15
79:7 93:7,9 94:12
95:12 104:22 105:9,
11,13 108:1,5,7,8,17
109:18 117:18 118:9
122:3 129:4 130:14
131:5 132:15,19
133:14,18,22 134:2,
18 140:21 141:24
144:7,10 150:4
152:14,22 153:1,17,

23 156:24 165:4
169:24 170:19 172:8
185:3,4 188:4,5
190:15 192:21
206:14,20 210:3
216:5 220:20 221:6
standards
173:13
standpoint
112:15
start
132:23 216:22
started
170:3 217:15 218:20
startup
128:12
state
4:22 45:11 90:23
119:11 127:4 151:13
178:19 193:13
stated
16:14 22:10 184:1
statement
94:16 104:24 107:2
118:2 132:5,7
statements
87:2,5,8,10 142:17
states
9:7 24:22 81:12
83:14 116:1,11
119:2,5,12,14
196:14
statistic
119:18
statistics
120:18
status
106:23
stay
27:23 30:11
stayed
90:15 141:5
stickers
86:20
stickie
71:19
stickies
68:2
sting
209:17
stop
153:5,11 215:14
218:8
stopped
49:19
straight
165:6
straightforward
126:17
strategy
192:1
stratified
155:14 187:4
strengths
198:22
strep
159:17
stress
212:23
stressed
163:1 205:5
stressors
198:14
strike
180:21
strong
131:15 177:24
178:11
stuck
39:13

student
53:17,22 110:4
181:5 219:7
students
16:24 52:23,24 53:2,
18
studies
137:4,21,23 138:3
212:18
stuff
49:12 73:23
subacute
158:22
subject
21:14 84:3
subjective
204:19
subjects
21:1
subscribe
30:15,20,21 31:15
subsequent
155:9
substance
23:10 219:20
substances
139:22 140:2 220:8
substandard
140:20,24 152:11
153:20
substantial
28:8 45:14
successful
21:6 58:11
suck
111:5 112:24
sudden
65:12
suffer
157:2
suffered
106:17 139:13
148:24 176:9
suffering
65:8
suggesting
154:23
suggestion
100:6
suggests
35:9
suicidal
32:7 33:23 34:13
57:10,18,19,20,24
58:3,4,6,8,9,13,21,
24 59:1,7,8,10,14
60:5 61:7 69:16
70:12,16,17 81:8,9
83:11 86:6 92:16
103:20,23 104:20
108:10,11,21 110:3
111:14,15 117:23
119:20 120:7 126:21
127:4,9,11 136:15,
18 142:8,14 146:16,
17,20 147:4,21
148:11 150:8,10,16
151:8,13,14,18
152:2 153:19 154:2,
6,22 157:12 158:16,
18,23 160:1,2,6,17
162:4 168:12,20,23
170:22 171:1,22
172:12 180:8 189:5,
22 191:9,10,11,12,
17,19 192:5 193:4
194:8,10 202:3,8,15,
17,20 203:12 204:4,
5,6 205:9 214:6
217:9,10,12,14

suicidality
126:14 136:7,10,14,
14 137:5 138:5,17,
24 194:6 219:23
220:2
suicide
15:13 32:5,15 33:12,
13,22 34:13 55:11,
18,20,23 56:1,3,11,
14,18,22 57:4,12
58:10,20 59:6,11
67:14 69:3 70:19,20
71:4,5 72:14 78:3
80:23 81:2,5,6,19
85:14 88:7 89:12
91:3,9 92:13 94:12,
16 103:17 106:23
107:18 108:13,19
109:10 117:21
118:24 119:4,11,14,
24 120:2,8,9,19,23
121:1,2,11,12,16,18,
19 122:5,7,8,19,21,
22 123:2,7,12,14,15,
19,24 124:7,11,15
125:1,9,18,19,23
126:11 128:9 131:22
135:18 136:16
139:8,9,15,19 141:1,
20,23 142:2,5,12,19
144:18 155:15
167:4,6 168:9 169:8
170:21 171:19
173:14,23 174:2,9,
12 177:8 179:11,13
180:9,17,22,24
181:3,9,10,13 182:8,
14 183:1,4,10,12
186:21,23 187:2,12,
13,14 188:6,7,8,18,
19 193:7,14 197:3,4
198:20 205:12 206:6
209:21 210:17
211:2,11,18,21,23
214:9 216:17,20
217:20,22,23,24
219:13 220:22
221:21,22 222:10,21
223:10,12
Suicide's
81:19
suicides
137:23
suiciding
91:11
suit
196:20
sum
183:17
summarize
148:16
summarized
92:20
summarizes
142:3
summary
94:22 95:13,16
98:23 112:9 179:12
209:3
summation
182:18
summarizes
72:8 90:14,20
superficially
168:1
supervise
113:8,9
supervised
102:12
supervising
102:9

supervision
17:1,2
Supp
83:14
support
90:1 138:4 168:23
170:11 190:1 212:24
213:4,6
supportive
89:24 166:18 167:1
184:19
supports
141:10
supposed
54:12 84:12,16
96:14,17 100:12
145:19 163:8,10,11
183:1,3 185:8
surely
100:12
surgeon
5:5 114:6 153:8
173:19
Surgeons
6:14 7:11 11:7,13
surgical
20:16
surprise
138:1
surprising
120:21
survey
111:17
suspiciously
84:13
sustaining
8:6
sweetheart
115:10
sworn
4:1,4 73:20
symptoms
68:17 129:5,24
130:13,15 165:18
210:4
synonym
57:24
Syrrus
87:5,21 93:9 104:21
186:14 187:8
system
4:12 37:10,13,22
41:3,20 42:7,10
43:11 70:5 91:17
180:17
systems
42:20 43:10 147:10
194:14 196:3

---

T

---

T-O-M-A-S-I-E-Q-I-
C-Z
83:15
tablets
176:13
takes
12:5 32:1 33:4 44:1
190:18 191:5
taking
10:16 128:22 135:5
159:5 216:22 217:15
talk
43:15 65:10 66:8,13,
14 68:4 70:23,24
71:3 73:13 100:15
108:18 124:11
127:23 130:20
144:13 173:22
179:14 180:5 187:17
189:19 202:10

213:17 219:20
talked
49:4 90:19 93:23
98:3 143:21,23
186:15 187:18 201:2
213:14 222:5
talking
60:16,23 70:4
106:10,14 125:8
133:17,18 134:2
152:24 153:11
169:13 209:2
taper
140:13 176:14,15
215:12,14
taught
33:11 106:22 190:1
teaching
16:21 20:22 21:12
22:6,7
team
26:7 54:5,7 123:16
techniques
66:21
television
168:18 169:14
telling
75:21 93:17 110:16,
19 112:5 147:13
168:5 200:12
tells
185:15
temperature
44:1
ten
7:17 48:2 50:15,17
55:16 67:11 130:17
141:5 210:6
ten-milligram
210:11
ten-year
7:13,14
tendencies
168:24
tens
203:3
term
58:3 59:4
terms
12:5
test
10:2 11:10 126:14,
16,17
testified
4:4 12:15,19 74:23
75:5 76:6 77:9 78:2,
11,16 79:6 88:1
90:15 130:21 135:18
151:16 170:18 206:3
216:4
testify
76:1 78:24
testifying
74:1 151:1 153:13
testimonial
75:6
testimonies
22:13
testimony
76:5 78:15 88:18
179:16 189:13 206:7
209:12 211:4
tests
212:11
text
94:23
textbook
35:23 37:3 159:7
textbooks
35:17,22 36:5,7



EXHIBIT C

Finley Brown, MD 10/16/2019

texts
  36:16
themself
  199:20
theories
  138:22,23
therapeutic
  122:15 128:13
  130:17,18
therapist
  66:19 112:14 181:21
  192:1
therapy
  25:1,9 54:21 62:20
  63:20 64:17 65:10
  66:8,14,21 71:12
  72:8,13 102:22
  104:9 108:18 110:20
  137:6 168:24 169:2,
  9,19 170:1 183:23
  201:19 213:13
thing
  30:17 36:18,21
  38:21 57:7 66:9 91:8
  109:2 114:15 121:22
  134:24 144:12,15
  145:4,7 149:3 158:7,
  24 167:11,13 187:21
  196:22 200:2,6
  202:7
things
  5:11 15:24 30:12
  71:8 84:15 92:20
  95:9 98:12 106:11
  125:21 142:23
  145:11 150:24 164:2
  168:7 177:9,14
  189:20 200:3,22
  212:20 221:1,18,23
  223:18
thinking
  8:23 218:11
thought
  7:14 10:10,21 12:1
  41:10 59:17 68:19
  88:4 102:23 143:22
  210:2 215:22 218:24
thoughts
  58:9,13 59:8,10,14
  148:11 160:6 162:4
  191:12,19 192:5,10
  194:8,10 206:6
thousands
  203:4
three-page
  87:9
three-year
  29:16
threw
  176:20
throat
  159:17
throw-away
  30:19
Thursday
  46:6
til
  10:10
time
  5:18 6:5 10:1,3
  12:15 14:15 15:10,
  15 16:17 24:10 28:1,
  2 34:24 35:3,7 38:14
  39:2,5,14,21 40:3,8
  47:12 48:8 52:7,17,
  18 56:4,8,11 59:7
  65:18 66:6 69:22
  70:8,17 74:13 76:20
  79:18 83:20 93:21
  96:12 98:4,11
  122:14 128:12
  146:4,21 147:4

161:3,4,8 163:5,9
180:6 184:13
197:16,24 209:16
220:23 221:3
timeframe
  15:2,15
timeline
  97:2
timely
  143:16
times
  30:23 54:9 71:5
  90:18 115:6 180:8
  190:15 202:15
  207:19 208:9 209:20
  217:20,21
tired
  219:17
title
  16:5,13 22:9 85:22,
  23
titled
  81:2 83:11 86:5
today
  13:22 22:15,17 50:14,
  21 51:2 55:21 73:14
  82:8 88:13 89:7
  93:15 96:19 99:24
  100:10 119:6 141:13
  152:11 153:15 166:5
  221:2 224:7
today's
  103:5
told
  5:24 16:7 21:15,20,
  23 66:11 97:21
  112:23 123:12
  140:12 150:2
  176:11,13 178:19,21
  179:8 200:19 202:6,
  11 218:2,3,5,7,9
Tomasieqicz
  83:23
tome
  29:11
tomes
  87:1
tomorrow
  51:17
tons
  13:23
Tony
  75:21 76:23 79:15
  99:23
tools
  117:21 118:5,11,14
  155:19
top
  14:4 49:4 60:2
  207:18
topics
  197:13
total
  75:1
totality
  65:1
totem
  103:1
town
  49:24 51:4
track
  89:9 91:16 95:5
  190:12
tracking
  43:11 67:13
trained
  13:6 101:3 104:12
training
  13:9 23:2 25:24
  26:11,16,19 27:14
  28:5,21,24 29:9,11,

13 33:24 82:17
100:20,22 101:1
102:16 105:7 192:19
trainings
  26:17 27:12
transcript
  215:1 220:17
transient
  58:8 59:14,16
transitioned
  47:2
transitioning
  48:13 52:6
transmitter
  129:3
trapped
  126:4
treat
  116:5 124:7 125:12
  128:7 166:16
treated
  56:7,22 63:16
  101:10 115:15
  128:10
treating
  56:4,18 64:16 69:17
  102:2 124:6 170:20
  221:3
treatment
  13:18 23:9 25:18
  32:4 33:7 54:20
  60:10 61:4 64:12
  72:7 80:22 81:7
  94:10,13 108:18
  109:6,15,19 114:2
  116:21 117:6 120:20
  127:24 129:4 130:14
  140:20 142:8 143:3
  144:16 155:15
  158:11,19 179:13
  184:10,11 185:12
  187:5 188:8 201:8,
  10,17 210:3 214:5
  220:22
Tremendous
  19:17
Trends
  119:11
Trevino
  84:7 89:16 90:6,11,
  22 92:3 212:15
trial
  78:22 141:13 163:2
  221:15
tricked
  135:19
trigger
  171:1 172:12
troubled
  113:13
true
  4:21 5:16,19,23 9:21
  10:3,6 11:1,8 12:1
  20:20 22:21 24:17
  25:13 26:3 42:8 45:3
  47:4 48:5,10 50:14,
  23 51:24 52:10 74:5,
  17 100:14,19 102:1,
  4,7 115:21 116:2,12
  117:3 123:20 131:2,
  3,11 136:8 137:24
  138:9,21 145:14
  148:12 151:2,3,4
  160:16 163:4 174:11
  186:24 189:15
  190:14 194:15 196:5
  215:10 217:1,17
  222:2 223:8
truth
  36:22 73:20 168:6
  224:4,7

Tuesday
  46:6
turkey
  215:15
turns
  44:2
TV
  177:13
twelve
  67:11
twin
  135:21
two-and-a-half
  20:15
two-hour
  21:21
two-page
  87:8
two-week
  20:12
Tyler
  83:16
type
  25:11 43:8 47:3
  48:13 49:16
types
  27:12

**U**

U.S.
  119:7 121:17
Uh-huh
  98:19 208:19
Ultimately
  156:6
unchangeable
  124:19
uncomfortable
  162:10
uncommon
  39:18 57:7,9,12
unconsciously
  218:6
under-24-year-old
  110:3
underlie
  138:3
underlying
  69:18 137:22
understand
  4:15 19:12 35:10
  76:22,23 91:10
  97:10 114:10,13
  115:1,4 185:11
  190:9
understanding
  4:17 7:5
understands
  32:13,22
Unfortunate
  87:2,4,8,10
uninterested
  104:17
unit
  24:19 39:13 57:22
  69:7 172:21 191:22
United
  9:7 81:11 83:14
  116:1,10 119:1,5,12
unlike
  198:3
unlimited
  47:12
unmodifiable
  124:19
unpaid
  19:14
unpublished
  43:13

unsuccessful
  32:6
untitled
  85:21
untoward
  220:10
untruthful
  152:15
unwarranted
  169:22
up-to-date
  32:10 33:6
upbeat
  182:1
Uptodate
  83:10 85:11,20
  91:23
use/sexual
  197:13
utilize
  117:19 199:1
utilizing
  200:20

**V**

vacation
  208:13
vacuum
  127:19
variable
  128:14,15
vary
  73:10
vast
  128:4 144:16
venture
  148:1
verb
  57:24
verification
  7:1 12:21
verified
  7:2
version
  134:6
versus
  60:9 61:4 81:11
  83:14,16 153:13
vice
  80:19
video
  87:12
view
  185:6 213:3
vigilance
  187:7
virtues
  182:4
visit
  47:16,21 103:21
  140:10 143:20 147:8
  164:12,13 165:6,16
  169:20,21 170:4
  178:8 186:13 190:3
  193:11 194:2 201:7
  202:11,22 204:13,22
  207:1 209:16 210:18
  211:12 221:24
visits
  26:6 122:10 146:21
  150:9 161:4,10,12
  164:8 169:16 175:18
  199:20 204:18
Vital
  119:11
vitally
  185:10
voice
  81:23

voices
  192:10
volume
  48:14 50:1
voluntary
  19:14 157:15
vulnerabilities
  198:22
vulnerable
  122:7 123:14 139:21
  140:1 176:22 186:9
  209:20

**W**

wait
  146:4 148:6
waiting
  50:20
walked
  72:1
wall
  177:14
wanted
  21:20 35:8 41:7,8
  90:5 178:18 179:17,
  19,20 218:6
ward
  101:15
wards
  101:22
warning
  121:12 122:6
  125:18,19 126:8,10
  134:1 136:9 137:2,3,
  9,10,17,22 138:4
  139:18 188:6
  217:10,12,14
wash
  168:2
watch
  68:24
Watts
  4:7,10 11:4 12:3
  13:1 30:6 44:17
  64:21 66:23 67:1
  69:24 70:3 76:15,19,
  22 77:8,12,17 84:13,
  18,22 85:22 86:4,9,
  16 90:17 95:8,14,22
  96:11,22 97:3,7,16
  98:19,24 99:2,17,23
  100:2 114:5,8 117:8
  123:6 125:5,7
  126:18 133:4,8,13,
  20 134:2,7 135:10
  136:2,21 137:13
  138:10 147:18
  149:14,18 150:6,23
  151:3,5 152:7,17,20
  153:4,11,21 155:10,
  12 161:10,20
  173:14,18,21 180:15
  186:17,18 208:5,7
  210:23 211:5,9
  215:7 218:16,19
  221:8,18 224:1,3,9
web
  22:24
wedding
  51:14
Wednesday
  46:6 51:2
week
  39:4,6 46:20 112:12
  192:14 201:21
  216:14 223:20
weeklong
  14:12
weekly
  73:12 107:20 122:9,

EXHIBIT C



10,12 140:9 163:11
201:21
**weeks**
75:23 128:16,21
149:24 155:4 163:13
205:13 208:23
209:10 216:15
223:20
**weighted**
130:23 135:12
141:15
**Welby**
27:22
**whatsoever**
212:10
**white**
80:19 87:3,19 110:3
**wide**
103:4
**wife**
48:2 51:13 66:15
115:11 158:14
**wife's**
55:19
**wildly**
29:14 45:16
**William**
87:3,19
**withdrawing**
126:4
**woman**
113:14 122:7
**won**
75:23
**wondered**
98:24
**word**
62:12 66:13 89:22
124:16 132:2 148:14
**words**
22:15,17 96:9
125:10 132:10
133:14 135:6,14
151:22
**work**
25:14 27:19 34:7,18
35:7 41:11 46:10
50:8 52:19 73:14
74:16,22 75:3,10,12,
20 98:17 105:8
109:22 111:8 123:17
129:1 162:2,11
167:23 169:2 187:19
199:13 200:15
213:10
**work-intensive**
108:16
**worked**
43:8 44:4,19 101:5,
8,13 182:3
**worker**
78:12 80:13 93:10
94:11 100:21,23
102:14 121:14
188:16 189:1
**workers**
29:7 100:17 102:24
172:19 173:2
**working**
25:24 46:13 129:18
163:3 182:1 207:6,
11
**works**
42:20 68:10 199:10,
11 207:15,18,20
208:8,10
**world**
35:4 134:20
**worldwide**
119:8

**worried**
70:12 205:20
**worrying**
191:5
**worse**
141:2 159:22 208:23
209:10
**worth**
216:6,10,18
**worthless**
105:16,17
**wow**
59:17 61:21 162:22
**write**
67:18 68:2 113:15
118:20 153:15,17
154:17 164:17 178:2
199:6,7 203:15,18,
22,23 204:1
**writes**
147:23 162:17
163:20,21
**writing**
23:24 152:9
**written**
67:5 88:15 95:3
134:16 137:10
148:13,14 149:19
155:6 162:21 193:23
198:24 200:10,13
206:8
**wrong**
16:10 26:23 171:4
184:9 218:14 219:16
**wrote**
93:5 94:13 98:5
149:21 151:22
163:17 164:13
176:12 184:21
191:21 199:4
200:16,18,24 204:16

---

**X**

**xenophobic**
113:18,19,23 114:3

**Y**

**year**
8:24 47:6,24 48:1
74:5,8,15,22 79:12
217:22
**year-and-a-half**
49:5
**years**
6:8,9 7:12,17 8:11,
16 9:20 14:19 16:5
27:18 28:6 29:18
36:8 38:16 40:10
44:5 45:23 55:7 74:6
75:15 82:16 101:17
131:8,16 133:3,5,16,
21 134:3 153:1
188:16 203:2 223:11
**yesterday**
50:24 51:1,18
**young**
54:4 81:10 110:3
138:5,17,24 142:20
206:6
**younger**
136:11 222:20
**Youth**
81:10 142:20



**EXHIBIT C**