UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT OWENSBORO

| | |
|---|---|
| **CYNTHIA GAY BORUM, as** | ) |
| **Administratrix of the Estate** | ) |
| **of Nicole Alyce Borum** | ) |
| | ) |
|     **PLAINTIFF** | ) |
| | ) |
| v. | )    **CASE NO.: 4:17-cv–00017-JHM-HBB** |
| | ) |
| **JUNG WOOK KANG SMITH, MD.,** | ) |
| **DEACONESS CLINIC, INC.,** | ) |
| **DEACONESS HOSPITAL, INC.** | ) |
| **DEACONESS HEALTH SYSTEM, INC.** | ) |
| | ) |
|     **DEFENDANTS** | ) |

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
ON PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES**

The Defendants, by counsel, move this Court for partial summary judgment on Plaintiff's claim for punitive damages. As grounds for this Motion, the Defendants state:

**I.**     **INTRODUCTION**

This is a medical negligence case that arises out of the care and treatment provided to Nicole Borum following her suicide attempt in the summer of 2015. Plaintiff alleges that Ms. Borum – who had just attempted suicide several days before establishing care with the Defendants – would not have attempted it again and succeeded but for the Defendants' negligence in treating her anxiety and depression.

In addition to claims for ordinary negligence, Plaintiff's Complaint also alleges that the Defendants' care "was extreme and outrageous, was grossly negligent, and constitutes fraud, malice and oppression [rising] to a level that permits the imposition of punitive damages[.]"

(Complaint ¶¶ 23, 26.) However, discovery in this case has not revealed any actions or inactions by any Defendant that would entitle Plaintiff to present a claim for punitive damages to a jury under Kentucky law.

Even taking as true all the Plaintiff's factual allegations regarding the care provided by these Defendants, the evidence – including testimony by Plaintiff's experts — simply cannot satisfy the stringent requirements for the imposition of punitive damages under Kentucky law. Accordingly, Plaintiff's claims for punitive damages against these Defendants must be dismissed.

## II.     STATEMENT OF UNDISPUTED FACTS

In the early summer of 2015, 23-year-old Nicole Borum was engaged to Oscar Trevino, with whom she was in a five-year relationship. They were living in Bowling Green, Kentucky, and Ms. Borum had one semester left before earning her degree from Western Kentucky University, where she was studying finance.

Mr. Trevino broke up with Ms. Borum on or around June 8, 2015. (Bowling Green Medical Center ("BGMC") History & Physical, Exhibit A.) Later that week, on or around June 11, 2015, Ms. Borum apparently found Mr. Trevino in a state of undress at the residence of a mutual female friend. (Cynthia Borum depo. 29:16 – 30:1. Cited portions of Cynthia Borum's deposition are attached as Exhibit B.) She thereupon intentionally overdosed on Tylenol, taking approximately 100 pills (Exhibit A), in Mr. Trevino's presence. He took her to Bowling Green Medical Center, and as she was fading from consciousness en route, she told him that "<u>when she finally did kill herself[,] it would always be [his] fault</u>." (Trevino depo. 43:1-9, Exhibit C.)

Ms. Borum was hospitalized at Bowling Green Medical Center until June 16, 2015, when she was discharged home. (BGMC Discharge Summary, Exhibit D.) Instead of returning to Bowling Green where she any Mr. Trevino shared a house, Ms. Borum went home to her mother

Cynthia Borum's house in Henderson, Kentucky, about a hundred miles from Bowling Green, where she would spend the summer. (Exhibit B, 30:4-7.) As a result, her follow-up care arrangements from Bowling Green Medical Center were made at Deaconess Health System in Henderson, Kentucky/Evansville, Indiana at the time of her discharge.

The day after her discharge from Bowling Green Medical Center, on June 17, 2015, Ms. Borum attended an outpatient counseling session at Deaconess Cross Pointe in Evansville, Indiana with Syrrus Powell, LCSW. Ms. Powell's narrative note states:

> Client presented for therapy due to recent discharge from in-patient psychiatric unit after attempted suicide. Client's fiance broke up with her last Monday and <u>she found out he was cheating on her on Thursday, at which time, she attempted suicide</u>. Client reports good support system, though she says many of her friends are also her fiance's friends, so she feels less comfortable talking with them. Client had been with her fiance for 5 years; client reports feeling sad partly due to all the plans they had made for a life together. Client [is] set to start an internship next week before her final semester of college. Client was articulate regarding her thoughts and feelings and exhibited good insight during the session. Client was able to name things she is looking forward to, including new possibilities for work after graduation that she would not have previously considered due to the relationship.
>
> Therapist explored coping strategies for moments where client is feeling overwhelmed with sadness. … Client stated she does not believe she will ever find another relationship where she feels as in love with her partner as she does with her fiance. Therapist encouraged client to separate … her grief about the end of the relationship and her grief about the fantasy of what she thought their life together would be. Therapist encouraged client to go to the emergency room or call the office if she felt suicidal and impulsive. Client to continue per treatment plan.

(Powell note, Exhibit E.) A follow-up session was scheduled for July 9, 2015.

Two days later, on June 19, 2015, Ms. Borum established care with Deaconess Clinic family medicine physician Jung Wook Kang Smith in Henderson, Kentucky. Dr. Smith took a thorough history, and she and Ms. Borum discussed medication to address her depression, but her liver enzymes were still elevated from the overdose and needed time to resolve. Dr. Smith's note states in part:

> She was able to briefly summarize [her suicide attempt] and recognized it was unreasonable. She denies … any other psychiatric problems. States she has been healthy. Now, she is excited to start her internship on next Monday. She is excited to get new job opportunities ... She is majoring in finance. She would like to get a job that can budget for a company as well as dealing with finances. …
>
> Impression:
> 1. Anxiety-primary
> 2. Major depressive disorder, single episode, severe without psychotic features.
> 3. [Overdose], intentional self-harm, sequela, last Thursday 100 pills of Tylenol.
> 4. Hx of suicide attempt.
>
> Plan: Instructed her to utilize her [hobbies] to distract and relax. Also instructed to increase her exercise to improve mood and relaxation. Recommend not to add any other medication at this time … will check it in 2 weeks. Her depression has improved with continuous counseling. Continue counseling for a while. … [Return in] 2 weeks (7/03/15), or if symptoms worsen or fail to improve …

(June 19, 2015 Smith note, Exhibit F.)

On July 8, 2015, Ms. Borum canceled her follow-up psychotherapy appointment that was scheduled for the next day, July 9, 2015. (Cancellation documentation, Exhibit G.)

On July 10, 2015, Ms. Borum followed up with Dr. Smith and reported that she was still experiencing emotional symptoms from the events with Mr. Trevino. Dr. Smith's note states in part:

> Impression: [Liver function] improved. Physically well, but <u>still stressed with the previous event with her ex-fiance. Trial of medication for depression. Call if not working or side effect. Seeing counselor</u>. Call if any problems. RTC. 1 month (8/10/15) or problems fail or worsen.

(July 10, 2015 Smith note, Exhibit H.) Dr. Smith started Ms. Borum on 10 mg/day of the antidepressant Lexapro. Ms. Borum reported to Dr. Smith that she was still in counseling, despite having canceled her appointment scheduled for the day before.

On August 17, 2015, Ms. Borum saw Dr. Smith a third and final time before heading back to Bowling Green to finish her last semester of college. Ms. Borum reported that Lexapro "works great" but that she "still feels a little anxious at times" and requested that Dr. Smith increase her

4

Lexapro dose to 20 mg/day, which Dr. Smith did. They discussed that Ms. Borum would be leaving for Bowling Green, and Dr. Smith advised Ms. Borum to establish care with a doctor there;[1] wrote her a prescription for the increased dose of Lexapro with refills; and educated her on how to wean off of it as she started to feel better as opposed to stopping the medication abruptly, as this type of medication can have withdrawal effects. Ms. Borum apparently seemed at least as concerned about a rash as her depression issues. Dr. Smith's note states in part:

> Graduating in Dec. 2015 as a finance major. Had finished internship in IN. No side effects from med. Patient went to the beach 2 weeks ago. [Stung] by jelly fish on her R lower leg. Has been applying Benadryl[,] but concerned about skin infection.
>
> Plan:
> 1) Depression and anxiety much better with Lexapro, however she wants to increase her medication thinking it can be better. Lexapro has been increased to 20 mg daily. Was instructed to call or come back if she has any other problems. If after 6 months of Lexapro the patient wishes to discontinue, will gradually wean off. Instructions given for weaning off Lexapro. **Pt seems to be doing better and stable.**
> 2) Skin Rash ... Does not appear infected …Pt instructed to continue Benadryl.
> 3) [Return] 11 months … or sooner if symptoms worsen or fail to improve.

(Smith August 17, 2015 note, Exhibit I.)

On August 21, 2015, Ms. Borum moved back to Bowling Green. (Exhibit B, 101:9 – 102:7.) The university semester began on August 24, 2015, but Ms. Borum never attended any of her classes. (Text messages, Exhibit J.)  On August 26, 2015, Ms. Borum purchased a pistol. (Receipt, Exhibit K.) On August 28, Ms. Borum's mother brought her the Lexapro 20 mg prescription she had picked up for her. (Exhibit B, 95:12 – 96:9.) Ms. Borum resumed a robust social life that included socializing and partying with friends, sex, and drug use including cocaine and marijuana. (Exhibit J.)

On Labor Day, September 7, 2015, she spent the day on a houseboat with friends. On September 8, 2015, Ms. Borum's mother went to Bowling Green to take her out to dinner. Cynthia

---

[1] Smith depo. 195:15 – 196:2, Exhibit L.

Borum testified that Ms. Borum seemed tired but that they had a "really nice time," and Nicole told her about a trip she had taken with friends to a lake for Labor Day Weekend a few days before. (Exhibit B, 106:6-20.) She also told her mother about upcoming social plans she had the following week. (Exhibit B, 114:23 – 115:12.) After leaving her mother that evening, Nicole had a series of interactions with male acquaintances over text message that reflect interpersonal conflict. (Text messages.)

The next morning, September 9, 2015, Ms. Borum took a box of mementos and dropped them off on Mr. Trevino's doorstep. Then, at 11:53 a.m., Ms. Borum texted Mr. Trevino and asked him to take care of their dog. Moments later, she shot herself in the chest and died shortly thereafter. (Police report, Exhibit M.) Ms. Borum left a suicide note that stated:

> Mum,
>
> I AM SO SORRY. I know there is nothing I can say to make this better. I am so selfish. The only thing that has kept me going on is you, Derek, Jessica, and the girls. But I can NOT go on like this. There is nothing you could have said or done. Believe me. Nothing. I really wish there was something I could say to take your pain away. Just know that I am in a better place now. Please take care of Sabu. I love him so much. I love you so much. You have been the greatest Mum in the entire world. You don't deserve this. None of this is your fault, I just can't take it anymore.
>
> I LOVE YOU.
>
> Nicole.

(Suicide note, Exhibit N.) Ms. Borum's autopsy revealed that she had both cocaine and marijuana in her bloodstream at the time of her death. (Autopsy report, Exhibit O.)

*****

On January 12, 2017, Cynthia Borum filed this wrongful death action against the Defendants: Dr. Smith and her employer, Deaconess Clinic, Inc.; Ms. Powell and her employer,

Deaconess Hospital, Inc.; and Deaconess Health System, Inc., which owns and contributes resources to the operations of Deaconess Hospital and Deaconess Clinic.

Plaintiff's theories of liability supported by expert testimony are that:

1. Dr. Smith should have referred Ms. Borum to a psychiatrist rather than managing Ms. Borum's antidepressant regimen herself;[2]
2. Dr. Smith should have referred Ms. Borum to the emergency department on July 10 and August 17 because "she was not better";[3]
3. Dr. Smith and Ms. Powell should have obtained more thorough histories for Ms. Borum (Exhibit P at 230:22 – 231:14, 115:22 – 116:23);
4. Ms. Powell should have followed up with Ms. Borum when she cancelled her appointment in July 2015 (Exhibit P at 226:9 – 227:19);
5. HIPAA and Ms. Borum's right to privacy notwithstanding, Dr. Smith should have warned Ms. Borum's friends, family, and university to watch for signs of suicidality (Exhibit Q at 180:1-9);
6. Dr. Smith should not have increased Ms. Borum's Lexapro dose from 10 mg to 20 mg on August 17, 2015 (Exhibit Q at 141:2-8);
7. Dr. Smith should not have written five refills for the 20 mg prescription on August 17, 2015 (Exhibit P at 260:16-25); and
8. Dr. Smith and Ms. Powell "abandoned" Ms. Borum by not setting up appointments for her with providers in Bowling Green and "ensuring" that she attend them (Exhibit P at 174:20 – 175:21, 227:21 – 229:4; Exhibit Q at 139:9-11).

Plaintiff's Complaint alleges that one or more of the alleged breaches of the standard of care outlined above "was extreme and outrageous, was grossly negligent, and constitutes fraud, malice and oppression … Such conduct by Defendants was the direct and proximate cause of Plaintiff's injuries and damages … These actions rise to a level that permits the imposition of punitive damages[.]" (Complaint ¶¶ 23, 24, 26.)

---

[2] Goldstein depo. 117:3-5. Dr. Goldstein's deposition is attached as Exhibit P.
[3] Brown depo. at 164:7 – 165:1. Dr. Brown's deposition is attached as Exhibit Q.

**III.     ARGUMENT**

The Defendants are entitled to summary judgment in their favor on Plaintiff's punitive damages claims. Even taking Plaintiff's factual allegations as true, none of the alleged actions or inactions attributable to these Defendants rise to the level of gross negligence. Plaintiff's punitive damages claims must be dismissed as a matter of law.

In a diversity action such as this case, punitive damages are governed by state law. *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278 (1989). To award punitive damages in Kentucky, a jury must first find that the defendant was negligent, and then an additional finding must be made that a defendant's actions rose to the level of gross negligence. *Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 51-52 (Ky. 2003); KRS 411.184(2). Ordinary negligence, even negligence *per se*, is not sufficient to support a claim for punitive damages. *Capitol Cadillac Olds, Inc. v. Roberts*, 813 S.W.2d 287, 291 (Ky. 1991); *Kinney v. Butcher*, 131 S.W.3d 357, 358-59 (Ky. App. 2004).

Rather, an award of punitive damages requires a finding that the defendant failed to exercise "even slight care" and demonstrated a "<u>wanton or reckless disregard for the rights of others</u>." *Peoples Bank of N. Kentucky, Inc. v. Crowe Chizek & Co. LLC*, 277 S.W.3d 255, 268 (Ky. App. 2008) (citing *Phelps*, 103 S.W.3d at 51-51). Only where negligence is "gross," in that it has the same character of outrage as is found in intentional torts that are inflicted with willful and malicious conduct, are punitive damages available. *Horton v. Union Light, Heat & Power*, 690 S.W.2d 382, 389 (Ky. 1985); *see also Hensley v. Paul Miller Ford Co., Inc.*, 508 S.W.2d 759, 762 (Ky. 1974) (The distinguishing characteristic in cases where punitive damages are authorized has not been whether the injury was intentional but whether the misconduct "has the character of outrage.").

The only reason that a plaintiff may be awarded punitive damages after being made whole through compensatory damages is that "the injury has been increased by the manner [in which] it was inflicted." *Horton*, 690 S.W.2d at 390 (citation omitted). In medical cases, Kentucky courts have refused to allow claims for punitive damages to be presented to a jury, for example, when a hospital nurse told a patient to "shut up" during the delivery of her stillborn baby into a bedpan and another nurse told the patient that dead babies were "disposed of" at the hospital. *Humana of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1 (Ky. 1990).

In cases alleging negligent supervision and training, Kentucky courts hold that evidence supports gross negligence only where the training actively ratified wanton or reckless conduct. *See MV Transp., Inc. v. Allgeier*, 433 S.W.3d 324, 338 (Ky. 2014) (finding evidence supported gross negligence on negligent training claim against employer where, among other things, the employees' training encouraged employees to call supervisors after serious accidents and *not* talk to victims and witnesses, rather than calling emergency assistance or offering help); *cf. City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) (holding that a claim for failure to properly train under § 1983 requires plaintiff to show defendant's actions amounted to deliberate indifference, that is, that the defendant knew the training was inadequate and failed to take steps to correct it).

Kentucky courts routinely dismiss punitive damages claims when the evidence will support no more than ordinary negligence. *Kinney*, 131 S.W.3d at 359; *Turner v. Werner Enterprises, Inc.*, 442 F. Supp.2d 384, 386-87 (E.D. Ky. 2006). For example, the defendant in *Kinney* attempted to pass a van on a two-lane highway, but, unable to complete the maneuver before entering a no-passing zone, he collided with the plaintiff's car in the oncoming lane. *Kinney*, 131 S.W.3d at 358. The plaintiff appealed the trial court's refusal to give a punitive damages instruction. The Court of Appeals, however, held that the defendant's actions were nothing more than ordinary negligence

9

and that an award of punitive damages in such circumstances "would effectively eliminate the distinction between ordinary and gross negligence in the context of automobile accidents." *Id.* at 359.

Similarly, permitting Cynthia Borum to present a claim for punitive damages to the jury would eliminate any distinction between ordinary and gross negligence. There is no evidence in this case that the actions of Dr. Smith, Ms. Powell, their employers Deaconess Clinic and Deaconess Hospital respectively, or Deaconess Health System amount to a "wanton or reckless disregard for the rights of others."

None of these opinions describe the type of malicious and outrageous conduct that amounts to gross negligence. The evidence in this case uniformly supports the conclusion that Dr. Smith was caring, attentive, and concerned for Nicole's wellbeing. The parties can present their standard of care arguments to a jury, but these criticisms do not rise to the level of a reckless disregard for the rights of others. Each standard of care criticism is addressed briefly.

### 1. Dr. Smith should have referred Ms. Borum to a psychiatrist rather than managing Ms. Borum's antidepressant regimen herself.

Plaintiff's psychiatry expert Dr. Robert Goldstein testified that 75 percent of mental health care in the United States is provided by family medicine physicians. (Exhibit P at 107:3-11.) Plaintiff's family medicine Dr. Finley Brown testified that family medicine residents are taught how to evaluate patients with depression, anxiety, prior suicide attempts, and suicidal ideation. (Exhibit Q at 33:10-14.) Given this testimony by Plaintiff's experts that family medicine physicians are qualified by their training to treat mental health issues and provide most of the mental health care in this country, the assertion that Dr. Smith's management of Ms. Borum's antidepressant regimen is grossly negligent is untenable. It may be for a jury to decide whether Dr.

10

Smith's care was within the standard of care, but under Kentucky law her decision to manage Ms. Borum's antidepressant regimen is not a basis for punitive damages.

### 2. Dr. Smith should have referred Ms. Borum to the emergency department on July 10 and August 17 because "she was not better."

This criticism is absurd and inconsistent with the records. The medical records on these dates are not consistent with an emergent condition. On July 10, 2015, Dr. Smith noted: "Physically well, but still stressed with the previous event with her ex-fiance. Trial of medication for depression. Call if not working or side effect. Seeing counselor. Call if any problems. RTC. 1 month (8/10/15) or problems fail or worsen." On August 17, 2015, Dr. Smith noted:

> Depression and anxiety much better with Lexapro, however she wants to increase her medication thinking it can be better. Lexapro has been increased to 20 mg daily. Was instructed to call or come back if she has any other problems. If after 6 months of Lexapro the patient wishes to discontinue, will gradually wean off. Instructions given for weaning off Lexapro. **Pt seems to be doing better and stable. …**

On these dates, the records reflect that Ms. Borum was improving. Dr. Smith's notes show that she ordered medication and believed Nicole was in counseling; both Dr. Goldstein and Dr. Brown acknowledge that counseling and medication are the treatment for depression and anxiety. (Exhibit Q 63:15-18; Exhibit P 148:15 – 149:8.) In other words, Dr. Smith believed Nicole was receiving the treatment that both of Plaintiff's experts testified is the standard of care for her conditions. None of the records or testimony are suggestive of an acute condition on July 10 or August 17, 2015. Plaintiff has failed to demonstrate basic negligence here, let alone gross negligence. This criticism is not a basis for punitive damages.

### 3. Dr. Smith and Ms. Powell should have obtained more thorough histories for Ms. Borum.

This criticism is curious because of how irrefutably the records contradict it. For example, Dr. Brown criticizes the fact that Dr. Smith did not note Ms. Borum's scars on her arms – self-

11

harm from several years before – when Dr. Smith was the first provider in Ms. Borum's life to notice them. (Exhibit Q at pp.148-49.) Dr. Brown criticizes Dr. Smith's failure to obtain whether Ms. Borum consumed alcohol or Ms. Borum's grandmother's history of depression, though he does not opine that this had anything to do with Dr. Smith's decisionmaking or Ms. Borum's death. (Exhibit Q at p. 197.)

The records and testimony reflect that Ms. Powell and Dr. Smith each obtained quite thorough histories, including specific descriptions of Ms. Borum's relationship with Mr. Trevino; why it ended; the acute event that led to her overdose; her thought process when she overdosed; her support network; her academic and career aspirations; relevant medical history; and previous lack of psychiatric care. Should they also have obtained the grandmother's history of depression? The Defendants' position is, obviously, no, but the question is not relevant for purposes of punitive damages. The records and testimony of Dr. Smith and Ms. Powell offer nothing to support the position that their histories showed reckless or wanton disregard for the rights of others. This criticism is not a basis for punitive damages.

**4. Dr. Smith should have warned Ms. Borum's friends, family, and university to watch for signs of suicidality;**

Dr. Smith's refusal to break federal law and her adult patient's expectation of confidentiality is not a basis for punitive damages against her. Ms. Borum never gave permission for Dr. Smith to discuss her care with anyone, and Dr. Smith appropriately abided by her legal and ethical duties to keep Ms. Borum's health information private.

Plaintiff will argue that the "serious threat to health or safety" exception to HIPAA's privacy rule applies, but it does not. That exception, codified at 45 C.F.R. § 164.512(j), states that a healthcare provider *may* (not *must*) disclose protected health information if the practitioner "in good faith, believes the use or disclosure [] is necessary to prevent or lessen a serious and imminent

12

threat to the health or safety of a person or the public; and [] is to a person or persons reasonably able to prevent or lessen the threat[.]"

Dr. Smith has testified, and both Plaintiff's experts concede, that Dr. Smith believed Nicole was not at imminent risk of suicide. Plaintiff's entire theory of the case is that Dr. Smith did not appreciate that Nicole was suicidal. Her belief that Nicole was stable renders 45 C.F.R. § 164.512(j) inapplicable, because Dr. Smith never had a good faith belief that disclosure was necessary to prevent or lessen a serious and imminent threat to Ms. Borum's safety. Thus, there is no applicable exception to the statutory or common law privacy protections precluding Dr. Smith from discussing Nicole's care with third parties. Once again, Plaintiff's theory of negligence makes no sense; it cannot form the basis for a claim of punitive damages.

5. **Dr. Smith should not have increased Ms. Borum's Lexapro dose from 10 mg to 20 mg on August 17, 2015 and should not have written five refills for the 20 mg prescription; and**

Dr. Goldstein agreed that Dr. Smith's six-month prescription of Lexapro 20 mg on August 17, 2015 "did not cause Nicole any harm." (Exhibit P at 262:11-14.) Conduct that did not cause any harm cannot be the basis for any damages in a personal injury action, let alone punitive damages. *M.T. v. Saum*, 3 F. Supp. 3d 617 (W.D. Ky. 2014) (noting that under Kentucky law, a plaintiff cannot recover punitive damages against a defendant unless that defendant's conduct was the proximate cause of an injury to the plaintiff). Therefore, no claim for punitive damages can be predicated on this allegation.

6. **Ms. Powell should have followed up with Ms. Borum when she cancelled her appointment in July 2015, and both Dr. Smith and Ms. Powell "abandoned" Ms. Borum by not setting up appointments for her with providers in Bowling Green and "ensuring" that she attend them.**

Dr. Brown has testified that Ms. Borum took her own life on September 9, 2015 not because of what she had been depressed about that entire summer, but because Dr. Smith and Ms. Powell

13

"abandoned" her by allowing her to establish care with more local providers in Bowling Green, where she was returning to finish college. When asked what evidence supported his position that Ms. Borum felt abandoned by Dr. Smith and Ms. Powell, he testified, "her death," and added that her death was "absolute proof" of her subjective feeling of abandonment. (Exhibit Q at 177:19 – 178:12.)[4]

In other words, there is no evidence at all to support Dr. Brown's "abandonment" theory. In fact, Ms. Borum *did* leave a suicide note, and it unsurprisingly makes no mention of any healthcare provider. A theory of negligence that contains no factual support and which is controverted by the little evidence we have about Nicole's mental state at the time of her death cannot form the basis of a claim for punitive damages.

\* \* \* \* \*

Plaintiff's criticisms of these Defendants' care do not reflect the characteristics of outrage found in intentional torts committed willfully and maliciously. Similarly, the testimony of Plaintiff's experts fails to show that these Defendants' actions or inactions constitute gross negligence. Consequently, the imposition of punitive damages is improper under Kentucky law.

## IV. CONCLUSION

For the reasons stated above, the Defendants respectfully request that this Court grant its Motion for Partial Summary Judgment and dismiss Plaintiff's claim for punitive damages.

    PHILLIPS PARKER ORBERSON & ARNETT, PLC

    /s/ Katherine T. Watts
    KATHERINE T. WATTS
    COLLEEN O. DAVIS

---

[4] Dr. Brown's comfort speculating about Ms. Borum's thought processes over the last couple weeks of her life is at odds with his testimony that he always refers patients with even mild anxiety or depression to psychiatrists because he is not qualified to treat them. (Exhibit Q at 61:2-16.)

716 West Main Street, Suite 300
Louisville, Kentucky 40202
(502) 583-9900
kwatts@ppoalaw.com
cdavis@ppoalaw.com
cpotts@ppoalaw.com
dchurchman@ppoalaw.com
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

It is hereby certified that a true and accurate copy of the foregoing was forwarded via email, this 30th day of October 2020 to:

William D. Nefzger, Esq.
BAHE COOK CANTLEY & NEFZGER, PLC
Marion E. Taylor Building, 6th Floor
317 South Fourth Street
Louisville, Kentucky 40202
will@bccnlaw.com
*Co-Counsel for Plaintiff*

Samuel J. Bach, Esq.
Bach & Armstrong LLC
312 First Street
P.O. Box 881
Henderson, Kentucky 42419
Sam@bacharmstrong.com
*Co-Counsel for Plaintiff*

/s/Katherine T. Watts
Katherine T. Watts